# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE, a New York unincorporated association, and NFL ENTERPRISES, LLC, a Delaware limited liability company, <br><br> Defendants. | Civil Action No. 1:21-cv-1032 <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |

## INTRODUCTION

1.     Plaintiff Sietel Singh Gill ("Plaintiff") brings this class action lawsuit on behalf of himself and all others similarly situated (collectively, "Class Members") against the National Football League (the "NFL"), a New York unincorporated association, and NFL Enterprises, LLC, a Delaware limited liability company ("NFL Enterprises," and together with the NFL, "Defendants"), and alleges the following based upon personal knowledge as to his own acts and upon information and belief upon the investigation of counsel as to all other matters.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and this is a class action in which at least one member of the putative class is a citizen of a foreign state, and Defendants are citizens of a State in the United States. The proposed class consists of more than one hundred persons. Further, the claims can be tried jointly because

they involve common questions of law and fact that predominate over the individual issues, as outlined below.

3.      This Court has personal jurisdiction over Defendants because Defendants do business in this District on a systematic and ongoing basis; hold or own real and personal property within this District; derive substantial revenue from their contacts within this District; and are headquartered or maintain offices within this District.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391 because Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District through offices maintained by Defendants in this District.

## THE PARTIES

5.      Plaintiff Sietel Singh Gill is and was at all relevant times a resident and citizen of New South Wales, Australia. Beginning in 2013, Plaintiff has subscribed to NFL's subscription services to watch United States football games, including post-season games and the Super Bowl.

6.      Class Members are residents and citizens of different countries (outside the United States and its territories, Canada, and China) who purchased subscription services provided by the NFL, interchangeably called "Game Pass," "Game Pass Pro," or "Game Pass International" (collectively, "Game Pass") to watch United States football games, including the Super Bowl, from Defendants.

7.      Defendant National Football League (the "NFL") is an unincorporated association founded in 1920. The NFL consists of 32 independent, for-profit football clubs and maintains a principal place of business at 345 Park Avenue, New York, NY 10154.

8.      Defendant NFL regularly engages in business throughout the State of New York, where it is headquartered and where its subsidiaries maintain their offices. The NFL likewise

regularly engages in business in New York City and its contiguous counties and jurisdictions.

9.     Defendant NFL Enterprises, LLC ("NFL Enterprises") is a limited liability company organized under the laws of the State of Delaware and maintains a principal place of business at 280 Park Avenue, New York, NY 10017. NFL Enterprises is a wholly-owned subsidiary of the NFL and its member teams. NFL Enterprises oversees, *inter alia*, satellite broadcasting, internet websites and applications, the NFL Network (a nationally distributed cable television network), and other digital media ventures on behalf of, and for the benefit of, the NFL.

10.     NFL Enterprises maintains an office in New York, New York out of which many digital media ventures are directed, including, but not limited to, Game Pass.

11.     Whenever this Complaint refers to any act(s) of Defendants, the reference shall be deemed to mean that the directors, officers, employees, affiliates, or agents of Defendants authorized such act while actively engaged in the management, direction, or control of the affairs of Defendants, and/or to mean acts by persons who are the parents or alter egos of Defendants while acting within the scope of their agency, affiliation, or employment.

## NATURE OF ACTION

12.     This class action is on behalf of Plaintiff and consumers who purchased the NFL's Game Pass subscription, which should have provided uninterrupted live streaming of the February 2, 2020 Super Bowl LIV ("Super Bowl"). However, as a result of Defendants' technical or other failures, Game Pass crashed multiple times during the Super Bowl, and Plaintiff and Class Members were unable to livestream crucial portions of the game, including the final three minutes when the teams were locked in a one-score game. Defendants' conduct constitutes breach of contract, breach of implied warranty of merchantability, or, in the alternative, unjust enrichment for which class redress is warranted.

## STATEMENT OF FACTS

**A.    Game Pass**

13.    Live streaming is a growing billion-dollar industry where consumers can receive and watch live video and audio of an event in real time over the internet.

14.    A large part of Defendants' business, from which the NFL and its member teams derive substantial revenue, is selling subscriptions for live streaming NFL games to consumers around the world. In particular, Defendants offer Game Pass as an online platform for digital NFL-related content, including live streaming of NFL games, through its websites. Customers purchase Game Pass through Defendants' websites by paying a subscription fee (converted to the local currency) to access NFL content, including both livestreams and archived videos, for the United States football season and postseason.

