UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SIETEL SINGH GILL, *individually and on behalf of other
similarly situated individuals*,

Plaintiff,

-v-

NATIONAL FOOTBALL LEAGUE, *a New York
unincorporated association*, and NFL ENTERPRISES
LLC, *a Delaware limited liability company*,

Defendants.

21 Civ. 1032 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

This case arises from the alleged interruption of a live-streaming service, Game Pass Pro

("Game Pass"), during the 2020 Super Bowl.  Plaintiff Sietel Singh Gill ("Gill"), an Australian

resident who subscribed to the service, brings a putative class action lawsuit against the National

Football League ("NFL") and NFL Enterprises LLC ("NFLE") (together, "defendants") for

breach of contract, breach of implied warranty of merchantability, and unjust enrichment.

Before the Court is defendants' motion to dismiss Gill's complaint under Federal Rule of

Civil Procedure 12(b)(6).  Defendants argue that the complaint does not adequately allege the

existence of a contract between him and them, or its breach.  In the alternative, they argue that

the complaint's class allegations should be struck under Rule 23(d)(1)(D).  The Court denies in

part and grants in part these motions.  On the face of the complaint and the materials cognizable

to it, Gill plausibly pleads that there was an agreement between the named defendants and Gill

that bound defendants in 2020; whether that is in fact so requires discovery to resolve.  The

Court thus denies the motion to dismiss the complaint's claims for breach of contract and

implied warranty of merchantability.  But the Court grants defendants' motion to dismiss the

complaint's unjust enrichment claim because it is pled alongside a claim for breach of an enforceable contract. The Court also denies defendants' motion to strike the class allegations as premature.

## I.     Background

### A.     Factual Background[1]

#### 1.     Gill's Alleged Contract With Defendants to Provide Game Pass

The FAC alleges that, in 2013, Gill contracted with the defendants, the NFL and NFLE, to buy a service, interchangeably titled "Game Pass," "Game Pass Pro," or "Game Pass International" ("Game Pass"), which afforded him access to NFL-related digital content, including both livestream and on-demand videos of NFL season games. FAC ¶¶ 6, 14–15, 30; *see also* 2013 T&Cs. The 2013 Terms and Conditions state that "[t]he NFL is currently offering . . . NFL Game Pass" as a product, and that "[w]e have contracted with a third party (currently NeuLion, Inc.) to operate," *inter alia*, Game Pass. 2013 T&Cs at 5–6.

The FAC alleges that Gill's Game Pass contract was automatically renewed every year from 2013 through 2019. *See* FAC ¶ 33. For the 2019 to 2020 season, Game Pass cost subscribers approximately $200, converted to the local currency of international users.[2] *Id.* ¶ 18.

The FAC alleges that, after subscribing, Gill "never received any notification that he needed to agree to any updated or change in website terms or contracting parties" during the

---

[1] These facts are drawn from the First Amended Class Action Complaint, Dkt. 23 ("FAC"), and the cognizable materials incorporated therein, *see* Dkt. 51. Relevant here, these include the terms and conditions of Gill's 2013 contract. *See* Dkt. 51 Ex. A ("2013 Terms and Conditions" or "2013 T&Cs"). For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] Game Pass is available to customers outside the United States and its territories; Canada; and China. FAC ¶ 6.

2

years in which he was contracted to purchase Game Pass. *Id.* ¶ 36. However, the FAC alleges that, at some point between 2013 and 2019, unbeknownst to Gill, defendants began to partner with Overtier Operations ("Overtier"), which is based in the Cayman Islands, and Deltatre S.p.A. ("Deltatre"), an Italian company, to provide Game Pass to customers. *See id.* ¶ 41.

According to the FAC, defendants' partnership with Overtier and Deltatre, and any alteration of Gill's rights that has been worked by such a partnership, was never consented to by Gill. Critical on the motion to dismiss, the FAC alleges that this partnership did not displace the 2013 contract between Gill and the defendants.

