UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals,

Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE, a New York unincorporated association, and NFL ENTERPRISES, LLC, a Delaware limited liability company,

Defendants.

Civil Action No. 1:21-cv-1032

VIDEOCONFERENCE DEPOSITION OF PERSON MOST KNOWLEDGEABLE FOR THE NATIONAL FOOTBALL LEAGUE - MAX BOIGON

DATE: Friday, March 4, 2022

TIME: 9:06 a.m.

LOCATION: Remote Proceeding
Los Angeles, CA 90305

REPORTED BY: Molly McColm, Notary Public

JOB NO.: 5116627

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF SIETEL SINGH GILL:

KARL KRONENBERGER, ESQUIRE (by videoconference)
Kronenberger Rosenfeld LLP
150 Post Street
Suite 520
San Francisco, CA 94108
karl@krinternetlaw.com

ON BEHALF OF DEFENDANTS NATIONAL FOOTBALL LEAGUE, NATIONAL FOOTBALL LEAGUE ENTERPRISES, LLC, AND MAX BOIGON:

THOMAS A. LEGHORN, ESQUIRE (by videoconference)
London Fischer LLP
59 Maiden Lane
39th Floor
New York, NY 10038
tleghorn@londonfischer.com

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS NATIONAL FOOTBALL LEAGUE:

MICHAEL A. BUCHWALD, ESQUIRE (by videoconference)
National Football League
345 Park Avenue
New York, NY 10154
michael.buchwald@nfl.com

ALSO PRESENT:

Jasper Eagleton, Paralegal for Kronenberger Rosenfeld LLP (by videoconference)

I N D E X

| EXAMINATION: | | PAGE |
|---|---|---|
| By Mr. Kronenberger | | 7 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Notice of Rule 30(b)(6) Deposition | 29 |
| Exhibit B | Overtier Contract | 14 |
| Exhibit C | Consolidated Timeline | 30 |
| Exhibit D | Links to Emails | 35 |
| Exhibit E | Subscription Terms & Conditions | 59 |
| Exhibit F | Defendant's Responses to Interrogatories | 64 |
| Exhibit G | Plaintiff's Account Information and Payment History | 65 |
| Exhibit H | Terms & Conditions | 66 |

(Exhibits attached.)

P R O C E E D I N G S

THE REPORTER: Good morning. My name is Molly McColm; I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 9:06 a.m.

This is the deposition of Max Boigon taken in the matter of Sietel Singh Gill vs. National Football League and NFL Enterprises, LLC on Friday, March 4, 2022, remotely via Zoom.

I am a notary authorized to take acknowledgements and administer oaths in California. Parties agree that I will swear in the witness remotely, outside of his presence.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording virtually of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time will everyone in attendance please identify yourself for the record, beginning the noticing attorney.

MR. KRONENBERGER: Good morning. My name is Karl Kronenberger with the law firm Kronenberger Rosenfeld, and I represent the plaintiff.

MR. LEGHORN: Thomas Leghorn, good morning, from the firm of London Fischer LLP, and representing the National Football League and National Football League Enterprises, as well as the witness, Max Boigon.

MR. BUCHWALD: Morning, Michael Buchwald from the National Football League.

MR. BOIGON: Good morning. Max Boigon from the National Football League.

MR. EAGLETON: Good morning, I'm Jasper Eagleton. I'm a paralegal with Kronenberger Rosenfeld.

THE REPORTER: Thank you.

Hearing no objection, I will now swear in the witness.

Please raise your right hand.

//

//

//

//

WHEREUPON,

MAX BOIGON,

called as a witness, and having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you.

Counsel, you may proceed.

EXAMINATION

BY MR. KRONENBERGER:

Q Good morning, Mr. Boigon.

A Good morning.

Q I'm going to just start off with some basics. Who is your employer?

A National Football League International.

Q And how long have you worked for -- I'm going to call it NFLI, is that fine?

A That's great.

Q So how long have you worked for NFLI?

A Approximately four years.

Q And what is your title?

A I am the senior director of direct to consumer.

Q Have you held any other titles during the four years you've worked for NFLI?

A Yes.

Q What were those titles?
A Director of subscription products.
Q Is that the only other title?
A Yes.
Q So when you started with NFLI you were director of subscription products?
A Yes.
Q Who was your employer prior you to joining NFLI?
A National Football League Enterprises.
Q How long did you work for I'm going to call it NFLE?
A Approximately two years.
Q And what was your title at NFLE?
A Head of product marketing.
Q Did you hold any other titles there?
A No.
Q Prior to your employment with NFLE, who was your employer?
A Advanced Sports Media Group.
Q And how long did you work for Advanced Sports Media Group?
A Approximately ten and a half years.
Q What was your role with that company?
A I was the COO and Co-Founder.

Q What did that company do?

A Predominantly offered sport subscription products in the high school and college space.

Q Have you ever been deposed before?

A No.

Q I failed to mention this at the beginning, and I think you're doing a good job with this already, but, you know, try to have verbal answers as opposed to head nodding or anything else nonverbal. I also failed to mention that we're going to take some breaks today, even though I don't think this is going to go all day. And if you do need a break, you can let us know. I just ask that you do not ask for a break while a question is pending.

So back to the questions. I would like to get a brief general understanding of the two organizations, NFLI and NFLE. So I'm going to ask you a few questions about that. How would you describe NFLE and what NFLE is in relationship to the overall corporate structure of the NFL?

MR. LEGHORN: Hey Karl, now as opposed to any time in the past?

MR. KRONENBERGER: Good qualification.

BY MR. KRONENBERGER:

Q While you were an employee of both NFLE and

then later NFLI, what has the role been of NFLE?

A Predominantly overseeing the domestic elements of the NFL operation.

Q Would that include subscription products?

A Yeah.

Q And just flipping now to NFLI, what is the role of NFLI during this period of time when you were working for both organizations?

MR. LEGHORN: Objection.

A I've never worked for both organizations, I've always -- I've worked for NFLE and then I worked for NFLI.

Q Well, during that period of six years -- I see your point. You weren't working concurrently for these two organizations. But during that six-year period, what has been the role of NFLI?

A To look after the international operations of the NFL business.

Q And that would include subscription sales?

A Yes.

Q Regarding your time at NFLI, what has been your role concerning the selection and management of vendors who would assist NFLI with subscription products?

MR. LEGHORN: Objection.

A During my time at NFLI, we have not had any direct vendors. We only work with our licensees of subscription products.

Q Would you call Neulion a licensee?

MR. LEGHORN: Objection.

A No.

Q I guess Neulion was a vendor of NFLE, correct?

A Prior to 2017, yes.

Q Okay. Why don't we back up and talk about the relationship between NFLE and Neulion? So due to your experience with NFLE, I'm assuming your familiar with a company called Neulion?

A Yes.

Q What did Neulion do?

A Neulion, prior to 2017, provided the Game Pass international product solution.

Q Now, the relationship with Neulion was with NFLE, correct?

A Yes.

Q However, the subscription product included international users?

A Yes.

Q Why wouldn't NFLI have contracted with Neulion to provide subscription products the international users?

A Neulion utilized the same platform to host the domestic subscription product.

Q What was your role during your time at NFLE regarding Neulion? In the overall relationship with Neulion?

A I was aware of the relationship, but it was not my direct responsibility.

Q So I'd like to go back to NFLI. When did those subscription sales to international users migrate over from Neulion and NFLE to licensees of NFLI?

A Between 2016 and 2017.

Q What was the purpose of that business decision to migrate subscription sales from Neulion and NFLE to NFLI and its licensees?

A I'm not sure. I was not -- not privy to that.

Q Well what was your role in the decision making of NFLI in developing the relationship with Overtier?

A Sorry, I -- I don't understand the question.

Q Yeah. So did you have a role NFLI's decision to enter into an agreement with Overtier?

A Not initially, in 2017, no.

Q Did eventually you have some sort of role in that relationship?

A Yes, when we consolidated in 2019.

Q What do you mean when you say consolidated?

A The licensee in 2017 was Perform. And then we transitioned from Perform to Overtier between 2018 and 2019.

Q Regarding the company Perform, did Perform ever appear in any terms of service or any other agreement between consumers and NFLI?

A Sorry, can you ask the question again?

Q Yes. Did the company Perform Media, the name of the company, did it ever appear as a party to or referenced in any agreement with consumers concerning subscription products with the NFL?

A Not to my knowledge.

Q However, later Overtier which you describe as a licensee did appear in terms of service and so-called agreements between customers or with customers regarding NFL subscription products, correct?

A Sorry, can you ask the question again?

Q Yes, but Overtier and the name Overtier did appear in terms of service and agreements, so to speak, between Overtier and customers regarding NFL subscription products, correct?

A Yes.

Q So my question is why would Overtier have a direct relationship with customers regarding subscription products, but Perform Media not have a

direct relationship with customers?

MR. LEGHORN: Objection.

A Perform failed to provide updated terms of service when they were the licensee in 2017, but Overtier held up to that obligation.

Q So was there ever any agreements -- or I should say were there ever any agreements between Perform Media and consumers directly?

A Not to my knowledge.

Q In the agreement between NFLI and Overtier, it references a new company called NewCo, or a company to be formed called NewCo. Are you familiar with that?

A Yep.

Q Why is it that the contract contains references to NewCo?

A I don't believe Overtier had a name at the time.

Q Bear with me. I'm just going to introduce an exhibit, Exhibit B.

(Exhibit B was marked for identification.)

MR. KRONENBERGER: Jasper, will you refresh and show this exhibit on the screen?

MR. EAGLETON: I'm refreshing now, just one moment.

MR. LEGHORN: And Karl, while he does that, we looked at Exhibit A which was the Notice when we were off the record. Do you want to get that out of the way at some point?

MR. KRONENBERGER: That's at that good point. I can get to that in a moment. Thank you, Tom.

BY MR. KRONENBERGER:

Q So I've introduced a document that's labeled as Exhibit B. Mr. Boigon, do you recognize this document?

A Yes.

Q And we were just talking about a reference to the word NewCo in this agreement. And on this first page, you can see that reference or references to NewCo, correct?

A Yes.

Q Will you explain the timeline of this agreement which appears to be an amended agreement?

MR. LEGHORN: Are you able to make it larger?

THE WITNESS: Sorry, what was the question, Karl?

BY MR. KRONENBERGER:

Q The question is that I'm trying to understand the timeline here. It looks like there was ani initial

agreement entered in 2017 with NewCo. And there's an amendment that references Overtier, but it's unclear why Overtier wasn't mentioned back in 2017. So what I wanted to get is an explanation for why the contract initially was referencing NewCo?

A Oh, I -- I'm not aware. I was not part of the original 2017 agreement.

Q But you do know that -- I think this is what you said, that Overtier had not been formed at that time?

MR. LEGHORN: Objection.

A Overtier did not have a name, I believe, in 2017 when they initially did the agreement. But I'm not aware.

Q Is it possible that the NFL did not know what company it was going to engage with at the time it created the NewCo agreement?

MR. LEGHORN: Objection.

A I -- I don't know.

MR. KRONENBERGER: We can remove the screen share.

BY MR. KRONENBERGER:

Q What is the advantage of the NFL having a licensing relationship with Overtier as opposed to another NFL entity having a vendor relationship with,

say, Neulion?

MR. LEGHORN: Objection.

A Unclear. I was not part of the decision-making process.

Q So you don't have any thoughts at all about the business purpose of a licensing relationship as opposed to a vendor relationship?

A No.

Q But in retrospect, do you feel like there are advantages to NFLI to having a licensing relationship right now as opposed to a vendor relationship?

A I don't know.

Q Are there some things that the NFL and Overtier can do due to the current relationship that they may not be able to do if it were a vendor relationship?

A I would say it would be NFLI and Overtier, and I don't know.

Q Do you know if Overtier runs any gambling or gaming advertising around NFL content streams internationally?

A Advertising, no, I don't believe so.

Q Does the NFL have any ownership interest in Overtier?

A No.

Q Does the NFL have any corporate control over Overtier?

A No.

MR. LEGHORN: Objection.

BY MR. KRONENBERGER:

Q Does the NFL have any board seats or control any board seats with Overtier?

A Not to my knowledge.

Q Are you familiar with the name Rover Europe Operations?

A No.

MR. KRONENBERGER: If we could do to screen share again with the contract? Scroll please. Keep going. Okay. Right there. Actually keep -- sorry. Stop there.

BY MR. KRONENBERGER:

Q Are you aware of the reasons for redactions in this agreement?

A I believe it's commercially sensitive.

MR. KRONENBERGER: You can keep scrolling. Just coming to the next redaction that -- okay, right there.

BY MR. KRONENBERGER:

Q So for these redactions, we're looking at the contract and the section is called Content Distribution

Obligations. Do you know the reasons for these redactions?

A I do not.

Q Who was it that redacted these provisions?

A I believe it was NFL internal and external counsel.

Q Bear with me.

MR. KRONENBERGER: If you could scroll to page 10 of the document. Okay. Right here.

BY MR. KRONENBERGER:

Q Operating profit. Are you aware of how operating profit is defined in this agreement?

A I'm not, no.

Q Do you know the reason for this particular redaction on operating profit?

A I imagine it's commercially sensitive.

Q I'm not going to go through all the redactions here, I don't think, but maybe I can sort of short circuit this with a question. Are you aware of any of the reasons for any of the redactions in this document other than that you just said? I think you mentioned sensitive business information.

A No.

MR. KRONENBERGER: We can stop the exhibit share.

BY MR. KRONENBERGER:

Q What is the role of Deltatre in the agreement between NFLI and Overtier?

A I believe it's pronounced "delta-tray".

Q Thank you. Thank you.

A For the record. Sorry, can you ask the question again?

Q Yes. What is the role of Deltatre in the relationship between NFLI and Overtier?

A They have no direct relationship with the NFLI. They were a vendor of our licensee, Overtier.

Q So what does Deltatre do?

A They provide the product solution on behalf of our licensee, Overtier.

Q Does Deltatre enter any agreements directly with consumers?

A I don't know, you would need to discuss with Overtier, our licensee.

Q Is the -- strike that. Has the agreement between NFLI and Overtier been terminated?

A Not to my knowledge.

Q So as of today, it's an active agreement that has not been terminated?

A Yes.

Q I'd like to ask some questions about the

beginning of the relationship between NFLI and Overtier.

A At what point in time?

Q Well, let's go back to as early as we can which it looks like it was, I think you said 2018 to 2019, when the relationship was developed.

A No, NFL contracted initially with Overtier in 2017, I think between the 2016 and 2017 season. But I did not personally start working with Overtier until I believe it was March of 2018.

Q Do you know when the baton was passed, so to speak, between Neulion and Overtier?

MR. LEGHORN: Objection.

A I'm sorry. When?

Q Yeah, so I won't use these stupid metaphors anymore. So regarding the provision of subscription products to international users, when did operations transition from Neulion to Overtier?

MR. LEGHORN: Same objection.

A Sorry, I don't know if I understand the question. Are you talking about in the -- the market in question, Australia?

Q Yes, let's start with Australia.

A Perform, our licensee in 2018, worked with Overtier, our licensee for the market, in 2019 between the 2018 and 2019 seasons.

