## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals,

Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, and NFL ENTERPRISES LLC,

Defendants.

Case No. 1:21-cv-01032-PAE

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

**LONDON FISCHER LLP**
**59 MAIDEN LANE**
**NEW YORK, NEW YORK 10038**
**(212) 972-1000**

# Table of Contents

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND...............................................................................................2

  NFLI Licenses the Right to Market and Sell Game Pass to Perform in 2017 ........................2

  NFLILI Licences the Right to Market and Sell NFL Game Pass International to OverTier in 2019......................................................................................................................................4

  Plaintiff Allegedly Experiences Outages During the 2020 Super Bowl and Files a Purported Class Action Lawsuit against the NFL and NFLE.................................................................6

ARGUMENT .....................................................................................................................8

    A.    Defendants Are Entitled to Summary Judgment as to Plaintiff's Claims of Breach of Contract and Implied Warranty of Merchantability Because Defendants Were Not Parties to the Applicable 2019 Terms and Conditions...........................................11

    B.    Defendants Are Entitled to Summary Judgment As Plaintiff Has Failed To Show That Any Terms and Conditions Other Than the 2019 Terms and Conditions Are Applicable Or That a Course of Dealings Applies. .........................................................................................................14

    C.    Defendants Are Entitled To Summary Judgment Because Plaintiff Received Abundantly Clear Notice of the Change in Service Provider and Continued to Use The Product. ...................................................17

  CONCLUSION....................................................................................................................22

# Table of Authorities

**Cases**                                                                          **Page(s)**

*61st & Park Ave. Corp. v. Port Morris Tile & Marble Corp.*,
    208 A.D.2d 397 (1st Dept. 1994) .................................................................... 14

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.*,
    438 F. App'x 20 (2d Cir. 2011) ........................................................... 11, 12, 13

*Broadvision Inc. v. GE*,
    08 Civ. 1478 (WHP), 2009 U.S. Dist. LEXIS 76610 (S.D.N.Y. Aug. 13, 2009) ........ 16, 17

*Broder v. Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005) ...................................................................... 9

*Dallas Aero., Inc. v. CIS Air Corp.*,
    352 F.3d 775 (2d Cir. 2003) ...................................................................... 9

*Fanok v. Carver Boat Corp., LLC*,
    576 F. Supp. 2d 404 (E.D.N.Y. 2008) ............................................................ 11

*Kennedy v. Basil*,
    531 F. Supp. 3d 828 (S.D.N.Y. 2021) ...................................................... 11, 12

*Marciano v. DCH Auto Group*,
    14 F. Supp. 3d 322 (S.D.N.Y. 2014) ............................................................ 18

*Meyer v. Uber Tech., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ............................................................. 19, 20, 21

*Osborne v. Fernandez*,
    No. 06-cv-4127, 2009 U.S. Dist. Lexis 27409 (S.D.N.Y. 2009) .................................. 8, 9

*Valle v. ATM Natl., LLC*,
    No. 14-cv-7993, 2015 U.S. Dist. LEXIS 11788 (S.D.N.Y. Jan. 30, 2015) ..................... 18

*Walz v. Todd & Honeywell, Inc.*,
    195 A.D.2d 455 (2d Dept. 1993) ................................................................ 13

**Rules**

Federal Rule of Civil Procedure 56 ............................................................ 1, 8, 22

Local Civil Rule 56.1 ............................................................................... 1

## PRELIMINARY STATEMENT

Defendants National Football League ("NFL") and NFL Enterprises LLC ("NFLE") respectfully submit this memorandum of law, together with the Declaration of Thomas A. Leghorn, the Affidavit of Richard Johnston ("Johnson Aff."), the Declaration of Max Boigon ("Boigon Dec."), and the Rule 56.1 Statement of Material Facts in support of their motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to the First Amended Class Action Complaint of Plaintiff Sietel Singh Gill ("Plaintiff" or "Gill") ("Am. Compl." or "Amended Complaint"). Additionally, Defendants rely upon the Joint Stipulation of Undisputed Facts and exhibits thereto.[1] Pursuant to the Court's Order dated November 2, 2021 [Opinion and Order on Motion to Dismiss, Doc. No. 52], this motion is limited to the issue of whether Plaintiff had a subscription contract for Game Pass Season Pro[2] for the 2019 NFL Season with the NFL defendants, or with other entities not a party to this case.

As set forth in detail below and within the Rule 56.1 Statement of Material Facts and the Joint Stipulation of Undisputed Facts, the evidence has irrefutably proven that Plaintiff contracted with non-parties OverTier Operations ("OverTier") and Deltatre, S.p.A. ("Deltatre") for his 2019 Game Pass Pro subscription, as expressly set forth in the NFL Game Pass International Terms and Conditions applicable to the 2019 NFL Season ("2019 Terms and Conditions"). As of the 2019 NFL Season, the Game Pass Season Pro subscription product was a licensed product sold and operated exclusively by OverTier and Deltatre, as the 2019 Terms and Conditions make clear; accordingly, there was no contract between Plaintiff and the NFL defendants for his subscription to Game Pass Season Pro for the 2019 NFL Season and his

---

[1] See Doc. No. 70.
[2] The name of Plaintiff's package from 2013-2016 was "Game Pass Season Plus." The name then changed to "Game Pass Season Plus Pass" starting with the 2017 NFL Season while the right to manage, operate, offer, and sell Game Pass was licensed to Perform Media Channels Ltd. Subsequently, when the license was granted to OverTier Operations for the 2019 NFL Season, the name was changed to "Game Pass Season Pro." See Boigon Dec., ¶ 4. Hereinafter, when the products are discussed in general or collectively, they will be referred to as "NFL Game Pass International." The particular names for each given season will be used when discussing Plaintiff's particular subscriptions for those seasons.

breach of contract and breach of warranty of merchantability claims against the NFL defendants must be dismissed.

