EXECUTION COPY

**Amended and Restated Product Development and Media Rights Agreement**

This Amended and Restated Product Development and Media Rights Agreement (this "**Agreement**") is entered into by and between OverTier Operations (formerly known as Rover Europe Operations), a Cayman Islands exempted company ("**NewCo**"), and NFL International LLC ("**NFLI**"), as of June 18, 2018 (the "**Amendment Effective Date**"). As of the Amendment Effective Date, this Agreement will amend, and restate as amended, the Product Development and Media Rights Agreement entered into by NewCo and NFLI (the "**Original Agreement**"), as of April 1, 2017 (the "**Effective Date**"), but will not constitute a novation or replacement thereof or in any way impair or otherwise affect the rights or obligations of the Parties thereunder, except as such rights or obligations are amended or modified by this Agreement. For the avoidance of doubt, the Original Agreement, as amended and restated by this Agreement, is a continuing agreement among the Parties and any reference to the Original Agreement in this Agreement or elsewhere (e.g., that certain Guarantee entered into by and among the Parties, Bruin Canada Holdings, L.P. and Deltatre S.p.A. as of the Effective Date) will be construed to mean this Agreement.

| | |
|---|---|
| Parties | NFLI and NewCo, each a "**Party**" and together the "**Parties**". |
| Certain Definitions | "**App Store**" means the on-screen menu available on certain Approved Devices which permits end users to browse and install thereon certain applications offered through the provider of the applicable platform, including Game Pass. |
| | "**Bruin**" means the collective reference to Bruin Canada Holdings, L.P. and any affiliate that is a direct owner in NewCo as of the Effective Date. |
| | "**Controlling Affiliate**" means any person or group of persons that possesses, directly or indirectly (including through one or more intermediaries): (a) the power to elect or control the votes of the majority of the board of directors or other governing body of NewCo; (b) more than fifty percent (50%) of the capital stock or other voting interests of NewCo; and/or (c) the power to direct or cause the direction of the management and policies of NewCo, whether through the ownership of voting securities, by contract, or otherwise. |
| | "**Fiscal Year**" means each period commencing April 1 of a calendar year and ending March 31 on the following calendar year during the Term; provided that the 2017 Fiscal Year shall run from the Effective Date through March 31, 2018, and each subsequent Fiscal Year shall run for each subsequent twelve (12) month period thereafter. |
| | "**Game Pass Information**" means screen shots, images, artwork, icons and/or any other text, descriptions, representations, metadata or information relating to Game Pass and/or GP Content that are approved by NFLI and displayed on, or in connection with, the user interface of the App Stores. |
| | "**Licensed Marks**" means the NFL Game Pass logo and such other NFL Marks (as defined below) as may be provided by NFLI and used as approved by NFLI in connection with the development and operation of Game Pass and/or promotion of Game Pass as described below. |
| | "**Measurement Date**" means the first Friday following the conclusion of the Super Bowl. |
| | "**Member Clubs**" means the member clubs of the NFL. |

"**NFL**" means the National Football League.

"**NFL Marks**" means the names, symbols, emblems, designs, and colors of the NFL and its Member Clubs, including, without limitation, the terms "National Football League", "NFL", "National Football Conference", "American Football Conference", "NFC", "AFC", "Super Bowl", "Pro Bowl", "NFL International Series", "NFL Network", "NFL RedZone", "NFL Network", the NFL Shield design, the NFL Game Pass logo as well as the full team names, nicknames, helmet designs, uniform designs, logos and slogans of the Member Clubs, and any other identifying symbols, slogans and indicia adopted for commercial purposes

by the NFL or any of its Member Clubs prior to, on or after the Effective Date.



"**NewCo Change of Control**" means:

(a) any assignment, conveyance, sale, transfer or other disposition of all or substantially all of the assets or business of NewCo or any Controlling Affiliate;

(b) any merger, acquisition, consolidation, reorganization, sale or transfer of equity or other transaction or series of transactions involving NewCo or any Controlling Affiliate, the result of which is that a new person (or group thereof) that was not a Controlling Affiliate immediately prior to such transaction(s) becomes a Controlling Affiliate following such transaction; and/or

(c) any merger, acquisition, consolidation, reorganization, sale or transfer of equity or other transaction or series of transactions, the result of which is that a Prohibited Issuer becomes a direct or indirect owner of thirty percent (30%) or more of the capital stock or other voting interests of NewCo; provided, however, that any investment by a Prohibited Issuer in Bruin and/or WPP plc (or any of their respective affiliates which is not made for purposes of directly or indirectly investing in NewCo) shall not be deemed a NewCo Change of Control.

Notwithstanding the foregoing definition of NewCo Change of Control, the occurrence of any event set forth in clause (a) or (b) with respect to Bruin shall not be deemed a NewCo Change of Control so long as George Pyne is the Chief Executive Officer (or equivalent) of Bruin (or any successor company) and holds substantially the same level of decision-making authority and responsibility with respect to Bruin (or any successor company) and NewCo as he does as of the Effective Date.

"**Personal Data**" means any information in any media or format that identifies or could reasonably be used to identify or be linked to an identified or identifiable natural person, or such person's device (including IP address and cookie information, or any other device-specific number or identifier).

"**Prohibited Issuer**" means (a) any entity actively engaged in the operation, manufacturing or sale, as applicable, of the following: (i) gambling or lottery

| | |
|---|---|
| | operations, casinos, horse and dog tracks, off-track betting organizations, gaming enterprises, jai alai frontons, bingo parlors, or any online or mobile gambling operations or applications, (ii) dietary or nutritional supplements, (iii) tobacco products, or (iv) pornography; (b) any entity engaged in any litigation or arbitration with the National Football League or any of its affiliates (excluding, for the avoidance of doubt, any of the Member Clubs and their respective owners); (c) any entity in which an owner, officer or director of any Member Club has a material interest; and/or (d) any entity that derives material revenues from business categories competitive with any sponsor or network television partner of the National Football League.<br><br>"**UK**" means, collectively, the United Kingdom of Great Britain and Northern Ireland, the Channel Islands, the Isle of Man and the Republic of Ireland, including oil rigs within the UK's territorial waters and British Forces overseas bases.<br><br>"**WPP**" means the collective reference to WPP plc and any affiliate that is a direct owner in NewCo as of the Effective Date. |
| Term | This Agreement shall be legally binding as of the Effective Date and shall expire, unless sooner terminated in accordance with its terms, on March 31, 2020 ("**Expiration Date**") (the "**Term**"); provided that (a) the distribution rights and obligations granted herein shall not commence until April 1, 2017 and (b) if across the Territory and across all platforms, as of the Measurement Date for the 2019 NFL season, REDACT    REDACT    instead be March 31, 2023; REDACT    REDACT |
| Territory | "**Territory**" means the countries listed in Exhibit A. |
| Game Pass Development | NewCo will develop and create, and throughout the Term, NewCo shall operate, maintain, support and host a premium, stand-alone subscription digital video product branded as "NFL Game Pass" that enables users to view the GP Content (as defined below) (together with any updates, enhancements and iterations approved in accordance with this Agreement, "**Game Pass**").<br><br>Game Pass shall have, at a minimum, features and functionality (including third-party functionality) consistent with the Product Roadmap attached to this Agreement as Exhibit B.  NewCo shall perform (or, in accordance with this Agreement, cause to be performed) all of the services set forth in the Product Roadmap as part of Game Pass.  NFLI shall (and NFLI shall cause NeuLion, Inc. (together with its affiliates, "**NeuLion**") and the NFL product team to) provide reasonable assistance as contemplated by this Agreement and the Product Roadmap with respect to Game Pass.  NewCo shall add updates and enhancements to the Game Pass features and services and/or different iterations of Game Pass with varying features (including, without limitation, localized content, different "look and feel" and functionality offerings).  Any such updates, enhancements, and iterations shall be consistent with a premium subscription video programming product and all other terms and conditions of this Agreement (e.g., no virtual reality, virtual advertising, or interactive |

experiences).  NewCo shall have sole discretion to determine the packaging and pricing of Game Pass, but shall not have rights to make significant changes to Game Pass (e.g., overhaul the app, add/remove Approved Devices, etc.) except as otherwise set forth herein.

NFLI shall have the sole right to determine and approve the branding of Game Pass.

Game Pass will be available, at a minimum, on desktop browsers, mobile (iOS, Android, etc.), game consoles (PlayStation 4, Xbox One), other connected devices (Apple TV, etc.) and certain products and platforms of key NFL partners, in each case, in accordance with the Product Roadmap (collectively, "**Approved Devices**").  Notwithstanding the foregoing, NewCo acknowledges and agrees that, with respect to the 2017 NFL season (and, as directed by NFLI, any other season thereafter as reasonably necessary to comply with continued contractual restrictions), (1) there will be an "NFL Game Pass"-branded environment within the "NFL" application as accessed on the Xbox 360 and Xbox One devices, and personal computers and Microsoft Surface tablets running Windows 10 (the "**Specified Microsoft Devices**") (provided that, for clarity, Game Pass will not be sold to end users through such environment or application), (2) NewCo will not offer a version of Game Pass pursuant to this Agreement on any Specified Microsoft Devices unless otherwise directed or approved by NFLI, and (3) NewCo will work with NeuLion (or another vendor selected by NFLI) and Microsoft to (x) deliver (or arrange for the delivery of) the GP Content for distribution via, and (y) allow Game Pass subscribers in the Territory to enable such subscribers to access GP Content on, such "NFL Game Pass"-branded environment as accessed on Specified Microsoft Devices.  The foregoing sentence shall be referred to herein as "**Microsoft Device Distribution**".

NewCo will be solely responsible for (a) ensuring the timely delivery of Game Pass prior to the start of the 2017 NFL regular season and each NFL regular season during the Term thereafter and (b) the accuracy and originality of all work product comprising Game Pass; provided that NewCo's obligations in clause (a) will be tolled solely to the extent and during the period that any late delivery of Game Pass is directly attributable to a failure of NFLI to deliver (or arrange for the delivery of) Live Content or approve the branding of or use of NFL Marks within Game Pass.