15.    Although Game Pass provides customers with both livestream (*i.e.*, live in real time) and archived (*i.e.*, on demand) videos of all NFL season games, the primary value of Game Pass is the livestream (to watch games live as they are happening before the outcome is known and the excitement is gone), especially the livestream of the Super Bowl, which is the ultimate matchup between the top two teams of the season. In fact, on information and belief, Defendants extensively promoted and advertised the livestream of the Super Bowl throughout international territories as a key feature of Game Pass.

16.    The most basic and important function of live streaming an NFL game, including the critical Super Bowl, is providing uninterrupted live streaming for the entire game without outages or other defects. Reasonable care and skill would prevent most outages from happening, and loss stemming from outages is an inherent foreseeable issue that cannot be repaired in the future given the nature of live-streaming games as they play out.

17.     NFL Game Pass Terms and Conditions purport to govern the Game Pass subscription and do not include any mandatory forum selection clause or enforceable requirement to arbitrate disputes. These Terms and Conditions are governed by New York law and confirm Defendants' duties to provide the subscription content (*e.g.,* live streaming the Super Bowl).

18.     On information and belief, for the 2019 to 2020 season, which included the 2020 Super Bowl, Game Pass was sold to and used by approximately 300,000 to 700,000 international consumers in about 181 countries around the world, including in the United Kingdom, Ireland, Austria, Norway, Denmark, Sweden, Australia, Brazil, Mexico, Japan, and Republic of Korea; and Game Pass customers paid Defendants, either directly or indirectly, approximately $200 USD (converted to the local currency) each in exchange for the use of Game Pass.

**B.      Defendants' Failure to Provide Live Streaming of the Complete Super Bowl**

19.     Game Pass was supposed to provide customers with uninterrupted live streaming of the 2020 Super Bowl between the San Francisco 49ers and the Kansas City Chiefs.

20.     Live viewing of the Super Bowl is a non-substitutable good. Not even uninterrupted viewing of the game later is an adequate substitute for live viewing because the publicity and social media commentary on the game inevitably means that a person viewing the game later will have already learned of the outcome of the game. Knowing the outcome of the game diminishes the excitement and interest of viewing the game live along with billions of other excited viewers worldwide. Indeed, it is precisely this excitement that Defendants relied on in their marketing of Game Pass to Plaintiff and Class Members.

21.     Despite the promises made by Defendants, Game Pass subscribers started experiencing streaming issues during the first quarter of the Super Bowl only a few minutes into the broadcast. Specifically, the live streaming crashed and displayed an error message. In fact,

Defendants' customer support admitted there were streaming defects in response to consumer inquiries, apologizing for the technical problems experienced during the live game.

22.     While the Game Pass live streaming eventually resumed during the Super Bowl, it crashed again during the critical conclusion of the Super Bowl, including throughout the final three minutes of the game when the two teams were locked in a one-score game.

23.     Individuals from all around the world flocked to social media to express their disbelief and frustration about the failure of Game Pass to live stream the Super Bowl. For example, consumers posted the following comments, such as on Twitter, many of which "tagged" Defendant NFL, confirming consumers believed Defendants were responsible for the Game Pass outage:

> @NFL What's happening with Game Pass in Sydney, Australia? Pretty unfortunate to pay for the service but not have it work on the Super Bowl #nflgamepass

> Game Pass goes down on the opening drive of the super bowl of course. And now we in Australia are stuck with Booger #SBLIV

> Game Pass crashing for millions of people one single minute into the BIGGEST game of the year is the height of professional negligence. #disgrace

> Wtf @nfl how can gamepass be down during the super bowl? #bebetter

> NFL Gamepass crashes on super bowl night ... Beyond ridiculous, I have no doubt I'm one of the many idiots,that have not bothered their asses, over the years , to unsubscribe! Well guess what my main mission is tomorrow! #nfl #NFLGamePass

> Gamepass International is not working! 200 dollars and you guys screw up during the final game! An absolute joke! I will not be subscribing to your crappy service anymore! Compensation is a must for all of your paying customers! @NFL Stop sh[***]ing on your fans #rookiemistake

> This! So much this! Having to buy extra subscription for Danish streaming service on the go (50$ out of the window right there) is what you get with NFL GamePass. So not cool! https://t.co/HLxK1AEUl4

> 49ers have a field goal? Didn't see it. Why? Because I use Game Pass.