Moreover, the FAC alleges, the Game Pass website continues to feature the NFL and its logos, indicating the NFL's continuing association with Game Pass. *See id.* ¶¶ 43–48. A page entitled "NFL.com – Terms and Conditions," accessible as of the FAC's filing and reproduced in the FAC, states that an agreement governs the use of "websites, mobile applications, and other online and mobile services . . . that are operated by NFL Enterprises, LLC," and that additional terms and conditions apply to certain services. *See id.* ¶ 49. Clicking on the link "NFL Game Pass Terms & Conditions" brings up a page that describes Overtier as "the official licensee of the content material" and Deltatre as the party that "operates the platform and deals with customer queries." *See id.* ¶ 50; Dkt. 27 ("Ricciardi Decl.") Ex. A ¶ 2.1; Dkt. 51 Ex. B ("2019 T&Cs") ¶ 2.1. The FAC alleges that Overtier and Deltatre are vendors or agents of the defendants, FAC ¶¶ 53–54, and that Overtier is a shell holding company, *id.* ¶ 53. In any event, the FAC alleges, even if defendants' intention had been to assign their contractual rights and obligations to Overbier and/or Delartre, Gill never consented to such an assignment. *Id.* ¶ 57.

### 2.      Game Pass and the 2020 Super Bowl

Among the NFL games that customers may view through Game Pass is the NFL's championship game, the Super Bowl. *See id.* ¶ 15. According to the FAC, defendants

3

"extensively promoted and advertised" the Super Bowl livestream "as a key feature of Game Pass." *Id.* The FAC alleges that it is important to Game Pass users that the livestream of games, including the Super Bowl, be uninterrupted. *See id.* ¶ 16. Otherwise, a fan might learn of the game's outcome before viewing key moments in the game, which "diminishes the excitement and interest of viewing the game live along with billions of other[s]" around the world. *Id.* ¶ 20.

The 2020 Super Bowl, between the San Francisco 49ers and the Kansas City Chiefs, was held on February 2, 2020. *Id.* ¶¶ 12, 19. The FAC alleges that Gill, a fan of Chiefs coach Andy Reid, was excited for the game. *Id.* ¶ 37. But, it alleges, a few minutes into the livestream, during the first quarter, the feed "crashed and displayed an error message." *Id.* ¶ 21. Game Pass again crashed in the game's final three minutes, "when the two teams were locked in a one-score game." *Id.* ¶ 22. This outage allegedly affected all Game Pass consumers. *Id.* ¶ 24.

The FAC alleges that, after the game, defendants "directly or indirectly" emailed some customers who had experienced outages and complained, and offered a $10 partial refund, converted to local currency, for Game Pass. *Id.* ¶ 26. However, the FAC alleges, Gill and the members of the putative class of Game Pass subscribers whose service was interrupted, did not receive a refund. *Id.* ¶ 28. The FAC alleges that, had Gill and the putative class known that the livestreaming would be interrupted during the Super Bowl, "they would not have purchased the services or would have paid significantly less for them." *Id.* ¶ 29; *see also id.* ¶ 38.

### B. The Parties

Gill at all relevant times has been a citizen of New South Wales, Australia. *Id.* ¶ 5. The putative class consists of persons—other than residents and citizens of the United States and its territories, Canada, or China—who purchased subscription services provided by defendants to

4

watch American football games, including the 2020 Super Bowl, from defendants. *Id.* ¶ 6.[3] The

FAC alleges, on information and belief, that between approximately 300,000 and 700,000

international customers in approximately 181 countries bought and used Game Pass during the

2019–2020 NFL season. *Id.* ¶ 18.

The NFL is a New York unincorporated association which "consists of 32 independent,

for-profit football clubs" and maintains a principal place of business in New York. *Id.* ¶ 7. The

NFLE is organized under the laws of Delaware and maintains a principal place of business in

New York. *Id.* ¶ 9. It is a wholly-owned subsidiary of the NFL. *Id.*

## C.   Procedural History

On February 4, 2021, the original complaint in this action was filed. Dkt. 1. On April 8,

2021, defendants filed a motion to dismiss, Dkt. 15, and, in support, a memorandum of law, Dkt.

16; and the declaration of Sara A. Ricciardi, Dkt. 17. On April 9, 2021, the Court ordered Gill to

file an amended complaint or to oppose the motion to dismiss. Dkt. 17.