Q Thank you for correcting me about the role of Perform versus Neulion. So let me ask it again here, the same question but regarding Perform Media. Regarding the management of the subscription product to international users that Perform Media was handling, do you know when they handed those responsibilities over to Overtier?

A Yes.

Q Generally when was that?

A Perform transitioned to Overtier in Australia between the 2018 and 2019 seasons.

Q So that's a fairly long period of time that you've mentioned. Was there a certain point where there was overlap between Perform Media and Overtier regarding responsibilities for implementing and managing the subscription product for Australian users?

A I don't know.

Q So in 2018, it's possible that Overtier had no role at all in managing the subscription product for Australian users, correct?

MR. LEGHORN: Objection.

A No.

Q Let's dig deeper here into what it means to manage a subscription program. Would you agree that there is a significant amount of data that is comprised

of consumer names, addresses, and credit cards and other information about consumers, would you agree that that's an aspect of a subscription service?

MR. LEGHORN: Objection.

A Sorry, can you ask the question again?

Q Just looking at the NFL subscription service and we can even dig down deep and go right to the subscription service as it relates to Australia. Would you agree that as part of managing this subscription service, the company managing it has to deal with all the consumer data that involves contact information, credit card numbers.

A So it's not the NFL subscription product, it's licensed out to, in this case, Perform and Overtier. They -- there is data, but I don't believe they keep certain types of data that pertain to payment processing.

Q So we can put payment processing data aside for a bit. But you're going to have information regarding name, address, and e-mail at minimum, correct?

A Yes.

Q And Perform Media had custody and control of this data while they were managing the subscription product for Australian users, correct?

MR. LEGHORN: Objection.

A No. Perform, who is the licensee, worked with Neulion, who is their vendor, at the time on data.

Q But even though Perform was using Neulion, they controlled the relationship with Neulion, correct?

MR. LEGHORN: Objection.

A At what point in time? Sorry.

Q In the short period of time that Perform Media was a licensee?

A Yes, they had the relationship with Neulion.

Q However, I believe that the contract with Neulion was between NFLE and Neulion, correct?

MR. LEGHORN: Objection.

A Only prior to the 2017 season.

Q So after the 2017 season, Perform Media entered a contract with Neulion?

A To my knowledge, yes.

Q So Perform Media was acting as a licensee and managing the subscription NFL product for users in Australia using Neulion and at a certain point, those operations were transitioned over to another company called Overtier; is that correct?

A Yes.

Q Were you in your role with NFLI at the time of that transition?

A Yes.

Q So what was your role in that transition of subscription operations from Perform Media over to Overtier?

A Just being the NFL representative and making sure the brand was being represented.

Q Did you play any role in the migration of data from Neulion to Overtier?

A No.

Q Do you know what Overtier's vendor was? Who was going to handle the data of all the consumers, specifically Australian consumers?

A Overtier works with Deltatre.

Q Do you know if Overtier or Deltatre used a company called Zuora, spelled Z-U-O-R-A, in order to manage the subscription product to international users?

A I believe Overtier uses Zuora for payment processing.

Q Regarding Perform Media and terms of service with consumers, I believe you testified that they never actually entered into agreement with consumers. Do you know if there were any draft terms of service where they were preparing to enter agreements directly with consumers?

MR. LEGHORN: Objection.

A I don't know.

Q Do you know why they didn't enter into agreements directly with consumers?

MR. LEGHORN: Objection.

A I don't know. No.

Q Did NFLI and the NFL organization get permission from consumers to transfer data, personal information data to Perform Media?

A Sorry, can you ask the question again?

Q Yes. This is building on some prior testimony about how Perform data through vendor Neulion was managing the subscription sales product and you characterized Perform as a licensee at that point. The question is did the NFL, any NFL entity get the permission of consumers, specifically Australian consumers, to transfer data from the NFL to Perform Media? And when I say data, I mean personal information of the consumers?

MR. LEGHORN: Objection.

A I -- I would defer to our license agreement between the NFL and Perform Media.

Q Okay. Does the NFL take the position that at any point Mr. Gill had an agreement with Perform Media?

MR. LEGHORN: Objection.

A Sorry, can you ask the question again?

Q Yes. Did Mr. Gill, the plaintiff in this

case, at any point have any agreement, for example, an agreement through -- an agreement to terms of service with Perform media?

MR. LEGHORN: Objection.

A Not to my knowledge.

Q So at the time Perform Media was, as you call it, a licensee. The agreement between Mr. Gill was -- let me restate that. At the time Perform Media was performing as what you call the licensee for NFLI in managing the subscription programming, including the subscription program for Australian consumers, the only agreement that Mr. Gill had with any entity at that point was the NFL, correct?

MR. LEGHORN: Objection.

A Prior to the 2019 season, I believe Mr. Gill had seasonal agreements with the NFL.

Q So even though the NFL was using Perform Media as a so-called licensee, the NFL was the one that was contracting with Mr. Gill, correct?

MR. LEGHORN: Objection.

A No.

Q Well, who was Mr. Gill contracting with?

A The terms of service for the product prior to 2019 were NFL International terms of service.

Q Yes. So at the time of the Perform Media

deal, when Perform Media was managing the subscription product, the contract the Mr. Gill had was with NFLI and not with Perform Media, correct?

MR. LEGHORN: Objection.

A When Perform was the licensee of the business between 2017 and 2018, the terms of service were those of NFLI.

Q So I just want to make sure that I'm not missing any part of this series of contracts. And that's why I'm asking this question. So the NFL is not taking the position that somehow Mr. Gill had a contract with Perform Media, correct?

MR. LEGHORN: You know, Karl, this goes beyond the scope of this. We certainly are taking that position from a legal position and, you know, Max is here as a witness as to what are the documents that existed whatever, but yes. That is our position.

MR. KRONENBERGER: Okay. I'll move on from this.

BY MR. KRONENBERGER:

Q I'm going to bring up another exhibit. Bear with me. If we could start with Exhibit A. It's something that I entered as an Exhibit, but I haven't shown on the screen yet.

MR. KRONENBERGER: So if we could bring

Exhibit A onto the screen, please.

(Exhibit A was marked for identification.)

BY MR. KRONENBERGER:

Q Mr. Boigon, have you seen this document? I know you're only seeing the first -- maybe we can scroll through the end of the first page. See if you recognize it. We can go ahead and keep scrolling.

Okay. We can stop here.

Mr. Boigon, do you recognize this document?

A I do.

Q And what is this document? Or maybe I could say, do you agree it's the Amended Notice of Deposition for today's deposition?

MR. LEGHORN: And Karl, I'll just have to say, I did not give Mr. Boigon the amended one since all you did was put the date and time in it. But he has seen the original one which has these same deposition topics.

MR. KRONENBERGER: Okay. Thank you for that clarification.

BY MR. KRONENBERGER:

Q Regarding these deposition topics, I'm assuming, Mr. Boigon, these are familiar to you? The ones up on the screen?

A Yes.

Q And you've read through these?

A Yes.

Q And have you prepared on each of these topics?

A Yes.

Q Okay. I'll come back to this later. So let's move on to the next exhibit which will be Exhibit C.

(Exhibit C was marked for identification.)

So I am going to ask you a series of questions about the overall timeline of the relationship between Mr. Gill and Overtier. And I'm going to present a number of documents, you've probably seen most if not all of them, to you and I'm going to ask you some questions about them.

This is a document that is on the screen now that has been produced to us by your counsel.

MR. KRONENBERGER: And if we could just scroll to the bottom of this page just so Mr. Boigon can see what it looks like. It's Bate's number DEF167. Unfortunately the exhibit tab is over the Bate's number. We can scroll back to the top.

BY MR. KRONENBERGER:

Q Do you recognize this page, Mr. Boigon?

A No.

MR. KRONENBERGER: Scroll to the top, please.

BY MR. KRONENBERGER:

Q Do you know who, just looking at that e-mail address, Alessio Soncin is?

A No.

Q It does appear that they're associated with Deltatre, correct?

A Yes.

Q And I'm just saying that because there's a Deltatre e-mail address. Do you have any idea why this database record would have been created back in May -- actually May 28, 2019?

MR. LEGHORN: Objection.

A No.

Q At this point Deltatre was likely working with Overtier; is that correct?

A In Australia?

Q Most likely because Mr. Gill was in Australia?

A So -- sorry, what's the question?

Q Yeah. So I'm asking why would Deltatre have Mr. Gill's personal information?

A You would need to ask Overtier.

MR. KRONENBERGER: Scroll to the bottom part of this page.

BY MR. KRONENBERGER:

Q You agree that this appears to be information to implement a subscription program where Mr. Gill would make payments on the NFL's subscription product?

MR. LEGHORN: Objection.

A Sorry, can you ask the questions again?

Q Would you agree that the bottom part of this page contains information about Mr. Gill that would be used to implement the subscription program that he was in regarding the Game Pass product?

A You would need to ask our licensee Overtier.

Q Do you know how Overtier would have obtained the credit card information for Mr. Gill?

A I do not.

Q Would it be fair to say that it was probably handed over by Neulion?

MR. LEGHORN: Objection.

A You need to ask Overtier.

Q Okay. At the top of the page, we've got May 28, 2019. So I'm going to go to the next page and the top of this page, there's another e-mail address of someone at the company Zuora, correct?

A Yes, it looks like a Zuora e-mail address on the screen.

Q And would you agree that this is some sort of

database record that looks to be created by someone at Zuora?

MR. LEGHORN: Objection.

A You would need to ask our licensee, Overtier.

Q Yeah, but this record was produced by the NFL. Would you agree with that?

MR. LEGHORN: Objection. Does it show the Bate's number?

MR. KRONENBERGER: Could we scroll down a bit?

BY MR. KRONENBERGER:

Q Would you agree?

A I defer to my counsel around what was disclosed and what was not.

Q I can tell you that we obtained this from a production from the NFL. And all of the NFL productions are Bate's labeled with this same number or tag that starts with DEF. Just as background and how I got this document.

MR. LEGHORN: Right, but it may very well have been through our efforts in a friendly reach out to Overtier or Deltatre to assist in getting you what you needed. Not necessarily from something from the witness's custody.

MR. KRONENBERGER: I see. Noted.

BY MR. KRONENBERGER:

Q Mr. Boigon, just going back to your prior comment about Zuora, I think you said that Zuora helps manage subscription products for companies?

A I did not say that.

Q I may have butchered what you said. What was your description of what you believe Zuora did?

A I did not describe Zuora.

Q Okay. Do you know what the company Zuora is?

A I know of them, yes.

Q And what do you know of them?

A I know they are a vendor of our licensee Overtier that manages payments for Overtier.

Q Manages payments. Thank you. So if Zuora is managing payments for Overtier, this document would reflect that Zuora created some record on June 13, 2019, about Mr. Gill, correct?

MR. LEGHORN: Objection.

A You would need to ask our licensee, Overtier.

Q Okay.

MR. KRONENBERGER: Okay. We can remove this exhibit from the screen. And I have put another, a new exhibit, Exhibit D into the folder which can be displayed on the screen.

//

(Exhibit D was marked for identification.)

BY MR. KRONENBERGER:

Q There's not going to be an exhibit tag on this because it's an excel spreadsheet, but it will be labeled as Exhibit D in the file name.

Mr. Boigon, I know this just looks like a screen with a bunch of data on it and hard to identify, but have you seen this document before?

A No.

Q And I'm going to represent to you that our law firm obtain this document from your counsel from a production in the NFL. Do you see the two tabs at the bottom of the spreadsheet?

A I do.

Q If we could click on the service tab.

Do you see the column headings which on the far right involve date sent, first opened, and date last opened?

A Yep.

Q Does this refresh your recollection at all about what this document may be?

A No.

Q I'm going to submit to you that my understanding of it is that these are e-mails that were

sent to Mr. Gill and reflecting when they were sent, when they were opened, with URLs that have the content of the e-mail. Again, I'm not sure if that refreshes your recollection at all. Does that trigger anything with you?

A No.

Q If we could scroll to the left. So I'm going to make that assumption that these were e-mails that were sent to Mr. Gill. And I'm going to show you one by one the documents that are reflected in columns 2 through 15. And I'm going to put them in chronological order according to date sent, which we have this data here. But before I did that, I wanted you to see what I was doing to minimize questions about it. So if you don't have any more questions about this spreadsheet, we can remove this spreadsheet from the screen and we can go back to Exhibit C.

MR. KRONENBEGER: If we could go to the third page of this PDF. Okay. That's good.

BY MR. KRONENBERGER:

Q So I represent to you that this is from an e-mail that was sent on June 19, 2019, according to the spread sheet.

MR. KRONENBEGER: If you could scroll to the bottom of this individual page so Mr. Boigon can see

that this is Bate's labeled -- this is from the NFL. You can scroll back to the top.

BY MR. KRONENBERGER:

A Have you ever seen this document before, Mr. Boigon?

A No.

Q As I mentioned, this is the media that was referenced on an e-mail that was sent to Mr. Gill on June 19, 2019. And so my question to you is -- well first, why don't you read to yourself the first sentence beginning with, As all 32 teams.

A Okay.

Q In this sentence it says, we wanted to share an update. And the question is, who is we?

MR. LEGHORN: Object.

A I don't know.

Q In the next paragraph that starts with, This offseason, we're updating our service provider. Who is we're -- W-E-'-R-E?

A I don't know.

Q Regarding this comment, we're updating our service provider, do you know what that is referring to?

A No.

Q Again, this e-mail was sent on June 19, 2019, does that give you any hint about what this new service

provider could be?

A I -- I don't know to whom this was sent, when it was sent, where it was sent. But Overtier did become our service -- our licensee, rather, for the 2019 season in Australia.

Q And I can represent to you that the way I got this is I looked at the e-mail that was sent to Mr. Gill on June 19, 2019. I clicked on the media. I noticed that it was identical to it was something that was already Bate's numbered so I provided this document here. So that, again, I'm saying that this is the content of an e-mail. And pretty much everything that I'm going to be showing to you in the next few minutes, it's going to be -- they're going to be e-mails to Mr. Gill.

MR. KRONENBERGER: If we could go down to the paragraph that starts with, Updated apps. Yeah. There we go.

BY MR. KRONENBERGER:

Q This, if you could just peruse this to yourself and then I can ask you a question about it.

A Okay.

Q I just want to ask you about those dates, July 1, 2019, and July 25, 2019. What was happening on those dates that caused the NFL to send this out in a

message to users?

MR. LEGHORN: Objection.

A NFL did not send this e-mail.

Q Okay. I should say that the reason I'm asking you about this is because in the NFL's responses in its interrogatories, it explained that the evidence about the contract that Mr. Gill entered into supposedly with Overtier was reflected in a number of documents. This is one of those documents.

So I hear you when you say that the NFL didn't send this, but that's not the point of my question. So because this is evidence of the contract that may or may not exist between Overtier and Mr. Gill, that's why I'm asking you. So given that explanation from me, do you know what the significance of these two dates are? July 1, 2019, and July 25, 2019?

A No.

MR. KRONENBERGER: We can move down to -- keep moving, keep going. Right there. Okay.