**FACTUAL BACKGROUND**

Plaintiff, a citizen of New South Wales, Australia, first purchased a one-year Game Pass Season Plus subscription for the 2013 NFL Season on or around September 10, 2013 from NFLE. At that time, NFLE retained the rights to market and sell the NFL Game Pass International subscription product, including in Australia, and contracted with a company called NeuLion, Inc. ("NeuLion") as a vendor to operate it. Plaintiff's subscription for the 2013 NFL Season was governed by the 2013 Terms and Conditions ("2013 Terms and Conditions"), which stated unequivocally that the term for the subscription was for one year. [Joint Stipulation of Undisputed Facts ("Joint Stip."), Ex. D, Doc. No. 70-4]. NFLE continued to offer NFL Game Pass International, operated by NeuLion, including in Australia, in 2014, 2015 and 2016, and Plaintiff purchased annual subscriptions for each of those NFL seasons via an auto-renewal option, each of which terminated at the end of a one-year term pursuant to the applicable terms and conditions. This is clearly reflected in data relating to Plaintiff's subscriptions, referred to within the Declaration of Max Boigon of NFL International Licensing Inc., which reflects that Gill's subscription for the 2014 NFL Season ran from August 1, 2014 through August 1, 2015, that his subscription for the 2015 NFL Season ran from August 7, 2015 through August 1, 2016, and that his subscription for the 2016 NFL Season ran from August 5, 2016 through August 1, 2017. Boigon Dec., ¶¶ 9-11 and Exhibit A, Subscription Order Tab, Columns U, AH, and AI.

**NFLI Licenses the Right to Market and Sell Game Pass to Perform in 2017**

By the start of the 2017 NFL Season, however, NFLE no longer retained the rights to market and sell NFL Game Pass International in Australia. Rather, prior to the 2017 NFL Season, in April 2017, NFL International LLC ("NFLI"), an affiliate of NFLE that became responsible for licensing certain of the NFL's media and intellectual property rights

internationally, entered into a license agreement with a company called Perform Media Channels Ltd. ("Perform"), which granted Perform the exclusive right to "manage, operate, offer and sell Game Pass as a standalone subscription offering," in various international territories including in Australia (the "NFLI-Perform License Agreement"). [Joint Stip., Ex. A, Doc. No. 70-1, p. 10]. The NFLI-Perform License Agreement further provided that "[s]ubject to the terms of this Agreement, during the GP Term, NFLI shall not itself, nor authorize any third party (other than Perform) or NFLI affiliate to manage, operate, offer and/or sell Game Pass as a standalone subscription offering within the GP Territory." [Joint Stip., Ex. A, Doc. No. 70-1, p. 15]. Among the rights exclusively granted by NFLI to Perform under the NFLI-Perform License Agreement was the "sole discretion to determine the packaging and pricing of Game Pass, including the retail prices to be paid for Game Pass in each country within the GP Territory. . . ." [Joint Stip., Ex. A, Doc. No. 70-1, p. 11]. The NFLI-Perform License Agreement also provided that "[a]t a minimum, Game Pass shall be offered throughout the GP Territory as one (1) season-long (including the postseason and Super Bowl) package subscription SKU for each NFL season during the GP Term." [Joint Stip., Ex. A, Doc. No. 70-1, p. 12]. Although Perform, pursuant to the NFLI-Perform License Agreement, maintained the exclusive right to market and sell NFL Game Pass International subscriptions, including in Australia, NeuLion continued to act as the vendor that operated the product during this time.

Plaintiff purchased one-year subscriptions to Game Pass Season Plus Pass in 2017 and in 2018 but did not do so via an auto-renewal option. Rather, Plaintiff manually registered on September 10, 2017 for a seven-day free trial period of Game Pass Season Plus Pass. See Boigon Dec., ¶¶ 12-13. Following the completion of that trial period, his credit card was charged for the 2017 Game Pass Season Plus Pass subscription on September 17, 2017. See Boigon Dec., ¶¶ 12-13. The records referred to in the Boigon Declaration show that Gill purchased a subscription for the 2017 NFL Season running from September 10, 2017 through

3

August 1, 2018. <u>See</u> Boigon Dec., Exhibit A, Subscription Order Tab, Columns U, AH and AL. Plaintiff then manually subscribed to Game Pass Season Plus Pass again for the 2018 NFL Season, manually paying with a credit card on August 1, 2018. <u>See</u> Boigon Dec., ¶¶ 14-15. The records of Gill's subscriptions show that that Gill purchased a subscription for the 2018 NFL Season running from August 1, 2018 through August 1, 2019. <u>See</u> Exhibit A, Subscription Order Tab, Columns U, AH and Al.

### **<u>NFLILI Licences the Right to Market and Sell NFL Game Pass International to OverTier in 2019</u>**

In 2018, NFLI terminated its License Agreement with Perform and, effective as of April 1, 2019, NFL International Licensing Inc. ("NFLILI"), an affiliate of NFLI that took over the role of licensing NFL Game Pass International, granted an exclusive license to OverTier to "market and sell Game Pass as a standalone subscription offering and distribute GP Content solely within Game Pass" in various international territories, including Australia. [Joint Stip., Ex. B, Doc. No. 70-2, p. 6; Ex. C, Doc. No. 70-3 (the "OverTier-NFLILI License Agreement")]. Like NFLI's prior license to Perform, the OverTier-NFLILI License Agreement provided OverTier the exclusive right to market and sell Game Pass subscriptions in Australia and did not permit NFLI/NFLILI or any of its affiliates (or anyone else other than OverTier) to market and sell Game Pass in Australia. [Joint Stip., Ex. B, Doc. No. 70-2, p. 9; Joint Stip., Ex. C, Doc. No. 70-3, p. 1]. OverTier utilized NeuLion with Deltatre as the operator of Game Pass in various international territories, including in Australia, starting with the 2019 NFL Season. <u>See</u> Ex. F,[3] Max Boigon Deposition, p. 25; <u>see also</u> Joint Stip., Exs. J, Q, Doc. Nos. 70-10, 70-17.