NFLI shall have the right to conduct acceptance and quality assurance testing of Game Pass which demonstrates that the specifications set forth in the Product Roadmap have been achieved.  If, as of May 1, 2017, either NFLI or NewCo believes that NewCo is unlikely to comply with Milestone 1 (as defined in the Product Roadmap) in all material respects throughout the Territory on or before June 15, 2017, then the Parties will discuss in good faith the prioritization of certain objectives and specifications in the Product Roadmap with the goal of launching a mutually acceptable version of the Launch Website (as defined in the Product Roadmap) throughout the Territory on or before June 15, 2017.  If, following such good faith discussions with NewCo, NewCo fails to comply with Milestone 1 in all material respects (or any mutually agreed revision to such milestone) throughout the Territory on or before June 15, 2017, then, unless such late delivery is directly attributable to a failure of NFLI to deliver (or arrange for the delivery of) Live Content or approve the branding of or use of NFL Marks within Game Pass (in either case, NewCo's delivery

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001047

obligation will be tolled solely to the extent and during the period that any late delivery of Game Pass is directly attributable to such failure), notwithstanding anything to the contrary in this Agreement, NFLI may either (A) immediately terminate this Agreement without penalty or payment or (B) contract with (or, at NFL's election, to require NewCo to contract with) NeuLion (or another vendor determined by NFLI) to operate an "NFL Game Pass"-branded digital subscription product in the Territory during the 2017 Fiscal Year, at NewCo's expense (and NewCo shall be responsible for the collection of revenues from and payment of expenses to NeuLion (or such other vendor) in connection with the operation of such product in the Territory during the 2017 Fiscal Year), in which case (i) the exclusivity provisions set forth in the "Exclusivity" section shall not apply with respect to the 2017 Fiscal Year, (ii) NewCo shall have no right to distribute any GP Content during the 2017 Fiscal Year, (iii) NewCo's marketing and promotional obligations set forth in this Agreement shall apply *mutatis mutandis* to such product with respect to the 2017 NFL season, (iv) all net revenues actually collected or received in respect of subscribers to such product in the Territory for the 2017 Fiscal Year shall be treated as Media Revenues (as defined below) and any payments of expenses to NeuLion (or such other vendor) in connection with the operation of such product in the Territory for the 2017 Fiscal Year shall be treated as Media Expenses, and (v) none of NewCo, Bruin, WPP or any subcontractor of NewCo shall have any liability arising from any services provided by NeuLion (or any other vendor determined by NFLI), including, without limitation, the use of any Personal Data processed by or on behalf of NeuLion.

| | |
|---|---|
| Game Pass Content | During the Term, NFLI will deliver (or arrange for the delivery of) to NFLI's designated delivery point ("**NFLI Delivery Point**"), all live NFL games (preseason, regular season, postseason) aired during the Term, all live pre-game broadcast shows aired prior to kickoff that are not proprietary to a third party (e.g., pre-game shows that begin approximately thirty (30) minutes prior to kickoff, but not, for example, ESPN NFL Countdown) during the Term (to the extent that such shows are cleared for distribution in any part of the Territory), all live episodes of NFL RedZone aired during the Term and a linear feed of NFL Network for distribution within Game Pass (collectively, "**Live Content**"). NFLI shall also provide NewCo with credentials to access and utilize a GSIS (Game Statistics & Information System) data feed and current NFL-created highlights and clips, video on demand content and other NFL-related video programming to be mutually agreed by the Parties (which content will in any event be generally consistent with that provided by NFLI with respect to the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season) ("**Other NFL Content**"), in each case, in HD video and audio container formats to be mutually agreed.  A list of Other NFL Content that was included in the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season is attached hereto as Exhibit E.  NewCo shall have the right to create clips from the raw feeds provided as part of Live Content solely for marketing and promotional purposes.

During the Term, NewCo shall transcode and archive all live NFL games and live episodes of NFL RedZone ("**Archive Content**"), and produce condensed replays (in a format reasonably acceptable to NFLI) of each NFL game included in Live Content ("**Condensed Games**"); provided, however, NewCo will review the scope of Archive Content and Condensed Games from time to time in good faith to determine whether Archive Content and Condensed Games should be reduced or supplemented; and provided, further, that NewCo (a) is required to |

archive only content that originally aired on or after the first day of the 2016 NFL season and (b) will use commercially reasonable efforts to include Archive Content that was originally aired prior to the 2016 NFL season. NewCo's costs to transcode and archive Content and condense Condensed Games shall be set forth in the Budget and shall constitute Media Expenses. NewCo will provide NFLI with copies of Archive Content and Condensed Games upon NFLI's reasonable request.

NewCo may provide to Game Pass subscribers temporary download rights for the video on-demand assets of GP Content generally consistent with the temporary download rights provided to subscribers of the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season; provided that the temporary download window for any video on-demand asset of GP Content shall not extend longer than seventy-two (72) hours from the time of download. For the avoidance of doubt, live NFL games played during the Term shall be available as video-on-demand assets promptly after the conclusion of such game.

Except as set forth herein, NewCo shall not be liable or responsible for any licensing fees for GP Content.

With respect to delivery costs, the transmission costs associated with the delivery of GP Content to the NFLI Delivery Point shall be borne by NFLI; provided that (a) all costs associated with providing NewCo access to the NFLI Delivery Point and (b) all delivery costs associated with delivering GP Content from the NFLI Delivery Point to Game Pass subscribers shall be borne by NewCo (and treated as Media Expenses).

"**GP Content**" means, collectively, Live Content, Other NFL Content, Archive Content and Condensed Games (including, for clarity, any NFL Marks that may be contained within such content as delivered by NFLI or its designee).

| | |
|---|---|
| Game Pass – General Grant of Rights | Subject to the terms and conditions of this Agreement, NFLI grants to NewCo the non-transferable right and license, and NewCo accepts the obligation, during the Term and throughout the Territory to offer, market and sell Game Pass as a standalone subscription offering and distribute GP Content solely within Game Pass running on Approved Devices.  For clarity, except as may be approved by NFLI in writing in its sole discretion, NewCo may not syndicate, sublicense, pass-through or otherwise distribute GP Content (other than within Game Pass running on Approved Devices).  NewCo shall have the right, but not the obligation, to implement "start over" and "lookback" (i.e., functionality whereby a subscriber may restart GP Content that is in progress at any time during the period of such GP Content's live or linear exhibition, and for a limited time thereafter for live games until a VOD or condensed version of such game is available) and rewind functionality with respect to any GP Content distributed on a live basis.

Subject to the terms and conditions of this Agreement (including NFLI's approval rights), NFLI hereby grants to NewCo, and NewCo hereby accepts, a non-exclusive, non-transferable, royalty-free, fully paid-up license during the Term and in the Territory to:  (a) display, reproduce, and distribute the Licensed Marks in connection with the operation of Game Pass, within the App Stores and in NFLI-approved promotion(s) of Game Pass as described below; (b) to display, reproduce and distribute the Game Pass Information via the App |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001049

| | |
|---|---|
| | Stores; and (c) to reproduce, display and distribute excerpted portions of the Game Pass Information on the user interface of the App Stores or in connection with the display of an end user's search results.<br><br>NewCo agrees that all distribution of GP Content hereunder shall be in compliance with the terms of this Agreement and that the distribution of GP Content shall be made solely through offerings that comply with, and are sold or otherwise made available in compliance with, the terms of this Agreement.<br><br>For clarity, (i) the licenses granted in this Agreement do not extend to, and any exclusivity provided herein does not apply, to rights to virtual reality, virtual advertising, or interactive experiences in connection with GP Content and (ii) Game Pass shall not be offered, marketed or sold in the Territory in any manner in which an end user is required to be a subscriber to another product or service (e.g., a particular mobile network or internet service provider) as a condition of access to Game Pass. Except as expressly granted herein, all rights are reserved by NFLI. |
| Game Pass –<br>Content<br>Distribution<br>Obligations | During the Term, NewCo (a) shall have the obligation to distribute all Live Content in its entirety in English on a live basis throughout the Territory and (b) shall not blackout any Live Content (for clarity, other than commercials therein as provided in the "Game Pass Advertising and Sponsorship" section below) in any country within the Territory unless directed by NFLI in order to comply with the NFL's then-current blackout policies or third-party contractual obligations. <span style="color:red">REDACT</span><br> |
| | NewCo may make proposals to localize certain Live Content (e.g., local language feeds) and offer additional audio feeds (e.g., local radio feeds, Spanish language radio feeds) in certain countries in the Territory, which shall be subject to |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY<br>DEF0001050

| | |
|---|---|
| | NFLI's prior approval (acting in good faith), and all costs associated therewith shall be treated as Media Expenses.<br><br>The available windows for all GP Content to be made available on an on-demand basis shall be reasonably consistent with the windows that existed with respect to the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season. |
| **Game Pass Advertising and Sponsorship** | NewCo shall blackout all commercials airing during live NFL games distributed via Game Pass and replace such commercials with NFLI-provided house ads or promotional units.  All units provided by NFLI for replacement are "**Required Advertising Materials**".  NewCo shall not sell or otherwise provide any other advertisements or any sponsorships in connection with Game Pass, unless otherwise approved by NFLI.  If NewCo wishes to begin selling any such advertising and/or sponsorships, then NewCo shall present a proposed advertising and/or sponsorship plan to NFLI, which NFLI shall in good faith consider such plan as part of a separate arrangement between the Parties. |
| **Game Pass Product Offerings** | NewCo shall have the right to determine the retail prices to be paid for Game Pass in each country within the Territory, provided that at all times Game Pass shall have pricing which reflects its status as a premium subscription video programming product in such country.<br><br>At a minimum, Game Pass shall be offered throughout the Territory as one (1) season-long (including the postseason and Super Bowl) package subscription SKU for each NFL season during the Term.  Subject to the immediately preceding paragraph, NewCo shall have the right to offer additional SKUs of Game Pass in the Territory (e.g., weekly, playoffs, Super Bowl), as NewCo may determine in its sole discretion.  NewCo shall have the right to offer to any end user in the Territory one (1) free trial per Fiscal Year for a period lasting no more than fourteen (14) consecutive days.<br><br>Subject to the last paragraph of the "Economics" section, NewCo shall be responsible for collecting all revenues from Game Pass subscribers. |
| **Additional Game Pass Restrictions** | Without limiting any of NFLI's approval rights hereunder, NewCo will not use the GP Content or distribute or offer Game Pass (a) in any manner that NFLI believes, in its sole good faith opinion, suggests or implies an association between any person or entity, on the one hand, and NFLI, the NFL, any Member Club, any NFL player and/or any other individual associated with the NFL, on the other, (b) in connection with what NFLI believes, in its sole good faith opinion, to be in connection with any "betting lines," gambling or any form of wagering (including, without limitation, casinos, sports books and telephone betting services), or (c) in any other manner that NFLI believes, in its sole good faith opinion, would reflect negatively on NFLI, the NFL, any Member Club, any NFL player, and/or any other individual associated with the NFL.<br><br>NewCo acknowledges and agrees that this Agreement does not grant to NewCo any rights with respect to the use of the names or likenesses of any NFL players, except to the extent that such players' names or likenesses are part of the GP Content used and distributed in accordance with the terms and conditions of this Agreement. |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY<br>DEF0001051