24.     On information and belief, the outage affected all Game Pass customers, including

in the United Kingdom, Ireland, Austria, Norway, Denmark, Sweden, Australia, Brazil, Mexico, Japan, and Republic of Korea. These customers were not able to easily switch to a free or other live streaming alternative to watch the Super Bowl live.

25.     Rather than releasing an official statement, full refund, or apology, Defendants' customer service merely responded with generic copy-and-paste emails to consumers (from "NFL Game Pass Support Team") that submitted complaints about the feed crashes. Defendants' email again admitted they were aware that fans experienced issues watching the Super Bowl on Game Pass and that they would share information about how they would make "amends for this issue."

26.     Several days later, Defendants, directly or indirectly, emailed customers who had complained—but not all Game Pass customers who had experienced outages—and offered and then followed up regarding a $10 "partial refund" for Game Pass (converted to the local currency) in the amounts shown below from "NFL Game Pass" at noreply@nflgamepass.com (using the NFL's logo in multiple emails and "© 2017 NFL Enterprises LLC" in a follow up email):

● **NFL Game Pass**
Important information about your subscription



| | | |
|---|---|---|
| USD 10.00 | EUR 10.00 | GBP 8.00 |
| AUD 15.00 | JPY 1,100.00 | DKK 70.00 |
| NOK 100.00 | SEK 100.00 | BRL 50.00 |
| MXN 190.00 | KRW 12,000.00 | |

From: **NFL Gamepass** noreply@nflgamepass.com



© 2017 NFL Enterprises LLC. NFL and the NFL shield design are registered trademarks of the National Football League.

27.     This "partial refund" failed to fully account for customers' damages in being deprived of the expected full enjoyment of this non-substitutable good.

28.     Further, Plaintiff and the proposed Class Members did not obtain any refund for the Game Pass outages described herein, as only customers who had complained directly to Defendants were offered refunds, despite all customers being equally affected.

29.     Plaintiff and Class Members had no reason to know that Defendants' Game Pass streaming services in connection with the Super Bowl would be defective. Had Plaintiff and Class Members known that Defendants were not going to provide a defect-free streaming service, they would not have purchased the services or would have paid significantly less for them. Therefore, Plaintiff and Class Members suffered injury in fact as a result of Defendants' unlawful practices.

**C.     Plaintiff Sietel Singh Gill's Contract with Defendants and Related Damages**

30.     In 2013, Plaintiff contracted with Defendants to provide Game Pass.

31.     Moreover, Plaintiff at all times reasonably believed he was contracting with Defendants to provide Game Pass and, on information and belief, Defendants at all times, produced, created, and materially and directly participated in and controlled Game Pass.

32.     As shown by the screenshots below, Plaintiff received an email from Defendants in September 2013 to confirm his purchase of the "NFL Game Pass" Service, stating Plaintiff would receive NFL.com newsletters and marketing messages from NFL.com, offering that Plaintiff could

share NFL Game Pass with friends by visiting http://nfl.com/gamepass/referral or sharing a unique

sub-URL of http://gamepass.nfl.com, and outlining that Plaintiff could cancel his subscription by

emailing gamepass.support@nfl.com or chatting with a customer service representative at

http://nfl.com/subscriptionsupport.

From: <nflgamepass@neulion.com>
Date: Tue, Sep 10, 2013 at 12:05 PM
Subject: NFL Game Pass Purchase Confirmation


Dear SIETEL:
Thank you for your recent purchase of NFL Game Pass! Your subscription
is now active.
Visit gamepass.nfl.com to begin enjoying your NFL Game Pass
subscription.



 Receive NFL.com newsletters and marketing messages from NFL.com: Yes


Referral Program
Earn the chance to get 150 NFL Fan Reward coins!
If you signed up for a NFL Game Pass Season or Season Plus Subscription,
and you get a friend to purchase a Season or Season Plus subscription, you
both will receive 150 NFL Fan Rewards Coins. Tell your friends to sign up
via your unique URL http://gamepass.nfl.com/nflgp/referafriend.jsp and get
more NFL Fan Rewards Coins.
Visit http://nfl.com/gamepass/referral to start telling your friends about NFL
Game Pass!