On April 30, 2021, Gill filed the FAC. Dkt. 23 ("FAC"). On May 20, 2021, defendants

filed their motion to dismiss the FAC, Dkt. 25, and, in support, a memorandum of law, Dkt. 26

("NFL Mem."); and a new declaration from Ricciardi, Dkt. 27 ("Ricciardi Decl."). On June 17,

2021, Gill filed a memorandum of law in opposition. Dkt. 31 ("Pl. Mem."). On June 24, 2021,

defendants filed a reply. Dkt. 33 ("NFL Reply").

On September 3, 2021, the Court received letters from Gill, asking the Court to schedule

an initial conference and issue a case management plan, Dkt. 36, and from defendants, seeking a

---

[3] The FAC also defines the putative class as "[a]ll persons who subscribed to Game Pass and whose subscription included the 2019 to 2020 NFL season," excluding defendants; their officers and directors; members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which the defendants have or had a controlling interest. FAC ¶ 60.

stay of discovery pending resolution of the motion to dismiss, Dkt. 37. On September 7, 2021, the Court scheduled a conference for September 29, 2021. Dkt. 38. On September 9, 2021, Gill opposed the motion to stay discovery. Dkt. 39. On September 21, 2021, the Court adjourned the conference until October 12, 2021, on account of defendants' substitution of counsel. Dkt. 45. On October 7, 2021, the Court notified the parties to be prepared to address at the conference, *inter alia*, whether the FAC incorporated the 2013 contract. Dkt. 49. On October 12, 2021, at the conference, the Court ordered Gill to submit the materials discussed at the conference and agreed upon by the parties as cognizable, which included the 2013 contract and associated terms and conditions, and stayed discovery. *See* Dkt. 50. On October 13, 2021, Gill submitted these materials. Dkt. 51.

## II.   Applicable Legal Standards

### A.   Motion to Dismiss under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**B.     Motion to Strike Class Allegations under Rule 23(d)(1)(D)**

Under Rule 23(d)(1)(D), a court may issue an order that "require[s] that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly." Fed. R. Civ. P. 23(d)(1)(D).  However, "[i]n this Circuit, motions to strike are generally looked upon with disfavor," *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 357 (S.D.N.Y. 2020) (cleaned up), and motions to strike class claims "are particularly disfavored because they require a reviewing court to preemptively terminate the class aspects of litigation," on the basis solely of a complaint and without the benefit of discovery, *id.* (cleaned up); *see also Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 462 (S.D.N.Y. 2013).  Motions to strike are entertained "if the inquiry would not mirror the class certification inquiry and if the resolution of the motion is clear." *Duran*, 450 F. Supp. 3d at 357 (quoting *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 166 (S.D.N.Y. 2019)).  But in general, district courts will defer such questions until the class certification stage. *See id.* (citing *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) (collecting cases)).

**III.    Discussion**

The Court first analyzes the choice of law question implicit in defendants' motion and finds New York law applicable.  It then reviews defendants' arguments for dismissal, which are that (1) Gill was not in privity with defendants, who claim as of 2020 not to have been parties to his contract to receive Game Pass; (2) Gill, in failing to attach the contract to his complaint, has failed to identify specific provisions that were breached; and (3) the unjust enrichment claim fails.  Finally, the Court addresses defendants' motion to strike the class allegations.

**A.     Choice of Law**

The parties have not cited any provision in the 2013 Terms and Conditions—the sole writing the Court has been furnished from the period when Gill claims to have contracted with

7

defendants to receive Game Pass—addressing the law applicable to claims by subscribers such

as Gill. The FAC states that the parties' agreement is governed by New York law, but is silent as

to the basis for this. FAC ¶¶ 17, 35. For their part, defendants note that, under the 2019 Terms

and Conditions that identify Overtier and Deltatre as responsible, respectively, for licensing and

operating the Game Pass product, a subscriber's lawsuit is governed by the law of the

jurisdiction where he or she resides (and is to be brought in a court within that jurisdiction).

NFL Mem. at 2; *see* 2019 T&Cs ¶ 15.6 ("The governing law and the competent jurisdiction are

the one[s] of the country where the consumer has his habitual residence."). However, defendants

do not themselves apply Australian law (or move to dismiss in favor of Australia). Their briefs

instead exclusively cite New York law. *See, e.g.*, NFL Mem. at 7–19; NFL Reply at 1–10.

In these circumstances, the Court will apply New York law to the motion to dismiss.

New York's choice-of-law rules provide that "the interpretation and validity of a contract is

governed by the law of the jurisdiction which is the 'center of gravity' of the transaction."