BY MR. KRONENBERGER:

Q So this is the next e-mail, from that list from the spread sheet, this is Bate's numbered DEF196. This was sent to Mr. Gill on June 1, 2019 -- I apologize. July 1, 2019, according to this spreadsheet. Have you ever seen this e-mail before?

A No.

Q Would you read to yourself the first paragraph?

A Okay.

Q The second sentence says that we're updating our service provider as part of our commitment to providing a premium NFL experience. Do you know -- and this e-mail's sent July 1, 2019, what the service provider is that's referenced in this e-mail?

A We did not send this e-mail. You would need to speak to our licensee, Overtier, who was responsible for these e-mails.

Q Would you then admit that -- I guess if you're not prepared to testify about these documents, that they did not play a part in any potential agreement between Mr. Gill and Overtier?

MR. LEGHORN: Objection.

A You would need to speak to our licensee, Overtier, who were the licensees in 2019, for the 2019 season.

Q I hear you that that -- that we could talk to them. I understand that. However, there is a deposition topic here that says communications with plaintiff. That you would be prepared to discuss communications with Mr. Gill and the NFL, NFLI, NFLE

and/or Overtier. So I'm not -- I feel like this is a reasonable question and I don't want to put you in an awkward spot, but we sort of need answers to these questions. Especially because your attorneys have said that this document is relevant on the formation -- contract. On top of that, it's communications with Overtier and that's part of this deposition.

MR. LEGHORN: And -- I didn't mean to cut you off, Karl. Are you done?

MR. KRONENBERGER: No, I'm done. Go ahead.

MR. LEGHORN: Okay. We're well aware of, you know, item 5 and this witness is well prepared to testify as to any communications that the NFL had with, you know, plaintiff, Mr. Gill, or that the NFL or those entities there had with Deltatre, Neulion, or Overtier. But we cannot create knowledge as to what went on between Mr. Gill and Overtier/Deltatre. And so I think that's where you're coming up against the wall here.

MR. KRONENBERGER: Okay. I think what I'm hearing is that the witness is able to testify about communications between any NFL entity and Mr. Gill, but he's not able to testify between other entities, like Overtier and Mr. Gill.

MR. LEGHORN: I think that's accurate.

MR. KRONENBERGER: You sort of put us in an awkward position though, because the interrogatory responses refer to this, this document.

MR. LEGHORN: No, it does because, you know, it's, you know, your lawsuit is -- let me come at a different way. Our position has remained and always will remain that the contractual relationships, whether they were with Perform or then with Overtier were created between your client and them. And what we've done to try to move the ball along is locate as much as we can to demonstrate that. Be it from our documents or otherwise and that's what we have here. But, you know, I can't do a Vulcan mind meld to Mr. Boigon here of, you know, Deltatre, Overtier into him. I don't even have that.

BY MR. KRONENBERGER:

Q So in this second sentence it says, As a reminder from our previous e-mail we're updating. Could you -- I may have asked this question before, I apologize if it's the second time, but what does we're refer to?

A You would need to speak with Overtier as the ones who sent this e-mail.

Q Well, putting aside Overtier, but just your

understanding as your role in the NFL and you've seen a bunch of e-mails over the years from NFL and licensees of the NFL, who do you think this refers to?

A You would have to ask Overtier. I -- I cannot do a Vulcan mind meld as --

Q No, I'm just -- I'm not asking for Vulcan mind melds, I'm just asking for your personal opinion here today?

A I don't have one. You would need to ask Overtier.

Q You don't have a personal opinion about what the word we're means in this sentence?

A No.

Q I mean, do you think it like refers to President --

A You would have to ask Overtier, Karl. We can keep doing this all day, man. Come on.

MR. KRONENBERGER: We can move to the next page. Keep going. Keep going. Right there.

BY MR. KRONENBERGER:

Q Do you recognize this e-mail which was sent to Mr. Gill on July 16, 2019?

A No.

Q In the first sentence, do you know who -- what the word we refers to?

A I do not.

Q There's a date in this first paragraph of July 25, 2019. Do you know why -- date is listed in this e-mail?

A You need to speak with Overtier. I don't.

Q Do you know when the agreement between Mr. Gill and the NFL ended?

MR. LEGHORN: Objection. What agreement are you talking about?

BY MR. KRONENBERGER:

Q Let me rephrase it. Mr. Boigon, you admit that before Overtier, the NFL's position is that Mr. Gill had a contractual relationship with an NFL entity, correct?

A Sorry, can you ask the question again?

Q Yes. When Mr. Gill signed up in 2013, he entered into a contractual relationship with an NFL entity, correct?

A For the 2013/2014 season. Just for this single season.

Q Yes. And for the year after that, for the 2014 season, he had an agreement with an NFL entity, correct?

A Yes.

Q And the same for the 2015 season?

A Yes.
Q And the same for the 2016 season?
A Yes.
Q And the same for the 2017 season?
A Perform was the licensee in 2017, but the terms of service were not updated by Perform.
Q So there was still that contractual relationship with an NFL entity at the time?
MR. LEGHORN: Objection.
A The terms of service were not updated.
Q Okay. And the same for the 2018 season. Is that situation the same were the terms weren't updated, it was still an NFL entity even though Perform was --
A Perform was licensee and the terms of service were not updated by Perform.
Q So at what point did any version of terms that referenced an NFL entity where Mr. Gill was operating under, at what point did that agreement end?
MR. LEGHORN: Objection.
A I don't know the date. But Overtier was the licensee for the 2019 season.
Q Do you think that date could have been July 25, 2019?
A You would need to ask Overtier.
Q Well, this is the question about the NFL and

their relationship with Mr. Gill, right? Because I'm asking at the end of the relationship is embodied in the terms of service?

A I don't know the specific date.

Q Okay.

MR. LEGHORN: Karl, not to interrupt your flow of questioning, but we've been going about an hour and a half. So when it's appropriate, can you let us know when we can take, like, a five- or ten-minute break?

MR. KRONENBERGER: I think it's a good break here. Why don't we go off the screen share and you want to take a ten-minute break or so? Come back at 20 till?

MR. LEGHORN: Yeah, that'll be perfect.

MR. KRONENBERGER: Okay.

THE REPORTER: Okay. The time is 10:27 a.m. and we are now off the record.

(Off the record.)

THE REPORTER: The time is 10:40 a.m. and we are back on the record.

MR. KRONENBERGER: So I'd like to continue with this chronology of communications to Mr. Gill. So if we could bring that same exhibit back up which I believe is Exhibit C. If we could scroll up

just a little bit so we could see the logo at the top. Okay.

BY MR. KRONENBERGER:

Q As I mentioned right before we took a break, this is an e-mail to Mr. Gill on July 16, 2019, that is obviously communication to him. It is also referenced in responses to interrogatories to the NFL on the topic of the contract that existed between Mr. Gill and Overtier. And so I asked you, Mr. Boigon, about the date July 25, 2019. I'll ask you one more time. Is that date significant in any way to the NFL?

A No.

Q And I asked about the use of the word we in this e-mail. And do you know who we refers to?

A You would need to speak with Overtier who sent this e-mail.

Q Is there anything in this e-mail that references Mr. Gill agreeing to new terms of service?

A You would need to speak with Overtier who sent this e-mail.

Q So it sounds like you really can't testify at all about this e-mail today, correct?

A NFL did not send this e-mail, so I cannot speak to its content, purpose, et cetera. You would need to ask our licensee, Overtier.

Q We can move on to the next page. Okay. Do you recognize this document?

A I do not.

Q Okay. I think that I had shown this document to you before, but the reason it's here is that the last e-mail -- actually strike that. Can you testify about this document at all?

A I cannot.

Q Do you know what contract effective date means in this document?

A I do not.

Q Keep scrolling. Okay. We can -- let's see, hold one second here. Do you recognize any of these transactions?

A I do not.

Q And the last line that's visible here, August 2, 2019, it appears that Mr. Gill was charged, his credit card was charged $274.99 Australian dollars, does that seem accurate to you?

A I don't know. I don't -- this is not our document.

Q Okay. But this was produced by your counsel; did you know that?

A Yes.

Q And your counsel has stated that this is the

grounds in part for the contract between Mr. Gill and Overtier; do you understand that?

A Yes.

Q And you're not able to testify about it?

A I don't know anything about this document as it's not an NFL document. We didn't produce it. So I can't comment on it.

Q It was produced by the NFL --

A No, I'm sorry. Like, this is -- this is part of -- this is an Overtier document. Overtier was our licensee so I can't speak to -- I mean, you can ask me a question and I'll tell you this is an Overtier document, who was our licensee in 2019. I -- I am not responsible for this document though. I don't know what anything means on it.

Q And I am not alleging that your responsible for the document.

A Okay.

Q What I'm doing is asking you questions about the document because the NFL has stated that this document is important to the NFL's legal position.

A Okay.

Q So I'm not trying to -- again, I'm not alleging the NFL created this, I just need to get to the bottom of the NFL's position.

Maybe for this document, we could -- if we could just scroll to that last payment, scroll a little bit. Why don't we just note this August 2, 2019, date even though you can't testify about it, I'm just noting it because it's sort of foundation for the next slide, fair enough?

A [No audible response.]

Q Okay. We can move to the next slide, next page. On here we have the same date, August 2, 2019, payment processed. I'm assuming your position is changed but you're still willing to at least see that date for the foundation for the next question?

A Sorry, where?

Q Really at the end of e-mail history.

A Yep.

Q It says, your payment has been successful, August 2, 2019.

A Okay.

MR. KRONENBERGER: Okay. You can scroll a bit here. Okay, scroll just a little bit more so we can see the first e-mail. Okay. That's it.

BY MR. KRONENBERGER:

Q This says, copies of e-mails, correct? Mr. Boigon?

A At the top of the screen? Yeah.

Q Do you know what this is?
A I do not.
Q Does it appear to be template e-mails that were going on upon payments processed?
A You would have to ask our licensee, Overtier.
MR. KRONENBERGER: Okay. Continue to scroll. And we can go all the way to the next document. Keep going. Keep going. Okay. Next -- okay. Here we go. Actually, if you could go to the top of that page where it says, Updates to terms and conditions. There we go.
BY MR. KRONENBERGER:
Q This is from an e-mail that was sent October 29, 2019, a few months after the payment was processed. Are you familiar with this e-mail?
A I am not.
Q Do you know what it is?
A It looks to be a update to terms and conditions.
Q Is there any reference to Overtier in this document?
MR. LEGHORN: I can't read the bottom part of --
THE WITNESS: It looks -- per what's on the screen, it says Overtier operations on the bottom.

BY MR. KRONENBERGER:

Q Yeah, we're going to zoom -- we're going to make it bigger for you.

MR. KRONENBERGER: Okay. Why don't you scroll toward the bottom so the witness can see the full bottom? Okay.

BY MR. KRONENBERGER:

Q So the question is do you see a reference to Overtier here?

A Yes.

MR. KRONENBERGER: So let's scroll to the meat of the e-mail. No, just go to the top of the e-mail.

MR. LEGHORN: You mean the box in white.

BY MR. KRONENBERGER:

Q All right. Here we go. This is where I want to be. So in this e-mail where there's a heading that says Updates to Terms and Conditions, there's a white box that contains text, correct?

A Yes.

Q Is there any reference to the word Overtier in this white box?

A No.

Q And this e-mail which I mentioned was sent on October 29, 2019, this was after Mr. Gill was charged in

August, correct?
A You would need to ask Overtier, who sent the e-mail and managed the payment processing.
Q Okay. In the second paragraph, do you see the reference to FAQs?
A Yep.
Q And there's a hyperlink where it says you can learn more on our FAQs here?
A It appears there's the hyperlink.
Q I can submit to you that there was a hyperlink in the documents that the NFL produced. What I'm going to do is move to the next page which is going to be the content at that hyperlink. Okay. Have you seen this document?
A No.
Q Will you read to yourself the first two paragraphs and perhaps the first two bullets as well to yourself?
A Okay.
Q So it appears this is the text from just an FAQ on the NFL website. And the question in the first paragraph, second sentence --
A I don't think this was on the NFL website.
Q Okay. It appears to me that this was -- actually it may have been NFL Game Pass website.

I stand corrected.

A Yeah, this is the website operated by our licensee, Overtier.

Q In the second sentence in that first paragraph, it says that we're making updates to clarify our terms. What is the word our, O-U-R, referring to?

A You would have to ask Overtier.

MR. KRONENBERGER: We can move to the next document. Oh, I'm sorry. Sorry about that. I meant the next page. Keep going, yep. Here we go.

BY MR. KRONENBERGER:

Q So this is an e-mail that was sent on July 1, 2020. Scroll just a little bit so that we can see the full logo, just a slight amount. And this was a document produced by the NFL. Do you recognize this document?

A No.

Q In the first line it says, We're all excited. Do you know what the word we're is referring to?

A I do not.

Q Can you testify about this document at all?

A I can testify that was an e-mail sent by our licensee, Overtier.

Q Okay. We can move on to the next page. It starts with, Updates for 2020. One more.

This is an e-mail sent on July 9, 2020. Do you recognize this e-mail?

A No.

Q Scroll to the next page, right there. Is it fair to say you can't really testify anything about this document?

A I can testify that this was produced by our licensee, Overtier.

Q Scroll to the next page. This is an e-mail sent on July 31, 2020. Would you read the first few sentences of this e-mail?

A Okay.

Q The second sentence says that we wanted to let you know that your payment details are not up to date. Is it fair to say that Overtier had payment details of Mr. Gill's, but they were not up to date?

A You would need to ask Overtier.

Q So you can't testify about this e-mail?

A I can testify this was an e-mail sent by our licensee, Overtier.

Q Scroll to the next page. I think this is an identical e-mail, but it was sent August 3, 2020. I'm assuming your testimony's the same, that you can't testify much about this document.

A I can testify that this was an e-mail sent by

our licensee, Overtier.

Q We can go to the next page. Again, this is going to be an identical document that was sent on August 6, three days later, 2020. Is your testimony the same about this e-mail?

A Yes, that this was apparently sent by our licensee, Overtier.

Q Okay. We can go to the next page. This is a document that was not in the production, Bate's labeled, but it was listed as a hyperlink. So we clicked on the hyperlink and put a screen shot in here. But this is an e-mail that was sent on August 13, 2020. Do you recognize this e-mail?

A No.

Q So I'm assuming your testimony's the same, you can't testify about this e-mail?

A I can testify that this was likely sent by our licensee, Overtier.

Q I got two more. Let's go to the next page. Again, this is another one where it was sent on the August 17, 2020. It wasn't Bate's labeled so we clicked on the link and took a screen shot. Do you recognize this e-mail?

A [No audible response.]

Q Pardon me? Do you recognize this e-mail?

A No.

Q And can you testify about this e-mail?

A I can testify that this appears to be an e-mail sent by our licensee, Overtier.

Q And then I think the last e-mail in this series is the next page. This was sent on June 24, 2021. Do you recognize this e-mail?

A No.

Q And can you testify at all about this e-mail?

A I can testify that this appears to be an e-mail sent by our licensee, Overtier.

MR. KRONENBERGER: We can stop the screen share.