On August 2, 2019, Plaintiff subscribed to Game Pass Season Pro for a one-year term covering the 2019 NFL Season, including the Super Bowl in February of 2020. [Joint Stip., Ex.

---

[3] References to "Ex. __" are to the exhibits to the accompanying Declaration of Thomas A. Leghorn.

M, Doc. No. 70-13]. The terms and conditions applicable to Plaintiff's subscription to Game Pass Season Pro for the 2019 NFL Season made clear that OverTier was the provider of the product, and that Plaintiff's subscription contract for Game Pass Season Pro for the 2019 NFL Season was with OverTier and Deltatre. Specifically, the 2019 Terms and Conditions stated as follows: "Who we are. Overtier Operations who is the official licensee of the content material and Deltatre S.p.A. who operates the platform and deals with customer queries. As a customer you are contracted with both entities." [Joint Stip., Ex. J, Doc. No. 70-10, p. 1].

The evidence proves that Plaintiff was notified multiple times of these provider changes, and of the applicable terms and conditions identifying OverTier and Deltatre as the provider and operator of the subscription product with whom Plaintiff was entering a contract, before he subscribed to Game Pass Season Pro for the 2019 NFL Season, as well as after he subscribed. Specifically:

- On June 19, 2019, Plaintiff received an email stating in bolded and underlined type, "**Your NFL Game Pass Subscription Is Getting An Update**." In the following paragraph, the email stated, "This offseason we're updating our service provider." The email additionally indicated that the user would need to update their app for the subscription and that "on July 25, 2019, [their] existing app(s) will no longer be in operation." The email referenced OverTier and made available to Plaintiff a hyperlink to the 2019 Terms and Conditions identifying OverTier and Deltatre. [Joint Stip., Ex. I, Doc. No. 70-9]. A screen shot of the new app clearly references "deltatre":



  Ex. H, DEF0001393.

- On July 1, 2019, Plaintiff received an email stating in bolded and underlined type, "**Important Information about your NFL Game Pass Subscription**." The email then stated, "As a reminder from our previous email, we're updating

our service provider." The email stated that Plaintiff's "NFL Game Pass subscription is set to auto-renew in **31 days**," explicitly indicated that Plaintiff would be billed on August 1, 2019, and provided a hyperlink to cancel his subscription. This email referenced OverTier as well and made available to Plaintiff a hyperlink to the 2019 Terms and Conditions identifying OverTier and Deltatre. [Joint Stip., Ex. K, Doc. No. 70-11].

- On July 16, 2019, Plaintiff received an email stating in bolded and underlined type, "**Reminder: Update your NFL Game Pass App(s).**" The email indicated that the user would "need to update [their] app(s) in order to watch this season" and would "have until **July 25, 2019**" to do so. This email also referenced OverTier and made available to Plaintiff a hyperlink to the 2019 Terms and Conditions identifying OverTier and Deltatre. [Joint Stip., Ex. L, Doc. No. 70-12].
- On August 28, 2019, Plaintiff received an email welcoming him back for the 2019 NFL Season, which again made reference to OverTier and included a hyperlink to the 2019 Terms and Conditions identifying OverTier and Deltatre. [Joint Stip., Ex. O, Doc. No. 70-15].

- On October 28, 2019, Plaintiff received another email stating in bolded type, "**Updates to Terms and Conditions**," inviting Plaintiff to review the terms and conditions, including a hyperlink to updated 2019 Terms and Conditions. That email further stated that, "If you continue to use our products and services on or after October 29, 2019, you are agreeing to the updated terms and conditions." Those terms and conditions once again noted the contract for Game Pass Season Pro was between Plaintiff and OverTier and Deltatre. [Joint Stip., Ex. P, Doc. No. 70-16; Ex. Q, Doc. No. 70-17].

Critically, as set forth in the Johnston Affidavit, each and every one of these emails was opened by Plaintiff—sometimes more than once. Johnston Aff., ¶¶ 18-20, 22-23. It is therefore indisputable that Plaintiff was provided and had notice, both before and after he subscribed to Game Pass Season Pro for the 2019 NFL Season, of the 2019 Terms and Conditions, and that OverTier and Deltatre – not the NFL Defendants – were the contracting parties.

### Plaintiff Allegedly Experiences Outages During the 2020 Super Bowl and Files a Purported Class Action Lawsuit against the NFL and NFLE

Plaintiff alleges that, on February 2, 2020, he utilized his subscription to Game Pass for the 2019 NFL Season to view a live stream of the 2020 Super Bowl, and experienced brief outages during his streaming, including towards the end of the game. Plaintiff subsequently filed this Class Action Complaint on February 4, 2021, alleging causes of action for breach of

contract, breach of implied warranty of merchantability, and unjust enrichment against the NFL and NFLE. [Complaint, Doc. No. 1]. The Defendants filed a motion to dismiss, pointing to the fact that the NFL and NFLE were not the providers of Plaintiff's Game Pass Season Pro subscription for the 2019 NFL Season, and that Plaintiff's subscription contract was with OverTier and Deltatre. Rather than respond to Defendants' motion, Plaintiff filed an Amended Complaint on April 30, 2021. Ex. A. Defendants then filed a renewed motion to dismiss the Amended Complaint, reiterating that, as set forth in the 2019 Terms and Conditions, Plaintiff's subscription contract for Game Pass Season Pro in 2019 was with OverTier and Deltatre, not the NFL or NFLE. On November 2, 2021, the Court denied Defendants' motion to dismiss in part as to the breach of contract and warranty claims but granted it in part as to the unjust enrichment claim. However, the Court ordered the parties to engage in limited discovery as to the "contractual relationship governing the Game Pass International service provided to Gill" in anticipation of this motion. [Opinion and Order on Motion to Dismiss, Doc. No. 52, p. 17].