| Exclusivity | During the Term, neither NFLI nor any of its affiliates shall distribute or license to any person (other than NewCo) the right to distribute, in any part of the Territory, a bundle of all or substantially all live NFL games (measured either over an entire NFL season (preseason, regular season and postseason) or the first or second half of an NFL regular season) in their entirety (or substantially in their entirety) in an HD video format via the open internet or mobile networks as part of an NFL-branded premium digital subscription product. REDACT [REDACTED] . NewCo agrees that NFLI's exclusivity obligations shall not be violated (i) in the event that NFLI makes arrangements during the Term with respect to the distribution of all or substantially all live NFL games via the internet or mobile networks through an NFL-branded premium digital subscription product following the Term or (ii) for clarity, by virtue of the Microsoft Device Distribution as contemplated hereunder. |
|---|---|
| Budget | REDACT [REDACTED] |
| Economic Definitions | REDACT [REDACTED] REDACT [REDACTED] |



HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001052



HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001053



HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001054



HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001055



| | |
|---|---|
| | REDACT |
| 2017 Fiscal Year Payment Terms | REDACT |
| 2018 Fiscal Year Payment Terms | REDACT |
| Taxes | REDACT |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001056



| | |
|---|---|
| Audit | During the Term and for one (1) year thereafter, NewCo shall maintain complete and accurate records of its activities under this Agreement to the extent they give rise to payment and reporting obligations hereunder. The records of NewCo's activities under this Agreement shall include, without limitation, complete and accurate records of all Media Revenues and Media Expenses.

NFLI shall, at its cost, have the right to audit, or to designate a third party to audit (provided that any such third party shall be required to be contractually bound to protect NewCo's confidential information), NewCo's books and records solely to determine NewCo's compliance with the calculation and payment of the amounts due under this Agreement. Unless otherwise agreed by the Parties, any such audit shall be conducted during normal business hours and in a manner that does not unreasonably interfere with NewCo's business activities. NFLI may not conduct an audit more than once per Fiscal Year during the Term and during the one (1) year period thereafter; provided that, for the avoidance of doubt, follow-ups reasonably necessary to complete any such audit shall not be considered a second audit. Any audit conducted under this Agreement may cover all prior periods during the Term that have not been audited previously, and no period may be audited more than once.

NFLI shall bear the expenses of its auditors; provided, however, that the expenses of any Mutually Selected Auditor (as defined below) shall be treated as a Media Expense. If the results of such audit indicate an underpayment of amounts due hereunder of more than five percent (5%) of the amount payable to NFLI under this Agreement for the period audited, then NewCo shall promptly pay to NFLI any such underpayment, and interest thereon at the then-current prime rate from the date such amount became due until the date of payment; provided that, for the avoidance of doubt, any amounts required to be paid to NFLI as a result of this provision shall not be treated as Media Expenses. NFLI's audit rights hereunder shall survive for one (1) year after any termination or expiration of this Agreement.

Notwithstanding anything in this section to the contrary, if NewCo disagrees with the results of NFLI's auditor, then (a) NewCo shall provide notice to NFLI of such disagreement within thirty (30) days of NewCo's receipt of such results (the "**Audit Dispute Notice**") and (b) NewCo, NFLI and such auditor shall discuss in good faith the results of such audit. If the Parties are unable to resolve such audit dispute within thirty (30) days of NFLI's receipt of the Audit Dispute Notice, the Parties shall mutually select an independent third-party auditor (a "**Mutually Selected Auditor**") to reexamine the applicable books and records of NewCo. The final determination of the Mutually Selected Auditor shall be binding on the Parties and the expenses of any Mutually Selected Auditor shall be treated as a Media Expense. |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001057

| | |
|---|---|
| | In the event an independent public accountant of recognized standing prepares audited financial statements of NewCo, NewCo shall provide NFLI with true and complete copies of such audited financial statements within thirty (30) days of NewCo receiving them. |
| **NFL Convenience Out** |  |
| **Mutual Termination Rights** | In the event that either Party is in material breach of this Agreement, the other Party may provide written notice of such material breach to the other Party, and if such material breach (a) is capable of being cured and is not cured within thirty (30) days or (b) not capable of being cured within such thirty (30) day period, then, in addition to any other rights and remedies available, the non-breaching Party may immediately terminate this Agreement by providing written notice of its election to the other Party.  In addition, either Party may immediately terminate this Agreement upon notice to the other Party, if the breaching Party has repeatedly materially breached material provisions of this Agreement to such a degree that it is unlikely that the breaching Party is willing or able to continue to perform its obligations under this Agreement without continuing to materially breach this Agreement. |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001058

| | |
|---|---|
| | Either Party may terminate this Agreement for cause, effective immediately upon written notice to the other Party, if such other Party is insolvent or subject to any bankruptcy or similar proceedings. |
| **Customer Agreement** | At the time of purchase, NewCo shall be responsible for requiring each end user seeking to purchase a subscription to Game Pass (or otherwise accessing GP Content via a free trial) to agree to an end user terms and conditions and a privacy policy (together with any other terms or disclosures to end users, "**Customer Agreements**") before being authenticated, which provides for the following terms and conditions, and otherwise is of form and substance approved by NFLI prior to implementation: (a) Game Pass and the GP Content may only be used for the end user's personal, private, non-commercial use within the Territory and not for any other purpose or for retransmission, distribution, or sale, (b) no NFL Marks may be used by such end user, (c) NFLI and its affiliates may enforce violations of the end user's agreement with respect to their respective intellectual property rights, and (d) Personal Data and data associated with such end user's viewing of such GP Content may be collected by NewCo and shared with NFLI or one or more of its affiliates. The Customer Agreements shall in all events comply with applicable law and industry best practices (including, without limitation, the Self-Regulatory Principles for Online Behavioral Advertising) and be adequate to provide NFLI all rights and consents required under applicable law for it and its affiliates to exercise their rights, title, and interests to Personal Data and as otherwise reserved to them under this Agreement. Without limitation to the foregoing, NewCo's collection, use, and other processing of Personal Data will accord with all such Customer Agreements and applicable laws. |
| **Authentication and Customer Data Protection** | NewCo will implement all necessary registration and sign-on capabilities in accordance with the Product Roadmap, including, if directed by NFLI, by integrating NFL.com accounts into Game Pass (as such integration occurred with respect to the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season). NewCo shall limit each subscriber account accessing Game Pass to one (1) stream at a time per device and per IP address.<br><br>Subject to the Payment Card Exception (defined below), NFLI shall be the sole "data controller" and NewCo shall be a "data processor" (as those terms are defined under European data protection law), in relation to all Existing Subscriber/Prospect Data and New Subscriber Data (each, as defined below), and NewCo shall process such Existing Subscriber/Prospect Data and New Subscriber Data only on the documented instructions of NFLI. For purposes of the foregoing, "**Existing Subscriber/Prospect Data**" refers to any Personal Data that NFLI or its authorized subcontractor makes available to NewCo that relates to existing subscribers to the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season ("**Existing Subscribers**") or prospective Game Pass subscribers ("**Prospects**") and "**New Subscriber Data**" refers to any Personal Data that is collected by or on behalf of NewCo pursuant to this Agreement that relates to end users of Game Pass that are not Existing Subscribers or Prospects ("**New Subscribers**"). For the avoidance of doubt, NFLI or its authorized subcontractor shall make available to NewCo the Personal Data of Prospects on an ongoing basis throughout the Term.<br><br>Payment Card Exception: Solely with respect to payment card number, expiration date, and any other payment card details necessary to process a |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001059

payment for a subscription to Game Pass in the Territory ("**Payment Data**"), NFLI and NewCo shall each be deemed a data controller (i.e., co-controllers); provided, that the Parties agree that NewCo will not transmit Payment Data to NFLI in the regular course during the Term of this Agreement; provided, further, that NewCo will promptly transmit all such Payment Data to NFLI or its designated agent in an industry standard format (1) upon NFLI's request no more than once per year during the Term of this Agreement and (2) in connection with the expiration or earlier termination of this Agreement (and shall promptly delete its records thereof following such expiration or termination).

Notwithstanding anything to the contrary in this Agreement, NewCo will not use, disclose, or otherwise process Personal Data except to perform its obligations under this Agreement or as mutually agreed upon by the Parties or as required by law.  Further to the foregoing, NFLI directs NewCo to conduct such analysis and other processing of Personal Data as appropriate (but including, for the avoidance of doubt, using Existing Subscriber/Prospect Data to contact directly, whether by email or otherwise, Existing Subscribers and/or Prospects) to drive Game Pass subscriber and revenue growth.  To the extent NewCo engages in any form of electronic marketing, it shall adhere to and abide by all applicable laws relating to direct marketing.  NewCo shall not share Personal Data with any third parties; except that NFLI agrees that NewCo may engage deltatre, Two Circles, MEC Global and Zuora to process Personal Data under contractual protections commensurate with those of this Agreement. NewCo may engage additional third parties to process such data only with the prior written consent of NFLI and only under contractual protections commensurate with those of this Agreement.  NewCo shall not transfer any Personal Data relating to EU data subjects outside the European Economic Area, unless expressly requested and authorized by NFLI to do so, in which case, NewCo shall execute with NFLI the European Commission's Standard Contractual Clauses, issued pursuant to Commission Decision 2004/915/EC (the "**Standard Contractual Clauses**") for the transfer of Personal Data of EU data subjects from NewCo to NFLI.  Any Personal Data held by NewCo at the Expiration Date (or the date of any earlier termination of this Agreement) shall be deleted by NewCo or returned to NFLI, at NFLI's election.