Auto Renewal
Your subscription will automatically renew annually (on or around August
1) at either the same price as the previous year's full season rate or the
current full season rate, whichever is lower. You may cancel auto renewal at
any time prior to next season.

Canceling Your Subscription
You can cancel your subscription in any of the following ways:

- Call customer support (any time from 12:00pm ET to 10:00pm ET) at
  407-936-0867
- Send an e-mail to gamepass.support@nfl.com
- Chat with a customer service representative at
  http://nfl.com/subscriptionsupport

33.     Pursuant to the contract with Defendants, to which Plaintiff agreed in 2013, Plaintiff was continually charged annually for Game Pass via automatic renewal for which, per an email from "NFL Game Pass" to Plaintiff, "no action is required." For example, in around July 2019, Plaintiff paid Defendants AUD 274.99 for the Game Pass subscription for the 2019 to 2020 season, including the critical 2020 Super Bowl; and Plaintiff paid Defendants the entire amount through four equal installments.

34.     Emails from Defendants about Game Pass through 2019 and 2020 continued to highlight the NFL name and logo:

From: **NFL Game Pass** <noreply@nflgamepass.com>
Date: Fri, Aug 2, 2019 at 2:24 PM
Subject: Your payment has been successful



From: **NFL Game Pass** <info@service.nflgamepass.com>
Date: Thu, 9 Jul 2020, 10:39 pm
Subject: Important information about your NFL Game Pass subscription



35.     The agreement between Defendants and Plaintiff relating to Game Pass is governed by New York law.

36.     While Defendants filed a version of recent website terms [D.E. 17-4], those terms did not cover Plaintiff's initial signup in 2013 or his contract governing the 2019 to 2020 season.

Indeed, Plaintiff never received any notification that he needed to agree to any updated or change in website terms or contracting parties each year his subscription to Game Pass was automatically renewed starting in 2013.

37.     Like other Game Pass customers, Plaintiff purchased Game Pass to watch the Super Bowl live through the Game Pass live-streaming feature. In particular, as a long-time fan of Andy Reid of the Kansas City Chiefs, one of the Super Bowl teams, Plaintiff was eager and excited to watch the Super Bowl live.

38.     In purchasing Game Pass, Plaintiff relied on Defendants to provide streaming services that were free of defect. Plaintiff would not have purchased Game Pass, or would have paid significantly less for it, had he known that it was defective.

39.     Due to defective streaming services rendered by Defendants, when Plaintiff attempted to stream the Super Bowl, he was unable to receive a clear feed to watch the entire game. Specifically, although Plaintiff was able to start streaming the Super Bowl using Game Pass, he experienced the outages described herein and, extremely disappointed and frustrated, was unable to livestream the entire game as anticipated.

40.     Plaintiff suffered injury in fact and lost money as a result of Defendants' conduct. Plaintiff has not received any refund or credit for his purchase of Game Pass.

**D.     Defendants' Use of Third Parties Related to Game Pass**

41.     Years after Plaintiff contracted with Defendants, Defendants purportedly partnered with Overtier Operations ("Overtier"), a Cayman Islands company, and Deltatre S.P.A. ("Deltatre"), an Italian company, as the licensee and operator of Game Pass, respectively.

42.     Plaintiff was unaware that Overtier and Deltatre had any involvement in providing Game Pass.

43.     Specifically, https://www.nflgamepass.com/en (the "Landing Page"), which is the website that purports to apply to users accessing "territory [ ] covered by NFL Game Pass International," is replete with NFL and Game Pass logos, references to "Game Pass," and to the NFL and NFL Enterprises.  Overtier and Deltatre are not mentioned anywhere on the Landing Page:



44.     The Landing Page also makes clear that all intellectual property, trademarks, and copyrights of NFL footage belongs to the NFL:



//

//

45.     Further, where the Landing Page directs users to select a Game Pass subscription,

Overtier and Deltatre are not mentioned, but instead, just the NFL:





46.     When users click on one of these subscription options, they are sent to a sign-up

page, which, once again, is replete with NFL and "Game Pass" logos, and does not mention

Overtier or Deltatre.

//

//

//

47.     The sign-up page asks the user to create an "NFL.com Account":



48.     It refers "to the NFL's Terms of Service and Privacy Policy" and "to the NFL Game Pass Terms & Conditions":



//

//

//

//

//

//

14

49.     If users click on the "NFL's Terms of Service and Privacy Policy," they are directed to a webpage, which contains the NFL logo, is replete with references to the NFL, and does not mention Overtier or Deltatre.