*Alderman v. Pan Am World Airways*, 169 F.3d 99, 103 (2d Cir. 1999). The "center of gravity,"

in turn, is determined by considering "the places of negotiation and performance; the location of

the subject matter; and the domicile or place of business of the contracting parties." *Longo v.*

*KeyBank Nat'l Ass'n*, 357 F. Supp. 3d 263, 270 (S.D.N.Y. 2019) (quoting *Zurich Ins. Co. v.*

*Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994)). But at the motion to

dismiss stage, courts often forego that analysis, particularly where—as here—the parties have

failed to brief the question of the governing law and jointly apply New York law in their briefs.

*See Hertz Glob. Holdings, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 19 Civ. 6957

(AJN), 2021 WL 1198802, at *2–3 (S.D.N.Y. Mar. 30, 2021) (declining to conduct choice-of-

law analysis at motion to dismiss stage and holding that application of New York law in briefs

acts as "implied consent . . . sufficient to establish the applicable choice of law" (quoting *Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.*, 203 F. Supp. 3d 312, 317 (S.D.N.Y. 2016)). And during the October 12, 2021 conference, the parties agreed that the Court should look to New York law to resolve the pending motions, and neither party suggested that the only alternative source of law that has been identified—Australia's, based on the 2019 Terms and Conditions—would yield a different outcome from New York's.

### B.      Privity

Defendants attempt to sideline Gill's claims sounding in contract—those for breach of contract and implied warranty of merchantability—by arguing that, based on the pleadings and the materials cognizable on them, they did not contract with Gill and were not in privity with him. NFL Mem. at 9, 11–12 (breach of contract); 12–13 (implied warranty of merchantability). Because Gill has not adduced a written contract between Gill and defendants, and because the 2019 Terms and Conditions identify Overtier and Deltatre (and not defendants) as the entities responsible for providing Game Pass to subscribers, defendants argue that they cannot be held liable in contract.

Defendants are correct that breach of contract and implied warranty of merchantability claims require privity—a contractual relationship—between the parties. *See Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 30 (2d Cir. 2018) ("In New York, liability for breach of contract does not lie absent proof of a contractual relationship or privity between the parties.") (cleaned up); *Patellos v. Hello Prod., LLC*, 523 F. Supp. 3d 523, 534–35 (S.D.N.Y. 2021) (breach of implied warranty claim requires privity). If the absence of such privity were clear on the face of the FAC or the materials it incorporates, dismissal of these claims would be in order.

But that is not so here. The FAC viably pleads that Gill contracted in 2013 with the NFL and NFLE for Game Pass. And the materials cognizable on Gill's claims do not clearly refute

9

this claim. Gill has not come forward with a written agreement from 2013 and, consistent with

their claim not to have been parties to that agreement, defendants profess not to have one. All

that has been adduced from the period during which Gill contracted to received Game Pass are

the 2013 Terms and Conditions. These are facially inconclusive as to the entity or entities with

which Gill contracted in 2013, but they do refer to the NFL in a manner consistent with Gill's

allegation that the NFL was a party to the agreement with him at the time, albeit not the entity

that operated the product. *See* 2013 T&Cs at 5–6 ("The NFL is currently offering . . . NFL

Game Pass . . . . We have contracted with a third party (currently NeuLion, Inc.) to operate,"

*inter alia*, Game Pass.)

As to ensuing years, the FAC alleges that, with Gill not having cancelled the automatic

renewal feature, his agreement to receive Game Pass was automatically renewed each year. *See*

2013 T&Cs at 7 ("Your annual subscription will automatically renew on approximately August 1

of at [sic] either the previous year's full season rate . . . or the current full season rate . . .

whichever is lower. To cancel the annual automatic renewal feature, you can send an email to

gamepass.support@nfl.com . . . " or perform other means of cancellation). The FAC does not

recite any information about communications, if any, to Gill or other subscribers from the

entities responsible for Game Pass during the years 2014–2018, including any speaking to the

identity of the entities contractually responsible for furnishing Game Pass to subscribers.

In disputing a present contractual relationship with Gill, defendants rely on the 2019

Terms and Conditions. They note that these identify Overtier and Deltatre as responsible for

operating Game Pass, and do not identify the NFL as having any role in connection with the

product. *See* 2019 T&Cs ¶ 2.1 ("Overtier . . . is the official licensee of the content material . . .