BY MR. KRONENBERGER:

Q So I just showed you a series of e-mails that were sent between June 19, 2019, and June 11, 2021, that were communications to Mr. Gill about his subscription for the Game Pass product. I just want to be super clear about this because I think that you had testimony about each individual communication in the series, but I wanted to clarify about the entire group of documents that you're not able to testify about the documents at all except for the fact that they were documents that were allegedly sent by Overtier?

A They appear to be documents that were sent by

our licensee, Overtier.

Q Have you ever seen the documents that I just showed you in that chronology? Have you seen them before?

A No. Not to my knowledge.

Q And I think I mentioned this, but I want to ask again, did you know that the NFL produced those documents to the plaintiff in this action?

A I defer to my counsel on what was produced.

Q I mention that because the first topic in this deposition to prepare for is defendant's discovery responses and productions in this action. So in your preparation for topic 1, did you review the documents I showed you about the series of communications over two years to Mr. Gill?

A No.

Q Another topic for the deposition was plaintiff's consent to each contract concerning Game Pass. Did you review any documents regarding how Mr. Gill consented to any contract regarding Game Pass?

A I only reviewed documents between the NFL and Mr. Gill.

Q So you have not reviewed any documents that would show any sort of contract with any other company other than the NFL, correct?

MR. LEGHORN: Objection.

A I've reviewed our contracts with our licensees. Yeah.

Q So you admit that at a certain point Mr. Gill had an agreement with the NFL, correct?

A In the 2013 through 2016 season, Mr. Gill had an agreement with the NFL.

Q The agreements auto renew though, correct?

MR. LEGHORN: Objection.

A They're seasonal agreements, for one year.

Q I understand that, but you have to admit that the NFL says that the agreements auto renew, correct?

MR. LEGHORN: Objection.

A During the time that we operated the business between 2013 and 2016, the terms of service were seasonal, only existing for one year at a time.

Q So the NFL never used the term auto renew in its agreements with customers on subscriptions?

A No.

MR. KRONENBERGER: If we could -- actually I have to rename this exhibit, bear with me. If we could go to Exhibit E on the screen share.

(Exhibit E was marked for identification.)

MR. EAGLETON: Yeah, bear with me, it gave me an error when I tried to reload the page.

MR. KRONENBERGER: Yeah, I was just renaming it. So hopefully I didn't foul it up.

MR. EAGLETON: Here we go, sorry. You said Exhibit E?

MR. KRONENBERGER: Yes.

MR. EAGLETON: Okay.

BY MR. KRONENBERGER:

Q Mr. Boigon, do you recognize this document?

A Yeah.

Q We can scroll to the bottom of the page so you can see the Bate's number. Okay. Yeah. It actually should say Exhibit E, we're going to have that fixed. But this was produced by the NFL to us. What is this document?

A Can you scroll up?

Q Yes. Scroll up a bit.

A All the way up, sorry. To the top. Yeah, this appears to be a look back into what our subscription terms and conditions were at a certain period of time between -- I don't know, around the 2012/2013 season.

MR. KRONENBERGER: Okay. Can we scroll down to paragraph F? Actually I need a number for you.

Let me see. I think it's 3-F. See the three is right there so keep scrolling. F, right there.

BY MR. KRONENBERGER:

Q If you could read through this, but it's really -- looks like the fifth line from the bottom I'd like you to read.

A Okay.

Q So you previously testified that the NFL agreements, subscription agreements with customers did not auto renew. However, this agreement does say that your annual subscription will automatically renew. So would you agree that the agreement between customers and the NFL automatically renewed every year?

MR. LEGHORN: Objection.

A No, I would not.

Q Well, do you take issue with what's written in this agreement?

A It says the terms of service and the subscription is an annual subscription that only exists for one year. At the top it says, the term begins when you purchase and ends before if start of the following year's NFL preseason.

Q Yes. And then down below it says your annual subscription will automatically renew on approximately August 1st?

A The payment will renew but the terms of service will not. The terms of service are a single year, seasonal -- annual.

Q So you're suggesting that there's a second contract that automatically renews in addition to the NFL terms of service?

MR. LEGHORN: Objection.

A No.

Q Well, what is automatically renewing with the customers?

A You will be -- it looks to say that you will be billed, but the terms of service are seasonal.

Q Even though the terms of service are seasonal, they can be renewed, correct?

A Each year the terms of service are renewed.

Q How are they renewed?

A How are they renewed?

Q Yes.

A It says the term begins when you purchase and ends before the start of the following year per this one specific year. I don't know if the terms of updated in subsequent years.

Q So what does a person have to do in order to have this agreement renew automatically?

A I don't know.

Q Let me restate that. What does a person need to do in order to have this allegedly one year or seasonal agreement renew for another season?

A It can -- this -- the terms of service cannot be renewed for another season. They are only for a single season.

Q Well, what happens if someone does not renew a subscription agreement, but they continue to get billed?

A Sorry, I don't understand the question.

Q Mr. Gill had an agreement with the NFL for multiple seasons, correct?

A For individual seasons, yes, between the 2013 and 2016 seasons.

Q For let's just say the 2014 season, how do you know that Mr. Gill wanted to keep his subscription for another year? Another season?

A You'd have to ask him.

Q Well, what did he do to tell the NFL that he wanted to continue?

A He paid.

Q But doesn't the payment happen automatically?

A You have the ability to opt out of the payment.

Q So it's a negative option, in a way. In other words, if Mr. Gill did nothing, the agreement would

renew.

A The payment would renew, a new term of service would begin.

MR. KRONENBERGER: If we could refresh and put Exhibit F on the screen?

(Exhibit F was marked for identification.)

BY MR. KRONENBERGER:

Q Mr. Boigon, do you recognize this document?

A Can you scroll through it?

Q Yes. We can scroll through this document.

A Yes.

Q We can go back to the top. What is this document?

A Seems to be my counsel's responses.

Q Let's go to page 2. First question, if you contend that you entered a contract with plaintiff, identify each contract, the contract start date, and the contract end date.

And I'm not going to read through this first part, but we can slowly scroll to the next page. Okay. Stop there. There's a paragraph that starts with, for his 2019 NFL season, do you see that?

A Yep.

Q It says, for his 2019 NFL season Game Pass

International subscription, plaintiff contracted with third parties Overtier Operations and Deltatre SPA on August 2, 2019. And then there's a Bate's number. So there's a statement about a contract that was created and a reference to this Bate's number. So do you see that?

A Yep.

Q And do you stand by this statement that plaintiff, Mr. Gill, contracted with Overtier and Deltatre?

A On the 2019 season?

Q Yes.

A Yes, they are our licensee.

Q And do you see how the documentary support for this statement are these two Bate's numbered documents, DEF164 through 170; do you see that?

A I see that.

MR. KRONENBERGER: Okay. We can introduce Exhibit G now onto the screen.

(Exhibit G was marked for identification.)

Okay. Let's scroll down one page.

BY MR. KRONENBERGER:

Q First you can see how this is -- this is not the right document which is my fault here. Bear with

me.

I just introduced Exhibit H. Sorry for that snafu.

(Exhibit H was marked for identification.)

MR. KRONENBERGER: Okay. If we could scroll down to Bate's 163? Actually Bate's 164 is what we need.

BY MR. KRONENBERGER:

Q Okay so this is -- I'm sorry? So this is Bate's number 164 and there was the reference so the support for the contract between Overtier and Deltatre were these documents provided by your counsel. Bate's 164 through 170. So why don't we slowly scroll through 164 through 170.

Mr. Boigon, are you familiar with these documents?

A They appear to be submitted by my counsel.

Q Do you believe that they are support -- that Plaintiff Gill contracted with Overtier and Deltatre for the 2019 NFL season?

A Yes.

Q How do they reflect the contract?

A Sorry, can you repeat it?

Q Do you see any reference in these documents

about Mr. Gill agreeing to a contract?

MR. LEGHORN: Objection.

A You would need to discuss it with Overtier as they are the owners of these documents.

Q So you're not prepared to explain how these documents can prove that Plaintiff Gill contracted with Overtier and Deltatre?

MR. LEGHORN: Objection.

A The -- these appear to be documents provided by Overtier. And so I would defer to them on the content.

MR. KRONENBERGER: If we go to the next page and look at question 2 -- I'm sorry. Let's go back to the interrogatories which I think are two Exhibits back. Yes, thank you. And if we can go to question 2. There we go. Actually go up a bit and Mr. Boigon -- scroll down a little bit so we can see question 2. There we go, right there.

BY MR. KRONENBERGER:

Q Mr. Boigon, could you read interrogatory number 2 to yourself?

A Okay.

Q So this interrogatory deals with the termination of any contract between the NFL and Mr. Gill, correct?

A Yeah.

Q And these are interrogatories to the NFL so the word, your contract, means the NFL's contract, would you agree with me there?

A No. It would be NFL International.

Q Okay. I believe that all of the NFL entities were included in the definition of you and your. I think -- but the point of my question is that I'm not asking you about Overtier contracts.

A Okay.

Q Or any contracts with any company other than an NFL entity; is that fair?

A [No audible response.]

Q And this question asks if the NFL contends that any contract has been terminated identify the termination date, the documents that support it, and facts supporting it. Is that a fair summary of this question?

A Yes. Sorry, can you scroll a little bit?

Q Yeah. So we can let you read -- if you want you can read through it, I was going to ask you a question about the sentence buried in this. If you would like, you can read it to yourself first?

A Yeah, that would be great.

THE WITNESS: Can you scroll up a little

bit more, Jasper? Just so I can see the full second page?

MR. LEGHORN: No, the other way. Yeah, that way.

THE WITNESS: Sorry, yeah right there. Okay.

BY MR. KRONENBERGER:

Q Okay. So if we can go to in the middle, there is a sentence that starts with, rather, on August 2, 2019. It's sort of buried in there. See that, so I'm just going read it here.

Rather, on August 2, 2019, plaintiff purchased his Game Pass International subscription for the 2019 NFL season from and entered into a contract solely with Overtier Operations and its third-party operator, Deltatre SPA.

Is there anything that Mr. Gill was given or shown by the NFL, or Overtier, or Deltatre that said that his Game Pass subscription was terminated with the NFL?

MR. LEGHORN: Objection.

A The terms of service for that season ended on, I believe if you scroll up and read the response on July 25, 2019.

Q But if he didn't do anything, that

subscription would renew, correct?

A No.

Q But didn't you testify previously that if a consumer would do nothing with the NFL for the previous seasons, 2014, 2015, 2016 that the -- would renew?

MR. LEGHORN: Objection.

A No. Did not testify to that.

Q So let's go back to this issue then. Let's go to the 2014 season, a year after Mr. Gill signed up. He obviously received Game Pass for 2014. But there's nothing that Mr. Gill did or said to cause the contract to renew, correct?

MR. LEGHORN: Objection.

A No, that's not correct.

Q What did he do to cause the contract to renew?

A The contract did not renew, he paid and then a new contract began.

Q So you're saying that the payment itself triggered a new contract to begin?

A Correct.

Q And you also agree that the payment was an automatic payment?

A No, he had the ability to opt out of the payment, it's not automatic.

Q But if he did not opt out, then it would

automatically charge his card, correct?

A For the -- between 2013 and 2014? Yes.

Q So for the 2019 season, Mr. Gill's credit card was charged, correct?

MR. LEGHORN: Objection.

A You would need to ask our licensee, Overtier.

Q Well, Mr. Gill has alleged that he was charged, and I don't think anybody's denied that he was charged. Am I right there?

MR. LEGHORN: Objection.

A We did not operate the product in 2019. You would have to ask our licensee, Overtier, to what extent he was charged.

Q Well, let's assume that he was charged. That would mean that the agreement would restart, correct?

MR. LEGHORN: Objection.

A No.

Q Well, didn't you just tell me a few minutes ago that the agreement would restart upon each payment each year?

MR. LEGHORN: Objection.

THE WITNESS: Sorry.

MR. LEGHORN: Go ahead, Max.

THE WITNESS: That was only when NFLE operated the product between 2013 and 2016. I am not

privy to what the terms of service were for the 2019 season when Overtier, our licensee, operated the product.

BY MR. KRONENBERGER:

Q But Mr. Gill was still working under the NFL terms when he was charged on August 2, 2019, correct?

MR. LEGHORN: Objection.

A No, he was not.

Q You're saying that at the time he was charged, August 2019, he was working under terms of service of Overtier and not terms of service of the NFL?

A Correct.

Q Now, I can bring this up if you want, but I did show you an e-mail that said that there were updates to terms of service that were sent in October of 2019. Is that the e-mail that you are referring to that somehow changed the terms of service for Mr. Gill?

MR. LEGHORN: Objection.

A No, that is not.

Q Well, how did Mr. Gill get knowledge of terms of service changing from the NFL to Overtier?

A You would need to ask our licensee, Overtier. Per this response, our agreement ended on July 25, 2019.

Q Can you testify at all about what Mr. Gill received, saw, heard, that would give him notice that

there were new terms of service that he was supposedly agreeing to with a different company called Overtier?

A No.

Q Is that perhaps because there wasn't any notice to him about these new terms?

MR. LEGHORN: Objection.

A You would need to ask our licensee for the 2019 season, Overtier.

Q Well, if you don't know, it's a possibility that there was no notice, correct?

MR. LEGHORN: Objection.

A You would need to ask our licensee for the 2019 season, Overtier.

Q Yes, and we can talk about that, but based on your knowledge here, you have no knowledge of any consent whatsoever of Mr. Gill to any terms of any other company, correct?

MR. LEGHORN: Objection.

A You would need to ask our licensee for the 2019 season, Overtier.

Q And I'm referring to your personal knowledge about information that is in the hands of the NFL, you just don't know.

A I don't know.

Q Regarding question 3 if we can scroll just a

bit. Could you read that to yourself, question 3?

A Yeah. Okay.

Q I believe you testified that there wasn't any transfer of an agreement to a third party. Instead, you testified that the agreement between Mr. Gill and the NFL ended, correct?

A Per I think our response here to number 2, it says the agreement ended on July 25, 2019.

Q Who had the contract with Endeavor Streaming for -- let me restate that. Starting in the 2019 season, was there an agreement with a company called Endeavor Streaming? A contract between the NFL and Endeavor Streaming?

A No.

Q Was there a contract for the 2019 season between Overtier and Endeavor Streaming?

A You would need to ask Overtier.

Q We can go to question 8. Okay. Could you read this to yourself? This references Endeavor Streaming.

A Okay. Okay.

Q First off, what is Endeavor Streaming?

A Neulion. It's the same, just changed the name.

Q I see. That clears it up.

A Okay.

Q That's the great thing about deposition, you can get cleared up very quickly. Or not.

MR. KRONENBERGER: I'm approaching the end. I would propose we take probably a five-minute break unless people need more. I can just make sure that I've covered everything I need. Is that -- and we can stop the screen share.

MR. LEGHORN: Five minutes is fine with me to give you a moment to look through.

MR. KRONENBERGER: Yeah. Why don't we come back at five till?

MR. LEGHORN: You know, and so a ten-minute break, in other words?

MR. KRONENBERGER: Eight-minute break.

MR. LEGHORN: Eight-minute break. Okay. Okay. Okay. Fine.

THE REPORTER: Okay. The time is 11:46 a.m. and we are now off the record.