After engaging in discovery limited to the contractual relationship governing Plaintiff's Game Pass Season Pro subscription for the 2019 NFL Season, it has become abundantly clear that neither of Plaintiff's remaining claims can survive summary dismissal. Contrary to Plaintiff's conclusory assertions, Plaintiff did not have a contract with Defendants NFL, NFLE or any NFL-affiliated entity for his subscription to Game Pass Season Pro for the 2019 NFL Season and at the time of the February 2020 Super Bowl. Indeed, the record establishes that as of 2017, NFLE no longer retained the right to market and sell the Game Pass Season Pro subscription product in Australia and that, in April 2019, that right was licensed exclusively to OverTier. And, as set forth expressly in the 2019 Terms and Conditions, the parties with whom Plaintiff contracted for the Game Pass Season Pro subscription product during the 2019 NFL Season were OverTier and Deltatre. Any contractual obligation of the NFL or NFLE that may have existed for any prior subscription, including for the Game Pass Season Plus subscriptions

for the 2013, 2014, 2015 and 2016 seasons, had long since been extinguished when the terms of those subscriptions expired.

Moreover, contrary to Plaintiff's assertions, the record establishes that Plaintiff was timely and appropriately notified on multiple occasions prior to the 2019 NFL Season and the 2020 Super Bowl of the 2019 Terms and Conditions, and that the provider and operator of his Game Pass Season Pro subscription for the 2019 NFL Season with whom he would be contracting were OverTier and Deltatre. Therefore, to the extent a claim even exists for the allegedly brief outage during the 2020 Super Bowl, such claim is not against the Defendants who were not in contractual privity with Plaintiff at any point during the 2019 NFL Season. Any argument by Plaintiff against the application of the clear contractual language in this case is nothing more than a transparent attempt to avoid the 2019 Terms and Conditions' requirement that the "governing law and the competent jurisdiction are the one of the country where the consumer has his habitual residence." [Joint Stip., Ex. J, p. 8; Ex. Q, p. 9]. As Plaintiff is a resident of Australia, his claims only were contractually limited to being brought in that jurisdiction. Plaintiff should not be permitted to proceed on this meritless claim against non-contracting parties simply because he prefers to litigate in the United States rather than in his home country of Australia.

Accordingly, each and every remaining cause of action within the Amended Complaint should be summarily dismissed pursuant to Federal Rule of Civil Procedure 56.

## ARGUMENT

Summary judgment is appropriate when, as in the case before this Court, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56; Osborne v. Fernandez, No. 06-cv-4127, 2009 U.S. Dist. Lexis 27409, at *10 (S.D.N.Y. 2009). When ruling on a summary judgment motion, the district court must

construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant. Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). The party moving for summary judgment "bears the burden of demonstrating the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to present evidence sufficient to satisfy every element of the claim." Osborne v. Fernandez, No. 06-cv-4127, 2009 U.S. Dist. Lexis 27409, at *11 (S.D.N.Y. 2009).

When, as in this case, a plaintiff is relying on a contract for their claim, the court, however, need not accept the plaintiff's interpretation of the contract but can look to the document itself. Broder v. Cablevision Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005). In Broder, the Second Circuit affirmed dismissal of the Plaintiff's breach of contract claim that had been based upon an alleged violation of Plaintiff's customer agreement with a cable company, finding that Plaintiff's allegation within his complaint that the rates he would be charged would be "subject to applicable law" was contrary to the actual language of the contract, which stated that the rates would be "subject to change in accordance with applicable law." Id. Here, as set forth below, Plaintiff's misrepresentation of the 2019 Terms and Conditions is even more baseless than in Broder. Rather than just misrepresenting a particular term in the contract, Plaintiff is attempting to claim—contrary to the clear text of the 2019 Terms and Conditions —that his subscription to Game Pass Season Pro for the 2019 NFL Season was with entirely different parties. The Court need not accept plaintiff's interpretation but can assess the 2019 Terms and Conditions as they are written and were accepted by Plaintiff when he subscribed to Game Pass Season Pro for the 2019 NFL Season and by continuing to use the service during that season.

Indeed, summary judgment is required as Defendants have satisfied each and every burden Plaintiff himself argued they must overcome in opposing Defendants' motion to

dismiss. There, Plaintiff argued to the Court that Defendants' well-reasoned argument that the 2019 Terms and Conditions applied only to OverTier and Deltatre was "better suited after discovery," because Defendants would have to disprove Plaintiff's allegations that:

> (1) Plaintiff's relationship with Defendants dates back to 2013;
>
> (2) Each year, Plaintiff's Game Pass subscription was automatically renewed without any action by Plaintiff; and
>
> (3) Defendants never provided any notice that Plaintiff was agreeing to new terms and conditions.

[Opposition to Motion to Dismiss, Doc. No. 31, p. 9].