As between NFLI and NewCo, all Personal Data provided by end users of Game Pass or otherwise accessible to NewCo in connection with this Agreement (including usage or tracking data which may be collected in accordance with the Customer Agreements to be provided by NFLI) shall be owned by NFLI.  The Parties agree that NFLI will designate a method of transport for NewCo to provide such Personal Data records to NFLI, and NewCo will deliver such records to NFLI via such method of transport in a mutually agreed, industry standard format and, subject to the obligations in the "Reporting" section below and the obligations relating to Standard Contractual Clauses set out above.

To the extent there is any conflict between the obligations of a Party under this Agreement and applicable law, such Party will comply with its obligations under this Agreement to the greatest extent permitted under applicable law, and will work in good faith with the other Party to agree to an appropriate solution that achieves the other Party's objectives and complies with applicable law.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001060

NewCo shall employ and maintain a written information security program that incorporates physical, technical, organizational and administrative security measures designed to ensure the security, confidentiality, reliability, and integrity of Personal Data and other confidential information and any systems, facilities, or software used by NewCo in connection with the Agreement using accepted industry standards, including the implementation of safeguards to protect Personal Data and other confidential information in NewCo's possession or control against unauthorized access, disclosure or loss.  Prior to processing any Personal Data, NewCo shall provide NFLI with a written certification that it has implemented such a written information security program.  The technology used by NFLI and its affiliates to perform the user authentication and management process shall implement industry standard (or better) technology.  Without limitation to the foregoing, NewCo represents, warrants, and covenants that its information security program will include appropriate, industry-standard (or better) controls to protect NewCo's systems, facilities, software, and other assets against external and internal threats.

In the event NewCo suspects or discovers any inadvertent, unauthorized or unlawful disclosure, access, loss or other use of any Personal Data processed by or on behalf of NewCo pursuant to this Agreement or any other act or omission by NewCo (or any subcontractor or other person or entity acting on behalf of NewCo pursuant to this Agreement) that compromises or would reasonably be expected to compromise the security, confidentiality, or integrity of Personal Data (a "**Security Breach**"), NewCo shall (a) promptly investigate such Security Breach (including, where appropriate, by retaining third-party forensic investigation services) and reasonably cooperate with NFLI in connection with its investigation, including by providing NFLI with the results of the investigation; (b) notify each contact person designated by NFLI promptly and in no event later than one (1) business day following the detection of such Security Breach (to the extent permitted by law enforcement); and (c) commence all actions required to comply with applicable laws, rules or governmental regulations related to such Security Breach.  NewCo agrees not to make any public announcements relating to such Security Breach without NFLI's prior written approval.  NewCo shall regularly update NFLI on (i) corrections or updates to NewCo's security software, protocols and procedures to prevent a reoccurrence of the Security Breach; and (ii) any legal action or investigation pursued by NewCo or, to NewCo's knowledge, by law enforcement agencies against any alleged perpetrators of the Security Breach.  Following NewCo's notification to NFLI of a Security Breach, NewCo will (x) preserve all electronic evidence in NewCo's possession or control relating to the Security Breach in accordance with NewCo's customary electronic record preservation standards and (y) assist with or perform all remediation efforts that are required of NewCo by applicable laws as a consequence of the Security Breach or that have been required by any governmental authority in similar circumstances (collectively, "**Remediation Efforts**").  Remediation Efforts may include, without limitation (1) development and delivery of notices to individuals whose Personal Data may have been affected, in consultation with NFLI and with NFLI's consent before any such notices are provided (except in such instances where notification obligations under applicable law do not reasonably allow for such consultation or consent); (2) establishment of a toll-free telephone number where affected individuals may receive assistance and information; (3) provision of credit reports, and credit monitoring for affected individuals; (4) reimbursement for costs of placing a freeze on a consumer

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001061

credit file; (5) investigation and resolution of the causes and impacts of the Security Breach; and (6) such other measures that NFLI and NewCo jointly determine are reasonable and commensurate with the nature and level of severity of the Security Breach. NewCo shall be solely responsible for the costs and expenses of all Remediation Efforts and all other actions undertaken pursuant to the foregoing, whether undertaken by NewCo or NFLI. Notwithstanding anything to the contrary herein, NewCo will be liable for reimbursement of costs and expenses for Remediation Efforts regardless of whether such amounts are characterized by any Party, government body or other third party as direct, indirect, consequential, special, punitive or other damages, or as contractually-agreed preventative measures designed to limit future damages, or in any other manner.

NewCo shall, and shall ensure that it and its subcontractors, comply in all respects with the Payment Card Industry Data Security Standard (PCI-DSS) and shall hold and maintain such compliance validation as is required by the relevant payment card brand, with respect to any payment card data stored, processed or transmitted by, or on behalf of, NewCo or its affiliates.

NewCo shall provide NFLI with all necessary materials, documents, assessments and other information to enable NFLI to confirm that NewCo has complied with its obligations under this Agreement. NewCo shall promptly correct or adopt an acceptable plan for promptly correcting any alleged risks or threats and/or nonconformance to generally accepted trade practices in the industry or other breach of the Agreement identified by any assessment, test result, audit, or review related to its security practices.

Upon entry into force in the European Union of Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data (the "**General Data Protection Regulation**") in 2018 (the "**GDPR Effective Date**"), the Parties agree to be bound by the additional terms provided in Exhibit F. Exhibit F shall supplement the terms of this section "Authentication and Customer Data Protection" from the GDPR Effective Date.

| Reporting | REDACT |
|-----------|--------|

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001062



HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001063

| | REDACT |
|---|---|
| **Intellectual Property Ownership** | As between the Parties, NFLI retains all ownership rights in and to all GP Content (and any excerpts thereof) and all NFL Marks. To the extent NewCo is deemed to possess any such rights, NewCo hereby assigns and transfers (and agrees to assign and transfer) all worldwide ownership rights, including all copyrights and all other intellectual property rights in and to such GP Content and/or NFL Marks to NFLI. NewCo shall take, at NFLI's reasonable expense, any and all such other actions reasonably deemed appropriate by NFLI in furtherance of such assignment.<br><br>NFLI will, at NFLI's option, own all signing identities and certificates associated with each version of Game Pass. As between NFLI and NewCo, NewCo will own all other aspects of Game Pass, including the "back-end" of Game Pass (i.e., code developed for each version of Game Pass, the video player and other feature sets developed). |
| **Game Pass SLA** | REDACT |
| **Geo-Location** | NewCo will make Game Pass available via Approved Devices and provide the Game Pass-related promotion set forth herein throughout the Territory. NewCo will work with NFLI as needed to define the technical implementation the Parties will use to geo-target the distribution of GP Content based on the identification of the physical location of the end user viewing the GP Content and/or purchasing Game Pass; provided that NewCo shall have "travel rights" solely within the Territory (i.e., the right to permit Game Pass subscribers to access the GP Content via the authentication methods set forth herein when travelling outside of such Game Pass subscriber's registered location, provided that such subscriber is within the Territory). NewCo will ensure that access via Approved Devices implements then-current, industry standard (or better) geo-location technologies commonly used for premium video subscription products in the European video programming delivery industry. |
| **Content Protection** | NewCo will ensure that all GP Content is secured in accordance with then-current, industry standard (or better) content protection technology commonly used for premium video subscription products in the European video programming delivery industry. |
| **Customer Service** | NewCo will provide user support and customer service for Game Pass on Approved Devices in a timely and effective manner, at least consistent with the level of support provided by NeuLion to subscribers of the product branded as "NFL Game Pass" in the Territory during the 2016 NFL season and as set forth in Exhibit B and in the long-form SLA. |
| **Subcontractors** | NewCo may subcontract any or all of the performance of the development work and marketing obligations contemplated under this Agreement to deltatre, Two Circles, MEC, Group M, ESP Properties and any subcontractor of the foregoing, and any other affiliated entities of WPP plc and certain other services in |

| | |
|---|---|
| | connection with the performance of this Agreement; provided, however, that (a) the use of each subcontractor shall be approved in advance by NFLI, which approval shall not be unreasonably withheld, conditioned or delayed; (b) NewCo shall oversee the performance by its subcontractors of the subcontracted activities in a manner that would be reasonably expected to result in their timely and successful completion; and (c) any breach of this Agreement by any such permitted subcontractor shall be deemed a breach by NewCo, and NewCo shall be primarily liable with respect thereto.<br><br>Notwithstanding the terms of the applicable subcontract or NFLI's approval of such subcontractor, NewCo shall be and remain responsible and liable to NFLI for any acts or omissions of any subcontractor or its personnel for failure to perform in accordance with this Agreement or to comply with any duties or obligations imposed on NewCo under or in respect of this Agreement to the same extent as if such failure to perform or comply was committed by NewCo or its personnel. |
| **Transition/ Wind-Down** | At the expiration or earlier termination of this Agreement, if requested by NFLI, NewCo will provide all necessary transition services, on reasonable, mutually agreed financial terms for a reasonable period of time, which shall ensure that Game Pass subscribers to continue to have access to Game Pass through the end of the then-current NFL season.<br><br>After the expiration or termination of the wind-down period set forth in the immediately preceding sentence, NewCo shall have no further right to use any GP Content, NFL Marks or other content owned or controlled by NFLI or its affiliates, and will promptly provide NFLI with all files and feeds of such GP Content requested by NFLI. |
| **Indemnification** | During and after the Term, NFLI shall defend, indemnify and hold harmless NewCo, its affiliates, and its and their respective related entities, directors, officers, employees, and representatives from and against any third party claims, demands, losses, causes of action, or damages (including reasonable outside attorneys' fees) (collectively, "**Claims**") arising out of or relating to an assertion that:  (a) the use of the GP Content, the Licensed Marks, Required Advertising Materials or other content owned or controlled by NFLI or its affiliates, when used as in the form provided by NFLI and as approved pursuant to this Agreement, violates or otherwise infringes upon any law, any third party right of privacy or any third party right in any copyright, trademark, right of publicity or other intellectual property right other than in public performance rights in music; (b) NFLI has violated any applicable law (including, without limitation, the General Data Protection Regulation from the GDPR Effective Date) or breached any term in this Agreement in connection with its (i) collection of Existing Subscriber/Prospect Data, or (ii) use or other processing of Existing Subscriber/Prospect Data, New Subscriber Data and/or Payment Data; (c) solely to the extent compelled by NFLI's specific instructions with respect to Personal Data for which NFLI is a data controller and NewCo is a data processor, NewCo has violated any law by virtue of it having complied with such instructions (provided, that, for clarity, the foregoing indemnity shall not apply to the extent NewCo could have complied with applicable law in carrying out NFLI's instructions (e.g., NFLI's direction to NewCo to conduct such processing of Personal Data as appropriate to drive Game Pass subscriber and revenue growth)); (d) NFLI's breach of any of its representations or warranties set forth herein; (e) any taxes, together with interest and penalties, that are the |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001065