//

//

//

//

//

//

//

//

50. If the user clicks on "NFL Game Pass Terms & Conditions," the user is directed to a page—also containing the NFL and "Game Pass" logos—which is the only place on the entire website that mentions Overtier and Deltatre:



51.   Furthermore, this "Subscription Product Terms" website, like others on this website, also makes clear that all intellectual property belongs to the NFL:



52.     Moreover, not only is this the *one* place on the entire Game Pass website where Overtier or Deltatre are mentioned, the website also lacks any hyperlinks redirecting customers away from the www.nfl.com domain to these two entities' websites.

53.     On information and belief, Overtier does not actually operate Game Pass as a licensee but is merely a vendor or agent of Defendants and/or a holding "shell" company without any meaningful employees or infrastructure.  Indeed, Overtier's mailing address, which is in the Cayman islands, is shared with an entity called Stuarts Corporate Services, which "provides a comprehensive range of offshore incorporation, management, accounting and administration services for entities registered in the Cayman islands." Moreover, Overtier's website does not contain any link or information for customers interested in subscribing to Defendants' Game Pass service.  It does not even mention Game Pass.

54.     Likewise, on information and belief, Deltatre is a vendor or agent of Defendants. Deltatre purports to "h[o]ld the rights to operate NFL Game Pass" and to function as a platform technology service provider for Defendants and others.

55.     Deltatre's website does not contain any link or information for customers interested in subscribing to Defendants' Game Pass service.

56.     Moreover, at all relevant times, Defendants offered, directed, controlled, and benefited from Game Pass, and there is such a unity of interest and/or ownership that all of the entities are effectively merged and there would be an inequitable result if the acts of Overtier and Deltatre, who act as Defendants' agents or vendors, related to Game Pass were not treated as the acts of Defendants.

57.     Plaintiff did not agree to any assignment of Defendants' rights and obligations under his applicable contract with Defendants.

58.     Plaintiff was unaware that Overtier and Deltatre purported to provide streaming services.

## CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure ("Rule(s)") 23(a) and 23(b)(3) and seeks certification of the class as identified below.

### Definition of Proposed Class

60.     Plaintiff brings this class action on behalf of the following class (the "Class"):

> All persons who subscribed to Game Pass and whose subscription included the 2019 to 2020 NFL season. Excluded from the Class are Defendants and their officers and directors at all relevant times, members of Defendants' immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which the Defendants have or had a controlling interest.

61.     Plaintiff reserves the right to amend or modify the Class in connection with a Motion for Class Certification or as the result of discovery.

62.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as individual Class Members would use to prove those elements in individual actions alleging the same claims.

### Size of the Proposed Class

63.     Plaintiff does not currently know the exact size of the proposed Class. However, Plaintiff is aware that the Class is so numerous that joinder of the individual Members of the proposed Class is impracticable. On information and belief, the Class includes at least thousands of people throughout the world. The number and identities of Class Members are unknown to Plaintiff, but can be ascertained through discovery, including into Defendants' sales records, electronic messages, and customer service files, as well as through published notice.

<u>Adequacy of Representation by the Class Representative</u>

64.     Plaintiff's claims are typical of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests adverse to the interests of the Class and has retained counsel with experience in the prosecution of class actions and complex litigation, including consumer litigation, and who will vigorously prosecute this action.

<u>Common Questions of Law and Fact</u>

65.     Questions of law or fact common to the Class exist as to Plaintiff and all Class Members, and these common questions predominate over any questions affecting only individual Class Members. Among the common questions of law and fact are the following:

a.   The extent of Game Pass streaming outages that occurred during the Super Bowl;

b.   The reasons for the Game Pass streaming outages that occurred during the Super Bowl;

c.   What steps, if any, Defendants took to correct, minimize, or prevent these outages;

d.   Defendants' contractual obligations to Plaintiff and the Class regarding, *inter alia*, the provision of outage-free Game Pass streaming services during the Super Bowl;

e.   Whether Defendants' conduct constituted a breach of contract;

f.   Defendants' warranty obligations to Plaintiff and the Class;

g.   Whether Defendants' conduct breached the implied warranty of merchantability;

h.   Defendants' use of or control over third-party entities related to Game Pass;

i.   The amount Defendants were unjustly enriched; and

j.   The amount of damages sustained by Plaintiff and the Class.