Deltatre . . . operates the platform and deals with customer queries. . . . As a customer you are

contracted with both entities.").[4]  Defendants thereby assert that, even if the FAC adequately

pleads that they were in privity with Gill in 2013, ensuing events—perhaps a contractual

assignment—must have removed the NFL as a contractual partner.  *See* NFL Mem. at 10–11.

Discovery will, presumably, bear out the identity of the entity or entities that were

contractually responsible to subscriber Gill—at the outset of Gill's subscription to Game Pass

and, critically, during 2019–2020, when he claims the service outage during the Super Bowl.

The pleadings and cognizable materials, at least as furnished to date, are not dispositive on that

point.  It is possible that, as defendants urge, the NFL and NFLE will be shown not to have been

parties to Gill's contract to obtain Game Pass.  But the FAC plausibly so pleads.  It identifies the

NFL and NFLE as Gill's counterparties in 2013 when he first subscribed to Game Pass; it

incorporates the 2013 Terms and Conditions, which identify the NFL as "currently offering"

Game Pass; it alleges that Gill's use of Game Pass in the ensuing years was a product of

automatic renewals of that original agreement, not of successor contracts with successor entities

responsible for the product; and it alleges that Gill is unaware of any assignment of contractual

duties from the NFL and NFLE to a successor.  *See generally* FAC ¶¶ 5, 30, 32, 33, 36, 41, 42.

Even the 2019–2020 Terms and Conditions, on which defendants rely insofar as they identify

Overtier as Game Pass's "official licensee," do not disclaim any continuing connection between

the NFL and NFLE, on the one hand, and Game Pass, on the other.  They are instead silent as to

the role, if any, played by these defendants.  And defendants have not identified any other

cognizable material reflecting, let alone establishing, a relinquishment by defendants of their

roles or responsibilities that the FAC alleges they bore in 2013.

---

[4] Gill acknowledges that the 2019 Terms and Conditions are cognizable but notes that, per the
FAC, these conditions "did not cover Plaintiff's initial signup in 2013." FAC ¶ 36.

The case authority on which defendants rely also does not take them down the field. In *Black Car & Livery Ins., Inc. v. H & W Brokerage, Inc.*, the Appellate Division affirmed the dismissal of a breach of contract claim against a defendant with whom the plaintiff was not in privity. *See* 813 N.Y.S.2d 751, 752 (N.Y. App. Div. 2006). But that was based on the trial court's finding that the defendant was not a party to the pertinent agreement, as he had signed it in a corporate, not a personal, capacity. *See Black Car & Livery Ins., Inc. v. H & W Brokerage, Inc.*, 814 N.Y.S.2d 889 at *4 (Sup. Ct. 2006). On the pleadings here, there is no similar basis for finding a lack of contractual obligation by defendants to Gill. And in *Maki v. Travelers Cos., Inc.*, the court held that the plaintiff, having not had contact with an insurance wholesaler or with the parent of the issuer of an insurance policy, did not have a contractual relationship with either entity. *See* 44 N.Y.S.3d 220, 222–23 (N.Y. App. Div. 2016). But that case is inapposite, as Gill claims to have had contact with both defendants at the time, in 2013, that he began subscribing to Game Pass, and that these remained his counterparties as of 2019–2020.

The Court accordingly denies the motion to dismiss based on an asserted lack of privity between Gill and defendants.[5]

## C.   Failure to Identify Specific Contractual Provision That Was Breached

Defendants separately move to dismiss the breach of contract claim because the FAC does not attach a contract or identify specific provision(s) of it that were breached when the Super Bowl livestream was disrupted. NFL Mem. at 11. But that argument falls incomplete. To state a claim for breach of contract, a complaint is not required to attach a copy of the agreement. *See Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909 (PAE), 2021 WL 2041639, at *12 (S.D.N.Y. May 21, 2021). And here the FAC clearly sets out defendants' central contractual obligation (to

---

[5] Given this holding, there is no occasion to tackle defendants' argument that the FAC fails to plead their liability on third-party beneficiary or agency theories. NFL Reply at 7–8.

livestream NFL games, including the Super Bowl) and their asserted breach (the failure to do so without interruption). *See* FAC ¶¶ 12, 16, 19, 21, 29. It thereby adequately, and plausibly, pleads the existence, and defendants' breach, of a contract with Gill. *See, e.g., Unicorn Crowdfunding Inc. v. New St. Enter., Inc.*, No. 18 Civ. 10110 (PAE), 2019 WL 2450911, at \*4 (S.D.N.Y. June 12, 2019).