(Off the record.)

THE REPORTER: The time is 11:55 a.m. and we are back on the record.

MR. KRONENBERGER: I have no further questions.

MR. LEGHORN: Okay. Thank you. I have

no questions at all, so I guess we're done.

MR. KRONENBERGER: We are indeed.

MR. LEGHORN: Okay. Thank you.

THE REPORTER: All right. And the time is 11:55 a.m. We are now going off the record.

(Signature reserved.)

(Whereupon, at 11:55 a.m., the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, MOLLY MCCOLM, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

MOLLY MCCOLM
Notary Public in and for the
State of California

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, ALLISON REYNOLDS, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ALLISON REYNOLDS

THOMAS A. LEGHORN, ESQUIRE

tleghorn@londonfischer.com

MARCH 8, 2022

RE: SIETEL SINGH GILL v. NATIONAL FOOTBALL LEAGUE

MARCH 4, 2022, MAX BOIGON, 5116627

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) — Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

SIETEL SINGH GILL v. NATIONAL FOOTBALL LEAGUE

MAX BOIGON (#5116627)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

PAGE_____ LINE_____ CHANGE______________________________

____________________________________________________________

REASON______________________________________________________

________________________________________    ___________________

WITNESS                                                    Date

**&**

**&** 4:11,16 79:23 80:9

**1**

**1** 38:24 39:16,23 39:24 40:8 54:12 58:13 80:1
**10** 19:9
**10038** 2:17
**10154** 3:6
**1032** 1:9
**10:40** 46:20
**11** 57:16
**11:55** 75:21 76:5,7
**13** 34:16 56:12
**14** 4:8
**15** 36:11
**150** 2:5
**16** 43:22 47:5
**163** 66:7
**164** 66:7,11,14,15
**17** 56:21
**170** 65:16 66:14,15
**19** 36:22 37:9,24 38:8 57:16
**1:21** 1:9
**1st** 61:25

**2**

**2** 36:10 48:17 50:3 50:9,17 64:16 65:3 67:13,15,18 67:21 69:9,12 72:6 74:7
**20** 46:14
**2012/2013** 60:23
**2013** 44:16 59:6,15 63:12 71:2,25
**2013/2014** 44:19
**2014** 44:22 63:14 70:5,9,10 71:2
**2015** 44:25 70:5
**2016** 12:11 21:7 45:2 59:6,15 63:13 70:5 71:25
**2017** 11:8,15 12:11 12:21 13:1 14:4 16:1,3,7,13 21:7,7 24:13,14 28:6 45:4,5
**2018** 13:2 21:4,9 21:23,25 22:11,18 28:6 45:11
**2019** 12:24 13:3 21:5,24,25 22:11 27:15,24 31:13 32:20 34:16 36:22 37:9,24 38:4,8,24 38:24 39:16,16,23 39:24 40:8,19,19 43:22 44:3 45:21 45:23 47:5,10 48:17 49:13 50:3 50:9,17 51:14 52:25 57:16 64:23 64:25 65:3,11 66:21 69:10,12,13 69:24 71:3,11 72:1,6,10,15,23 73:8,13,20 74:8,10 74:15
**2020** 54:13,25 55:1 55:10,22 56:4,12 56:21
**2021** 57:7,16
**2022** 1:18 5:9 79:3 79:5
**2025.520** 79:9,12
**24** 57:6
**25** 38:24 39:16 44:3 45:23 47:10 69:24 72:23 74:8
**25728** 77:16
**27038** 78:14
**274.99** 48:18
**28** 31:13 32:20
**29** 4:7 51:14 52:25

**3**

**3** 55:22 61:1 73:25 74:1
**30** 4:7,9 80:1
**31** 55:10
**32** 37:11
**345** 3:5
**35** 4:10
**39th** 2:16

**4**

**4** 1:18 5:9 79:5

**5**

**5** 41:14
**5116627** 1:23 79:5 81:2
**520** 2:6
**59** 2:15 4:11

**6**

**6** 4:7 56:4
**64** 4:13
**65** 4:15
**66** 4:16

**7**

**7** 4:3

**8**

**8** 74:18 79:3

**9**

**9** 55:1
**90305** 1:21
**94108** 2:7
**9:06** 1:19 5:5

**a**

**a.m.** 1:19 5:5 46:18,20 75:19,21 76:5,7
**ability** 63:22 70:23 77:9 78:7
**able** 15:19 17:15 41:22,24 49:4 57:22
**absent** 5:14
**account** 4:14
**accurate** 42:1 48:19 77:8 78:5
**acknowledgeme...** 5:11
**acting** 24:17
**action** 1:8 58:8,12 77:11,15 78:8,12
**active** 20:22
**addition** 62:5
**additionally** 5:14
**address** 23:20 31:5,11 32:21,23
**addresses** 23:1
**administer** 5:11
**admit** 40:13 44:11 59:4,11
**advanced** 8:20,21
**advantage** 16:23
**advantages** 17:10
**advertising** 17:20 17:22
**ago** 71:19
**agree** 5:12,16 22:24 23:2,9 29:13 32:2,7,25 33:6,12 61:12 68:4 70:21
**agreeing** 47:18 67:1 73:2

[agreement - boigon]

**agreement** 12:20 13:6,10 14:10 15:13,18,18 16:1,7 16:13,17 18:18 19:12 20:2,19,22 25:20 26:19,22 27:1,2,2,7,12 40:15 44:6,8,22 45:18 59:5,7 61:10,12,17 62:24 63:3,8,10,25 71:15 71:19 72:23 74:4 74:5,8,11
**agreements** 13:15 13:19 14:6,7 20:15 25:22 26:2 27:16 59:8,10,12 59:18 61:9,9
**ahead** 29:8 41:12 71:23
**alessio** 31:5
**alleged** 71:7
**allegedly** 57:24 63:2
**alleging** 49:16,24
**allison** 78:2,15
**amended** 15:18 29:13,16
**amendment** 16:2
**amount** 22:25 54:14
**angeles** 1:21
**ani** 15:25
**annual** 61:11,19 61:23 62:3
**answers** 9:8 41:3
**anybody's** 71:8
**anymore** 21:15
**apologize** 39:24 42:21
**apparently** 56:6
**appear** 13:5,9,14 13:19 31:7 51:3 57:25 66:18 67:9
**appearing** 79:18 80:7
**appears** 15:18 32:2 48:17 53:9 53:20,24 57:3,10 60:20
**applicable** 5:20
**approaching** 75:4
**appropriate** 46:8
**approximately** 7:19 8:13,23 61:24
**apps** 38:17
**aside** 23:18 42:25
**asked** 42:20 47:9 47:13
**asking** 28:10 31:21 39:4,14 43:6,7 46:2 49:19 68:9
**asks** 68:14
**aspect** 23:3
**assigned** 5:3
**assist** 10:23 33:22
**associated** 31:7
**association** 1:11
**assume** 71:14
**assuming** 11:11 29:24 50:10 55:23 56:15
**assumption** 36:8
**attached** 4:18
**attendance** 6:1
**attorney** 6:3 77:13 78:10
**attorneys** 41:4
**audible** 50:7 56:24 68:13
**audio** 77:7 78:3
**august** 48:17 50:3 50:9,17 53:1 55:22 56:4,12,21 61:25 65:3 69:9 69:12 72:6,10
**australia** 21:21,22 22:10 23:8 24:19 31:18,19 38:5
**australian** 22:16 22:20 23:24 25:11 26:14 27:11 48:18
**authorized** 5:10
**auto** 59:8,12,17 61:10
**automatic** 70:22 70:24
**automatically** 61:11,13,24 62:5,9 62:24 63:21 71:1
**avenue** 3:5
**aware** 12:6 16:6 16:14 18:17 19:11 19:19 41:13
**awkward** 41:3 42:3

**b**

**b** 4:5,7,8 14:19,20 15:9 80:1
**back** 9:15 11:9 12:8 16:3 21:3 30:6,22 31:12 34:2 36:17 37:2 46:13,21,24 60:20 64:13 67:13,15 70:8 75:12,22
**background** 33:18
**ball** 42:11
**based** 73:14
**basics** 7:12
**bate's** 30:20,21 33:8,17 37:1 38:10 39:22 56:9 56:21 60:13 65:3 65:5,15 66:7,7,11 66:13
**baton** 21:10
**bear** 14:18 19:7 28:21 59:21 60:1 65:25
**began** 70:17
**beginning** 6:2 9:6 21:1 37:11
**begins** 61:20 62:19
**behalf** 1:5 2:2,10 3:2 20:13
**believe** 14:16 16:12 17:22 18:19 19:5 20:4 21:9 23:15 24:10 25:16 25:19 27:15 34:7 46:25 66:19 68:6 69:23 74:3
**best** 77:9 78:6
**beyond** 28:14
**bigger** 52:3
**billed** 62:12 63:8
**bit** 23:19 33:10 47:1 50:3,20,20 54:13 60:18 67:16 67:17 68:19 69:1 74:1
**board** 18:6,7
**boigon** 1:17 2:12 5:6 6:11,14,14 7:2 7:10 15:9 29:5,10 29:16,24 30:19,24 34:2 35:7 36:25 37:5 42:14 44:11

47:9 50:24 60:10 64:9 66:16 67:17 67:20 79:5 81:2
**bottom** 30:19 31:24 32:7 35:14 36:25 49:25 51:22 51:25 52:5,6 60:12 61:5
**box** 52:14,19,22
**brand** 25:5
**break** 9:12,13 46:10,12,13 47:4 75:6,14,15,16
**breaks** 9:10
**brief** 9:16
**bring** 28:21,25 46:24 72:13
**buchwald** 3:3 6:12 6:12
**building** 26:9
**bullets** 53:17
**bunch** 35:8 43:2
**buried** 68:22 69:10
**business** 10:18 12:12 17:6 19:22 28:5 59:14
**butchered** 34:6

**c**

**c** 2:1 3:1 4:9 5:1 30:7,8 36:17 46:25
**ca** 1:21 2:7 79:9,12 79:20
**california** 5:11 77:19
**call** 7:16 8:11 11:4 27:6,9
**called** 7:3 11:12 13:14 14:11,12 18:25 24:21 25:14 27:18 73:2 74:11
**card** 23:12 32:13 48:18 71:1,3
**cards** 23:1
**case** 23:14 27:1
**cause** 70:11,15
**caused** 38:25
**ccp** 79:9,12
**certain** 22:13 23:16 24:19 59:4 60:21
**certainly** 28:14
**certificate** 77:1 78:1
**certified** 5:16
**certify** 77:3 78:2
**cetera** 47:24
**change** 81:4,7,10 81:13,16,19
**changed** 50:11 72:17 74:23
**changing** 72:21
**characterized** 26:12
**charge** 71:1
**charged** 48:17,18 52:25 71:4,8,9,13 71:14 72:6,9
**chronological** 36:11
**chronology** 46:23 58:3
**circuit** 19:19
**civil** 1:7 79:19,20
**clarification** 29:21
**clarify** 54:5 57:21
**clear** 57:19
**cleared** 75:3
**clears** 74:25
**click** 35:16
**clicked** 38:8 56:10 56:21
**client** 42:10
**code** 79:9,12,19,20
**college** 9:3
**column** 35:17
**columns** 36:10
**come** 30:6 42:6 43:17 46:13 75:12
**coming** 18:21 41:20
**comment** 34:3 37:21 49:7
**commercially** 18:19 19:16
**commitment** 40:6
**communication** 47:6 57:20
**communications** 40:23,25 41:7,15 41:23 46:23 57:17 58:14
**companies** 34:4
**company** 1:13 8:24 9:1 11:12 13:4,8,9 14:11,11 16:16 23:10 24:20 25:14 32:22 34:9 58:24 68:11 73:2 73:17 74:11
**completed** 79:7,17 80:6
**completion** 80:10
**comprised** 22:25
**concerning** 10:22 13:10 58:18
**concluded** 76:8
**concurrently** 10:14
**conditions** 4:11,16 51:10,19 52:18 60:21
**consent** 58:18 73:16
**consented** 58:20
**consolidated** 4:9 12:24,25
**constitute** 5:24
**consumer** 7:22 23:1,11 70:4
**consumers** 13:6 13:10 14:8 20:16 23:2 25:10,11,19 25:20,23 26:2,6,14 26:15,17 27:11
**cont'd** 3:1
**contact** 23:11 79:9
**contains** 14:14 32:8 52:19
**contend** 64:17
**contends** 68:14
**content** 17:20 18:25 36:2 38:12 47:24 53:13 67:11
**continue** 46:23 51:6 63:8,19
**contract** 4:8 14:14 16:4 18:13,25 24:10,15 28:2,11 39:7,12 41:6 47:8 48:9 49:1 58:18 58:20,24 62:5 64:17,18,18,19 65:4 66:12,23 67:1,24 68:3,3,15 69:14 70:11,15,16 70:17,19 74:9,12 74:15
**contracted** 11:23 21:6 65:1,9 66:20 67:6

[contracting - documents]

**contracting** 27:19 27:22
**contracts** 28:9 59:2 68:9,11
**contractual** 42:8 44:13,17 45:7
**control** 18:1,6 23:22
**controlled** 24:4
**coo** 8:25
**copies** 50:23
**corporate** 9:19 18:1
**correct** 11:7,18 13:16,21 15:15 22:20 23:20,24 24:4,11,21 27:13 27:19 28:3,12 31:8,17 32:22 34:17 44:14,18,23 47:22 50:23 52:19 53:1 58:25 59:5,8 59:12 62:14 63:11 67:25 70:1,12,14 70:20 71:1,4,15 72:6,12 73:10,17 74:6
**corrected** 54:1
**correcting** 22:1
**corrections** 79:14 79:15 80:3,4
**counsel** 7:7 19:6 30:17 33:13 35:12 48:22,25 58:9 66:13,18 77:10,13 78:7,10 79:18,21 80:7
**counsel's** 64:15
**court** 1:1
**covered** 75:7
**create** 41:18
**created** 16:17 31:12 33:1 34:16 42:10 49:24 65:4
**credit** 23:1,12 32:13 48:18 71:3
**current** 17:14
**custody** 23:22 33:24
**customers** 13:15 13:15,20,24 14:1 59:18 61:9,12 62:10
**cut** 41:9
**cv** 1:9