Now that discovery has been completed, it has been established without Plaintiff offering any evidence to the contrary that (1) OverTier was the exclusive licensee with the sole right to market and sell the Game Pass Season Pro subscription product in Australia during the 2019 NFL Season; (2) the 2019 Terms and Conditions, which state expressly that OverTier and Deltatre were the contracting parties for the Game Pass Season Pro subscription, were in effect for the 2019 NFL Season and at the time of the February 2020 Super Bowl, and there was no existing contract with the Defendants; (3) Plaintiff never entered into a contract with the NFL, and any contracts Plaintiff had with NFLE for any of his prior season subscriptions had been extinguished by the time of the 2019 NFL Season because each year's subscription and set of Terms and Conditions was for a one-year period; (4) contrary to Plaintiff's assertions, Plaintiff did not auto-renew his subscriptions from 2013 through 2019, but rather manually subscribed to Game Pass Season Plus Pass in 2017 and 2018; and (5) despite Plaintiff's assertions to the contrary, Plaintiff received abundant, conspicuous, and repeated notice of the new Terms and Conditions with OverTier and Deltatre and his agreement to those Terms and Conditions and failed to opt out during the specified time period in which he had an opportunity to do so. By

Plaintiff's own standards, Defendants have met their burden and should be granted judgment as a matter of law.

**A. Defendants Are Entitled to Summary Judgment as to Plaintiff's Claims of Breach of Contract and Implied Warranty of Merchantability Because Defendants Were Not Parties to the Applicable 2019 Terms and Conditions.**

In the absence of any contract existing between Plaintiff and either the NFL or NFLE for the 2019 NFL Season of Game Pass Season Pro, a necessary and fundamental element of both of Plaintiff's purported claims is not present. See Beautiful Jewellers Private Ltd. v. Tiffany & Co., 438 F. App'x 20, 21-22 (2d Cir. 2011); Fanok v. Carver Boat Corp., LLC, 576 F. Supp. 2d 404, 413 (E.D.N.Y. 2008). The evidence has conclusively proven that the applicable contract for the time period was with OverTier and Deltatre.

First, the 2019 Terms and Conditions state unequivocally that Plaintiff contracted with OverTier and Deltatre for the 2019 NFL Season. There is absolutely no question that no Terms and Conditions with Plaintiff in 2019 were agreed to by either NFL or NFLE. Specifically, the 2019 Terms and Conditions states in pertinent part the following:

> 2.1 Who we are. Overtier Operations who is the official licensee of the content material and Deltatre S.p.A. who operates the platform and deals with customer queries (referred to as "we", "our" and "us"). **As a customer you are contracted with both entities**.

[Joint Stip., Ex. J, Doc. No. 70-10, p. 1; Ex. Q, Doc. No. 70-17, p. 1] (emphasis added).

It is well settled that courts should accord the language of a contract "its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." Kennedy v. Basil, 531 F. Supp. 3d 828, 840 (S.D.N.Y. 2021) (citation omitted). There is no dispute that Plaintiff was entering into a contract for a one-year subscription to Game Pass Season Pro with OverTier and Deltatre for the 2019 NFL Season. Accordingly, there should be no need to look beyond the express words and clear intent of the 2019 Terms and Conditions. Summary judgment as to an issue of contractual interpretation is appropriate where the provision is "wholly unambiguous." Id. at 841 (citation omitted). There

is no ambiguity where the contract has "definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." Id. (citation omitted). Here, there is "no reasonable basis for a difference of opinion" as to the parties with whom Plaintiff contracted for the 2019 NFL Season.

Despite Plaintiff's persistent claim throughout this case, including the opposition to motion to dismiss, that Plaintiff had a "contractual agreement with Defendants covering the 2019 NFL season" [Doc. No. 31, p. 2], Plaintiff was not able to identify any contract other than the 2019 Terms and Conditions for that time period, let alone one that involved the NFL defendants. During his deposition, Plaintiff was specifically asked so, and denied even searching for such a contract:

> Q: Do you have any document that embodies a contract between you and either the NFL or NFL Enterprises for the provision of Game Pass to you in Australia?
> A: I do not know.
> …
>
> Q: Have you looked for one? Have you undertaken a search for any such document?
>
> …
>
> A: [D]o I have a document that says that I was clearly in a direct contract for the provision of Game Pass with NFL Enterprises? I've not looked for that.
>
> Ex. G, pp. 56-58.

The Second Circuit's holding in Beautiful Jewellers Private Ltd. v. Tiffany & Co., 438 F. App'x 20, 21-22 (2d Cir. 2011) supports the application of the 2019 Terms and Conditions due to Plaintiff's failure to present evidence of any other applicable agreement. In that case, a jewelry retailer ("BJP") sued Tiffany & Co. ("Tiffany") for breach of contract claiming that Tiffany had verbally agreed that BJP would be Tiffany's exclusive retailer in India for as long as Tiffany sold goods there. Id. at 21. In affirming the district court's grant of summary judgment for Tiffany, the Second Circuit found no written evidence of that verbal agreement,

particularly relying on draft agreements between the parties which included expiration dates with optional extension dates. Id. In our case as well, no matter how many times Plaintiff makes the conclusory claim that there was some contract between him and Defendants in effect during the 2019 NFL Season and the February 2020 Super Bowl, Plaintiff has failed to come forward with any evidence in support of that claim, and the plain meaning of the documentary evidence available shows that the relevant contract was not with Defendants. As addressed in detail in Section B below, Plaintiff's contention that he entered into a contract in 2013 and somehow that contract with an express term of one year continued to remain in existence for the next seven years is utterly meritless. To borrow phrases used by the Court within the decision denying the motion to dismiss, this is a "Hail Mary" by Plaintiff, and it does not get his claim "down the field." [Doc. No. 52, pp. 12, 15].