responsibility of NFLI under this Agreement; or (f) any act or omission or willful misconduct by NFLI that results in the inadvertent, unauthorized and/or unlawful access, processing, loss, use or destruction of NFLI's or any Game Pass subscriber's data (including Personal Data), confidential or proprietary information, data or materials, in each case to the extent within NFLI's possession or control.

During and after the Term, NewCo shall defend, indemnify and hold harmless NFLI, the NFL, its Member Clubs, and each of their respective affiliates, related entities, directors, officers, employees, representatives and owners from and against any Claims arising out of or relating to an assertion that:  (a) the use of the GP Content, Licensed Marks, Required Advertising Materials or other content owned or controlled by NFLI or its affiliates, when used other than as in the form provided by NFLI and as approved pursuant to this Agreement, violates or otherwise infringes upon any law, any third party right of privacy or any third party right in any copyright, trademark, right of publicity or other intellectual property right; (b) Game Pass (other than elements included therein that are provided by NFLI) or any other technology or functionality used by or on behalf of NewCo in connection with Game Pass violates or infringes upon any law, any third party right of privacy or any third party right in any copyright, trademark, right of publicity or other intellectual property right; (c) NewCo has violated any applicable law (including the General Data Protection Regulation from the GDPR Effective Date) or breached any term in this Agreement in connection with its collection, use, disclosure or other processing of Existing Subscriber/Prospect Data, New Subscriber Data and/or Payment Data (except where such violation has arisen by virtue of either NFLI failing to comply with its obligations under this Agreement or applicable law, or NewCo having complied with NFLI's specific instructions with respect to Personal Data for which NFLI is a data controller and NewCo is a data processor (provided, that, for clarity, this exception shall not apply to the extent NewCo could have complied with applicable law in carrying out NFLI's instructions (e.g., NFLI's direction to NewCo to conduct such processing of Personal Data as appropriate to drive Game Pass subscriber and revenue growth))); (d) any act or omission or willful misconduct by NewCo that results in the inadvertent, unauthorized and/or unlawful access, processing, loss, use or destruction of NFLI's or any Game Pass subscriber's data (including Personal Data), confidential or proprietary information, data or materials (including a Security Breach and any costs incurred in connection with all Remediation Efforts), in each case to the extent within NewCo's or any subcontractor's or service provider's possession or control (including possession or control that occurs via Game Pass); (e) NewCo's promotional, marketing or advertising activities involving or related to the Agreement (unless in connection with any Required Advertising Materials that are the subject of NFLI's indemnification obligations pursuant to clause (a) of the immediately preceding paragraph); (f) NewCo's breach of any of its representations or warranties set forth herein; or (g) any taxes, together with interest and penalties, that are the responsibility of NewCo under this Agreement.

For clarity, each Party's indemnity obligation under this Agreement shall not apply to the extent a Claim is subject to the other Party's indemnity obligations. In the event both Parties bear fault for any indemnified Claim, each Party's liability shall be equal to the percentage determined to be due to the fault of such Party as agreed upon by the Parties, as fixed by a settlement agreement

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001066

| | |
|---|---|
| | approved by the Parties, or as set forth in a final judgment of a court of competent jurisdiction.<br><br>In any instance to which the foregoing indemnities pertain, the indemnified party shall (a) give the indemnifying party prompt written notice of the relevant Claim, provided, however, that failure to give such notification shall not relieve the indemnifying party of its indemnification obligations except to the extent that such failure prejudices the indemnifying party's defense of such Claim, (b) cooperate with and assist the indemnifying party in all respects in connection with any such defense, and (c) give the indemnifying party the right to control the defense and settlement of any such Claim, except that the indemnifying party will not enter into any settlement of a Claim or admit liability or fault without the indemnified party's prior written approval, which shall not be unreasonably withheld.  The indemnified party will have the right to participate in the defense at its expense.  The indemnifying party shall reimburse the indemnified party for all reasonable out-of-pocket costs actually incurred by the indemnified party in connection with such cooperation and assistance as set forth in (b) above.  In any instance to which such indemnities pertain, the indemnifying party shall keep the indemnified party fully advised of all material developments pertaining to such Claim. |
| Limitations on Liability | REDACT |
| Insurance | At all times during the Term, NewCo shall carry such insurance as is standard and reasonable in connection with its operations (and at NewCo's election, insurance covering Security Breaches and Remediation Efforts), the costs of which (including, without limitation, any deductibles) shall be considered Media Expenses to the extent that such insurance relates to the operation of Game Pass and is specified in the Budget. |
| Representations & Warranties | Each Party represents and warrants that (a) it has the right and authority to enter into and perform this Agreement; (b) its execution of this Agreement and performance of its obligations under this Agreement do not and will not violate any other agreement to which it is a Party; and (c) this Agreement will constitute the legal, valid and binding obligation of such Party when executed and delivered.<br><br>NewCo further represents and warrants that (i) it has, if necessary, a valid governmental license or governmental authorization to distribute the GP Content in the Territory; (ii) to the best of its knowledge and belief, all advertising and promotional materials for, all commercial insertions and other changes made to and all graphics used in connection with the GP Content, in each case as provided or conducted by or on behalf of NewCo, will not violate the intellectual property rights of any third party (provided, however, that NewCo makes no representation or warranty regarding the NFL Marks or content provided by NFLI); (iii) it shall ensure that the GP Content is made |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001067

available by or on behalf of NewCo only in the Territory and in accordance with and subject to the terms and conditions set forth in this Agreement; (iv) it will not violate any applicable laws, regulations or standards applicable to NewCo (or any subcontractor acting on behalf of NewCo) in relation to the distribution, advertisement, promotion, possession or use of any GP Content or other content owned or controlled by NFLI or its affiliates; (v) it will have at all times during the Term any necessary valid public performance licenses (or other similar agreements) with the applicable music societies in the Territory so that its distribution of any music in the GP Content shall not violate any third party rights; (vi) it shall not use the GP Content or other content owned or controlled by NFLI or any of its affiliates for any purpose other than as specifically authorized by this Agreement; (vii) as of the Effective Date, there are no actual or threatened Claims against NewCo by any third party based on an alleged violation of such person or entity's intellectual property rights; and (viii) during the Term and thereafter, Game Pass (other than GP Content within Game Pass that is distributed as provided by NFLI, without alteration) will not infringe upon any intellectual property rights of any third party.

NFLI further represents and warrants that:  (A) NFLI has all necessary rights to grant to NewCo the rights granted by NFLI in this Agreement; (B) NFLI, its affiliates and/or the Member Clubs own the copyrights to the GP Content licensed hereunder; and (C) to the best of its knowledge and belief, the GP Content and the NFL Marks as delivered by NFLI or its designee, when used in accordance with the terms of this Agreement will not violate any intellectual property right or any other right of any third party (including, without limitation, defamation or any copyright, trademark, literary, dramatic or motion picture right, right of privacy or publicity but excluding any public performance rights in music).  Notwithstanding the foregoing, for purposes of clarity, NFLI does not represent or warrant that NFLI has cleared any public performance rights in the music that may be contained in the GP Content.

THE REPRESENTATIONS AND WARRANTIES SET FORTH ABOVE ARE EACH PARTY'S ONLY REPRESENTATIONS WARRANTIES AND NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WILL APPLY.