<u>Typicality of Claims of the Class Representatives</u>

66.     Plaintiff does not anticipate any difficulties in the management of this action as a

class action. The Class is ascertainable, and there is a well-defined community of interests in the questions of law and fact alleged because the rights of each Class Member were violated in similar fashion based on Defendants' misconduct. Notice can be provided through records and publication, the cost of which is properly imposed upon Defendants.

67.     Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class Members. Common questions of law and fact predominate over any individual questions that may arise.

68.     The injuries sustained by Plaintiff and the Class Members flow, in each instance, from a common nucleus of operative facts, *i.e.*, Defendants' contractual promise and implied warranty to provide live streaming for NFL games, including the 2020 Super Bowl, without outages or other defects, and Plaintiff's and the Class Members' damages resulting from Defendants' breach of contract and violation of warranty as well as Defendants' unjust enrichment from Plaintiff's and the Class Members' subscription fees.

69.     Plaintiff's claims are typical of the claims of the Class he seeks to represent. Defendants' uniform offer and obligations relating to Game Pass apply equally to Plaintiff and all Class Members. Moreover, the defenses, if any, that will be asserted against Plaintiff's claims are typical of the defenses, if any, that will be asserted against all Class Members' claims (*e.g.,* that outages were not caused by Defendants).

<u>Nature of the Notice to the Proposed Class</u>

70.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The vast majority of the names and contact information of the Class Members is likely available from Defendants or their partners, including through Defendants' records of customers who purchased the Game Pass subscription.

71.     The class definition is carefully drawn such that the Class Members can easily be identified and notified using standard class notification methods, including analysis of Defendants' sales records, mailing, electronic notification, and other methods.

72.     To the extent possible, Plaintiff contemplates providing notice(s) to the Class, as approved by the Court, through the mail or as otherwise directed.  In the alternative or in connection with mailed notices, Plaintiff may utilize paid advertising notices online or in media likely to draw attention of Class Members *e.g.,* specialty magazines. The notice(s) shall, among other things, advise the Class that they shall be entitled to "opt out" of the Class if they so request by a date specified within the notice and that any judgment, whether favorable or not, entered in this case will bind all members except those who affirmatively exclude themselves by timely opting out.

<u>Additional Matters Pertinent to the Findings as</u>

<u>Provided by Fed. R. Civ. P. 23(b)(3)</u>

73.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and individual joinder of all Class Members is impracticable, if not impossible, because the massive number of Class Members are scattered throughout the world. Moreover, the cost to the court system of such individualized litigation would be substantial. Individualized litigation would likewise present the potential for inconsistent or contradictory judgments and would result in significant delay and expense to all parties and courts hearing virtually identical lawsuits. By contrast, the conduct of this action as a class action would present fewer management difficulties, conserve the resources of the parties and the courts, and protect the rights of each Class Member and maximize recovery to them.

74.     Given the amount in controversy for each individual Member of the Class, the relief sought in this case, that Defendants have acted on grounds generally applicable to the entirety of

the Class, and the large size of the anticipated Class, the interest of each Class Member in controlling his or her own case is relatively low; there are relatively minimal expected difficulties likely to be encountered in managing a class action; Plaintiff anticipates that relevant foreign courts will recognize a United States judgment in this case; Plaintiff is not aware of other litigation by individual Class Members already in progress involving the same controversy; and there is a strong desirability of consolidating all claims in a single action before a single court in the United States.

<u>FIRST CAUSE OF ACTION</u>

<u>(Breach of Contract)</u>

75.     Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

76.     Plaintiff brings this claim on behalf of himself and the Members of the proposed Class.

77.     Plaintiff and the Class entered into valid contracts with Defendants to livestream the complete Super Bowl, free from defects, through Game Pass in exchange for payment of money. Plaintiff and the Class fulfilled their obligations under, and provided payment to Defendants as sufficient consideration for, the contracts.

78.     Defendants materially breached the contracts by failing to provide a complete live streaming of the Super Bowl free from defects.

79.     As a direct and proximate result of Defendants' breach of contract, Plaintiff and the Class have been damaged because they received streaming services with less value than the amounts paid for them; Plaintiff and the Class Members have suffered economic losses and other general and specific damages, including amounts paid for Game Pass, and interest that would have accrued, in amounts to be proven at trial.