Defendants' authorities are again inapposite. *Marshall v. Hyundai Motor America* held that failure to plead the specific contract that was breached "*may* be fatal" to a claim. 51 F. Supp. 3d 451, 468 (S.D.N.Y. 2014) (emphasis added). The complaint in that case, however, generically referred to "certain contracts and warranty agreements," and its failure to identify or attach a particular agreement required dismissal. *Id.* And *Mandarin Trading Ltd. v. Wildenstein* held the plaintiff to have failed to plead the required elements of a third-party beneficiary claim, 944 N.E.2d 1104, 1110 (N.Y. 2011). That issue is not present here.[6]

### D.    The Unjust Enrichment Claim

Defendants also move to dismiss the FAC's unjust enrichment claim, on the ground that such a claim cannot coexist alongside a breach of contract claim where the existence of a valid contract is undisputed. NFL Mem. at 13–14. Gill counters that unjust enrichment may be pled in the alternative where there is a genuine dispute over the existence of a contract. Pl. Mem. at 14. Here, the FAC unavoidably pleads the existence of an enforceable contract of which an unjust enrichment claim would be duplicate.

---

[6] Defendants also fault Gill for, ostensibly, changing his legal theory between the Complaint and the FAC. NFL Mem. at 8, 10. The changes reflected in the FAC do not warrant relief, let alone dismissal. Whereas the initial Complaint focused on the 2019–2020 period, the FAC sets out a fuller history, including that Gill contracted with defendants in 2013. *Compare* Dkt. 1 at ¶¶ 12, 30 *with* FAC ¶¶ 5, 30. There is nothing wrong with Gill's having supplemented his pleading with these facts, which usefully clarify his basis for alleging that the defendants were parties with whom he was in contractual privity in 2019–2020.

To establish unjust enrichment, a plaintiff must show that (1) "defendant was enriched;" (2) "at plaintiff's expense;" and (3) "equity and good conscience" requires restitution for what the plaintiff seeks to recover. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (2002)). It is not a "catchall cause of action"; rather; such a claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

Although New York law "precludes a party from, ultimately, recovering on both breach of contract and quasi contract claims," at the motion to dismiss stage, pleading a "viable breach of contract claim does not preclude [a plaintiff's] pursuit . . . of parallel quasi-contract claims." *Unicorn Crowdfunding*, 2019 WL 2450911, at \*5; *see also, e.g.*, *Johnson v. Carlo Lizza & Sons Paving, Inc.*, 160 F. Supp. 3d 605, 617 (S.D.N.Y. 2016). But unjust enrichment claims may not be pled in the alternative alongside a claim that the defendant breached an enforceable contract. *Quintanilla v. W.W. Int'l, Inc.*, No. 20 Civ. 6261 (PAE), 2021 WL 2077935, at \*14 (S.D.N.Y. May 24, 2021). Nor may such a claim proceed where it "simply duplicates, or replaces, a conventional contract . . . claim." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 483 (S.D.N.Y. 2014) (quoting *Corsello*, 967 N.E.2d at 1185). "[C]laims for unjust enrichment will not survive a motion to dismiss where plaintiffs fail to explain how their unjust enrichment claim is not merely duplicative of their other causes of action." *Nelson v. MillerCoors, LLC*, 246 F. Supp. 3d 666, 679 (E.D.N.Y. 2017).