**d**

**d** 4:1,10 5:1 34:23 35:1,6
**data** 22:25 23:11 23:15,16,18,23 24:2 25:6,10 26:6 26:7,10,15,16 35:8 36:12
**database** 31:12 33:1
**date** 1:18 29:17 35:18,18 36:12 44:2,3 45:20,22 46:4 47:10,11 48:9 50:3,9,12 55:14,16 64:18,19 68:16 79:16 80:5 81:24
**dates** 38:23,25 39:15
**day** 9:11 43:17
**days** 56:4
**deal** 23:10 28:1
**deals** 67:23
**decision** 12:12,16 12:19 17:3
**deep** 23:7
**deeper** 22:23
**def** 33:18
**def164** 65:16
**def167** 30:20
**def196** 39:22
**defendant's** 4:12 58:11
**defendants** 1:14 2:10 3:2
**defer** 26:19 33:13 58:9 67:10
**defined** 19:12
**definition** 68:7
**delaware** 1:12
**delta** 20:4
**deltatre** 20:2,8,12 20:15 25:12,13 31:8,11,16,21 33:22 41:17,19 42:15 65:2,10 66:12,20 67:7 69:16,18
**demonstrate** 42:12
**denied** 71:8
**deposed** 9:4
**deposition** 1:16 4:7 5:6,22 29:13 29:14,18,23 40:23 41:8 58:11,17 75:2 77:1 79:19 79:22,24 80:8,10
**describe** 9:18 13:13 34:8
**description** 4:6 34:7
**details** 55:14,15
**determined** 79:18 79:22 80:7
**developed** 21:5
**developing** 12:17
**different** 42:7 73:2
**dig** 22:23 23:7
**digital** 77:7 78:3
**direct** 7:21 11:2 12:7 13:24 14:1 20:10
**directly** 14:8 20:15 25:22 26:2
**director** 7:21 8:2,6
**disclosed** 33:14
**discovery** 58:11
**discuss** 20:17 40:24 67:3
**displayed** 34:24
**distribution** 18:25
**district** 1:1,2
**document** 15:8,10 19:9,20 29:5,10,12 30:16 33:19 34:15 35:9,12,22 37:4 38:10 41:5 42:4 48:2,4,7,10,21 49:5,6,10,12,14,17 49:20,21 50:1 51:7,21 53:14 54:9,15,16,21 55:6 55:24 56:3,9 60:10,16 64:9,11 64:14 65:25
**documentary** 65:14
**documents** 28:16 30:13 36:10 39:8 39:9 40:14 42:12 53:11 57:21,22,23 57:25 58:2,8,13,19 58:21,23 65:15 66:13,17,25 67:4,6 67:9 68:16

doing 9:7 36:14 43:17 49:19
dollars 48:18
domestic 10:2 12:2
draft 25:21
due 11:10 17:14
duly 7:3 77:5

e

e 2:1,1 3:1,1 4:1,5 4:11 5:1,1 23:20 31:4,11 32:21,23 35:25 36:3,8,22 37:8,19,19,24 38:7 38:12,14 39:3,21 39:25 40:8,9,10,12 42:19,24 43:2,21 44:4 47:5,14,16,17 47:20,22,23 48:6 50:14,21,23 51:3 51:13,15 52:12,13 52:17,24 53:3 54:12,22 55:1,2,9 55:11,18,19,22,25 56:5,12,13,16,23 56:25 57:2,4,5,7,9 57:11,15 59:22,24 60:6,14 72:14,16 79:9,12 80:1 81:3 81:3,3
eagleton 3:10 6:16 6:17 14:24 60:1,5 60:8
early 21:3
effective 48:9
efforts 33:21
eight 75:15,16
elements 10:2
emails 4:10
embodied 46:2
employed 77:10 77:13 78:8,10
employee 9:25 77:13 78:10
employer 7:13 8:8 8:19
employment 8:18
endeavor 74:9,12 74:13,16,19,22
ended 44:7 69:22 72:23 74:6,8
ends 61:21 62:20
engage 16:16
enter 12:20 20:15 25:22 26:1
entered 16:1 24:15 25:20 28:23 39:7 44:17 64:17 69:14
enterprises 1:11 2:11 5:8 6:10 8:10
entire 57:21
entities 41:17,24 68:6
entity 16:25 26:13 27:12 41:23 44:14 44:18,22 45:8,13 45:17 68:12
errata 79:14,16 80:3,5
error 60:2
es 77:4
especially 41:4
esquire 2:3,13 3:3 79:1
et 47:24
europe 18:9
eventually 12:22
evidence 39:6,12
evidentiary 5:21
examination 4:2 7:8
examined 7:5
example 27:1
excel 35:5
excited 54:18
exhibit 4:7,8,9,10 4:11,12,14,16 14:19,19,20,23 15:2,9 19:25 28:21,22,23 29:1,2 30:7,7,8,21 34:22 34:23,23 35:1,4,6 36:17 46:24,25 59:21,22,24 60:6 60:14 64:5,6 65:19,20 66:2,4
exhibits 4:18 67:14
exist 39:13
existed 28:17 47:8
existing 59:16
exists 61:19
experience 11:11 40:7
explain 15:17 67:5
explained 39:6
explanation 16:4 39:14
extent 71:12
external 19:5

f

f 4:12 60:25 61:1,2 64:5,6
fact 57:23
facts 68:17
failed 9:6,9 14:3
fair 32:15 50:6 55:5,15 68:12,17
fairly 22:12
familiar 11:11 14:12 18:9 29:24 51:15 66:16
faq 53:21
faqs 53:5,8
far 35:18
fault 65:25
federal 80:1,8,9
feel 17:9 41:1
fifth 61:5
file 35:6
financially 77:14 78:11
fine 7:16 75:9,17
firm 6:5,8 35:12
first 7:3 15:13 29:6,7 35:18 37:10,10 40:2 43:24 44:2 50:21 53:16,17,21 54:4 54:18 55:10 58:10 64:16,20 65:24 68:23 74:22
fischer 2:14 6:8
five 46:9 75:5,9,12
fixed 60:14
flipping 10:6
floor 2:16
flow 46:7
folder 34:23
following 61:21 62:20
follows 7:5 79:8
football 1:9,17 2:10,11 3:2,4 5:8 6:9,10,13,15 7:14 8:10 79:4 81:1
foregoing 77:3,4 78:4
formation 41:6
formed 14:12 16:9
foul 60:4
foundation 50:5 50:12

founder 8:25
four 7:19,23
francisco 2:7
frcp 80:1
friday 1:18 5:8
friendly 33:21
full 52:5 54:14 69:1
further 75:23 77:12 78:9

**g**

g 4:14 5:1 65:19 65:20
gambling 17:19
game 11:15 32:10 53:25 57:18 58:18 58:20 64:25 69:13 69:19 70:10
gaming 17:20
general 9:16
generally 22:9
getting 33:22
gill 1:4 2:2 5:7 26:22,25 27:7,12 27:15,19,22 28:2 28:11 30:12 31:19 32:3,8,13 34:17 36:1,9 37:8 38:7 38:15 39:7,13,23 40:16,25 41:16,19 41:23,25 43:22 44:7,13,16 45:17 46:1,24 47:5,8,18 48:17 49:1 52:25 57:17 58:15,20,22 59:4,6 63:10,15,25 65:9 66:20 67:1,6 67:25 69:17 70:9 70:11 71:7 72:5 72:17,20,24 73:16 74:5 79:4 81:1
gill's 31:22 55:16 71:3
give 29:16 37:25 72:25 75:10
given 39:14 69:17
go 9:11 12:8 19:17 21:3 23:7 29:8 32:20 36:17,18 38:16,18 41:11 46:12 51:7,9,9,11 52:12,16 54:10 56:2,8,19 59:22 60:5 64:13,16 67:12,13,15,16,16 67:18 69:8 70:8,8 71:23 74:18
goes 28:13
going 7:12,15 8:11 9:10,11,17 14:18 16:16 18:14 19:17 23:19 25:10 28:21 30:10,12,14 32:20 34:2 35:4,11,24 36:7,9,11 38:13,14 38:14 39:19 43:19 43:19 46:7 51:4,8 51:8 52:2,2 53:11 53:12 54:10 56:3 60:14 64:20 68:21 69:11 76:5
good 5:2 6:4,7,14 6:16 7:10,11 9:7 9:23 15:5 36:19 46:11
great 7:17 68:24 75:2
grounds 49:1
group 8:20,22 57:21
guess 11:7 40:13 76:1

**h**

h 4:5,16 66:2,4 81:3
half 8:23 46:8
hand 6:21
handed 22:6 32:16
handle 25:10
handled 79:8
handling 22:5
hands 73:22
happen 63:21
happening 38:24
happens 63:7
hard 35:8
head 8:15 9:8
heading 52:17
headings 35:17
hear 39:10 40:21
heard 72:25
hearing 6:19 41:22
held 7:23 14:5
helps 34:3
hereto 77:14 78:11
hey 9:21
high 9:3
hint 37:25
history 4:15 50:14
hold 8:16 48:13
hopefully 60:4
host 12:1
hour 46:7
hyperlink 53:7,9 53:10,13 56:10,11

**i**

idea 31:11
identical 38:9 55:22 56:3
identification 14:21 29:3 30:9 35:2 59:25 64:7 65:21 66:5
identify 6:2 35:8 64:18 68:15
imagine 19:16
implement 32:3,9
implementing 22:15
important 49:21
include 10:4,19
included 11:20 68:7 79:14 80:3
including 27:10
individual 36:25 57:20 63:12
individually 1:4
individuals 1:6
information 4:14 19:22 23:2,11,19 26:7,16 31:22 32:2,8,13 73:22
initial 15:25
initially 12:21 16:5,13 21:6
intended 5:19
interest 17:23
interested 77:14 78:11
internal 19:5
international 7:14 10:17 11:16,21,24 12:9 21:16 22:5 25:15 27:24 65:1 68:5 69:13
internationally 17:21
interrogatories 4:13 39:6 47:7 67:14 68:2
interrogatory 42:3 67:20,23

**interrupt** 46:6
**introduce** 14:18 65:19
**introduced** 15:8 66:2
**involve** 35:18
**involves** 23:11
**issue** 61:16 70:8
**item** 41:14

**j**

**jasper** 3:10 6:16 14:22 69:1
**job** 1:23 9:7
**joining** 8:8
**july** 38:24,24 39:16,16,24 40:8 43:22 44:3 45:23 47:5,10 54:12 55:1,10 69:24 72:23 74:8
**june** 34:16 36:22 37:9,24 38:8 39:23 57:6,16,16

**k**

**karl** 2:3,8 6:5 9:21 15:1,22 28:13 29:15 41:10 43:16 46:6
**keep** 18:14,15,20 23:15 29:8 39:19 39:19 43:17,19,19 48:12 51:8,8 54:10 61:2 63:15
**know** 9:8,12 16:8 16:15,19 17:12,18 17:19 19:1,14 20:17 21:10,19 22:6,17 25:9,13,21 25:25 26:1,4 28:13,15 29:6 31:4 32:12 34:9 34:10,11,12 35:7 37:16,20,22 38:2 39:15 40:7 41:14 41:16 42:6,6,13,15 43:24 44:3,6 45:20 46:4,9 47:14 48:9,20,23 49:5,14 51:1,17 54:19 55:14 58:7 60:22 62:21,25 63:15 73:9,23,24 75:13
**knowledge** 13:12 14:9 18:8 20:21 24:16 27:5 41:18 58:5 72:20 73:15 73:15,21 77:9 78:6
**knowledgeable** 1:16
**krinternetlaw.com** 2:8
**kronenbeger** 36:18,24
**kronenberger** 2:3 2:4 3:10 4:3 6:4,5 6:5,17 7:9 9:23,24 14:22 15:5,7,23 16:20,22 18:5,12 18:16,20,23 19:8 19:10,24 20:1 28:18,20,25 29:4 29:20,22 30:18,23 31:1,3,24 32:1 33:9,11,25 34:1,21 35:3 36:20 37:3 38:16,19 39:18,20 41:11,21 42:2,17 43:18,20 44:10 46:11,16,22 47:3 50:19,22 51:6,12 52:1,4,7,11,15 54:8,11 57:12,14 59:20 60:3,7,9,24 61:3 64:4,8 65:18 65:23 66:6,9 67:12,19 69:7 72:4 75:4,11,15,23 76:2

**l**

**labeled** 15:8 33:17 35:6 37:1 56:9,21
**lane** 2:15
**larger** 15:20
**law** 6:5 35:11
**laws** 5:21
**lawsuit** 42:6
**league** 1:9,17 2:10 2:11 3:2,4 5:8 6:9 6:10,13,15 7:14 8:10 79:4 81:1
**learn** 53:8
**left** 36:7
**legal** 28:15 49:21 79:7
**leghorn** 2:13 6:7,7 9:21 10:9,25 11:5 14:2 15:1,19 16:11,18 17:2 18:4 21:12,18 22:21 23:4,25 24:5,12 25:24 26:3,18,23 27:4,14 27:20 28:4,13 29:15 31:14 32:5 32:17 33:3,7,20 34:18 37:15 39:2 40:17 41:9,13 42:1,5 44:8 45:9 45:19 46:6,15 51:22 52:14 59:1 59:9,13 61:14 62:7 67:2,8 69:3 69:21 70:6,13 71:5,10,16,21,23 72:7,18 73:6,11,18 75:9,13,16,25 76:3 79:1
**liability** 1:13
**license** 26:19
**licensed** 23:14
**licensee** 11:4 13:1 13:14 14:4 20:11 20:14,18 21:23,24 24:1,8,17 26:12 27:7,9,18 28:5 32:11 33:4 34:12 34:19 38:4 40:11 40:18 45:5,14,21 47:25 49:11,13 51:5 54:3,23 55:8 55:20 56:1,7,18 57:4,11 58:1 65:13 71:6,12 72:2,22 73:7,12,19
**licensees** 11:2 12:10,14 40:19 43:2 59:3
**licensing** 16:24 17:6,10
**limited** 1:12
**line** 48:16 54:18 61:5 79:15 80:4 81:4,7,10,13,16,19
**link** 56:22
**links** 4:10
**list** 39:21
**listed** 44:3 56:10
**little** 47:1 50:2,20 54:13 67:17 68:19 68:25

**llc** 1:12 2:11 5:8
**llp** 2:4,14 3:11 6:8
**locate** 42:11
**location** 1:20
**locked** 79:12 80:1
**logo** 47:1 54:14
**london** 2:14 6:8
**londonfischer.c...** 2:18 79:2
**long** 7:15,18 8:11 8:21 22:12
**look** 10:17 60:20 67:13 75:10
**looked** 15:2 38:7
**looking** 18:24 23:6 31:4
**looks** 15:25 21:4 30:20 32:23 33:1 35:7 51:18,24 61:5 62:11
**los** 1:21