The Appellate Division, Second Department's holding in Walz v. Todd & Honeywell, Inc., 195 A.D.2d 455, 455 (2d Dept. 1993) similarly shows that because neither Defendant was a party to the 2019 Terms and Conditions, Plaintiff's claims must be dismissed. In Walz, a novelist sued both a publishing company and the president of the publishing company based on an alleged breach of the publishing company's contract to publish the plaintiff's novel. Id. In affirming summary judgment for the president of the publishing company, the court found that the action could not proceed against him because he was not a party to the contract—the contract was with the publishing company. Id. As in Walz, Plaintiff's Amended Complaint should be dismissed because neither the NFL nor the NFLE were parties to the contract that undisputedly governed Game Pass Season Pro at the time of the 2019 NFL Season and the February 2020 Super Bowl.

In addition to the applicable Terms and Conditions, the evidence has clearly proven Plaintiff's lack of a contract with either of Defendants based on the payment for Plaintiff's subscription service. On August 2, 2019, Plaintiff received an email informing him that his

"payment ha[d] been successful" for his subscription which came from neither NFL nor NFLE, but "noreply@nflgamepass.com." [Joint Stip., Ex. M, Doc. No. 70-13]. That the email address contains a name similar to Defendants is of no import. The Appellate Division, First Department's holding in 61st & Park Ave. Corp. v. Port Morris Tile & Marble Corp., 208 A.D.2d 397 (1st Dept. 1994) is instructive on this point. There, the court granted summary judgment in favor of the defendant even though that defendant "ha[d] a similar name to the corporation which actually entered into, and performed, the contract with plaintiff." Id. at 397. As was held in 61st & Park Ave. Corp., the applicable contract should be enforced only as to the entities that were actually party to it, and the documentary evidence produced in discovery sets forth without a doubt that Plaintiff neither contracted with Defendants nor paid Defendants for his Game Pass Season Pro subscription for the 2019 NFL Season. As such, Plaintiff is unable to support either his breach of contract or breach of warranty of merchantability claims, which undisputedly require a contractual relationship. [Opinion and Order on Motion to Dismiss, Doc. No. 52, p. 9].

**B. Defendants Are Entitled to Summary Judgment As Plaintiff Has Failed To Show That Any Terms and Conditions Other Than the 2019 Terms and Conditions Are Applicable Or That a Course of Dealings Applies.**

Plaintiff's effort to circumvent the controlling 2019 Terms and Conditions by arguing that the 2013 Terms and Conditions were auto-renewed continuously and were still in effect during the February 2020 Super Bowl is meritless and should be denied. In the Opposition to Motion to Dismiss, Plaintiff claimed that Defendant's argument as to the application of the 2019 Terms and Conditions was better suited after discovery, in part because "each year [Plaintiff's] Game Pass subscription was automatically renewed without any action by Plaintiff." [Opposition to Motion to Dismiss, Doc. No. 31, p. 9]. Now, having completed discovery, it cannot be denied that directly contrary to Plaintiff's claim, each and every set of Terms and Conditions for Plaintiff's NFL Game Pass Season Plus, Season Plus Pass, and

Season Pro subscriptions terminated seasonally after one year. In particular, the 2013 Terms and Conditions state:

> For Subscription Products billed on an annual basis (e.g., NFL Game Pass - Season Plus Subscription, NFL Game Rewind - Season Plus Subscription) the term begins when you purchase and **ends before the start of the following year's NFL Preseason (approximately July 31)**, with one-time billing immediately following your purchase.
>
> [Joint Stip., Ex. J, Doc. No 70-10, p. 3]. (emphasis added).

This termination date was also explicitly conveyed to Plaintiff, having been included within a September 10, 2013 email from nflgamepass@neulion.com to Plaintiff, stating, "Your NFL Game Pass subscription for the 2013 season will end at 11:59 pm GMT on 31 Jul 2014." [Joint Stip., Ex. E, Doc. No. 70-5]. Thus, the 2013 Terms and Conditions by their plain meaning terminated years before the February 2020 Super Bowl. Plaintiff cannot escape the undisputed fact that the Terms and Conditions and contract for his Game Pass Season Pro subscription for the 2019 NFL Season was with parties other than Defendants, and nothing Plaintiff has alleged or produced during discovery alters this evidentiary fact.

As such, the Terms and Conditions for the 2013 NFL Season are not the applicable contract in this case. Nor are any of the other subsequent Terms and Conditions prior to the 2019 Terms and Conditions applicable to this case. The 2014 Terms and Conditions, 2015 Terms and Conditions, and 2018 Terms and Conditions all referred to a "term" that began upon the customer's purchase and concluded "before the start of the following year's NFL Preseason (approximately July 31)." Ex. C, 2014 Terms and Conditions; Ex. D, 2015 Terms and Conditions; and Ex. E, 2018 Terms and Conditions. See also Joint Stip., Ex. H, Doc. No. 70-8, 2017 Terms and Conditions. This arrangement of one-year-limited Terms and Conditions was explained clearly in the deposition of Max Boigon on behalf of the NFL:

> Q: Let me restate that. What does a person need to do in order to have this allegedly one year or seasonal agreement renew for another season?
>
> A: It can – this – the terms of service cannot be renewed for another season. They are only for a single season.

Ex. F, p. 63.

Boigon additionally made a critical distinction between renewal of payments and renewal of Terms and Conditions, stating that the "payment will renew but the terms of service will not. The terms of service are a single year, seasonal – annual." Ex. F, pp. 60-61. Therefore, any claim that the 2013 Terms and Conditions to which NFLE was party—and to which NFL was never party—somehow existed in perpetuity because his payment kept auto-renewing does not move Plaintiff any closer to avoiding dismissal.