| | |
|---|---|
| Confidentiality | Neither Party shall disclose to any third party any information with respect to the financial or other terms of this Agreement, any matters relating to the course of dealings between the Parties, or any other proprietary information of the other Party except (a) to the extent necessary to comply with any law (including the making of any required filings or recordings), any legal proceedings, or the valid order of a court of competent jurisdiction provided that the Party making such disclosures shall promptly notify the other Party of the disclosure obligation in writing and seek confidential treatment of such information; (b) as part of its reporting or review procedures to its affiliated entities (which includes NFLI's ability to disclose any such information to the Member Clubs and their owners); (c) in order to enforce the rights granted to a Party hereunder or to perform its obligations hereunder; or (d) to such Party's agents, representatives, investors, advisers, employees, officers, accountants, financiers and subcontractors to the extent necessary to comply with and perform under this Agreement, provided that each such person (other than attorneys) agrees to be bound by terms and conditions at least as restrictive as this "Confidentiality" section. |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001068

| | |
|---|---|
| | The decision to release a statement and in the event Parties agree to such a release, any press releases issued regarding this Agreement must be approved by both Parties. |
| **Standard Terms** | *Entire Agreement.* This Agreement embodies the entire agreement between the Parties regarding the subject matter hereof, and replaces any prior agreement, understanding and/or commitment between the Parties related thereto. No modifications, amendments or variations to this Agreement shall be effective unless in writing signed by an authorized representative of each Party.<br><br>*No Joint Venture, Partnership, etc.* Neither Party hereto (nor any of their officers, directors, agents, or employees) shall act or hold itself out as an agent of the other Party hereto. The Parties do not intend this Agreement or the relationship hereunder to constitute a joint venture or partnership. The provisions of this Agreement are for the benefit only of the Parties hereto, and no third party may seek to enforce, or benefit from, these provisions.<br><br>*Choice of Law.* This Agreement (including any and all attachments hereto) shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws rules.<br><br>*Assignment.* Neither Party may assign this Agreement, or any of its rights or obligations under it, without the prior written consent of the other Party. For purposes of this provision, a NewCo Change of Control shall be deemed an assignment.<br><br>*Severability.* If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed severed from the remainder, which shall remain enforceable. If any provision of this Agreement does not comply with any law, ordinance or regulation of any governmental or quasi-governmental authority, now existing or hereinafter enacted, such provision shall to the extent possible be interpreted in such a manner so as to comply with such law, ordinance or regulation, or if such interpretation is not possible, it shall be deemed amended, to satisfy the minimum requirements thereof.<br><br>*Survival.* The covenants, obligations, terms and conditions herein which, by their terms or nature, extend beyond the termination or expiration of this Agreement, shall survive such termination or expiration until fully performed. No expiration or termination of this Agreement shall relieve NewCo of its obligations to pay any amounts then due to NFLI at the time of such expiration or termination.<br><br>*Expansion of Scope.* In the event that NFLI grants NewCo or any subcontractor of NewCo (e.g. deltatre, Two Circles) the right to expand the scope of any of the licenses or services described herein (e.g., new territories, new marketing rights), then the Parties shall discuss in good faith amending this Agreement to account for such events.<br><br>REDACT |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001069



*Waiver.* The failure of either Party to enforce any provision or condition contained herein at any time shall not be construed as a waiver of that condition or provision nor shall it operate as a forfeiture of any right or future enforcement of such condition or provision.

*Expenses.* Except as explicitly set forth in this Agreement, each Party shall pay all of its costs and expenses under this Agreement and shall be solely responsible for the acts and expenses of its own agents and employees.

*Notices.* All notices hereunder shall be in writing and shall be sent via certified (return receipt requested) or registered mail, by air courier service, or by personal delivery to the address of the Party for whom it is intended with courtesy copies to:

If to NFLI:
c/o Michael Markovich
Vice President, International Media
With a copy to:  Vice President and Senior Media Counsel
National Football League
345 Park Avenue
New York, NY 10154

If to NewCo:
OverTier Operations
c/o Stuarts
PO Box 2510
Flr 4, 36A Dr.  Roy's Drive
Grand Cayman KY1-1104

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001070

Cayman Islands
With copies to:  George Pyne and Jeff Roth
Bruin Canada GP, LLC
7 Renaissance Square
White Plains, NY 10601

With a copy (which shall not constitute notice) to:
Gibson, Dunn & Crutcher LLP
c/o James R.  Howe
Telephone House
2-4 Temple Avenue
London EC4Y 0HB, United Kingdom

*Interpretation*.  Paragraph captions and headings used in this Agreement are for convenience only, and no such heading shall in any way alter the meaning of any provision.  Any reference in this Agreement to the singular form of a word will include the plural form of the word, if applicable, and any reference to the plural will include the singular, if applicable.  Forms of the word "include" mean "including, without limitation" and references to "hereunder," "herein," "hereof" and the like refer to this Agreement.  Except to the extent a provision in this Agreement expressly refers to natural persons (in which case such provision shall apply only with respect to natural persons), references to persons in this Agreement shall be deemed to include natural persons, corporations, companies and other corporate entities, unincorporated associations, partnerships, firms and government bodies, governments, states and any other organizations (whether or not in each case having separate legal personality).

*Counterparts*.  This Agreement shall not be effective until signed by an authorized signatory of each Party.  Each of the individuals executing this Agreement certifies that he or she is duly authorized to do so.  This Agreement may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same document.  Signatures sent by facsimile or other generally used electronic means (e.g., via PDF) shall be deemed original signatures.

[Signature page follows]

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001071

IN WITNESS WHEREOF, the undersigned Parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**OverTier Operations**

By:_____
*(Signature)*

Name: George Pyne
*(Print or Type)*

Title: Director
*(Print or Type)*

Date: 6/18/2018

**NFL International LLC**

By: _____
*(Signature)*

Name: Michael Markovich
*(Print or Type)*

Title: VP of INTL MEDIA
*(Print or Type)*

Date: 6.21.2018

Approved by Finance
RZ

APPROVED
NFL LEGAL & BUSINESS AFFAIRS
ASS

[Signature Page]

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001072

**EXHIBIT A**

**TERRITORY**

| | | |
|---|---|---|
| United Kingdom | Greece | Guernsey |
| Germany | Luxembourg | Faroe Islands |
| Denmark | Croatia | Azerbaijan |
| Spain | Ukraine | Macedonia, Republic of |
| Netherlands | Ireland | Belarus |
| Sweden | Slovakia | Moldova |
| France | Bulgaria | Liechtenstein |
| Italy | Serbia | Armenia |
| Switzerland | Slovenia | Kyrgyzstan |
| Norway | Latvia | Gibraltar |
| Austria | Estonia | Montenegro |
| Belgium | Kazakhstan | Andorra |
| Finland | Bosnia and Herzegovina | Tajikistan |
| Hungary | Malta | Aland Islands |
| Romania | Albania | San Marino |
| Poland | Lithuania | Uzbekistan |
| Russian Federation | Georgia | Holy See (Vatican City State) |
| Czech Republic | Isle of Man | Turkmenistan |
| Portugal | Jersey | Svalbard and Jan Mayen Islands |
| Iceland | Monaco | Kosovo |
| Cyprus | | |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001073

**EXHIBIT B**

**GAME PASS PRODUCT ROADMAP**

1. <u>Delivery Milestones.</u>  The following shall set forth the delivery milestones for the development and launch of Game Pass:

    a.  On or before June 15, 2017:  The launch of the pilot website for Game Pass in the Territory (the "**Launch Website**"), with the goal of starting the collection for the next season, which pilot website shall include as of such launch at least:
        i.   Landing page and payment pages (pages must be multi-lingual and multi-currency);
        ii.  On-boarding workflow (including SKU purchase and renewal capability); and
        iii. Video player.
    b.  As of such launch, the Launch Website will include (the requirements under clause (a) above and this clause (b), collectively, "**Milestone 1**"):
        i.   Access to the NFL Network live channel (subject to feasibility analysis to be performed); and
        ii.  At minimum, all 2016 NFL games content (subject to feasibility analysis of content that NeuLion can provide, in which format, and within what time period).
    c.  On or before August 1, 2017 ("**Milestone 2**"):  The launch of the:
        i.   Full Game Pass website;
        ii.  iOS smartphone and tablet application; and
        iii. Android smartphone and tablet application.
    d.  On or before September 6, 2017:
        i.   The launch of the PlayStation4 and Apple TV application.
        ii.  The launch of Amazon Firestick and AndroidTV (provided that NewCo's failure to meet the foregoing launch date shall not be a material breach of this Agreement).
        iii. In addition, the Parties will discuss in good faith whether to add Roku as an Approved Device and set a reasonable launch date for Roku.
    e.  On or before December, 31, 2017:  The launch of the Windows Phone application.

2. <u>Microsoft:</u>  In addition to the delivery milestones set forth above, NewCo will provide integration support to NeuLion (or another vendor selected by NFLI) and Microsoft with respect to Xbox, Surface, and Windows 10.

3. <u>Video:</u>  NewCo will provide the signal decode, demux and multiple transcode, as well as service for adaptive streaming of video content (including support for CDN caching, load balancing and real time QoS monitoring) and post processing of live game content for archive and VOD access.

4. <u>Video Editing/Monitoring:</u>  NewCo will provide editing relating to features included across Game Pass, including broadcast, condensed and coaches' film.

5. <u>Mobile/Tablet App Development:</u>  NewCo will develop and support mobile applications (as referenced above) to make Game Pass available on all supported platforms.

6. <u>CTV Development:</u>  NewCo will develop and support a Game Pass app for "connected" television and/or game consoles.  The Parties will discuss in good faith the addition of content other than GP Content within such app.

7. <u>Microsoft:</u>  Assuming that Microsoft will be building the "NFL" application as accessed on Specified Microsoft Devices, NewCo shall make the following services available solely with respect to the Territory:

Exhibit B

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001074

a.  Entitlement:  Microsoft needs to be able to access NewCo's Game Pass service to determine whether or not a user of Microsoft's NFL application has a valid subscription for Game Pass.

b.  Video Streams:  Microsoft needs to be able to access NewCo's Game Pass service to acquire all GP Content from NewCo that NewCo distributes as part of Game Pass (e.g., all live and on-demand video and audio, live NFL Network and NFL RedZone streams, VOD NFL Network shows, VOD NFL RedZone).

8.  Transition Period.  Following is a high-level description of the forecasted transition period.

The timeframe taken into consideration is June 15 to the completion of Milestone 2 (the "**Transition Period**"), during which time only the Launch Website will be available for Game Pass in the Territory.

On or before June 15, 2017, NewCo will launch the Launch Website, pursuant to the Milestone 1 above, and, as of the date of the launch of the Launch Website, all European Union users of the existing Game Pass platform will be migrated to the new Game Pass platform in order to enable automatic renewals.

During the Transition Period and subject to the Delivery Milestones described above, migrated users will be able to access (i) at minimum, any 2016 NFL games content integrated into the Launch Website (exact content to be included during the Transition Period will be determined by NewCo on an ongoing basis) and (ii) the NFL Network live channel (with no or limited archived content).

During the Transition Period, users will be able to purchase 2017 subscription SKUs or renew existing subscriptions through the Launch Website.

During the Transition Period, the following scenarios that may occur have been identified:

- Scenario 1:  A new user in the Territory has a valid 2017 subscription only (*i.e.*, he/she do not have a 2016 subscription), which was purchased through the Launch Website.
  - i.   **Web:** During the Transition Period, such user can access the Launch Website and can view the 2016 NFL games and/or the NFL Network live channel (each, to the extent available at such time).
  - ii.  **Mobile/CTV Apps:** During the Transition Period, such user will not be able to access the existing mobile and CTV Game Pass apps, as he/she did not have a valid subscription for the 2016 NFL season.  He/she will access the new mobile and CTV Game Pass apps to the extent available during the Transition Period pursuant to the Delivery Milestones.