SECOND CAUSE OF ACTION

(Breach of Implied Warranty of Merchantability)

80.    Plaintiff incorporates by reference all of the above allegations as if fully set forth herein.

81.    Plaintiff brings this claim on behalf of himself and the members of the proposed Class.

82.    A warranty that goods shall be merchantable is implied in a contract for their sale. To be merchantable, goods must be at least fit for the ordinary purpose for which such goods are used.

83.    Defendants' Game Pass product is a "good" subject to the implied warranty of merchantability, and Defendants did not effectively disclaim or limit this warranty in this case.

84.    Defendants are merchants with respect to providing live streaming to consumers through Game Pass, including for the Super Bowl.

85.    By providing Game Pass for the Super Bowl, Defendants impliedly warranted that the live streaming would be defect-free and fit for its ordinary purpose. Ordinary streaming of live events is not defective where it allows consumers to stream content in real time without outages.

86.    Defendants did not provide Plaintiff or the Class with live streaming of the Super Bowl that was free of defects or fit for its ordinary purpose. Instead, Plaintiff and the Class received substantially defective streaming given the Game Pass outages during the Super Bowl that prevented customers from live streaming the game in its entirety.

87.    The streaming provided by Defendants was not merchantable, and Defendants breached their implied warranty of merchantability with respect to Game Pass.

88.    If Plaintiff and other Members of the Class had known that Game Pass was

defective, they would not have purchased it and/or would not have been willing to pay as much for it. Thus, as a direct and/or indirect result of Defendants' breach, Plaintiff and the Class have suffered injury and are entitled to recover damages.

THIRD CAUSE OF ACTION

(Unjust Enrichment)

89.     Plaintiff incorporates by reference all of the above allegations as if fully set forth herein and, if necessary, pleads this cause of action in the alternative.

90.     Plaintiff brings this claim on behalf of himself and the Members of the proposed Class and as an alternative to the First and Second Causes of Action herein.

91.     Plaintiff and the Class conferred benefits on Defendants by purchasing Game Pass and as Defendants have retained money paid by Plaintiff and the Class.

92.     Plaintiff and the Class reasonably relied on Defendants, who created, produced, materially and directly participated in, and controlled the Game Pass services, to provide defect-free live streaming services in connection with the Super Bowl, but they have not received all of the benefits from Defendants, including given the Game Pass outages during the Super Bowl.

93.     The money received by Defendants was obtained under circumstances that were at the expense of Plaintiff and the Class in that Plaintiff and the Class did not receive the full value of the benefit conferred upon Defendants.

94.     Defendants have been unjustly enriched in retaining revenues derived from Plaintiff's and the Class's purchases of Game Pass.

95.     As a matter of justice, equity, and good conscience, Defendants should not be able to retain the fees they charged Plaintiff and the Class for the portions of Game Pass that were not provided or received. Plaintiff and the Class are entitled to restitution based on Defendants' unjust

enrichment.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff and all Class Members pray that the Court rule as follows by:

A.      Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding all remedies available at law or by equity, including actual, consequential, compensatory, and punitive damages, or disgorgement, in an amount to be determined at trial, against all Defendants, jointly and severally;

C.      Awarding pre- and post-judgment interest;

D.      Awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

E.      Awarding Plaintiff and other Class members such other and further relief the Court deems appropriate.

DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

//

//

//

Respectfully Submitted,                    **KRONENBERGER ROSENFELD, LLP**

Dated: April 29, 2021

<u>            /s/ Karl S. Kronenberger        </u>
Karl S. Kronenberger
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@KRInternetLaw.com

**ROME & ASSOCIATES, A.P.C.**

<u>            /s/ Eugene Rome            </u>
Eugene Rome (*pro hac vice forthcoming*)
2029 Century Park East, Suite 450
Los Angeles, CA 90067
Telephone: (310) 282-0690
Facsimile: (310) 282-0691
eugene@romeandassociates.com

**POLLOCK COHEN LLP**

<u>            /s/ Raphael Janove           </u>
Adam Pollock
Christopher K. Leung
Raphael Janove
60 Broad St., 24th Fl.
New York, NY 10004
Telephone: (212) 337-5361
adam@pollockcohen.com
cleung@pollockcohen.com
rafi@pollockcohen.com

*Attorneys for Plaintiff Sietel Singh Gill
and the Proposed Class*