These principles require dismissal of the unjust enrichment claim here. The FAC unavoidably—and, given the nature of his claim to have subscribed to receive a streaming

14

service subject to contractual terms and conditions, necessarily—pleads a breach of an

enforceable contract. *See, e.g.,* FAC ¶¶ 30, 33, 35, 38. Gill notes that it remains to be seen

which entities are contractually responsible for the breach he claims. Pl. Mem. at 15. But

whether Gill has sued the right defendants, his contract-breach claim necessarily describes an

enforceable commercial agreement that covers this dispute. And the unjust enrichment claim

duplicates that claim, in that it is based on the same alleged breaching conduct, namely, the

interruption of the livestream of the Super Bowl, and seeks substantially the same relief,

recoupment of the sums Gill paid for the streaming service. *See Goldberg v. Pace Univ.*, No. 20

Civ. 3665 (PAE), 2021 WL 1565352, at \*12 (S.D.N.Y. Apr. 21, 2021) (describing duplication as

"particularly acute" where the unjust enrichment claim sought to recover the same payments and

was based on the same allegedly breaching conduct as the breach of contract claims); *Polk v. Del

Gatto, Inc.*, No. 21 Civ. 129 (PAE), 2021 WL 3146291, at \*11–12 (S.D.N.Y. July 23, 2021)

(collecting cases) ("Polk's unjust enrichment claim is based on the same allegations as his claim

for breach of contract . . . . The Court therefore dismisses the unjust enrichment claim as

duplicative."). Gill has not identified any consequential difference between his breach of

contract and unjust enrichment claims. The latter therefore must be dismissed.

### E.    The Class Allegations

In something of a Hail Mary, defendants, finally, attempt to strike the FAC's class

allegations, arguing that, on the face of the FAC, class certification is necessarily unsustainable.

NFL Mem. at 3, 16. They argue, first, that because the class definition is not limited to

subscribers in privity with the NFL and NFLE and may include subscribers who obtained Game

Pass from other or successor entities, a certified class could include persons who lack Article III

standing to sue defendants. *Id.* at 17. Second, they argue, individual issues will predominate,

either because the FAC pleads an individualized series of events particular to each plaintiff,

and/or because the 2019 Terms and Conditions require lawsuits to be filed in the jurisdiction and under the law of each plaintiff's residence. *Id.* at 17–18; *see also* NFL Reply at 9.

This bid fails at this stage. As noted, a motion to strike class allegations may be granted only "if the inquiry would not mirror the class certification inquiry and if the resolution of the motion is clear." *Duran*, 450 F. Supp. 3d at 357 (quoting *Talarico*, 367 F. Supp. 3d at 172). Here, defendants' arguments are ones properly made and resolved at the class certification stage. To the extent defendants posit that some members of the proposed class may prove not to have Article III standing, that question is aptly addressed at the class certification stage, at which, with the benefit of discovery, the Court may narrow the proposed class definition to respond to Article III concerns. *See Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 65 (2d Cir. 2012). To the extent individual issues may predominate, that concern, too, is paradigmatically one to be litigated at class certification—with the possible outcomes including certification, non-certification, or certification of narrowed or subclass(es), tailored to match unifying features of the plaintiffs therein. *See Haley v. Tchrs. Ins. & Annuity Assoc. of Am.*, 377 F. Supp. 3d 250, 273 (S.D.N.Y. 2019) (denying as premature motion to strike when it challenged typicality and predominance); *cf. Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06 Civ. 6198 (LAK) (JCF), 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008) (entertaining motion to strike "since the extent to which the claims of absent members of the putative class have been exhausted is an issue separate and apart from the issues that will be decided on a class certification motion"). And at this early, pre-discovery stage, it is by no means clear whether or to what extent a class could properly be certified, consistent with Fed. R. Civ. P. 23.

16

The Court accordingly denies defendants' motion to strike the class allegations, without prejudice to defendants' right to make the same or similar arguments in the event of a later motion for class certification stage.

## CONCLUSION

For the reasons above, the Court denies defendants' motion to dismiss, save that the Court grants the motion to dismiss the FAC's unjust enrichment claim. The Court also denies defendants' motion to strike the class allegations, without prejudice to defendants' right, later in this litigation, to oppose class certification on similar grounds.

The case will now proceed to discovery. The Court directs the parties to submit a joint case management plan within one week of this order. The Court's judgment is that in the first instance, discovery should be limited to the contractual relationship governing the Game Pass service provided to Gill, and that such discovery should be capable of completion within three months. If, following such discovery and any ensuing motion for summary judgment, plaintiff's claims has survived, discovery would then be warranted on issues of breach, damages, and potential class certification. The Court directs counsel to formulate a case management plan consistent with these parameters.

The Court respectfully directs the Clerk of the Court to close the motions pending at dockets 15 and 25.

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 2, 2021
       New York, New York

17