**m**

**maiden** 2:15
**mail** 23:20 31:4,11 32:21,23 36:3,22 37:8,24 38:7,12 39:3,21,25 40:9,10 42:19,24 43:21 44:4 47:5,14,16,17 47:20,22,23 48:6 50:14,21 51:13,15 52:12,13,17,24 53:3 54:12,22 55:1,2,9,11,18,19 55:22,25 56:5,12 56:13,16,23,25 57:2,4,5,7,9,11 72:14,16
**mail's** 40:8
**mails** 35:25 36:8 38:14 40:12 43:2 50:23 51:3 57:15
**making** 12:16 17:4 25:4 54:5
**man** 43:17
**manage** 22:24 25:15 34:4
**managed** 53:3
**management** 10:22 22:4
**manages** 34:13,14
**managing** 22:15 22:19 23:9,10,23 24:18 26:11 27:10 28:1 34:15
**manner** 5:22
**march** 1:18 5:9 21:9 79:3,5
**marked** 14:20 29:2 30:8 35:1 59:24 64:6 65:20 66:4
**market** 21:20,24
**marketing** 8:15
**matter** 5:7
**max** 1:17 2:11 5:6 6:10,14 7:2 28:15 71:23 79:5 81:2
**mccolm** 1:22 5:3 77:2,17
**mean** 12:25 26:16 41:9 43:14 49:11 52:14 71:15
**means** 5:23 22:23 43:12 48:9 49:15 68:3
**meant** 54:10
**meat** 52:12
**media** 8:20,22 13:8,25 14:8 22:3 22:5,14 23:22 24:7,14,17 25:2,18 26:7,16,20,22 27:3 27:6,8,17,25 28:1 28:3,12 37:7 38:8
**meld** 42:14 43:5
**melds** 43:7
**mention** 9:6,10 58:10
**mentioned** 16:3 19:21 22:13 37:7 47:4 52:24 58:6
**message** 39:1
**metaphors** 21:14
**michael** 3:3 6:12
**michael.buchwald** 3:7
**middle** 69:8
**migrate** 12:9,13
**migration** 25:6
**mind** 42:14 43:5,6
**minimize** 36:14
**minimum** 23:20
**minute** 46:9,13 75:5,14,15,16
**minutes** 38:13 71:18 75:9
**missing** 28:9
**molly** 1:22 5:3 77:2,17
**moment** 14:25 15:6 75:10
**months** 51:14
**morning** 5:2 6:4,8 6:12,14,16 7:10,11
**move** 28:18 30:7 39:18 42:11 43:18 48:1 50:8 53:12 54:8,24
**moving** 39:19
**multiple** 63:11

**n**

**n** 2:1 3:1 4:1 5:1
**name** 5:2 6:4 13:8 13:18 14:16 16:12 18:9 23:20 35:6 74:24
**names** 23:1
**national** 1:9,17 2:10,11 3:2,4 5:7 6:9,9,13,15 7:14 8:10 79:4 81:1
**necessarily** 33:23
**necessary** 79:14 80:3
**need** 9:12 20:17 31:23 32:11,18 33:4 34:19 40:10 40:18 41:3 42:23 43:9 44:5 45:24 47:15,19,25 49:24 53:2 55:17 60:25 63:1 66:8 67:3 71:6 72:22 73:7 73:12,19 74:17 75:6,7
**needed** 33:23
**negative** 63:24
**neither** 77:10 78:7
**neulion** 11:4,7,10 11:12,14,15,17,23 12:1,4,5,10,13 17:1 21:11,17 22:2 24:2,3,4,9,11 24:11,15,19 25:7 26:10 32:16 41:17 74:23
**never** 10:10 25:19 59:17
**new** 1:2,10 2:17 3:6 14:11 34:23 37:25 47:18 64:2

**[new - overtier]**

70:17,19 73:1,5
**newco** 14:11,12,15
15:13,14 16:1,5,17
**nfl** 1:11 5:8 9:20
10:3,18 13:11,16
13:20 16:15,23,25
17:13,20,23 18:1,6
19:5 21:6 23:6,13
24:18 25:4 26:5
26:13,13,15,20,21
27:13,16,17,18,24
28:10 33:5,16,16
35:13 37:1 38:25
39:3,10 40:7,25
41:15,16,23 43:1,2
43:3 44:7,13,17,22
45:8,13,17,25 47:7
47:11,23 49:6,8,20
49:24 53:11,21,23
53:25 54:15 58:7
58:21,25 59:5,7,12
59:17 60:15 61:8
61:13,22 62:6
63:10,18 64:23,25
66:21 67:24 68:2
68:5,6,12,14 69:14
69:18,20 70:4
72:5,11,21 73:22
74:6,12
**nfl's** 32:4 39:5
44:12 49:21,25
68:3
**nfl.com** 3:7
**nfle** 8:12,14,18
9:17,18,18,25 10:1
10:11 11:7,10,11
11:18 12:3,10,13
24:11 40:25 71:24
**nfli** 7:16,18,24 8:5
8:9 9:17 10:1,6,7
10:12,16,21,23

11:1,23 12:8,10,14
12:17 13:6 14:10
17:10,17 20:3,9,11
20:20 21:1 24:23
26:5 27:9 28:2,7
40:25
**nfli's** 12:19
**nodding** 9:9
**nonverbal** 9:9
**notary** 1:22 5:10
77:18
**notating** 79:15
80:4
**note** 50:3
**noted** 33:25
**notice** 4:7 15:2
29:13 72:25 73:5
73:10
**noticed** 38:8
**noticing** 6:3
**noting** 50:4
**number** 30:13,20
30:21 33:8,17
39:8 60:13,25
65:3,5 66:11
67:21 74:7 79:15
80:4
**numbered** 38:10
39:22 65:15
**numbers** 23:12
**ny** 2:17 3:6

**o**

**o** 5:1 25:14 54:6
**oaths** 5:11
**object** 37:15
**objection** 5:14
6:19 10:9,25 11:5
14:2 16:11,18
17:2 18:4 21:12
21:18 22:21 23:4
23:25 24:5,12

25:24 26:3,18,23
27:4,14,20 28:4
31:14 32:5,17
33:3,7 34:18 39:2
40:17 44:8 45:9
45:19 59:1,9,13
61:14 62:7 67:2,8
69:21 70:6,13
71:5,10,16,21 72:7
72:18 73:6,11,18
**obligation** 14:5
**obligations** 19:1
**obtain** 35:12
**obtained** 32:12
33:15
**obviously** 47:6
70:10
**october** 51:14
52:25 72:15
**offered** 9:2
**office** 79:11
**officer** 77:1,2
**offseason** 37:18
**oh** 16:6 54:9
**okay** 11:9 18:14
18:22 19:9 26:21
28:18 29:9,20
30:6 32:19 34:9
34:20,21 36:19
37:12 38:22 39:4
39:19 40:4 41:13
41:21 45:11 46:5
46:16,17 47:2
48:1,4,12,22 49:18
49:22 50:8,18,19
50:20,21 51:6,8,8
52:4,6 53:4,13,19
53:24 54:24 55:12
56:8 60:8,13,24
61:7 64:21 65:18
65:22 66:6,10

67:22 68:6,10
69:6,8 74:2,18,21
74:21 75:1,16,17
75:17,18,25 76:3
**ones** 29:25 42:24
**opened** 35:18,19
36:2
**operate** 71:11
**operated** 54:2
59:14 71:25 72:2
**operating** 19:11
19:12,15 45:17
**operation** 10:3
**operations** 10:17
18:10 21:16 24:20
25:2 51:25 65:2
69:15
**operator** 69:15
**opinion** 43:7,11
**opposed** 9:8,21
16:24 17:7,11
**opt** 63:22 70:23,25
**option** 63:24
**order** 25:14 36:12
62:23 63:2
**organization** 26:5
**organizations** 9:16
10:8,10,15
**original** 16:7
29:18 79:10,21
**outcome** 77:15
78:12
**outside** 5:13
**overall** 9:19 12:4
30:11
**overlap** 22:14
**overseeing** 10:2
**overtier** 4:8 12:17
12:20 13:2,13,18
13:18,20,23 14:5
14:10,16 16:2,3,9

16:12,24 17:14,17 17:19,24 18:2,7 20:3,9,11,14,18,20 21:1,6,8,11,17,24 22:7,10,14,18 23:14 24:21 25:3 25:7,12,13,16 30:12 31:17,23 32:11,12,18 33:4 33:22 34:13,13,15 34:19 38:3 39:8 39:13 40:11,16,19 41:1,7,17,19,25 42:9,15,23,25 43:4 43:10,16 44:5,12 45:20,24 47:9,15 47:19,25 49:2,10 49:10,12 51:5,20 51:25 52:9,21 53:2 54:3,7,23 55:8,15,17,20 56:1 56:7,18 57:4,11,24 58:1 65:2,9 66:12 66:20 67:3,7,10 68:9 69:15,18 71:6,12 72:2,11,21 72:22 73:2,8,13,20 74:16,17
**overtier's** 25:9
**owners** 67:4
**ownership** 17:23

**p**

**p** 2:1,1 3:1,1 5:1
**page** 4:2,6 15:14 19:9 29:7 30:19 30:24 31:25 32:8 32:19,20,21 36:19 36:25 43:19 48:1 50:9 51:9 53:12 54:10,24 55:4,9,21 56:2,8,19 57:6 60:2,12 64:16,21 65:22 67:13 69:2 79:15 80:4 81:4,7 81:10,13,16,19
**pages** 79:14,17,17 80:3,6,6
**paid** 63:20 70:16
**paragraph** 37:17 38:17 40:3 44:2 53:4,22 54:5 60:25 64:22
**paragraphs** 53:17
**paralegal** 3:10 6:17
**pardon** 56:25
**park** 3:5
**part** 16:6 17:3 23:9 28:9 31:25 32:7 40:6,15 41:7 49:1,9 51:23 64:21
**particular** 19:14
**parties** 5:12,15 65:2 77:11,14 78:8,11
**party** 13:9 69:15 74:4
**pass** 11:15 32:10 53:25 57:18 58:19 58:20 64:25 69:13 69:19 70:10
**passed** 21:10
**payment** 4:15 23:16,18 25:16 50:2,10,16 51:14 53:3 55:14,15 62:1 63:21,23 64:2 70:18,21,22 70:24 71:19
**payments** 32:4 34:13,14,15 51:4
**pdf** 36:19 79:12 80:1
**penalty** 79:16 80:5
**pending** 9:14
**people** 75:6
**perfect** 46:15
**perform** 13:1,2,4 13:4,8,25 14:3,8 21:23 22:2,3,5,10 22:14 23:14,22 24:1,3,7,14,17 25:2,18 26:7,10,12 26:15,20,22 27:3,6 27:8,17,25 28:1,3 28:5,12 42:9 45:5 45:6,13,14,15
**performing** 27:9
**period** 10:7,13,15 22:12 24:7 60:22 79:18 80:7
**perjury** 79:17 80:6
**permission** 26:6 26:14
**permitted** 5:19
**person** 1:16 62:23 63:1
**personal** 26:6,16 31:22 43:7,11 73:21
**personally** 21:8
**pertain** 23:16
**peruse** 38:20
**plaintiff** 1:7 2:2 6:6 26:25 40:24 41:16 58:8 64:17 65:1,9 66:20 67:6 69:12
**plaintiff's** 4:14 58:18
**platform** 12:1
**play** 25:6 40:15
**please** 6:2,21 18:13 29:1 31:2
**point** 10:14 15:4,6 21:2 22:13 24:6 24:19 26:12,22 27:1,13 31:16 39:11 45:16,18 59:4 68:8
**position** 26:21 28:11,15,15,17 42:3,7 44:12 49:21,25 50:10
**possibility** 73:9
**possible** 16:15 22:18
**post** 2:5
**potential** 40:15
**predominantly** 9:2 10:2
**premium** 40:7
**preparation** 58:13
**prepare** 58:11
**prepared** 30:4 40:14,24 41:14 67:5 78:3
**preparing** 25:22
**preseason** 61:22
**presence** 5:13
**present** 3:9 30:12
**president** 43:15
**pretty** 38:12
**previous** 42:19 70:4
**previously** 61:8 70:3
**prior** 8:8,18 11:8 11:15 24:13 26:9 27:15,23 34:2 77:4

[privy - refreshes]

**privy** 12:15 72:1
**probably** 30:13 32:15 75:5
**procedural** 5:20
**procedure** 79:19 79:20
**proceed** 7:7
**proceeding** 1:20 5:4,18 76:7 78:4
**proceedings** 77:3 77:4,5,8 78:6
**process** 17:4
**processed** 50:10 51:4,15
**processing** 23:17 23:18 25:17 53:3
**produce** 49:6
**produced** 5:17 30:17 33:5 48:22 49:8 53:11 54:15 55:7 58:7,9 60:15
**product** 8:15 11:16,20 12:2 20:13 22:4,16,19 23:13,24 24:18 25:15 26:11 27:23 28:2 32:4,10 57:18 71:11,25 72:3
**production** 33:16 35:13 56:9
**productions** 33:16 58:12
**products** 8:2,6 9:3 10:4,24 11:3,24 13:11,16,21,25 21:16 34:4
**profit** 19:11,12,15
**program** 22:24 27:11 32:3,9
**programming** 27:10
**pronounced** 20:4
**propose** 75:5
**prove** 67:6
**provide** 11:24 14:3 20:13
**provided** 11:15 38:10 66:13 67:9 79:19 80:8
**provider** 37:18,22 38:1 40:6,9
**providing** 40:7
**provision** 21:15
**provisions** 19:4
**public** 1:22 77:18
**purchase** 61:21 62:19
**purchased** 69:12
**purpose** 12:12 17:6 47:24
**put** 23:18 29:17 34:22 36:11 41:2 42:2 56:11 64:5
**putting** 42:25

**q**

**qualification** 9:23
**qualified** 77:7
**question** 9:13 12:18 13:7,17,23 15:22,24 19:19 20:7 21:20,21 22:3 23:5 26:8,13 26:24 28:10 31:20 37:9,14 38:21 39:11 41:2 42:20 44:15 45:25 49:12 50:12 52:8 53:21 63:9 64:16 67:13 67:15,18 68:8,14 68:18,22 73:25 74:1,18
**questioning** 46:7
**questions** 9:15,17 20:25 30:10,15 32:6 36:14,15 41:4 49:19 75:24 76:1
**quickly** 75:3

**r**

**r** 2:1 3:1 5:1 25:14 37:19 54:6 81:3,3
**r&s** 80:1,9
**raise** 6:21
**reach** 33:21
**read** 30:2 37:10 40:2 51:22 53:16 55:10 61:4,6 64:20 67:20 68:20 68:21,23 69:11,23 74:1,19
**reading** 79:23 80:9
**really** 47:21 50:14 55:5 61:5
**reason** 19:14 39:4 48:5 81:6,9,12,15 81:18,21
**reasonable** 41:2
**reasons** 18:17 19:1 19:20
**received** 70:10 72:25
**recognize** 15:9 29:7,10 30:24 43:21 48:2,13 54:15 55:2 56:13 56:22,25 57:7 60:10 64:9
**recollection** 35:21 36:4
**record** 5:4,5,15 6:2 15:3 20:6 31:12 33:1,5 34:16 46:18,19,21 75:19,20,22 76:5 77:9 78:5
**recorded** 5:22 77:6
**recording** 5:17 77:8 78:4
**redacted** 19:4
**redaction** 18:21 19:15
**redactions** 18:17 18:24 19:2,17,20
**reduced** 77:6
**refer** 42:4,22
**reference** 15:12,14 51:20 52:8,21 53:5 65:5 66:11 66:25
**referenced** 13:10 37:8 40:9 45:17 47:6 79:6
**references** 14:11 14:15 15:14 16:2 47:18 74:19
**referencing** 16:5
**referring** 37:22 54:6,19 72:16 73:21
**refers** 43:3,14,25 47:14
**reflect** 34:16 66:23
**reflected** 36:10 39:8
**reflecting** 36:1
**refresh** 14:23 35:21 64:4
**refreshes** 36:3