Even if the Court were to accept the theory that continuous auto-renewal of payments would show that the 2013 Terms and Conditions continued to be applicable for the 2019 NFL Season and the February 2020 Super Bowl—contrary to the plain meaning of the contract—the evidence produced in discovery establishes that Plaintiff's auto-payments ceased at the start of the 2017 NFL Season when he paid for a Game Pass Season Plus Pass subscription by entering his credit card details manually on September 10, 2017 and again on August 1, 2018. Boigon Dec., ¶¶ 12-15. Moreover, it has been explicitly conceded by Plaintiff that OverTier's billing system recognized a "New Subscription Created" on 06/05/2019 [Joint Stip., ¶ 33], supporting that Plaintiff's subscription was not merely a continuation of his 2013 Game Pass Season Plus subscription.

Nor should this Court credit Plaintiff's argument raised in the opposition to motion to dismiss that there was an "overall course of dealings" on which to base the contractual claims. [Opposition to Motion to Dismiss, Doc. No. 31, p. 8]. In general, a "contract cannot be implied in fact where there is an express contract covering the subject matter involved." Broadvision Inc. v. GE, 08 Civ. 1478 (WHP), 2009 U.S. Dist. LEXIS 76610, at *7 (S.D.N.Y. Aug. 13, 2009). In Broadvision, the plaintiff sued both GE and MedPro—a subsidiary of GE—after the plaintiff had entered into a licensing agreement **solely** with GE allowing for the use of plaintiff's software, and GE and MedPro allegedly failed to adhere to provisions of the

licensing agreement. Id. at 1-4. In denying the plaintiff's motion to replead a claim of breach of implied contract against MedPro, the Court found that because there undisputedly was an "express contract with GE" that covered the subject matter, the breach of implied contract claim against MedPro could not survive. Id. at 6-8. Similarly, here, evidence produced in discovery has shown that there was an express contract in place during the 2019 NFL Season and February 2020 Super Bowl governing the subject matter of Plaintiff's subscription—the 2019 Terms and Conditions. The fatal flaw with Plaintiff's Amended Complaint has always been, and continues to be, that Plaintiff elected to file his lawsuit against Defendants, who never were parties to that agreement.

## C. Defendants Are Entitled To Summary Judgment Because Plaintiff Received Abundantly Clear Notice of the Change in Service Provider and Continued to Use The Product.

Plaintiff claimed in the Opposition to Motion to Dismiss that Defendants' argument that the 2019 Terms and Conditions were applicable was better suited for consideration after discovery on the issue had been completed, in part, because "Defendants never provided any notice that Plaintiff was agreeing to new terms and conditions. [Opposition to Motion to Dismiss, Doc. No. 31, p. 9]. Plaintiff additionally argued that he did not know that he was contracting with OverTier or Deltatre. [Opposition to Motion to Dismiss, Doc. No. 31, pp. 9-10]. That argument and position is anticipated to be the crux of the opposition to the instant motion. Despite these contentions, the evidence has proven that Defendants in fact provided extensive notice to Plaintiff of the change in service provider and of the 2019 Terms and Conditions, as set forth in detail above, including through informing Plaintiff of the need to update his subscription to a Deltatre app for the 2019 NFL Season. See Preliminary Statement.

Critically, the email account associated with Plaintiff's Game Pass Season Pro subscription opened every single one of these notification emails, completely belying any claim that Plaintiff did not receive notice. See Johnston Aff., ¶¶ 18-20, 22-23. To the extent that

Plaintiff seeks to argue that he lacked notice because he did not read these conspicuous emails—even though his email account opened them—it is of no relevance to his argument. It is well settled that a party is not excused from their obligations under a contract merely because they failed to read it. See Marciano v. DCH Auto Group, 14 F. Supp. 3d 322, 330 (S.D.N.Y. 2014). Plaintiff cannot claim that lack of notice excuses his ignorance of who he contracted with when he was provided with that information in no uncertain terms.

After receiving this extensive notice of his contract with OverTier and Deltatre and that his continued use of the product after a certain date would amount to his consent to the 2019 Terms and Conditions, Plaintiff continued to use his subscription, evidencing his consent to the new one-year Terms and Conditions. Plaintiff's continued use of his subscription is closely analogous to the facts of Valle v. ATM Natl., LLC, No. 14-cv-7993, 2015 U.S. Dist. LEXIS 11788 (S.D.N.Y. Jan. 30, 2015). There, the Court assessed the enforceability of a newly added arbitration clause contained within a supplementary agreement provided by a bank to its customers regarding their savings account with the bank. Id. at 3. The Court reiterated the established standard that "customers accept revised terms of their accounts by continuing to use their accounts after receiving revised terms." Id. at 7. Therefore, since the bank had provided a letter explaining the change sent to the address "regularly used to communicate with its customers" and provided an opt-out provision allowing customers to reject the new terms "by closing their account within 60 days," the plaintiffs were bound through the continued use. Id. at 8-10. Plaintiff here received even more conspicuous notice of the change of terms than the notice that was found sufficient in Valle, including reminders that the service provider was being updated, a reminder in the July 1, 2019 email that his account (with the new service provider) would be auto-renewed in 31 days, and, critically, an email indicating that if Plaintiff "continue[d] to use [the] products and services on or after October 29, 2019, [he was] agreeing to the updated terms and conditions." [Joint Stip., Exs. I, K, L, O, Q, Doc. Nos. 70-9, 70-11,