- Scenario 2:  A Territory user with a valid 2016 subscription.
  - i.   **Web:** During the Transition Period, such user can access the Launch Website and can view the 2016 NFL games and/or the NFL Network live channel (each, to the extent available at such time).  The Launch Website, after such user logs in and has been identified as a user with a valid 2016 subscription, will display a prompt to such user with a message asking whether he/she would like to access the legacy NeuLion platform and notifying such user that such platform will be decommissioned no later than August 1, 2017.

Exhibit B
HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001075

ii.  **Mobile/CTV Apps:** During the Transition Period, such user will have access to the existing mobile and CTV Game Pass apps, as he/she had a valid subscription for the 2016 NFL season.  Such user will have to install each of the new Game Pass mobile, CTV, AppleTV and PlayStation4 apps, as desired, upon such apps being launched pursuant to the Delivery Milestones above.

- Scenario 3:  A Territory user with a valid subscription for 2016 who has renewed the subscription for the 2017 NFL season.
    i.  **Web:** Same as Scenario 2.
    ii.  **Mobile/CTV Apps:** Same as Scenario 2.

9.  <u>NeuLion Involvement.</u>  In order to successfully implement the services described above, NeuLion, as the supplier of the 2016 Game Pass product, will need to work with NewCo to implement the following actions:
    a.  <u>Migration of entitled users:</u>  NeuLion will need to provide NewCo with the full list of all entitled users who are allowed to access the 2016 Game Pass product through July 31, 2017.
    b.  <u>Migration of Territory users for auto-renewal:</u>  NeuLion will need to provide PCI data via secure transfer with NewCo eCommerce platform (Zuora).
    c.  <u>Archived content migration:</u>  During the development of the new Game Pass product, NewCo will analyze which types of content will be worth migrating to the new Game Pass product, in relation to which NeuLion will need to verify which metadata (title, description, game unique identifier, thumbnail) are available, as well as time constraints and format availability of archived content.
    d.  <u>Audio:</u>  NeuLion will need to supply all audio streams for every live game for the 2017 NFL season.
    e.  <u>Transition assistance:</u>  NeuLion will also be needed for the following transition assistance tasks:
        i.   Coordination of SKU retirement/release with NFL and NewCo;
        ii.  Messaging users within existing Game Pass apps to locate/download the new Game Pass apps for the 2017 NFL season;
        iii.  Redirection of users;
        iv.  Geo-location of users; and
        v.   Availability during critical windows if necessary.
    f.  <u>Changes to the current platform:</u>  NeuLion will need to make any changes to the existing Game Pass app required in order to cause transition to take place as planned.
    g.  NeuLion to provide a non geo-blocked URL to allow any 2016 subscriber access to the fully legacy 2016 player.  URL will not redirect user to a Game Pass page controlled by NewCo.
    h.  <u>Sales:</u>  NeuLion will need to close purchase availability for the 2017 NFL season at a mutually agreed upon date.  Revenue from any such subscriptions collected by NeuLion will be treated as prescribed by the body of this Agreement.

10.  <u>NFL Involvement:</u>  NFL will use reasonable efforts to facilitate the transition between NeuLion, the current Game Pass supplier, and the new Game Pass product provided by NewCo.  NFL will provide video feeds and API for NewCo to access content for NFL CTV application.

11.  <u>Content:</u>  Following is a list of content that will be available through the Game Pass product no later than August 1, 2017:
    a.  Live streaming of NFL games;
    b.  Replay of NFL games in three different versions:
        i.   Full event replay;

Exhibit B
HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001076

      ii.   Condensed replay; and
      iii.  Coaches Film;
  c.   Live NFL Network; and
  d.   VOD NFL Network shows.

Following is a list of content that will be available through the Game Pass product no later than September 6, 2017:
  e.   Live NFL RedZone; and
  f.   VOD NFL RedZone.

12. <u>NFL SSO:</u>  NewCo shall integrate with NFL.com SSO to ensure that user requesting Game Pass in the Territory is allowed and authorized to watch content.

13. <u>Territory Restrictions and Geo-Filtering:</u>  In accordance with the terms of the Agreement, (A) Game Pass may be made available only in the Territory and (B) NewCo will comply in full with all blackout restrictions.
NewCo will (i) incorporate then-current industry standard geo-targeting protections into Game Pass and (ii) provide solely a live (or archived) video stream of Game Pass and not permit Game Pass subscribers or other persons to 'download' to their own computers or viewing devices (or otherwise access directly) the digital files containing the Game Pass licensed programming, except in accordance with the downloads feature for mobile/tablet.

NewCo will use then-current industry standards to prevent any geographic leakage and/or piracy of any Game Pass programming.

Additionally, verification of a Game Pass subscriber's country of residence will be based on, at a minimum, an IP address from a country within the Game Pass Territory.  Game Pass subscribers will not be permitted to sign-up from an IP address registered in a country not included in the Game Pass Territory, and NewCo will use then current industry standards to ensure that no Game Pass subscriber can access the Game Pass from a country not included in the Game Pass Territory.

14. <u>Environments and IP adjustment:</u>  NewCo will be responsible for the development, production and hosting of a production, development and QA environments for all landing/payment/my account and confirmation pages.  NewCo shall also provide capabilities to alter a particular IP address to simulate visiting a page from a different country.

15. <u>User Access Authentication:</u>  Geo-filtering will be implemented as set forth above.
  a.   Content Access Privileges:  Based on package purchased.
  b.   In the event of any issue with the Game Pass in any material respect the user experience (e.g., database issue, connectivity issues, etc.), NewCo will, at NFLI's request, make available Game Pass (including the Live Content) to all users.  NewCo must accommodate this request within 30 minutes of the request being submitted by NFLI.

16. <u>Pause/Rewind/Fast-Forward Functionality:</u>  NewCo shall provide the ability for users to pause, rewind and fast-forward live and archived game audio / video prior to the game being fully available via a commercial free broadcast feed.

17. <u>Synchronized Stats:</u>  NewCo shall ensure that game stats are synchronized to video playout in both the live and archive game states.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001077

18. <u>Audio/Video Timeline, Game Navigation and Chapter Marking:</u>  NewCo shall mark each quarter (1, 2, halftime, 3, 4, OT) for easy video navigation, and mark each scoring play in the game (i.e., big play markers).

19. <u>Encoding:</u>  NewCo will encode feeds and will distribute them for end user consumption on the aforementioned devices.

20. <u>Content Management System:</u>  NewCo will make available a Content Management System ("**CMS**") that has the features set forth below with respect to video metadata management:
    a.   Thumbnail;
    b.   Title of the video;
    c.   Description of the video;
    d.   Content classification (i.e., tags to drive the categorization of the video);and
    e.   Competition data (i.e., bind NFL sport data to the video).

21. <u>Reporting:</u>  Specific analytics data will be made available for business analysis to NFLI team for their review.  Raw data should be presented in real time to NFLI or its partners in feed or triggers both for subscriber/revenue data and consumption data.  Additionally, NewCo shall provide reports as prescribed in the "Reporting" section in the Agreement.

22. Video Player Features:
    a.   DIVA player with enhanced statistics integration will be available on the following platforms:
         i.   Web desktop by using the Flash plugin;
         ii.  iOS; and
         iii. Android
    b.   Controls:
         i.    Pause/Play;
         ii.   Skip Forward/Skip Back
         iii.  Duration;
         iv.   LIVE Indicator (ability to "jump" to LIVE);
         v.    Closed captioning for NFL regular and postseason games to the full extent required by applicable law;
         vi.   Chromecast;
         vii.  Airplay; and
         viii. Volume Control.
    c.   No "DVR" functionality will be available (provided that temporary downloading of GP Content, "start over" and "lookback" pursuant to the body of this Agreement and pause, rewind and fast-forward pursuant to this <u>Exhibit B</u> are permitted).

23. Other Game Pass Features:
    a.   In-video player statistics supported on Web, iOS, and Android;
    b.   Live game statistics; and
    c.   Standings.

24. Video Scheduler:
    a.  NewCo will make available a Video Scheduler fully integrated with Microsoft Azure in order
        to properly manage the live workflow.  In further detail, following is a list of high-level functionalities of such Video Scheduler:

         i.    Managing Microsoft Azure video platform in an automated way;
         ii.   Automatic data binding for sport data synchronizations;
         iii.  Monitoring live operations; and

    iv.   Automatic publishing of the video on the CMS when live.
- b. The system will support two types of live video streams:
  - i. Linear, such as NFL Network, a 24/7 channel and NFL RedZone; and
  - ii. Event-based, used for streaming NFL games/events.

25. Game Pass Services:
   a. Signal capture, encoding and transcoding (including archiving of live NFL games and live episodes of NFL RedZone);
   b. Production of Condensed Games;
   c. Ingestion, processing and production of Coaches Film;
   d. User authentication, entitlement and management;
   e. Monitoring; and
   f. Deep Linking (if directed by NFLI, Game Pass subscribers in the Territory shall be able to access Game Pass, or GP Content distributed through Game Pass, through "deep links" made available on NFL.com or other NFL digital properties (such "deep links" to be included on digital properties by NFLI or its affiliates)).

26. Analytics Tags:  NewCo will implement NFLI's analytics collection tags, to the full extent of the tracking requirements as provided by NFLI or its affiliates, within each version and iteration of Game Pass and each stream of GP Content within Game Pass for data analytics purposes.

27. Payment Gateway Integration:  NewCo shall provide third-party credit card authorization and billing services.  Payment types for the customer shall include, but not be limited to the following:  credit/debit card, PayPal, ACH/SEPA bank transfers or additional alternative payment methods.

28. Product Catalog:  NewCo to define and manage multiple content packages and price point variations based upon IP address, including, without limitation:
   a. Subscriptions;
   b. A la carte purchases;
   c. Bundling of both subscription and a la carte purchases; and
   d. Flexibility pricing by product type, geography, affiliate partner, etc.