**refreshing** 14:24
**regarding** 10:21 12:4 13:4,15,20,24 21:15 22:3,4,14 23:20 25:18 29:23 32:10 37:21 58:19 58:20 73:25
**related** 77:10 78:7
**relates** 23:8
**relationship** 9:19 11:10,17 12:4,6,17 12:23 13:24 14:1 16:24,25 17:6,7,10 17:11,14,16 20:9 20:10 21:1,5 24:4 24:9 30:11 44:13 44:17 45:8 46:1,2
**relationships** 42:8
**relative** 77:12 78:9
**released** 79:21
**relevant** 41:5
**reload** 60:2
**remain** 42:8
**remained** 42:7
**reminder** 42:19
**remote** 1:20
**remotely** 5:9,12
**remove** 16:20 34:21 36:16
**rename** 59:21
**renaming** 60:4
**renew** 59:8,12,17 61:10,11,24 62:1 62:24 63:3,7 64:1 64:2 70:1,5,12,15 70:16
**renewed** 61:13 62:14,15,16,17 63:5
**renewing** 62:9
**renews** 62:5
**repeat** 66:24
**rephrase** 44:11
**reported** 1:22
**reporter** 5:2,3 6:18 7:6 46:17,20 75:18,21 76:4
**represent** 6:6 35:11 36:21 38:6
**representative** 25:4
**represented** 25:5
**representing** 6:9
**requested** 77:21 80:1,9,10
**reserved** 76:6
**response** 50:7 56:24 68:13 69:23 72:23 74:7
**responses** 4:12 39:5 42:4 47:7 58:12 64:15
**responsibilities** 22:6,15
**responsibility** 12:7
**responsible** 40:11 49:13,16
**restart** 71:15,19
**restate** 27:8 63:1 74:10
**retrospect** 17:9
**return** 79:17 80:6
**review** 58:13,19 77:21 79:8,10,13 80:2
**reviewed** 58:21,23 59:2
**reynolds** 78:2,15
**right** 6:21 17:11 18:14,22 19:9 23:7 33:20 35:18 39:19 43:19 46:1 47:4 52:16 55:4 61:1,2 65:25 67:18 69:5 71:9 76:4
**role** 8:24 10:1,7,16 10:22 12:3,16,19 12:22 20:2,8 22:1 22:19 24:23 25:1 25:6 43:1
**rosenfeld** 2:4 3:11 6:6,17
**rover** 18:9
**rule** 4:7
**rules** 5:21 80:8
**runs** 17:19

**s**

**s** 2:1 3:1 4:5 5:1 81:3
**sales** 10:19 12:9,13 26:11
**san** 2:7
**saw** 72:25
**saying** 31:10 38:11 70:18 72:9
**says** 37:13 40:5,23 42:18 50:16,23 51:10,25 52:18 53:7 54:5,18 55:13 59:12 61:18 61:20,23 62:19 64:25 74:8
**schedule** 79:10
**school** 9:3
**scope** 28:14
**screen** 14:23 16:21 18:13 28:24 29:1 29:25 30:16 32:24 34:22,24 35:8 36:16 46:12 50:25 51:25 56:11,22 57:12 59:22 64:5 65:19 75:8
**scroll** 18:13 19:8 29:6 30:19,22 31:1,24 33:9 36:7 36:24 37:2 46:25 50:2,2,19,20 51:7 52:5,11 54:13 55:4,9,21 60:12,17 60:18,24 64:10,11 64:21 65:22 66:7 66:14 67:17 68:19 68:25 69:23 73:25
**scrolling** 18:21 29:8 48:12 61:2
**season** 21:7 24:13 24:14 27:15 38:4 40:20 44:19,20,22 44:25 45:2,4,11,21 59:6 60:23 63:3,5 63:6,14,16 64:23 64:25 65:11 66:21 69:14,22 70:9 71:3 72:2 73:8,13 73:20 74:11,15
**seasonal** 27:16 59:10,16 62:3,12 62:13 63:3
**seasons** 21:25 22:11 63:11,12,13 70:5
**seats** 18:6,7
**second** 40:5 42:18 42:21 48:13 53:4 53:22 54:4 55:13 62:4 69:1
**section** 18:25
**see** 10:13 15:14 29:7 30:20 33:25 35:13,17 36:13,25

47:1 48:12 50:11 50:21 52:5,8 53:4 54:13 60:13 61:1 61:1 64:23 65:5 65:14,16,17,24 66:25 67:17 69:1 69:10 74:25
**seeing** 29:6
**seen** 29:5,18 30:13 35:9 37:4 39:25 43:1 53:13 58:2,3
**selection** 10:22
**send** 38:25 39:3,11 40:10 47:23
**senior** 7:21
**sensitive** 18:19 19:16,22
**sent** 35:18 36:1,1,9 36:12,22 37:8,24 38:2,3,3,7 39:23 40:8 42:24 43:21 47:15,19 51:13 52:24 53:2 54:12 54:22 55:1,10,19 55:22,25 56:3,6,12 56:17,20 57:4,6,11 57:16,24,25 72:15
**sentence** 37:10,13 40:5 42:18 43:12 43:24 53:22 54:4 55:13 68:22 69:9
**sentences** 55:11
**series** 28:9 30:10 57:6,15,20 58:14
**service** 13:5,14,19 14:4 23:3,6,8,10 25:18,21 27:2,23 27:24 28:6 35:16 37:18,22,25 38:4 40:6,8 45:6,10,14 46:3 47:18 59:15
61:18 62:2,2,6,12 62:13,15 63:4 64:2 69:22 72:1 72:10,11,15,17,21 73:1
**share** 16:21 18:13 19:25 37:13 46:12 57:13 59:23 75:8
**sheet** 36:23 39:22
**short** 19:18 24:7
**shot** 56:11,22
**show** 14:23 33:7 36:9 58:24 72:14
**showed** 57:15 58:3 58:14
**showing** 38:13
**shown** 28:24 48:4 69:18
**sietel** 1:4 2:2 5:7 79:4 81:1
**sign** 79:16 80:5
**signature** 76:6 77:16 78:14 79:21 79:23,23 80:9
**signed** 44:16 70:9
**significance** 39:15
**significant** 22:25 47:11
**similarly** 1:5
**singh** 1:4 2:2 5:7 79:4 81:1
**single** 44:20 62:2 63:6
**situated** 1:6
**situation** 45:12
**six** 10:13,15
**skills** 77:9 78:6
**slide** 50:5,8
**slight** 54:14
**slowly** 64:21 66:14
**snafu** 66:3
**solely** 69:14
**solution** 11:16 20:13
**solutions** 79:7
**soncin** 31:5
**sorry** 12:18 13:7 13:17 15:21 18:15 20:6 21:13,19 23:5 24:6 26:8,24 31:20 32:6 44:15 49:9 50:13 54:9,9 60:5,19 63:9 66:2 66:10,24 67:13 68:19 69:5 71:22
**sort** 12:22 19:18 32:25 41:3 42:2 50:5 58:24 69:10
**sounds** 47:21
**southern** 1:2
**spa** 65:2 69:16
**space** 9:3
**speak** 13:19 21:11 40:11,18 42:23 44:5 47:15,19,24 49:11
**specific** 46:4 62:21
**specifically** 25:11 26:14
**spelled** 25:14
**sport** 9:2
**sports** 8:20,21
**spot** 41:3
**spread** 36:23 39:22
**spreadsheet** 35:5 35:14 36:15,16 39:24
**stand** 54:1 65:8
**start** 7:12 21:8,22 28:22 61:21 62:20
64:18
**started** 8:5
**starting** 74:10
**starts** 33:18 37:17 38:17 54:25 64:22 69:9
**state** 77:19 79:9,12
**stated** 48:25 49:20
**statement** 65:4,8 65:15
**states** 1:1
**stenographic** 5:23
**stipulation** 5:24 79:20
**stop** 18:15 19:24 29:9 57:12 64:22 75:8
**streaming** 74:9,12 74:13,16,20,22
**streams** 17:20
**street** 2:5
**strike** 20:19 48:6
**structure** 9:19
**stupid** 21:14
**submit** 35:24 53:10
**submitted** 66:18
**subscription** 4:11 8:2,6 9:2 10:4,19 10:23 11:3,20,24 12:2,9,13 13:11,16 13:21,25 21:15 22:4,16,19,24 23:3 23:6,8,9,13,23 24:18 25:2,15 26:11 27:10,11 28:1 32:3,4,9 34:4 57:17 60:21 61:9 61:11,19,19,24 63:8,15 65:1 69:13,19 70:1

**subscriptions** 59:18
**subsequent** 62:22
**successful** 50:16
**suggesting** 62:4
**suite** 2:6
**summary** 68:17
**super** 57:18
**support** 65:14 66:12,19 68:16
**supporting** 68:17
**supposedly** 39:7 73:1
**sure** 12:15 25:5 28:8 36:3 75:6
**swear** 5:12 6:19
**sworn** 5:15 7:3 77:5

**t**

**t** 4:5 81:3,3
**tab** 30:21 35:16
**tabs** 35:13
**tag** 33:17 35:4
**take** 5:4,10 9:10 26:21 46:9,13 61:16 75:5
**taken** 5:7 77:3,12 78:9
**talk** 11:9 40:21 73:14
**talking** 15:12 21:20 44:9
**teams** 37:11
**tell** 7:4 33:15 49:12 63:18 71:18
**template** 51:3
**ten** 8:23 46:9,13 75:14
**term** 59:17 61:20 62:19 64:2
**terminated** 20:20 20:23 68:15 69:19
**termination** 67:24 68:16
**terms** 4:11,16 13:5 13:14,19 14:3 25:18,21 27:2,23 27:24 28:6 45:6 45:10,12,14,16 46:3 47:18 51:10 51:18 52:18 54:6 59:15 60:21 61:18 62:1,2,6,12,13,15 62:21 63:4 69:22 72:1,6,10,11,15,17 72:20 73:1,5,16
**testified** 7:5 25:19 61:8 74:3,5
**testify** 40:14 41:15 41:22,24 47:21 48:6 49:4 50:4 54:21,22 55:5,7,18 55:19,24,25 56:16 56:17 57:2,3,9,10 57:22 70:3,7 72:24
**testifying** 77:5
**testimony** 26:9 56:4 57:19
**testimony's** 55:23 56:15
**text** 52:19 53:20
**thank** 6:18 7:6 15:6 20:5,5 22:1 29:20 34:14 67:15 75:25 76:3
**thing** 75:2
**things** 17:13
**think** 9:7,11 16:8 19:18,21 21:4,7 34:3 41:19,21 42:1 43:3,14 45:22 46:11 48:4 53:23 55:21 57:5 57:19 58:6 61:1 67:14 68:8 71:8 74:7
**third** 36:19 65:2 69:15 74:4
**thomas** 2:13 6:7 79:1
**thoughts** 17:5
**three** 56:4 61:1
**till** 46:14 75:12
**time** 1:19 6:1 9:22 10:7,21 11:1 12:3 14:17 16:10,16 21:2 22:12 24:2,6 24:7,23 27:6,8,25 29:17 42:21 45:8 46:17,20 47:10 59:14,16 60:22 72:9 75:18,21 76:4 79:10,18,24 80:7
**timeline** 4:9 15:17 15:25 30:11
**title** 7:20 8:3,14
**titles** 7:23 8:1,16
**tleghorn** 2:18 79:2
**today** 9:10 20:22 43:8 47:22
**today's** 29:14
**tom** 15:6
**top** 30:22 31:1 32:19,21 37:2 41:6 47:1 50:25 51:9 52:12 60:19 61:20 64:13
**topic** 40:23 47:7 58:10,13,17
**topics** 29:19,23 30:4
**transactions** 48:14
**transcriber** 78:1
**transcript** 5:17 77:21 78:3,5 79:6 79:8,10,13,13,21 80:2,2
**transcriptionist** 77:7
**transfer** 26:6,15 74:4
**transition** 21:17 24:24 25:1
**transitioned** 13:2 22:10 24:20
**tray** 20:4
**tried** 60:2
**trigger** 36:4
**triggered** 70:19
**true** 77:8 78:5
**truth** 7:4,4,5
**try** 9:8 42:11
**trying** 15:24 49:23
**two** 8:13 9:16 10:15 35:13 39:15 53:16,17 56:19 58:14 65:15 67:14
**types** 23:16
**typewriting** 77:6

**u**

**u** 25:14 54:6
**unclear** 16:2 17:3
**understand** 5:16 12:18 15:24 21:19 40:22 49:2 59:11 63:9
**understanding** 9:16 35:25 43:1
**unfortunately** 30:21

**unincorporated** 1:10
**united** 1:1
**update** 37:14 51:18
**updated** 14:3 38:17 45:6,10,12 45:15 62:21
**updates** 51:10 52:18 54:5,25 72:14
**updating** 37:18,21 40:5 42:19
**urls** 36:2
**use** 21:14 47:13
**users** 11:21,25 12:9 21:16 22:5 22:16,20 23:24 24:18 25:15 39:1
**uses** 5:19 25:16
**utilized** 12:1

**v**

**v** 1:8 79:4 81:1
**vendor** 11:7 16:25 17:7,11,15 20:11 24:2 25:9 26:10 34:12
**vendors** 10:23 11:2
**verbal** 9:8
**veritext** 5:3 79:7,9 79:11
**version** 45:16
**versus** 22:2
**videoconference** 1:16 2:3,13 3:3,11
**virtually** 5:17
**visible** 48:16
**vs** 5:7
**vulcan** 42:14 43:5 43:6

**w**

**w** 37:19
**waived** 79:23,23
**waiving** 79:20
**wall** 41:20
**want** 15:3 28:8 38:23 41:2 46:13 52:16 57:18 58:6 68:20 72:13
**wanted** 16:4 36:13 37:13 55:13 57:21 63:15,19
**way** 15:4 38:6 42:7 47:11 51:7 60:19 63:24 69:3 69:4
**we've** 32:19 42:10 46:7
**website** 53:21,23 53:25 54:2
**went** 41:18
**whatsoever** 73:16
**white** 52:14,18,22
**willing** 50:11
**witness** 5:12,15,16 6:10,20 7:3 15:21 28:16 41:14,22 51:24 52:5 68:25 69:5 71:22,24 77:4 79:13,16 80:2,5 81:24
**witness's** 33:24
**word** 15:13 43:12 43:25 47:13 52:21 54:6,19 68:3
**words** 63:25 75:14
**work** 8:11,21 11:2
**worked** 7:15,18,24 10:10,11,11 21:23 24:1
**working** 10:8,14 21:8 31:16 72:5 72:10
**works** 25:12
**written** 5:24 61:16

**x**

**x** 4:1,5 77:21 80:1

**y**

**yeah** 10:5 12:19 21:14 31:21 33:5 38:17 46:15 50:25 52:2 54:2 59:3 60:1,3,11,13,19 68:1,20,24 69:3,5 74:2 75:11
**year** 10:15 44:21 59:10,16 61:13,20 62:3,15,20,21 63:2 63:16 70:9 71:20
**year's** 61:22
**years** 7:19,24 8:13 8:23 10:13 43:2 58:15 62:22
**yep** 14:13 35:20 50:15 53:6 54:10 64:24 65:7
**york** 1:2,10 2:17 3:6

**z**

**z** 25:14
**zoom** 5:9 52:2
**zuora** 25:14,16 32:22,23 33:2 34:3,3,7,8,9,14,16

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.