70-12, 70-15, 70-16]. Additionally, all of those emails were sent to the email address "regularly used to communicate" with Plaintiff (Johnston Aff., ¶ 10), and all of these emails contained hyperlinks to the 2019 Terms and Conditions identifying OverTier and Deltatre. [Joint Stip., Exs. I, K, L, O, Q, Doc. Nos. 70-9, 70-11, 70-12, 70-15, 70-16]. Plaintiff was also explicitly told in the July 1, 2019 email, "[i]f you wish to cancel your subscription, you can manage your preferences **here**," with "here" appearing as a hyperlink. Moreover, the 2019 Terms and Conditions explicitly contained a clause stating that "[f]or any subscription product bought online you have a legal right to change your mind within 14 days and receive a refund," indicating that Plaintiff had ample opportunity to cancel his subscription if he did not agree to the new Terms and Conditions [Joint Stip., Ex. J, Doc. No. 70-10, p. 4; Ex. Q, Doc. No. 70-17, p. 4]. Therefore, Plaintiff's argument that lack of notice allows the court to enforce any terms other than the 2019 Terms and Conditions is meritless and should be denied, because Plaintiff in fact received repeated and conspicuous notice and continued to use the subscription nevertheless, despite being given a chance to cancel, indicating his assent and ratification of the contractual relationship with OverTier and Deltatre.

Moreover, to the extent that Plaintiff argues that the 2019 Terms and Conditions were not binding on him because they were located behind a hyperlink, such an argument is unsuccessful in showing lack of an enforceable contract. The Second Circuit has held that the mere fact that terms and conditions are behind a hyperlink does not render them invalid. Meyer v. Uber Tech., Inc., 868 F.3d 66, 75 (2d Cir. 2017). In the context of "browsewrap" agreements in which terms and conditions are located behind a hyperlink, the agreement is enforceable as long as the party to the agreement had actual or constructive notice of the terms. Id. In evaluating the adequacy of the notice provided, a court will assess the conspicuousness of the notice, accounting for the screen design and language used in order to determine if a reasonable person "would have known about the terms and the conduct that would be required to assent

to them." Id. at 77-78 (internal quotation marks and citation omitted). In Meyer, the court found there was sufficient notice of an arbitration provision in the plaintiff's terms and conditions with Uber to enforce the agreement, even though the plaintiff admittedly did not read the terms and conditions. Id. at 71. In so finding, the court emphasized that the screen for processing payment indicated in black text—contrasting with the bright white background and blue hyperlinks—that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," that the screen was "uncluttered," and that the screen was entirely visible at once without any need for the user to scroll. Id. at 78. The court found that the agreement was still valid even though it was behind a hyperlink because the "hyperlinked text itself was reasonably conspicuous." Id. at 79.

Here, Plaintiff's argument that he was not aware of OverTier and did not agree to contract with OverTier is belied by the conspicuousness of the agreement just like in Meyer, comprising multiple emails. Not only did Plaintiff receive emails explicitly informing him of the change in the service provider and reminding him of his auto-renew status, but he also received multiple emails beginning in June 2019 providing him with the updated Terms and Conditions for OverTier and Deltatre, as well as an email on October 29, 2019 which specifically referenced the updated Terms and Conditions for OverTier and Deltatre, stating in bolded type, "**Updates to Terms and Conditions**." [Joint Stip., Ex. P, Doc. No. 70-16]. Without any need to scroll throughout the document, the viewer of this email would have been able to see the invitation to "review the new Terms and Conditions in full here," with the word "here" appearing in a hyperlink:



**Updates to Terms and Conditions**

We are writing to let you know about updates we are making to our Terms and Conditions. These updates apply to all existing NFL Game Pass Australian subscribers only and take effect on October 29, 2019.

We invite you to please review the new Terms and Conditions in full here. You can also learn more on our FAQs page here.

[Joint Stip., Ex. P, Doc. No. 70-16]. Additionally, the text was fairly spread out with extra spaces between paragraphs. Lastly, the email contained the clear message that, "If you continue to use our products and services on or after October 29, 2019, you are agreeing to the updated Terms and Conditions":

If you continue to use our products and services on or after October 29, 2019, you are agreeing to the updated Terms and Conditions.

Thank you for being part of the continuous growth of the NFL in Australia.

NFL Game Pass

[Joint Stip., Ex. P, Doc. No. 70-16]. Thus, this case is precisely like <u>Meyer</u>, in which the court found reasonably conspicuous notice of terms and conditions based on the lack of screen clutter, the warning that by creating an account the party would be agreeing to the terms and conditions, the visibility of all text at once without needing to scroll, and the contrasting hyperlinked text link to the actual terms. <u>Meyer v. Uber Tech., Inc.</u>, 868 F.3d 66, 78-79 (2d Cir. 2017). As such, there is no issue of material fact as to whether or not Plaintiff consented to the 2019 Terms and Conditions which set forth a contractual agreement with OverTier and Deltatre and not with either of Defendants. The court's guidance in <u>Meyer</u> is instructive, that "[w]hile it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice." <u>Id.</u> at 79. Therefore, without a

valid contractual basis for either his breach of contract or warranty of merchantability claims, Plaintiff's Amended Complaint must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Amended Complaint should be summarily dismissed in its entirety pursuant to Federal Rule of Civil Procedure 56.

Dated: New York, New York
      May 16, 2022

                        Respectfully submitted,

                        LONDON FISCHER LLP

                        *Thomas A. Leghorn*

By: _____
                        Thomas A. Leghorn
                        Jason M. Myers
                        Joshua J. Kelly
                        *Attorneys for Defendants*
                        National Football League and
                        NFL Enterprises LLC
                        59 Maiden Lane
                        New York, New York 10038
                        (212) 972-1000
                        Fax (212) 972-1030
                        File No.: 810.0567597