29. Gift card/coupon/voucher support for discounts/marketing campaigns as decided by NewCo.

30. Commercial Slating:
   a. NewCo to slate all commercials for live NFL games viewed in Game Pass with automated markers.
   b. NewCo to slate all commercials for live NFL Network linear feed in Game Pass with or without automated markers.
   c. NewCo's failure to slate all commercials pursuant to this Section 30 shall not be a material breach of this Agreement.

31. In app purchases:
   a. NewCo to setup, maintain and control all pricing/packaging on all native stores.
   b. NewCo to set up seasonal, auto renewable SKUs where available (Google Play)
   c. NewCo to set up one time consumable purchases that are not auto renewable in Apple Store.

32. VIP access:  NewCo to provide NFLI with VIP solution allowing NFLI to view all content (live and VOD games/shows) without any geo-blocking restrictions.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001079

33. <u>Scores on/off:</u> NewCo to ensure that the user can easily turn scores on/off as a persistent setting.

34. <u>Search:</u> NewCo will enable editorial search through all video metadata including title, description and related tagging.

35. Self Service Cancellation:  NewCo shall:
    a.  Allow a user to opt out of free trial at any time during their trial and not be charged (functionality should be available at launch).
    b.  Allow user to opt out of auto renew and not be charged for the upcoming season (functionality should be available post launch).

36. <u>Download functionality:</u> Ability to download games (broadcast, condensed, Coaches Film) at minimum on iOS phones/tablets.

Exhibit B
HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001080

**EXHIBIT C**

**BUDGET AND 2017 PROFIT AND LOSS STATEMENT**



Exhibit C

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001081

**PROFIT AND LOSS STATEMENT**



Exhibit C

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001082

**EXHIBIT E**

## OTHER NFL CONTENT IN "NFL GAME PASS" AS OF 2016 NFL SEASON

| Program | Seasons | Episodes | Supported Platform | Notes |
|---|---|---|---|---|
| Games - ALL TEAMS | 2009-2016 | N/A | | Includes Regular Season & Post-Season Includes Condensed Games, Audio, Coaches Film, Broadcast |
| RedZone | 2011-2016 | N/A | | All 17 Weeks |
| A Football Life | 2015 | 25 | Browser, CTV | |
| | 2014 | 21 | Browser, CTV | |
| | 2013 | 21 | Browser, CTV | |
| | 2012 | 15 | Browser, CTV | |
| Hall Of Fame | 2015 | 0 | Browser | |
| | 2014 | 1 | Browser | |
| Hard Knocks | 2016 | 5 | Browser, CTV | Restricted for Canada only |
| | 2015 | 5 | Browser, CTV | |
| | 2014 | 5 | Browser, CTV | |
| | 2013 | 5 | Browser, CTV | |
| NFL Films Present | 2013 | 17 | Browser | |
| NFL Game Day | 2015 | 23 | Browser | |
| | 2014 | 24 | Browser | |
| | 2013 | 22 | Browser | |
| | 2012 | 23 | Browser | |
| | 2011 | 30 | Browser | |
| | 2010 | 23 | Browser | |
| NFL Honors | 2015 | 0 | Browser | |
| | 2014 | 1 | Browser | |
| The NFL Show | 2016 | 17 | | |
| NFL this Week | 2016 | 19 | | |
| NFL Total Access | 2015 | 50 | Browser | |
| | 2014 | 38 | Browser | |
| | 2013 | 47 | Browser | |
| | 2012 | 13 | Browser | |
| | 2011 | 17 | Browser | |
| | 2010 | 4 | Browser | |
| Playbook | 2014 | 36 | Browser | |
| | 2013 | 42 | Browser | |
| | 2012 | 44 | Browser | |
| | 2011 | 44 | Browser | |
| | 2010 | 50 | Browser | |
| Sound FX | 2015 | 20 | Browser, CTV | |
| | 2014 | 32 | Browser, CTV | |
| | 2013 | 38 | Browser, CTV | |
| | 2012 | 39 | Browser, CTV | |
| | 2011 | 33 | Browser, CTV | |
| SB Archives | See below | 25 | Browser | Selected SBs (SB I, '69,'73,'79,'80,'86-89,'91,'93,'96-'00,'02,'04-'11) |
| The Timeline | 2015 | 6 | Browser, CTV | |
| Top 100 Players | 2014 | 12 | Browser | |
| | 2013 | 11 | Browser | |
| | 2012 | 13 | Browser | |
| Undrafted | 2015 | 6 | Browser, CTV | |
| | 2014 | 6 | Browser, CTV | |

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001091

**EXHIBIT F**

**SUPPLEMENTAL AUTHENTICATION AND CUSTOMER DATA PROTECTION TERMS**

WHEREAS the Parties seek to supplement, by way of amendment, the Agreement from the GDPR Effective Date to include appropriate data protection terms to comply with Article 28 of the General Data Protection Regulation.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the following:

1.     **Definitions**

    1.1     Unless otherwise stated, defined terms used in this Exhibit F shall have the same meaning as the defined terms provided in the Agreement.  Terms used in this Exhibit F that are not specifically defined will have the meaning set out in the General Data Protection Regulation.

    1.2     "**Covered Personal Data**" means any and all Personal Data that NewCo processes on behalf of NFLI, including Existing Subscriber/Prospect Data and New Subscriber Data.

2.     **Processing of Covered Personal Data by NewCo**

    2.1     **General.**  The types of Covered Personal Data, the categories of EU data subject to whom that Covered Personal Data relate, the duration of the processing, the nature and purpose of the processing carried out by NewCo, and the obligations and rights of NFLI are as set out in the Agreement and, where applicable, the section entitled "Authentication and Customer Data Protection".

    2.2     **Processing or disclosure required by EU or Member State law.**  Where NewCo is required by applicable EU or Member State law to process (including disclose) Covered Personal Data, it shall do so notwithstanding the requirements of the Agreement in the section entitled "Authentication and Customer Data Protection".  In such cases, NewCo shall inform NFLI of that legal requirement before processing (including disclosing) Covered Personal Data, unless the relevant law prohibits such information on important grounds of public interest.

    2.3     **Confidentiality.**  NewCo shall, and shall ensure that any third party it engages to process Covered Personal Data shall, at all times keep confidential all Covered Personal Data it processes pursuant to the Agreement.  NewCo and any third party it engages to process Personal Data under the Agreement may disclose Covered Personal Data to its employees, officers, representatives or advisers who need to know such information for the purposes of carrying out its obligations under the Agreement.  NewCo shall, and shall ensure that any third party it engages to process Covered Personal Data shall, ensure that its employees, officers, representatives or advisers to whom it discloses Covered Personal Data comply with this Section 2.3.

    2.4     **Security of processing.**  NewCo shall provide NFLI, upon request, with a copy of the written information security program that it employs and maintains to ensure the security, confidentiality, reliability, and integrity of Personal Data and other confidential information.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001092

2.5     **Compliance assistance.**  NewCo shall duly assist and cooperate with NFLI to allow NFLI to comply with (i) its obligations under the General Data Protection Regulation and other applicable data protection law, including, where relevant, carrying out data protection impact assessments and engaging in prior consultations with the relevant supervisory authorities; (ii) any requests by data subjects to access, correct, delete, erase, restrict processing of, block, receive (for the purpose of porting) or cease the processing of Covered Personal Data by providing NFLI with the ability to take these actions directly or by NewCo doing so on NFLI's behalf, and through appropriate technical and organizational measures; and (iii) requests or notices served by public authorities (including supervisory authorities) on NFLI in relation to the processing of Covered Personal Data pursuant to the Agreement.

2.6     **Data breach notification.**  If NewCo suspects or discovers a Security Breach it shall take the steps set out in the Agreement, and shall, when notifying NFLI of the Security Breach, provide at least the following detailed information, where possible:

      a.      the categories and approximate number of data subjects concerned;

      b.      the categories and approximate number of Personal Data records concerned;

      c.      the impact and likely consequences on NFLI and the affected data subjects of the Security Breach; and

      d.      the corrective action taken or to be taken by NewCo.

If NewCo is unable to provide the notice to NFLI within one (1) business day, it shall provide NFLI with reasons for the delay.

2.7     **Notification Obligation.**  NewCo shall notify NFLI promptly of the receipt of any communication, inquiry, request, or complaint from any third party, including a public authority or a data subject, relating to the processing by NewCo of Covered Personal Data.

2.8     **Compliance with Applicable Data Law.**  NewCo shall at all times comply with all relevant provisions of the General Data Protection Regulation and other applicable data protection law.  NewCo shall immediately inform NFLI if NewCo is of the opinion that an instruction of NFLI's regarding the processing of Personal Data infringes the General Data Protection Regulation or other applicable data protection law.

2.9     **Inspection and Audit Rights.**  As part of NewCo providing NFLI with all necessary materials, documents, assessments and other information to enable NFLI to confirm that NewCo has complied with its obligations under the Agreement, NewCo shall allow for and contribute to audits, including inspections, conducted by NFLI or another auditor mandated by NFLI to ensure compliance with the General Data Protection Regulation and other applicable data protection law.

3.     **Miscellaneous**.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001093

3.1   Except as specifically provided above, all terms and provisions of the Agreement shall remain unmodified and in full force and effect; provided, that in the event of a conflict between this <u>Exhibit F</u> and the Agreement (excluding any conflict in which the terms of the Agreement are more protective of Covered Personal Data), the terms of this <u>Exhibit F</u> shall control and govern.

3.2   This <u>Exhibit F</u> may be executed in counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute but one and the same instrument.

3.3   It shall not be necessary to refer to this <u>Exhibit F</u> in any reference to the Agreement.  Any reference to the Agreement shall be deemed to be a reference to the Agreement as amended by this <u>Exhibit F</u> from the GDPR Effective Date.

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001094

**EXHIBIT G**

**REPORTING – RELEVANT DATA**

[Attached]

HIGHLY CONFIDENTIAL- ATTORNEY AND EXPERT EYES ONLY
DEF0001095

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT