**EXECUTION COPY**

## Product Development and Media Rights Agreement

This Product Development and Media Rights Agreement (the "**Agreement**") is entered into by and between Perform Media Channels Ltd and NFL International LLC, as of April 10, 2017 ("**Effective Date**"), on the terms and conditions set forth below.

| | |
|---|---|
| **Parties** | NFL International LLC ("**NFLI**") and Perform Media Channels Ltd ("**Perform**"), each a "**Party**" and together the "**Parties**." |
| **Contract Structure** | This Agreement shall be executed together with a Programming License Agreement covering the distribution of certain NFL content in Canada ("**Canada Agreement**"). |
| **Certain Definitions** | "**App Store**" means the on-screen menu available on certain Approved Devices which permits end users to browse and install thereon certain applications offered through the provider of the applicable platform, including Game Pass.

"**Background Technology**" means all information, materials, inventions, data, know-how, methodologies, software (including source code and related information) and processes that a Party (i) acquired or developed prior to the Effective Date, or (ii) acquired or developed independently after the Effective Date and provided or made available pursuant to this Agreement, whether or not acquired or developed specifically for use with Game Pass.

"**Controlling Affiliate**" means any Person or group of Persons that possesses, directly or indirectly (including through one or more intermediaries): (1) the power to elect or control the votes of the majority of the board of directors or other governing body of a Person; (2) more than fifty percent (50%) of the capital stock or other voting interests of a Person; and/or (3) the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Expedited Arbitration Proceeding**" means a binding arbitration proceeding conducted in New York City, New York, under the Commercial Arbitration Rules of the American Arbitration Association and administered pursuant to the Expedited Procedures; provided that (a) the arbitration shall consist of a single arbitrator to be mutually agreed by the Parties (acting reasonably) with substantial experience in sports media licensing (provided that if the Parties cannot agree on the arbitrator, then Section E-4 of the Expedited Procedures shall apply, except (i) the list of arbitrators referred to in Section E- 4(b) of the Expedited Procedures shall be returned by each Party within three (3) business days of its receipt thereof and (ii) the Parties shall notify the American Arbitration Association by telephone, within four (4) business days, of any objections to the arbitrator appointed and shall have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration Association and was not objected to in accordance with Section E-4(b) of the Expedited Procedures), (b) the notification of the hearing referred to in Section E- 7 of the Expedited Procedures shall be made within three (3) business days after the arbitrator's appointment, (c) the hearing shall take place within fourteen (14) |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001428

business days after the appointment of the arbitrator (provided that the Parties may mutually agree to submit written briefs in lieu of a hearing), (d) the decision of the arbitrator shall be (i) given within thirty (30) days from the date of the hearing and (ii) final and binding on the Parties, (e) the arbitrator shall not have been employed by any Party hereto (or their respective affiliates) during the period of three (3) years immediately prior to the date of the Expedited Arbitration Proceeding, (f) Perform shall bear the costs of the arbitrator and (g) each Party shall bear its own costs associated with the RedZone Dispute.  The arbitrator shall determine the prevailing Party in rendering a decision on the RedZone Dispute.

"**Expedited Procedures**" means the Expedited Procedures provisions of the American Arbitration Association.

"**Fiscal Year**" means each period commencing April 1 of a calendar year and ending March 31 on the following calendar year during the Term; provided that the 2017 Fiscal Year shall run from the Effective Date through March 31, 2018, and each subsequent Fiscal Year shall run for each subsequent twelve (12) month period thereafter.

"**Game Pass Information**" means screen shots, images, artwork, icons and/or any other text, descriptions, representations, metadata or information relating to Game Pass and/or GP Content that are approved by NFLI and displayed on, or in connection with, the user interface of the App Stores.

"**Holdback Period**" means the periods of time applicable to each country and/or Region (as applicable) listed in Schedule A following the conclusion of the applicable live NFL game.  For clarity, there is no Holdback Period for any country or Region in the GP Territory and/or Broadcast Territory that is not listed in Schedule A.

"**Licensed Marks**" means the NFL Game Pass logo and such other NFL Marks (as defined below) as may be provided by NFLI and used as approved by NFLI (in accordance with this Agreement) in connection with the development and operation of Game Pass and/or promotion of Game Pass as described below.

"**Member Clubs**" means the member clubs of the NFL.

"**NFL**" means the National Football League.

"**NFL Marks**" means the names, symbols, emblems, designs, and colors of the NFL and its Member Clubs, including the terms "National Football League", "NFL", "National Football Conference", "American Football Conference", "NFC", "AFC", "Super Bowl", "Pro Bowl", the NFL Shield design, the NFL Game Pass logo as well as the full team names, nicknames, helmet designs, uniform designs, logos and slogans of the Member Clubs, and any other indicia adopted for commercial

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001429

purposes by the NFL or any of its Member Clubs.

"**NFL Materials**" means (a) GP Content, Required Advertising Materials or other content owned or controlled by NFLI or its affiliates (including all data delivered to Perform hereunder in respect of NFL games) and any excerpts thereof (including any audio or video recording, or any photograph or digital image included in GP Content), (b) Game Pass Information, (c) NFL Marks, (d) NFL.com, (e) the App Store signing identities and certificates associated with each version of Game Pass (subject to Perform's ownership rights in the Perform Materials), (f) all Personal Data provided by end users of Game Pass or otherwise accessible to Perform in connection with this Agreement (including usage or tracking data which may be collected in accordance with the Customer Agreements to be provided by NFLI) and (g) the Confidential Information and Background Technology of NFLI and its affiliates and all improvements thereto.

"**Non-Standard Television**" means any subscription television system that is used to provide multiple channels of linear audio-visual television programming services on a substantially continuous, real-time, uninterrupted and simultaneous basis for television signal reception (e.g., via cable or satellite television systems or closed-system internet protocol delivery of multi-channel programming services solely for television signal reception within a subscriber's premises (e.g., telephone MVPD service using internet protocol packet delivery)) primarily for in-home viewing (but also including viewing in commercial and public establishments); provided that the term Non-Standard Television shall not include Standard Television, the internet (other than closed-system internet protocol delivery of multi-channel programming services solely for television signal reception within a subscriber's premises (e.g., telephone MVPD service using internet protocol packet delivery)), distribution to mobile devices, radio, home video (e.g., DVD), pay-per-view services, or any other non-television distribution platform.

"**OTT**" means distribution of audio-visual programming over the internet to any internet-connected device, including laptops, PCs, gaming consoles, smartphones, tablets and connected TVs.

"**Perform Change of Control**" means:

(a) any assignment, conveyance, sale, transfer or other disposition of all or substantially all of the assets or business of Perform or any of the Perform Holding Companies;

(b) any merger, acquisition, consolidation, reorganization, sale or transfer of equity or other transaction or series of transactions involving, directly or indirectly, Perform and/or any Perform Holding Company, the result of which is that a new Person (or group, if two or more Persons act as a partnership, limited partnership, syndicate or other group for purposes of acquiring, holding or

3

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001430

disposing of direct or indirect interests in Perform or any Perform Holding Company) that was not a Controlling Affiliate of Perform and/or any Perform Holding Company immediately prior to such transaction(s) becomes a Controlling Affiliate of Perform and/or any Perform Holding Company following such transaction; and/or

(c) any merger, acquisition, consolidation, reorganization, sale or transfer of equity or other transaction or series of transactions, the result of which is that a Prohibited Issuer becomes a "beneficial owner," as such term is used in Rule 13d-3 promulgated under the Securities Exchange Act of 1934, as amended, of thirty five percent (35%) or more of the capital stock or other voting interests of Perform or any Perform Holding Company.

Notwithstanding the foregoing definition of Perform Change of Control, the occurrence of any event set forth in clause (a) or (b) with respect to all of Perform and the Perform Holding Companies shall not be deemed a Perform Change of Control so long as an entity currently within the Access Industries group or a successor to any such entity's business or assets (excluding, for clarity, operating companies held by entities in the Access Industries group) is the Controlling Affiliate of all such Persons following such event.

"**Perform Holding Companies**" means Perform Group Limited, Perform Midco Limited, and Perform Media Services Ltd (and/or any successor to the assets or business of any of the foregoing in a transaction (or series of transactions) that does not result in a Perform Change of Control) and a "Perform Holding Company" shall be a reference to any one of them.

"**Perform Investment Limited**" means Perform Investment Limited, a limited company registered under company number 09676399, whose registered office is at Hanover House, Plane Tree Crescent, Feltham, TW13 7BZ.

"**Perform Materials**" means (a) the Perform Player and all intellectual property rights owned or controlled by Perform related thereto, (b) Game Pass, and any work product or deliverables created by Perform pursuant to the development work contemplated in this Agreement (including all derivatives thereof, but excluding NFL Materials embedded, distributed or otherwise incorporated therein), (c) the Confidential Information of Perform and (d) the Background Technology of Perform and its affiliates and all improvements thereto.

"**Perform Player**" means Perform's proprietary end user video service application providing GP Content to end users.

"**Person**" means a natural person, partnership, limited liability company, limited liability partnership, association, joint venture, corporation, legal representative, trustee, trustee in bankruptcy, receiver, governmental authority, or any other legal entity whatsoever.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001431

"**Personal Data**" means any information in any media or format that identifies or could reasonably be linked to an identified or identifiable natural person.

"**Product Roadmap**" means the terms set forth in <u>Exhibit B</u>.

"**Prohibited Issuer**" means (a) any Person actively engaged in any of the following businesses: (i) gambling or lottery operations, casinos, horse and dog tracks, off-track betting organizations, gaming enterprises, jai alai frontons, bingo parlors, or any online or mobile gambling operations or applications, (ii) dietary or nutritional supplements, (iii) tobacco products, or (iv) pornography; (b) any Person engaged in any litigation or arbitration with the National Football League or any of its affiliates (excluding, for the avoidance of doubt, any of the Member Clubs and their respective owners); (c) any Person in which an owner, officer or director of any Member Club has a material interest; and/or (d) any Person that derives material revenues from business categories competitive with the National Football League.



"**RedZone Program**" means the studio show, produced by an NFLI affiliate, that provides coverage of NFL games on each Sunday afternoon during the NFL regular season (currently 17 Sundays) from approximately 12:30pm to 8:00pm (New York time), which program may include live game cut-ins, near live highlights and other highlights from those NFL games and is known as "NFL RedZone" (or such other name as may be selected by the NFLI affiliate).

5

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001432

| | |
|---|---|
| | "**Standard Television**" means analog and digital broadcast television currently transmitted or assigned to be transmitted via terrestrial distribution on a single channel in a local market.<br><br>"**Unavoidable Overspill**" means the possibility that NFLI content may be received in the GP Territory and/or Broadcast Territory (as applicable) due to unintentional and unavoidable satellite overspill, roaming of mobile services or through place shifting devices (e.g., Slingbox) not authorized by NFLI which will not be considered a breach of the applicable provision by NFLI provided that: (a) such overspill is de minimis; (b) NFLI's licensee is adopting its then-most effective technology and procedures to prevent such overspill; and (c) NFLI's licensee does not promote or advertise the possibility of reception of such content inside of the GP Territory and/or Broadcast Territory (as applicable).<br><br>"**VOD**" means the method of distribution of content that responds to viewer-initiated commands and allows the viewer to instantly (i.e., at a time selected by the viewer) view such programs or content and thereafter control the playback of such programs or content.<br><br>The terms **include**, **including** and **in particular** (and similar expressions) in this Agreement are to be construed without limitation. |
| **Term** | This Agreement shall be legally binding as of the Effective Date and shall expire, unless sooner terminated in accordance with its terms, on March 31, 2022 ("**Term**").<br><br>REDACT<br><br>If this Agreement has not been earlier terminated in accordance with its terms, then the Parties will negotiate in good faith with each other on a non-exclusive basis regarding an extension of the rights granted by this Agreement during a period occurring between March 1, 2021 and March 31, 2021.  For clarity, at any time during the Term, NFLI shall be free, without any restrictions or rights owing to Perform, to negotiate with third parties regarding any rights granted by NFLI to Perform under this Agreement in respect of any period after the Term. |
| **Territory** | "**GP Territory**" means Mexico, Japan, India, Israel, Brazil, New Zealand, Australia and the following regions ("**Regions**") (as defined in Exhibit A): Middle East, Other South America, Pan Asia, ROW and Sub-Saharan Africa.<br><br>"**Broadcast Territory**" means Japan, India, Israel, Brazil, New Zealand, Australia and the following Regions: LatAm, Middle East, and Pan Asia. |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001433

| | |
|---|---|
| **Canada** |  |
| **Game Pass - 2017** | With respect to the period commencing on the Effective Date and ending on or about the start of the GP Term, NFLI shall contract with NeuLion, Inc. ("**NeuLion**") (or another vendor agreed between the Parties) to operate Game Pass (as defined below) in the GP Territory, at Perform's expense (and Perform shall be responsible for the collection of revenues from and payment of expenses to NeuLion (or such other vendor) in connection with the operation of such product in the GP Territory during such period).  As further described in this Agreement, (a) Perform shall market and promote Game Pass to former, existing and potential subscribers in the GP Territory during such period in order to drive subscriptions thereto (and relevant marketing expenses shall be treated as Media Expenses (as defined below)), and (b) all net revenues actually collected or received by Perform in respect of subscribers to Game Pass in the GP Territory during the period commencing on the Effective Date and ending on or about the start of the GP Term shall be treated as Media Revenues (as defined below) and any payments to be made to NeuLion (or other mutually agreed vendor) in respect of Game Pass in the GP Territory during such period shall be treated as Media Expenses. |
| **Game Pass Development** | In accordance with the terms of this Agreement, Perform will develop and create, and throughout the GP Term, Perform shall operate, maintain, support and host a premium, stand-alone subscription digital video product branded as "NFL Game Pass" that enables users to view the GP Content (as defined below) (together with any updates, enhancements and iterations approved in accordance with this Agreement, "**Game Pass**").

Game Pass shall have, at a minimum, the features and functionality (including third party functionality) set forth in the Product Roadmap attached to this Agreement as <u>Exhibit B</u>.  Perform shall perform (or, in accordance with this Agreement, cause to be performed) all of the services set forth in the Product Roadmap as part of Game Pass.  Perform shall add updates and enhancements to the Game Pass features and services for each NFL season during the GP Term; provided that, without prejudice to the rights granted in the section titled "Game Pass – General Grant of Rights", any such updates and enhancements shall be consistent with a premium subscription video programming product and all other terms and conditions of this Agreement (e.g., no virtual reality, virtual advertising, |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001434

interactive experiences or "watch and bet" rights). Perform shall not have rights to make any significant changes to Game Pass following the initial launch (e.g., development of any feature sets unique to Game Pass, an overhaul of the app, the addition or removal of Approved Devices other than as agreed in the Product Roadmap, etc.), except as otherwise set forth herein (including the Product Roadmap).

Notwithstanding anything to the contrary in this Agreement, NFLI shall have the sole right to determine and approve the branding of Game Pass.

Perform shall ensure that Game Pass will, at a minimum, be available on the devices set out in the Product Roadmap (collectively, "**Approved Devices**"). The Parties will discuss in good faith and mutually agree upon the availability of Game Pass on additional Approved Devices and the removal of any devices. Notwithstanding the foregoing, Perform agrees that, with respect to the 2017 NFL season (and, as directed by NFLI, any other season thereafter during the GP Term as reasonably necessary to comply with continued NFL contractual restrictions), Perform will work with Microsoft to (x) deliver (or arrange for the delivery of) GP Content for distribution via, and (y) allow Game Pass subscribers in the GP Territory to access GP Content through, an "NFL Game Pass"-branded environment accessed on certain Microsoft devices (e.g., Xbox); provided that NFLI will reimburse Perform for the reasonable, actual and documented out-of-pocket expenses Perform incurs that are directly related to the foregoing. The foregoing sentence shall be referred to herein as "**Microsoft Device Distribution**."

Perform will be solely responsible for (a) ensuring the timely delivery of Game Pass prior to the start of the 2018 NFL regular season and each NFL regular season during the GP Term thereafter and (b) save for the GP Content, the accuracy and originality of all work product developed by or on behalf of Perform comprising Game Pass; provided that Perform's obligations in clause (a) will be tolled solely to the extent and during the period that any late delivery of Game Pass is directly attributable to (a) a failure of NFLI to approve the branding of or use of NFL Marks within Game Pass; or (b) NFLI's breach of this Agreement.

NFLI, acting reasonably and in good faith, shall have the right to conduct acceptance and quality assurance testing of Game Pass which demonstrate that the specifications set forth in the Product Roadmap and this Agreement have been achieved. The level and process of such testing shall be mutually agreed between the Parties (with each Party acting at all times reasonably and in good faith).

Each Party acknowledges that it is working to launch Game Pass by the 2018 NFL Draft (e.g., April 2018). If, as of May 1, 2018, either NFLI or Perform believes (acting reasonably) that Perform is unlikely to deliver a version of Game Pass that complies in all material respects with the Product Roadmap and the terms of this Agreement throughout the GP Territory on or before July 15, 2018, then the Parties will discuss in good faith the prioritization of certain objectives and specifications in the Product Roadmap with the goal of launching a mutually acceptable version of Game Pass throughout the GP Territory on or before July 15,

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001435

| | |
|---|---|
| | 2018.  If, following such good faith discussions with Perform, Perform fails to deliver a version of Game Pass that complies in all material respects with the Product Roadmap (or any mutually agreed revised version of the Product Roadmap following such discussions) and the terms of this Agreement throughout the GP Territory on or before July 15, 2018, then, unless such late delivery is directly attributable to (a) a failure of NFLI to timely approve the branding of (including the use of Licensed Marks within) Game Pass or (b) NFLI's breach of this Agreement (in which case Perform's delivery obligation will be tolled solely to the extent and during the period that any late delivery of Game Pass is directly attributable to such failure).  Notwithstanding anything to the contrary in this Agreement, such failure shall be deemed a material breach of this Agreement by Perform. |
| **Game Pass Content** | During the GP Term, NFLI will deliver (or arrange for the delivery of) to the mutually agreed existing NFLI delivery point ("**NFLI Delivery Point**"), all live NFL games (preseason, regular season, postseason) played during the GP Term, all live pre-game broadcast shows aired prior to kickoff that are not proprietary to a third party (e.g., pre-game shows that begin approximately thirty (30) minutes prior to kickoff, but not, for example, ESPN NFL Countdown) (solely to the extent that such shows are cleared for distribution in any applicable part of the GP Territory), all live episodes of the RedZone Program produced during the GP Term and a linear feed of NFL Network for distribution within Game Pass (collectively, "**Live Content**"). NFLI shall also provide Perform with credentials to access and utilize a GSIS (Game Statistics & Information System) data feed and current NFL-created highlights and clips, VOD content and other NFL-related video programming to be mutually agreed by the Parties (which content will in any event be generally consistent with that provided by NFLI with respect to the product branded as "NFL Game Pass" in the GP Territory during the 2016 NFL season) ("**Other NFL Content**"), in each case, in traditional 2D high definition video format to be mutually agreed (including, if such feeds are produced by an NFL telecast partner and made generally available, in 4K format).  A list of Other NFL Content that was included in Game Pass in the GP Territory during the 2016 NFL season is attached hereto as <u>Exhibit F</u>.

During the GP Term, Perform shall transcode and archive all live NFL games and live episodes of the RedZone Program ("**Archive Content**") and produce condensed replays (in a format reasonably acceptable to NFLI) of each NFL game included in Live Content ("**Condensed Games**").  For the avoidance of doubt, all such transcoding and archiving costs shall be treated as Media Expenses.  Perform shall provide NFLI with copies of all Archive Content and Condensed Games upon NFLI's reasonable request.

With respect to delivery costs, the transmission costs associated with the delivery of GP Content to the NFLI Delivery Point shall be borne by NFLI; provided that (a) all costs associated with providing Perform access to the NFLI Delivery Point and (b) all delivery costs associated with delivering GP Content from the NFLI Delivery Point to Game Pass subscribers shall be borne by Perform (and treated as Media Expenses).

"**GP Content**" means, collectively, Live Content, Other NFL Content, Archive |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001436

| | Content and Condensed Games. |
|---|---|
| **Game Pass - General Grant of Rights** | Subject to the terms and conditions of this Agreement, NFLI grants to Perform the non-transferable right and license, and Perform accepts the obligation, during the GP Term and throughout the GP Territory to manage, operate, offer and sell Game Pass as a standalone subscription offering and distribute GP Content solely within Game Pass running on Approved Devices. For clarity, except as may be approved by NFLI in writing in its sole discretion, but without prejudice to the grant of the Broadcast Rights below, Perform may not syndicate, sublicense, pass-through or otherwise distribute GP Content (other than within Game Pass running on Approved Devices).<br><br>Subject to the terms and conditions of this Agreement (including NFLI's approval rights), NFLI hereby grants to Perform, and Perform hereby accepts, a non-exclusive, non-transferable, royalty-free, fully paid-up license during the GP Term and in the GP Territory to: (a) display, reproduce, and distribute the Licensed Marks in connection with the operation of Game Pass, within the App Stores and in NFLI-approved promotion(s) of Game Pass as described in this Agreement; (b) to display, reproduce and distribute the Game Pass Information via the App Stores; (c) to display excerpted portions of the Game Pass Information on the user interface of the App Stores or in connection with the display of an end user's search results; and (d) to distribute highlights or NFL game previews on a VOD basis on (i) Perform's social media platforms and (ii) digital properties controlled by Perform (e.g. goal.com and sportingnews.com); provided that, in the cases of (i) and (ii), such distribution shall be permitted solely for purposes of tune-in promotion for specific upcoming NFL games, subject to the following conditions: (A) any such distribution shall be subject to the restrictions set forth in the section titled "Marketing and Promotional Obligations" below (including NFLI's approval rights), (B) any such highlight or game preview must be directly relevant to the specific matchup of the game for which such tune-in promotion relates, and (C) each such execution must include audio-visual tune-in information (i.e., date, time, and availability on Game Pass). For clarity, other than in connection with its distribution of GP Content and its operation of Game Pass in accordance with this Agreement, Perform shall have no rights under this Agreement to syndicate any NFL highlights or otherwise make available an archive of any NFL content (including highlights).<br><br>Perform agrees that all distribution of GP Content hereunder shall be in compliance with the terms of this Agreement and that the distribution of GP Content shall be made solely through offerings that comply with, and are sold or otherwise made available in compliance with, the terms of this Agreement.<br><br>For clarity, the licenses granted in this Agreement do not extend to, and any exclusivity provided herein does not apply to rights to virtual reality, mixed reality, virtual advertising, interactive features or experiences in connection with Game Pass or GP Content, or "watch and bet" rights. Notwithstanding the foregoing, Perform shall be entitled to deploy functionality that is generally consistent with that provided by NFLI with respect to Game Pass in the GP Territory during the 2016 NFL season (such as integrated social media experiences, the ability to watch multiple games at the same time and statistics |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001437

| | dashboards).  Except as expressly granted herein, all rights are reserved by NFLI. |
|---|---|
| **Game Pass - Content Distribution Obligations** | During the GP Term, Perform (a) shall have the obligation to distribute all Live Content in its entirety in English on a live basis throughout the GP Territory and (b) shall not blackout any Live Content (for clarity, other than commercials therein as provided in the "Game Pass Advertising and Sponsorship" section below) in any country within the GP Territory unless required in order to comply with applicable law or directed by NFLI in order to comply with the NFL's then-current blackout policy (applied consistently as compared to third parties) or third party contractual obligations entered into in connection with the Broadcast Rights.<br><br>Perform may make proposals to localize certain Live Content (e.g., local language feeds) and offering additional audio feeds (e.g., local radio feeds, Spanish language radio feeds) in certain countries in the GP Territory, which shall be subject to NFLI's prior approval (solely with respect to branding considerations) (such approval not to be unreasonably withheld or delayed), and all costs associated therewith shall be treated as Media Expenses.<br><br>Perform shall have the right, but not the obligation, to implement "start over" and "lookback" (i.e., functionality whereby a subscriber may restart GP Content that is in progress at any time during the period of such GP Content's live or linear exhibition, and for a limited time thereafter for live games until a VOD or condensed version of such game is available) and rewind functionality with respect to any GP Content distributed on a live basis.  Perform may provide to Game Pass subscribers temporary download rights for the VOD assets of GP Content generally consistent with the temporary download rights provided to subscribers of the product branded as "NFL Game Pass" in the GP Territory during the 2016 NFL season; provided that the temporary download window for any VOD asset of GP Content shall not extend longer than seventy-two (72) hours from the time of download.  For the avoidance of doubt, live NFL games played during the GP Term shall be available as video-on-demand assets promptly after the conclusion of such game. |
| **Game Pass Advertising and Sponsorship** | Perform shall blackout all commercials airing during live NFL games distributed via Game Pass and replace such commercials with either (as determined in Perform's sole discretion) (i) NFLI-provided house ads or promotional units or (ii) NFL game highlights and/or clips included within Other NFL Content; provided that, notwithstanding the foregoing, Perform shall have the right to not black out commercials (and if Perform elects to distribute such commercials, then Perform shall be solely responsible for Claims arising from the distribution of such commercials (e.g., the commercials not being cleared within any portion of the GP Territory).  All units provided by NFLI for replacement are "**Required Advertising Materials**."  Perform shall not sell or otherwise provide any other advertisements or any sponsorships in connection with Game Pass.  If Perform wishes to begin selling any such advertising and/or sponsorships, then Perform shall present a proposed advertising and/or sponsorship plan to NFLI, which shall in good faith consider such plan as part of a separate arrangement between the Parties. |
| **Game Pass** | Perform shall have sole discretion to determine the packaging and pricing of |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001438

| | |
|---|---|
| **Product Offerings** | Game Pass, including the retail prices to be paid for Game Pass in each country within the GP Territory, provided that at all times Game Pass shall have pricing which reflects its status as a premium subscription video programming product.<br><br>At a minimum, Game Pass shall be offered throughout the GP Territory as one (1) season-long (including the postseason and Super Bowl) package subscription SKU for each NFL season during the GP Term.  Subject to the terms of this Agreement, Perform shall have the right to offer additional SKUs of Game Pass in the GP Territory, as Perform may determine in its sole discretion (and each SKU shall be reflective of a premium subscription video programming product).   Unless otherwise agreed by the Parties (acting reasonably and in good faith), Perform shall have the right to offer to any end user in the GP Territory one (1) free trial per Fiscal Year for a period lasting no more than two (2) consecutive weeks of the NFL season.<br><br>Perform shall be responsible for collecting all revenues from Game Pass subscribers during the GP Term. |
| **Additional Game Pass Restrictions** | Without limiting any of NFLI's approval rights hereunder, Perform will not use the GP Content or distribute or offer Game Pass (a) in any manner that NFLI believes, in its sole good faith opinion, suggests or implies an association between any Person, on the one hand, and NFLI, the NFL, any Member Club, any NFL player and/or any other individual associated with the NFL, on the other, (b) in connection with what NFLI believes, in its sole good faith opinion, to be in connection with any "betting lines," gambling or any form of wagering (including casinos, sports books and telephone betting services), or (c) in any other manner that NFLI believes, in its sole good faith opinion, would reflect negatively on NFLI, the NFL, any Member Club, any NFL player, and/or any other individual associated with the NFL.<br><br>Perform acknowledges and agrees that this Agreement does not grant to Perform any rights with respect to the use of the names or likenesses of any NFL players, except to the extent that such players' names or likenesses are part of the GP Content used and distributed in accordance with the terms and conditions of this Agreement. |
| **Broadcast Rights** | REDACT |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY<br>DEF0001439



13

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001440



14

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001441

| | |
|---|---|
| | REDACT ████████████████████████████████████ |
| **Game Pass Exclusivity** | Subject to the terms of this Agreement, during the GP Term, NFLI shall not itself, nor authorize any third party (other than Perform) or NFLI affiliate to manage, operate, offer and/or sell Game Pass as a standalone subscription offering within the GP Territory.<br><br>REDACT |



HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001442



16

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001443



HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001444

| | |
|---|---|
| | REDACT  |
| **Budget** | An annual budget setting forth projected Media Revenues and Media Expenses ("**Budget**") for each Fiscal Year during the Term is attached as Exhibit D.  The Parties acknowledge that if NFLI exercises the NFL Convenience Out or the NFL Performance Out prior to either the 2020 or 2021 Fiscal Years, then the Budget for the 2020 and/or 2021 Fiscal Years shall be revised to account for the termination of the Game Pass rights.

By no later than ninety (90) days prior to the start of the upcoming Fiscal Year, Perform may propose modifications to the Budget for the upcoming Fiscal Year, and the Parties shall, acting reasonably, discuss in good faith whether such modifications to the Budget are warranted.  In the event that the Parties cannot agree on modifications to the Budget at least thirty (30) days prior to the commencement of the applicable Fiscal Year, the Parties shall continue performance of this Agreement in accordance with the Budget for the Fiscal Year in question (as reflected in the Budget set forth in Exhibit D). |
| **Economic Definitions** | REDACT |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001445



HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001446

REDACT

REDACT

REDACT

| Canada Agreement Subscription Bonus | If, at any point during the relevant period specified in the table below, the Licensed Digital Service (as defined in the Canada Agreement) has reached the corresponding number of then-active paid subscribers set forth in the table below, then Perform shall make a payment ("**Subscription Bonus**") to NFLI for the corresponding amount set forth in the applicable waterfall tables below (for clarity, only one such payment shall be due in respect of Perform's reaching the applicable number of paid subscribers). |
|---|---|



REDACT
REDA
REDACT

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001447

| | REDACT |
|---|---|

| **Payment Terms** | On or before each December 1 and February 1 during the Term, Perform shall pay NFLI the sum of the MG and Canada MG set forth in the applicable waterfall tables below for the then-current Fiscal Year in two (2) equal installments.  If payable in accordance with the "Canada Agreement Subscription Bonus" section, Perform shall pay NFLI the Subscription Bonus set forth in the applicable waterfall tables below no later than February 1 following the relevant calendar year specified in the table above.  To the extent payable under the Canada Agreement, Perform shall pay NFLI the Licensor RHP Share in accordance with the invoicing procedures set forth in the Canada Agreement. |
|---|---|

On or before each March 1 during the Term (the "**Additional Fee Payment Date**"), Perform shall pay to NFLI the estimated amount of the Additional NFL Fee for such Fiscal Year, based on estimated sales of Game Pass through the final day of February of the applicable Fiscal Year (the "**Estimated Payment**"); provided that if (x) the actual amount of the Additional NFL Fee for any Fiscal Year (as determined following the end of such Fiscal Year) exceeds the Estimated Payment for that Fiscal Year, then Perform shall pay to NFLI an amount equal to the difference between the Estimated Payment for that Fiscal Year and the actual Additional NFL Fee for that Fiscal Year within forty-five (45) days after the end of such Fiscal Year; or (y) the Estimated Payment for any Fiscal Year exceeds the total amount of the Additional NFL Fee for that Fiscal Year (as determined following the end of such Fiscal Year), then NFLI shall refund to Perform an amount equal to the difference between the Estimated Payment for that Fiscal Year and the actual Additional NFL Fee for that Fiscal Year within forty-five (45) days after the end of such Fiscal Year.

Perform shall issue timely requests for invoices that detail the specific amounts to be paid to NFLI hereunder.  Following each such request, NFLI shall issue valid invoices in a timely manner for all payments to be made under this Agreement.  Any amounts that are not paid by Perform on or before its applicable payment date shall accrue interest REDACT from the payment date until the date such amount is actually paid.

On or before the Additional Fee Payment Date for each Fiscal Year and within forty-five (45) days of the end of each Fiscal Year, Perform shall provide NFLI with an itemized statement showing: (a) the Media Revenues for such Fiscal Year; (b) the Media Expenses for such Fiscal Year; (c) the exchange rates used for calculating any Media Revenues or Media Expenses (to the extent applicable); and (d) such other particulars as are reasonably requested by NFLI for an accurate accounting of the payments made pursuant to this Agreement (including all supporting documentation necessary for NFLI to reconcile Perform's cash P&L to USD cash basis results in accordance with any US GAAP requirements).  The "Economics" provisions, including Net Media Revenues, the Additional NFL Fee and the Additional Perform Fee, shall be determined on a USD cash basis.

All payments by Perform to NFLI hereunder shall be in U.S. dollars.  At the request of NFLI, Perform will report the currency conversion rates used in respect of converting amounts to U.S. dollars under this Agreement, which rates shall be

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001448

| | |
|---|---|
| | consistently applied as compared to third parties. |
| **Waterfall - No NFL Out** | The following economic terms shall apply if NFLI does not exercise the NFL Performance Out or NFL Convenience Out prior to the 2020 or 2021 Fiscal Years (as applicable):<br><br><br><br>For the avoidance of doubt, Section 8 (Termination) of Schedule B to the Canada Agreement sets forth the Parties' rights and obligations with respect to the Canada MG, Subscription Bonus and Licensor RHP Share in the event the Canada Agreement is terminated early. |
| **NFL - Game Pass Performance Out** | REDACT |



**NFL - Game Pass Convenience Out**

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001450

| | |
|---|---|
| |  REDACT |
| **Taxes** | All payments due hereunder shall be made free and clear of, and without deduction or withholding for, or on account of, any income, stamp, or other taxes, charges, fees, deductions, or withholdings, unless the deduction or withholding is required by law.  Each Party shall be liable for the cost of any tax imposed on its net income, regardless of whether collected by withholding or otherwise, and for any interest or penalties imposed with respect to such liability.  Upon a Party's reasonable request, the other Party shall provide all applicable documentation required by local tax authorities.<br><br>As the seller of record of Game Pass to customers and as a party to the Customer Agreements (as defined below), Perform shall be responsible for and manage all VAT compliance duties including but not limited to, VAT registration, collection from customers, filings and payment with respect to Game Pass in the GP Territory which are incurred during, and relate solely to, the GP Term.  To the extent that NFLI is required to directly remit VAT relating to Game Pass subscriptions to any taxing authority pursuant to a government audit or examination, Perform shall REDACT |
| **Audit** | During the Term and for one (1) year thereafter, in addition to providing the Daily Revenue-Related Reporting and Monthly Expense-Related Reporting (as such terms are defined below), Perform shall maintain complete and accurate records of its activities under this Agreement to the extent they give rise to payment and reporting obligations hereunder.  Without limiting the foregoing, the records of Perform's activities under this Agreement shall include complete and accurate records of all Media Revenues and Media Expenses. |

Upon reasonable notice to Perform by NFLI, NFLI shall select an independent auditor and submit the identity of such auditor to Perform for approval (not to be unreasonably withheld, conditioned or delayed). Upon approval of such auditor (who shall be required to be contractually bound to protect Perform's confidential information), the auditor shall conduct an audit of Perform's books and records solely to determine Perform's compliance with the calculation and payment of the amounts due under this Agreement. Unless otherwise agreed by the Parties, any such audit shall be conducted during normal business hours and in a manner that does not unreasonably interfere with Perform's business activities. NFLI may not conduct an audit more than once per Fiscal Year during the Term and during the one (1) year period thereafter; provided that follow-ups reasonably necessary to complete any such audit shall not be considered a second audit. Any audit conducted under this Agreement may cover all prior periods during the Term that have not been audited previously, and no period may be audited more than once. Such audit shall be conducted as a "black box" audit as follows:

a) If, as a result of an audit conducted pursuant to this subsection, the auditor determines that the Audited Party has fully complied with respect to the calculation and payment of the amounts due under this Agreement, then the auditor shall provide written notice to the Parties stating only that Perform has complied.

b) If, as a result of an audit, the auditor determines that Perform has failed to comply with such respect to the calculation and payment of the amounts under this Agreement, then the auditor shall notify Perform in writing of such non-compliance and during the thirty (30) days following the delivery of such notice, the auditor and Perform shall commence good faith discussions regarding such non-compliance. In the event that after such thirty (30) day good faith discussion period, the auditor concludes that Perform, in fact, has complied with such obligations, then the auditor shall provide written notice to the Parties stating only that Perform has complied. In the event that after such thirty (30) day good faith discussion period, the auditor concludes that Perform has not complied with such obligations, then within thirty (30) days after such period (the "**Cure Date**"), Perform may cure such non-compliance (including remitting the amount of any overpayment to NFLI) by the Cure Date. If Perform's non-compliance is not cured by the Cure Date, then the auditor shall be authorized to provide to NFLI only that limited information acquired during the course of the audit as is relevant (in the reasonable opinion of the auditor) to a claim or claims that NFLI may have related to such alleged non-compliance; any information that is not so relevant shall not be disclosed to NFLI by the auditor and shall remain strictly confidential.

c) If the auditor reasonably determines that it needs more information to make the determination contemplated in either clause (a) or (b), then the auditor shall be permitted to request in writing that Perform provide such reasonably requested additional information; provided that, for the avoidance of doubt, the auditor may or may not know, at the time of the request, whether the information requested will ultimately be material to the determination contemplated in clause (a) or (b). Where Perform has, or can reasonably collect, such information, it shall provide such

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001452

information to the auditor within thirty (30) days of the auditor's request. A failure by Perform to comply within thirty (30) days after such notice shall be deemed to be a material breach of this Agreement.  For the avoidance of doubt, despite the description of the audit contemplated herein as a "black box" audit , the auditor shall be permitted to disclose to, and discuss with, NFLI the type of information that has been requested, but (subject to paragraph (b) above) not the actual information provided by Perform.

d) If as a result of an audit, irrespective of whether the auditor determines that there has been non-compliance as contemplated in clause (b), the auditor determines that the Daily Revenue-Related Reporting or the Monthly Expense-Related Reporting are inaccurate, Perform shall use commercially reasonable efforts to correct all such reporting within thirty (30) days.  Further, if as a result of an audit, the auditor has suggestions for improvement of the transparency and accuracy of such reporting, Perform shall not unreasonably withhold incorporating such suggestions into future reporting (it being understood that the incurrence by Perform of more than a de minimis amount of additional costs shall not be considered an unreasonable reason for not incorporating such suggestions into future reporting).

NFLI shall bear the expenses of its auditors; provided, however, that the expenses of any Mutually Selected Auditor (as defined below) shall be treated as a Media Expense.  If the results of such audit indicate an underpayment of amounts due hereunder of more than five percent (5%) of the amount payable to NFLI under this Agreement for the period audited, then Perform shall promptly pay to NFLI any such underpayment, and interest thereon at the then-current prime rate from the date such amount became due until the date of payment; provided that, for the avoidance of doubt, any amounts required to be paid to NFLI as a result of this provision shall not be treated as Media Expenses.  NFLI's audit rights hereunder shall survive for one (1) year after any termination or expiration of this Agreement.

Notwithstanding anything in this section to the contrary, if Perform disagrees with the results of NFLI's auditor, then (a) Perform shall provide notice to NFLI of such disagreement within thirty (30) days of Perform's receipt of such results (the "**Audit Dispute Notice**") and (b) Perform, NFLI and such auditor shall discuss in good faith the results of such audit.  If the Parties are unable to resolve such audit dispute within thirty (30) days of NFLI's receipt of the Audit Dispute Notice, the Parties shall mutually select an independent third-party auditor (a "**Mutually Selected Auditor**") to reexamine the applicable books and records of Perform. The final determination of the Mutually Selected Auditor shall be binding on the Parties and the expenses of any Mutually Selected Auditor shall be treated as a Media Expense.

The Parties acknowledge that, in any Fiscal Year, Perform may incur incidental expenses that are not explicitly included in the line items in the Budget.  Perform shall be permitted to treat such incidental expenses as Media Expenses without causing a breach of its obligations under this Agreement; provided that such

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001453

| | |
|---|---|
| | expenses do not either (i) increase the overall budgeted Media Expenses for the applicable Fiscal Year and (ii) exceed five percent (5%) of the total budgeted Media Expenses for such Fiscal Year (for clarity, Perform shall not be required to provide detail of such incidental expenses during an audit contemplated herein). For the avoidance of doubt, if Perform incurs incidental expenses in excess of the threshold stated herein and treats such excess expenses as Media Expenses, then Perform shall be deemed to have breached its obligations hereunder, unless the Parties have agreed to a modification of the Budget.<br><br>In the event an independent public accountant of recognized standing prepares audited financial statements of Perform, Perform shall provide NFLI with true and complete copies of such audited financial statements within thirty (30) days of Perform receiving them. |
| **Mutual Termination Rights** | In the event that either Party is in material breach of this Agreement, the other Party may provide written notice of such material breach to the other Party, and if such material breach (a) is capable of being cured and is not cured within thirty (30) days or (b) not capable of being cured within such thirty (30) day period, then, in addition to any other rights and remedies available, the non-breaching Party may immediately terminate this Agreement by providing written notice of its election to the other Party.   In addition, either Party may immediately terminate this Agreement upon notice to the other Party, if the breaching Party has repeatedly materially breached material provisions of this Agreement to such a degree that it is unlikely that the breaching Party is willing or able to continue to perform its obligations under this Agreement without continuing to materially breach this Agreement.<br><br>Either Party may terminate this Agreement for cause, effective immediately upon written notice to the other Party, if such other Party is insolvent or subject to any bankruptcy or similar proceedings. |
| **Customer Agreement** | At the time of purchase, Perform shall be responsible for requiring each end user seeking to purchase a subscription to Game Pass (or otherwise accessing GP Content via a free trial) to agree to an end user terms and conditions and a privacy policy (together with any other terms or disclosures to end users, "**Customer Agreements**") before being authenticated, which provides for the following terms and conditions, and otherwise is of form and substance approved by NFLI prior to implementation: (a) Game Pass and the GP Content may only be used for the end user's personal, private, non-commercial use within the GP Territory and not for any other purpose or for retransmission, distribution, or sale, (b) no NFL Marks may be used by such end user, (c) NFLI and its affiliates may enforce violations of the end user's agreement with respect to their respective intellectual property rights, and (d) NFLI is a data controller (as defined under European data protection law) and, as such, Personal Data and data associated with such end user's viewing of such GP Content may be collected by Perform and shared with NFLI or one or more of its affiliates.  The Customer Agreements shall in all events comply with applicable law (including privacy laws in each country in the GP Territory) and industry best practices (including the Self-Regulatory Principles for Online Behavioral Advertising) and be adequate to provide NFLI all rights and consents required under applicable law for it and its affiliates to exercise their rights, title, and interests to Personal Data and as otherwise reserved to them |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001454

| | |
|---|---|
| | under this Agreement.  Without limitation to the foregoing, Perform's collection, use, and other processing of Personal Data will accord with all such Customer Agreements and applicable laws. |
| **Authentication and Customer Data Protection** | Perform will implement all necessary registration and sign-on capabilities in accordance with the Product Roadmap, including, if directed by NFLI, by integrating NFL.com accounts into Game Pass (as such integration occurred with respect to the product branded as "NFL Game Pass" in the GP Territory during the 2016 NFL season).  Perform shall limit each subscriber account accessing Game Pass to one (1) stream at a time per device and per IP address.

Subject to the Payment Card Exception (defined below), NFLI shall be the sole "data controller," and each of Perform and Perform Investment Limited shall be a "data processor" (as those terms are defined under European data protection law), in relation to all Existing Subscriber/Prospect Data and New Subscriber Data (each, as defined below), and Perform shall process such Existing Subscriber/Prospect Data and New Subscriber Data only on the instructions of NFLI.  For purposes of the foregoing, "**Existing Subscriber/Prospect Data**" refers to any Personal Data that NFLI or its authorized vendor makes available to Perform that relates to existing subscribers to the product branded as "NFL Game Pass" in the GP Territory during the 2017 NFL season ("**Existing Subscribers**") or prospective Game Pass subscribers ("**Prospects**") and "**New Subscriber Data**" refers to any Personal Data that is collected by or on behalf of Perform pursuant to this Agreement that relates to end users of Game Pass that are not Existing Subscribers or Prospects ("**New Subscribers**").  For clarity, NFLI or its authorized vendor shall make available to Perform (a) the Personal Data of Existing Subscribers located in the GP Territory that it has not already made available to Perform prior to the commencement of the GP Term (subject to any transmission being prohibited by applicable law) and (b) the Personal Data of Prospects located in the GP Territory on an ongoing basis throughout the GP Term.   For the avoidance of doubt, Perform shall not be liable for any claim by any Existing Subscriber and/or Prospect in respect of data protection, privacy or marketing where the liability arose prior to Perform's processing (as defined under European data protection law) of the Personal Data of the Existing Subscriber and/or Prospect.

*Payment Card Exception*.  Solely with respect to payment card number, expiration date, and any other payment card details necessary to process a payment for a subscription to Game Pass in the GP Territory ("**Payment Data**"), NFLI and Perform shall each be deemed a data controller (i.e., co-controllers); provided, that the Parties agree that Perform will not transmit Payment Data to NFLI in the regular course during the GP Term; provided, further, that, subject to any transmission being prohibited by any applicable laws, Perform will promptly transmit all such Payment Data to NFLI or its designated agent in an industry standard format (1) upon NFLI's request no more than once per year during the GP Term of this Agreement and (2) in connection with the expiration or earlier termination of the GP Term (and shall promptly delete its records thereof following such expiration or termination).

Notwithstanding anything to the contrary in this Agreement, Perform will not use, |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001455

disclose, or otherwise process Personal Data except to perform its obligations under this Agreement or as mutually agreed upon by the Parties or as required by law.  Further to the foregoing, NFLI directs Perform to conduct such analysis and other processing of Personal Data as appropriate (but including, for the avoidance of doubt, using Existing Subscriber/Prospect Data to contact directly, whether by email or otherwise, Existing Subscribers and/or Prospects) to drive Game Pass subscriber and revenue growth.  To the extent Perform engages in any form of electronic marketing, it shall adhere to and abide by all applicable laws relating to direct marketing.  Perform, on NFLI's behalf, shall be responsible for collecting any necessary consents to permit all Existing Subscribers, Prospects and/or New Subscribers to receive electronic marketing sent by either Party in accordance with this Agreement.  The Parties shall only send electronic marketing to Existing Subscribers, Prospects and New Subscribers where such Person has given their consent (whether by 'opt-in' or 'opt-out', as permitted under applicable laws) to receive certain marketing communications for goods and services.  Each Party shall share with the other Party information setting out which Existing Subscribers, Prospects and New Subscribers have given consent to receive electronic marketing and, if applicable, where such Persons have withdrawn their consent.

Perform shall not share Personal Data with any third parties, and may engage third parties to process such data only with the prior written consent of NFLI and only under contractual protections commensurate with those of this Agreement. NFLI hereby consents to Perform sharing Personal Data with Perform Investment Limited solely for the purpose of processing Personal Data pursuant to this Agreement.

Perform shall not transfer any Personal Data relating to EU data subjects outside the European Economic Area, unless expressly requested and authorized by NFLI to do so, in which case, Perform shall execute with NFLI the European Commission's Standard Contractual Clauses, issued pursuant to Commission Decision 2004/915/EC (the "**Standard Contractual Clauses**") for the transfer of Personal Data of EU data subjects from Perform to NFLI.  Any Personal Data held by Perform as of the termination or expiration of the GP Term shall be deleted by Perform or returned to NFLI, at NFLI's election.

The Parties agree that NFLI will designate a method of transport for Perform to provide such Personal Data records to NFLI, and Perform will deliver such records to NFLI via such method of transport in a mutually agreed, industry standard format and, subject to the obligations in the "Reporting" section below and the obligations relating to Standard Contractual Clauses set out above.

To the extent there is any conflict between the obligations of a Party under this Agreement and applicable law, such Party will comply with its obligations under this Agreement to the greatest extent permitted under applicable law, and will work in good faith with the other Party to agree to an appropriate solution that achieves the other Party's objectives and complies with applicable law.

Perform shall employ and maintain a written information security program that

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001456

incorporates physical, technical and administrative security measures designed to ensure the security, confidentiality, reliability, and integrity of Personal Data and other confidential information and any systems, facilities, or software used by Perform in connection with the Agreement using accepted industry standards, including the implementation of safeguards to protect Personal Data and other confidential information relevant to this Agreement in Perform's possession or control against unauthorized access, disclosure or loss.  Prior to processing any Personal Data, upon NFLI's request, Perform shall provide NFLI with a written certification that it has implemented such a written information security program. Without limitation to the foregoing, Perform represents, warrants, and covenants that its information security program will include appropriate, industry-standard (or better) controls to protect Perform's systems, facilities, software, and other assets against external and internal threats.

In the event Perform discovers (or has reasonable suspicion of) any inadvertent, unauthorized or unlawful disclosure, access, loss or other use of any Personal Data processed by or on behalf of Perform pursuant to this Agreement or any other act or omission by Perform (or any subcontractor or other Person acting on behalf of Perform pursuant to this Agreement) that compromises or may compromise the security, confidentiality, or integrity of Personal Data (a "**Security Breach**"), Perform shall (a) promptly investigate such Security Breach (including, where appropriate, by retaining third-party forensic investigation services) and reasonably cooperate with NFLI in connection with its investigation, including by providing NFLI with the results of the investigation; (b) notify each contact person designated by NFLI promptly and in no event later than forty-eight (48) hours following the detection of such Security Breach; and (c) commence all actions required to comply with applicable laws, rules or governmental regulations related to such Security Breach.  Each Party agrees not to make any public announcements relating to such Security Breach without the other Party's prior written approval.  Perform shall regularly update NFLI on (i) corrections or updates to Perform's security software, protocols and procedures to prevent a reoccurrence of the Security Breach; and (ii) any legal action or investigation pursued by Perform or, to Perform's knowledge, by law enforcement agencies against any alleged perpetrators of the Security Breach.  Following Perform's notification to NFLI of a Security Breach, at NFLI's request to the extent permitted by applicable law, Perform will (x) preserve all electronic evidence in Perform's possession or control relating to the Security Breach in accordance with Perform's customary electronic record preservation standards and (y) assist with or perform (at NFLI's election) all remediation efforts that are required of Perform by applicable laws as a consequence of the Security Breach or that have been required by any governmental authority in similar circumstances (collectively, "**Remediation Efforts**").  Remediation Efforts may include (1) development and delivery of notices to individuals whose Personal Data may have been affected, in consultation with NFLI and with NFLI's consent before any such notices are provided (except in such instances where notification obligations under applicable law do not reasonably allow for such consultation or consent); (2) establishment of a toll-free telephone number where affected individuals may receive assistance and information; (3) provision of credit reports, credit monitoring and repair, and identity restoration products and insurance products

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001457

| | |
|---|---|
| | for affected individuals; (4) reimbursement for costs of placing a freeze on a consumer credit file; (5) investigation and resolution of the causes and impacts of the Security Breach; and (6) such other measures that NFLI and Perform jointly determine are reasonable and commensurate with the nature and level of severity of the Security Breach.  Perform shall be solely responsible for the costs and expenses of all Remediation Efforts and all other actions undertaken pursuant to the foregoing, whether undertaken by Perform or NFLI.   Notwithstanding anything to the contrary herein, Perform will be liable for reimbursement of the actual costs and expenses (i.e., on a dollar-for-dollar basis, with no margin) for Remediation Efforts regardless of whether such amounts are characterized by any Party, government body or other third party as direct, indirect, consequential, special, punitive or other damages, or as contractually-agreed preventative measures designed to limit future damages, or in any other manner.<br><br>Perform shall, and shall ensure that it and its subcontractors, comply in all respects with the Payment Card Industry Data Security Standard (PCI-DSS) and shall hold and maintain such compliance validation as is required by the relevant payment card brand, with respect to any payment card data stored, processed or transmitted by, or on behalf of, Perform or its affiliates.<br><br>At the request of NFLI, Perform shall provide NFLI with all necessary information (which may be in summary form) to enable NFLI to confirm that Perform has complied with its obligations under this Agreement (e.g., SSAE 16, SOC I, II, and III, SysTrust, Web Trust, or perimeter certifications or other third-party assessments, test results, audits or reviews).  Perform shall promptly correct or adopt an acceptable plan for promptly correcting any alleged risks or threats and/or nonconformance to generally accepted trade practices in the industry or other breach of the Agreement identified by any assessment, test result, audit, or review related to its security practices.<br><br>Upon entry into force in the European Union of Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data (the "**General Data Protection Regulation**") on 25 May 2018 (the "**GDPR Effective Date**"), the Parties agree to be bound by the additional terms provided in <u>Exhibit G</u> to the extent that such terms apply to the Parties.  <u>Exhibit G</u> shall supplement the terms of this section "Authentication and Customer Data Protection" from the GDPR Effective Date. |
| **Reporting** | Perform shall provide NFLI on at least a daily basis during the GP Term the following information and data with respect to Game Pass and GP Content: REDACT<br><br>other information as may |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001458

| | |
|---|---|
| | be reasonably requested by NFLI and that can be provided by Perform without significant time and expense to Perform; provided that to the extent any of the foregoing is not reasonably available, Perform will provide such data as soon as practicable (collectively, "**Daily User Reporting**").<br><br>Perform shall also provide NFLI on a daily basis the following information and data with respect to Game Pass and GP Content: (i) Media Revenues generated by subscriber base, (ii) categorization of subscribers across new vs. returning subscribers, and (iii) metrics with respect to free trial subscribers (e.g., conversion rate, sign-up date) (collectively, "**Daily Revenue-Related Reporting**").<br><br>Perform shall provide NFLI on at least a calendar monthly basis (no later than ten (10) days after the conclusion of each calendar month) reports of the actual Media Expenses (including allocations of salaries and overheads for internal staff time) incurred by Perform in connection with this Agreement, with appropriate supporting detail to allow NFLI to verify Perform's calculations ("**Monthly Expense-Related Reporting**").<br><br>In addition, by no later than ten (10) days after the conclusion of each calendar month, Perform shall provide NFLI with a monthly summary of (x) the Daily Revenue-Related Reporting for such month and (y) the Media Revenues earned in connection with each license of the Broadcast Rights, so as to enable NFLI to determine the monthly Media Revenues that are attributable to each of Game Pass and the Broadcast Rights. |
| **Marketing and Promotional Obligations** | For each Fiscal Year during the Term, Perform shall create and execute promotional plans to promote awareness of the availability in the GP Territory of Game Pass and GP Content. Perform shall spend at least the amounts set forth in the marketing line-items of the Budget for purposes of marketing and promoting Game Pass for each Fiscal Year during the Term (provided the NFL Performance Out or NFL Convenience Out is not exercised), as such expenses are further set forth and described in the Budget.<br><br>Perform shall manage all Game Pass-related creative from the creative brief generation to creative asset development and shall incorporate NFLI in the approval process. All promotions and marketing executions and other uses of NFL Marks shall comply with and be in accordance with the terms of this Agreement and the NFL's then-current trademark usage guidelines and shall be subject to NFLI's prior written approval; provided that (a) such approval shall not be unreasonably withheld or delayed, (b) Perform shall not be required to obtain approval where the proposed usage is substantially similar to usage previously approved by NFLI; (c) NFLI shall approve or reject such proposed usage within five (5) business days of submission; and (d) in the event that approval or rejection is not given within such five (5) business day period, the proposed usage will be deemed to be rejected.<br><br>In each Fiscal Year NFLI will allocate promotional inventory in respect of Game Pass in the GP Territory on platforms available to NFLI that is generally consistent with the amount of such promotional inventory provided by NFLI in respect of |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001459

| | |
|---|---|
| | Game Pass in the GP Territory during the period April 1, 2016 to March 31, 2017.<br><br>Throughout the GP Term, NFLI shall ensure that the production of the GP Content is operated in a manner that is generally consistent with the production of GP Content during the 2016 NFL season.<br><br>REDACT <br><br>Perform agrees that it will not grant any facilities-based multi-channel video programming distributor (i.e., cable operators, satellite or IPTV platforms) in Mexico and/or any "virtual multi-channel video programming distributor" in Mexico (i.e., a service in Mexico substantially similar to DISH's Sling TV in the United States), the right to promote Game Pass for sale to its subscribers in Mexico.<br><br>Perform agrees that it shall not market to any Game Pass subscribers any non-Game Pass products or services without NFLI's express written approval. Perform agrees that its marketing and promotion of Game Pass will primarily focus on the general features and functionality of Game Pass (e.g., the ability to watch all or substantially all NFL games; the product features and functionality offered on Game Pass), and Perform will not unduly focus its marketing and promotion on any particular Member Club or particular NFL game. |
| **Intellectual Property Ownership** | NFLI shall own all right, title and interest in and to the NFL Materials, and derivatives thereof.  Nothing in this Agreement confers in Perform any right of ownership in any of the NFL Materials.  If for any reason, the ownership rights in any NFL Materials are held by Perform or do not accrue to NFLI as provided in this Agreement, Perform hereby assigns to NFLI all of its right, title and interest to such NFL Materials to vest in NFLI all ownership rights to the foregoing, and Perform will provide NFLI with reasonable assistance to further evidence NFLI's intellectual property rights therein.<br><br>Perform shall own all right, title and interest in and to the Perform Materials and derivatives thereof.  Nothing in this Agreement confers in NFLI any right of ownership in any of the Perform Materials.  If for any reason, the ownership rights in any Perform Materials are held by NFLI or do not accrue to Perform as provided in this Agreement, NFLI hereby assigns to Perform all of its right, title and interest to such Perform Materials to vest in Perform all ownership rights to the foregoing, and NFLI will provide Perform with reasonable assistance to further evidence Perform's intellectual property rights therein.<br><br>Perform further agrees that its utilization of GP Content and other NFL Materials and any excerpts thereof (including any encoding, transcoding, encryption, translating, editing or formatting changes) will not create in it, nor will it represent it has, any right, title or interest in or to such NFL Materials and any |

33

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001460

| | |
|---|---|
| | excerpts thereof other than the limited licenses expressly granted herein. Perform shall provide reasonable assistance to NFLI (and its affiliates) in the protection of the copyright in and to such GP Content and other NFL Materials and any excerpts thereof, and that any copyrights affecting such NFL Materials or any excerpts thereof applied for during the Term shall be procured for the benefit of NFLI or its designees.  Perform will cause to appear on the GP Content (or any excerpts thereof) or the production in which such content are contained, such copyright, trademark and other notices as NFLI may include.<br><br>Perform further recognizes and acknowledges that its uses of the Licensed Marks shall not create in Perform any right, title or interest in the Licensed Marks (except as a licensee), and that all uses of the Licensed Marks and all goodwill generated thereby shall inure solely to the benefit of NFLI and its affiliates and/or the Member Clubs, as the case may be.  Perform covenants and agrees that Perform shall not, during or after the Term, use any NFL Marks except as expressly authorized hereunder.  With respect to those countries in the GP Territory which require applications to register Perform as a permitted or registered user of any Licensed Marks, or which require the recordation of this Agreement, NFLI shall notify Perform of such requirements and Perform shall execute and deliver to NFLI such applications, agreements or other documents as may be necessary.  In such event, this Agreement rather than such agreements will govern any disputes between Perform and NFLI, and when this Agreement expires or is terminated, any such other agreement shall also be deemed expired or terminated. |
| **Game Pass SLA** | REDACT |
| **Geo-Location** | Perform will make Game Pass available via Approved Devices in accordance with the Product Roadmap and provide the Game Pass-related promotion set forth herein throughout the GP Territory.  As of the 2018 NFL season, verification of a Game Pass subscriber's country of residence will be based on, at a minimum, an IP address from a country within the GP Territory.  Game Pass subscribers will not be permitted to sign-up from an IP address registered in a country not included in the GP Territory.  Perform will work with NFLI as needed to define the technical implementation the Parties will use to geo-target the distribution of GP Content based on the identification of the physical location of the end user viewing the GP Content and/or purchasing Game Pass (i.e., only show the SKU intended for purchase in the country where the user is located).  Perform will ensure that access via Approved Devices implements then-current, industry standard (or better) geo-location technologies and procedures commonly used for premium video products in the video programming delivery industry.<br><br>In addition to the geo-blocking obligations, Perform shall ensure that the availability of access to Game Pass is based on the package purchased by the subscriber (as applicable); provided that in the event of any issue with Game Pass impacting the user experience (e.g., database issue, connectivity issues, etc.), Perform will, at NFLI's request, make Game Pass available (including the Live |

34

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001461

| | |
|---|---|
| | Content) to all users.  Perform must accommodate this request within thirty (30) minutes of the request being submitted by NFLI.<br><br>NFLI will have contractual obligations with the providers of its Game Pass product in territories outside of the GP Territory which obligate each provider to implement then-current, industry standard (or better) geo-location technologies and shall ensure that such providers are employing such geo-location technologies and other content protection measures commensurate with those adopted by Perform in respect of Game Pass in the GP Territory. |
| **Content Protection** | Perform will ensure that all GP Content is secured in accordance with Perform's then-most effective technology and procedures (which shall be at least industry-standard) to prevent copying and downloading.   In all cases, the encryption technologies used shall be at least as effective as the most effective technology used for any other content made available on other Perform platforms.<br><br>NFLI, as copyright owner of all GP Content, shall use commercially reasonable efforts to engage in and adopt anti-piracy measures for the purposes of tracking and halting unauthorized transmissions of GP Content in the GP Territory during the GP Term. |
| **Customer Service** | Perform will provide user support and customer service for Game Pass on Approved Devices in a timely and effective manner, at least consistent with the level and quality of support provided to Game Pass subscribers by NeuLion during the 2016 NFL season. |
| **Subcontractors** | Perform may subcontract the performance of the development work contemplated under this Agreement; provided, however, that (a) the use of any subcontractor that solely provides services in respect of Game Pass  hereunder (i.e. and not in respect of subcontractors that also provide services to Perform in respect of other products and services)shall be approved in advance by NFLI (not to be unreasonably withheld or delayed); (b) Perform shall oversee the performance by its subcontractors of the subcontracted activities in a manner that would be reasonably expected to result in their timely and successful completion; (c) any agreement pursuant to which Perform engages a subcontractor must be consistent in all material respects with the provisions of this Agreement that relate to the development work performed by such subcontractor; and (d) any breach of this Agreement by any such permitted subcontractor shall be deemed a breach by Perform, and Perform shall be primarily liable with respect thereto.<br><br>Notwithstanding the terms of the applicable subcontract or NFLI's approval of such subcontractor, Perform shall be and remain responsible and liable for any acts or omissions of any subcontractor or its personnel (including failure to perform in accordance with this Agreement or to comply with any duties or obligations imposed on Perform under this Agreement) to the same extent as if such failure to perform or comply was committed by Perform or its personnel. |
| **Transition/ Wind-Down** | At the expiration or earlier termination of this Agreement, if requested by NFLI, Perform will provide all necessary transition services, on reasonable financial terms for a reasonable period of time, which shall ensure that Game Pass subscribers continue to have access through to the end of the then-current NFL season. |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001462

| | |
|---|---|
| | Save for the fulfillment of existing Game Pass subscriptions (which shall be fulfilled) and without prejudice to the Canadian Rights, after the expiration or termination of this Agreement, Perform shall have no further right to use any GP Content, NFL Marks or other content owned or controlled by NFLI or its affiliates and shall promptly provide NFLI with all files and feeds of such content or marks in its possession. |
| **Amendment to Existing Agreements** | Perform agrees that its agreements with NFLI with respect to the distribution of NFL content in each of Germany and Japan shall be deemed amended to allow NFLI to distribute live game telecasts and other NFL content through digital product(s) branded as "Game Pass," irrespective of whether such products are owned and controlled by NFLI (or an NFLI affiliate).  NFLI will deliver to Perform a form of amendment to the Germany and Japan agreements to memorialize this agreement and, so long as the proposed amendments are reasonable, Perform shall promptly (and in any event within ten (10) days of receipt of the forms from NFLI) execute such amendments.   Perform's agreement reflected in the first sentence of this section shall be binding whether or not so memorialized. |
| **Indemnification** | During and after the Term, NFLI shall defend, indemnify and hold harmless Perform, its affiliates, related entities, directors, officers, employees, and representatives from and against any third party claims, demands, losses, causes of action, or damages (including reasonable outside attorneys' fees) (collectively, "**Claims**") arising out of: (a) the use of the NFL Materials when used in the form provided by NFLI and as approved pursuant to this Agreement, violates or otherwise infringes upon any law, any third party rights including rights of privacy or any third party right in any copyright, trademark, right of publicity or other intellectual property right but excluding any public performance rights in music required to be licensed from any performing rights society in the GP Territory; (b) any technologies or delivery methods of the product branded as "NFL Game Pass" that existed prior to the start of the 2018 NFL season that are not created, developed, operated, maintained, supported or hosted by Perform and are alleged to violate or infringe upon any intellectual property right of any third party (including any copyright, trademark or patent right), (c) NFLI's breach of this Agreement; (d) NFLI's violation of any applicable law (including the General Data Protection Regulation from the GDPR Effective Date) or any term in this Agreement in connection with its (i) collection of Existing Subscriber/Prospect Data or (ii) use or other processing of Existing Subscriber/Prospect Data, New Subscriber Data and/or Payment Data; or (e) solely to the extent compelled by NFLI's specific instructions with respect to Personal Data for which NFLI is a data controller and Perform is a data processor, Perform's violation of any law by virtue of it having complied with such instructions (provided, that, for clarity, the foregoing indemnity shall not apply to the extent Perform could have complied with applicable law in carrying out NFLI's instructions (e.g., NFLI's direction to Perform to conduct such processing of Personal Data as appropriate to drive Game Pass subscriber and revenue growth)).

During and after the Term, Perform shall defend, indemnify and hold harmless NFLI, the NFL, its Member Clubs, and each of their respective affiliates, related entities, directors, officers, employees and representatives from and against any |

36

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001463

third party Claims arising out of: (a) the use by (or on behalf of) Perform of the NFL Materials, when used other than as in the form provided by NFLI and/or as approved pursuant to this Agreement, violates or otherwise infringes upon any law, any third party rights including rights of privacy or any third party right in any copyright, trademark, right of publicity or other intellectual property right; (b) the breach of this Agreement by Perform or any other Person acting on Perform's behalf (whether or not such other Person has been approved by NFLI pursuant to this Agreement); (c) an allegation that Game Pass (other than NFL Materials included therein) or any other technology or functionality used by or on behalf of Perform in connection with the GP Content or Game Pass violates or infringes upon any law, any intellectual property right or any other right of any third party (including any copyright, trademark, or patent right); (d) Perform's violation of any applicable law (including the General Data Protection Regulation from the GDPR Effective Date) or any term in this Agreement in connection with its collection, use, disclosure or other processing of Existing Subscriber/Prospect Data, New Subscriber Data and/or Payment Data; (e) any act or omission or willful misconduct by Perform that results in the inadvertent, unauthorized and/or unlawful access, processing, loss, use or destruction of NFLI's or any Game Pass subscriber's data (including Personal Data), confidential or proprietary information, data or materials (including a Security Breach and any costs incurred by NFLI or its affiliates in connection with all Remediation Efforts); or (f) Perform's promotional, marketing or advertising activities involving or related to the Agreement.

For clarity, each Party's indemnity obligation under this Agreement shall not apply to the extent the Claim is subject to the other Party's indemnity obligations. In the event both Parties bear fault for any indemnified Claim, each Party's liability shall be equal to the percentage determined to be due to the fault of such Party as agreed upon by the Parties, as fixed by a settlement agreement approved by the Parties, or as set forth in a final judgment of a court of competent jurisdiction.

In any instance to which the foregoing indemnities pertain, the indemnified party shall (A) give the indemnifying party prompt written notice of the relevant claim, provided, however, that failure to give such notification shall not relieve the indemnifying party of its indemnification obligations except to the extent that such failure prejudices the indemnifying party's defense of such claim, (B) cooperate with and assist the indemnifying party in all respects in connection with any such defense, and (C) give the indemnifying party the right to control the defense and settlement of any such claim, except that the indemnifying party will not enter into any settlement of a Claim or admit liability or fault without the indemnified party's prior written approval, which shall not be unreasonably withheld. The indemnified party will have the right to participate in the defense at its expense, except that the indemnified party will not enter into any settlement of a Claim or admit liability or fault without the indemnifying party's prior written approval, which shall not be unreasonably withheld. The indemnifying party shall reimburse the indemnified party for all reasonable out-of-pocket costs actually incurred by the indemnified party in connection with such cooperation and assistance as set forth in (B) above. In any instance to which such indemnities

37

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001464

| | |
|---|---|
| | pertain, the indemnifying party shall keep the indemnified party fully advised of all material developments pertaining to such Claim. |
| **Limitations on Liability** | Except for obligations related to confidentiality, indemnification, the unauthorized use of the intellectual property rights of a Party (e.g., in a manner not permitted by this Agreement), willful misconduct or gross negligence, neither Party, in connection with or related to this Agreement, shall be liable to the other Party for any indirect, incidental, consequential, special, reliance, or punitive damages (including loss of business, revenue, profits, use, data, or other economic advantage), however caused and regardless of theory of liability, even if such Party is informed in advance of the possibility of such damages. |
| **Insurance** | At all times during the Term, Perform shall carry such insurance as is standard and reasonable in connection with its operations. |
| **Reps & Warranties** | Each Party represents and warrants that (a) it has the right and authority to enter into and perform this Agreement; (b) its execution of this Agreement and performance of its obligations under this Agreement do not and will not violate any other agreement to which it is a Party; and (c) this Agreement will constitute the legal, valid and binding obligation of such Party when executed and delivered. |
| | Perform further represents and warrants that (i) it has a valid license (if necessary) to distribute the GP Content in the GP Territory via Game Pass; (ii) save for the GP Content, Licensed Marks and any other elements included therein, as provided by NFLI without alteration, all advertising and promotional materials for, all commercial insertions and other changes made by, or on behalf of, to, and all graphics used in connection with the GP Content will not violate the intellectual property rights of any third party; (iii) it shall ensure that (except for Unavoidable Overspill) the GP Content is made available only in the GP Territory and in accordance with and subject to the terms and conditions set forth in this Agreement; (iv) it will not violate any applicable laws, regulations or standards in relation to the distribution, advertisement, promotion, possession or use of any GP Content or other content owned or controlled by NFLI or its affiliates (save where occasioned by the nature of the GP Content as provided by NFLI without alteration); (v) it will be responsible for the necessary valid public performance licenses (or other similar agreements) with the applicable music societies in the GP Territory so that its public performance of any music in the GP Content shall not violate any third party rights; (vi) it shall not use the GP Content or other content owned or controlled by NFLI or its affiliates for any purpose other than as specifically authorized by this Agreement; (vii) during the GP Term, Game Pass (other than the GP Content, Licensed Marks and any other elements included therein, as provided by NFLI without alteration) will not infringe upon any intellectual property rights of any third party; and (viii) Perform is not related to any of the Member Clubs or their owners under section 267(b) or section 707(b)(1) of the U.S. Internal Revenue Code of 1986, as amended. |
| | NFLI further represents and warrants that: (i) NFLI has all necessary rights to grant to Perform the rights granted by NFLI in this Agreement; (ii) NFLI, its affiliates and/or the Member Clubs own the copyrights to the GP Content licensed hereunder; and (iii) the GP Content and NFL Marks, as delivered by NFLI or its designee, when used in accordance with the terms of this Agreement do not |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001465

| | |
|---|---|
| | violate any intellectual property right or any other right of any third party (including defamation or any copyright, trademark, literary, dramatic or motion picture right, right of privacy or publicity but excluding any public performance rights in music required to be licensed from any performing rights society in the GP Territory).  Notwithstanding the foregoing, for purposes of clarity, NFLI does not represent or warrant that NFLI has cleared any public performance rights in the music that may be contained in the GP Content.  With respect to NFL Films-produced long-form content provided by NFLI hereunder (excluding, for clarity, any live/VOD games or cut-downs or clips thereof), upon request by Perform, NFLI will provide music cue sheets.  Such requests shall be made to Christine.Black@NFL.com (or such other person as may be designated by NFLI); provided that cue sheets for NFL GameDay will available at www.nflmedia.com to the extent such program includes music.  In addition, to the extent that NFLI is able to obtain music cue sheets from the producers of other GP Content during the Term, it will share such music cue sheets with Perform.

THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT ARE EACH PARTY'S ONLY REPRESENTATIONS WARRANTIES AND NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WILL APPLY. |
| **Confidentiality** | Neither Party shall disclose to any third party any information with respect to the financial or other terms of this Agreement, any matters relating to the course of dealings between the Parties, or any other proprietary information of the other Party ("**Confidential Information**") except (a) to the extent necessary to comply with any law (including the making of any required filings or recordings), any legal proceedings, or the valid order of a court of competent jurisdiction provided that the Party making such disclosures shall promptly notify the other Party of the disclosure obligation in writing and seek confidential treatment of such information; (b) as part of its reporting or review procedures to its affiliated entities (which includes NFLI's ability to disclose any such information to the Member Clubs and their owners); or (c) in order to enforce the rights granted to a Party hereunder or to perform its obligations hereunder.

The decision to release a statement and in the event Parties agree to such a release, any press releases issued regarding this Agreement must be approved by both Parties. |
| **Standard Terms** | *Entire Agreement*.  This Agreement, together with the Canada Agreement, embodies the entire agreement between the Parties regarding the subject matter hereof, and replaces any prior agreement, understanding and/or commitment between the Parties related thereto; provided that except as expressly set forth in this Agreement and the Canada Agreement, this Agreement and the Canada Agreement shall be construed as separate agreements, and a Party's breach of this Agreement shall not give rise to any remedy with respect to the Canada Agreement (and vice versa).  No modifications, amendments or variations to this Agreement shall be effective unless in writing signed by an authorized representative of each Party.

*No Joint Venture, Partnership, etc.*  Neither Party hereto (nor any of their officers, directors, agents, or employees) shall act or hold itself out as an agent of the other Party hereto. The Parties do not intend this Agreement or the relationship |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001466

hereunder to constitute a joint venture or partnership.  The provisions of this Agreement are for the benefit only of the Parties hereto, and no third party may seek to enforce, or benefit from, these provisions.

*Choice of Law*.  This Agreement (including any and all attachments hereto) shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws rules.

*Assignment*.  Save as set out in the section entitled "Subcontractors" above, neither Party may assign this Agreement, or any of its rights or obligations under it, without the prior written consent of the other Party save that (a) Perform may assign this Agreement without NFLI's prior written consent to any of the Perform Holding Companies or any subsidiary under the control of any of the Perform Holding Companies (provided that Perform remains primarily liable to NFLI for any breach of this Agreement by such assignee) and (b) NFLI may assign this Agreement to any NFLI affiliate (provided that NFLI remains primarily liable to Perform for any breach of this Agreement by such assignee).  For purposes of this provision, a Perform Change of Control shall be deemed an assignment which requires the prior written consent of NFLI.  Any purported assignment contrary to the terms hereof shall be null, void and of no force and effect.

*Severability*.  If any provision of this Agreement is determined to be invalid or unenforceable, the provision shall be deemed severed from the remainder, which shall remain enforceable.  If any provision of this Agreement does not comply with any law, ordinance or regulation of any governmental or quasi-governmental authority, now existing or hereinafter enacted, such provision shall to the extent possible be interpreted in such a manner so as to comply with such law, ordinance or regulation, or if such interpretation is not possible, it shall be deemed amended, to satisfy the minimum requirements thereof.  In the event the value of the rights granted to Perform is materially diminished as a result of any provision of this Agreement being determined to be invalid or unenforceable NFLI agrees to discuss in good faith with Perform regarding a potential, mutually agreeable amendment to the commercial terms of this Agreement in order to reflect such materially diminished value.

*Survival*.  The covenants, obligations, terms and conditions herein which, by their terms or nature, extend beyond the termination or expiration of this Agreement, shall survive such termination or expiration until fully performed.  No expiration or termination of this Agreement shall relieve Perform of its obligations to pay any amounts then due to NFLI up to the time of such expiration or termination.

*Force Majeure*.  Neither NFLI nor Perform shall be liable to the other for the nonperformance of its obligations hereunder (other than payment obligations) due to an event of Force Majeure.  "**Force Majeure**" shall include REDACT

Any delay or non-performance of

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001467

obligations (other than payment obligations) due to a Force Majeure event shall not be deemed a breach of this Agreement. Notwithstanding the foregoing, in the event that a Force Majeure event causes the cancellation (as opposed to the postponement) of some number of weeks of an NFL season during the Term (but not the entire season), REDACT

Any refund payment will be payable by NFLI within forty-five (45) days from the conclusion of the applicable Fiscal Year. Notwithstanding the foregoing, if a Force Majeure event cancels an entire NFL season during the Term (and such season is not postponed), REDACT

*Waiver.* The failure of either Party to enforce any provision or condition contained herein at any time shall not be construed as a waiver of that condition or provision nor shall it operate as a forfeiture of any right or future enforcement of such condition or provision.

*Expenses.* Except as explicitly set forth in this Agreement, each Party shall pay all of its costs and expenses under this Agreement and shall be solely responsible for the acts and expenses of its own agents and employees.

*Notices.* All notices hereunder shall be in writing and shall be sent via certified (return receipt requested) or registered mail, by air courier service, or by personal delivery to the address of the Party for whom it is intended with courtesy copies to:

If to NFLI:
c/o Michael Markovich
Vice President, International Media
With a copy to: Vice President and Senior Media Counsel
National Football League
345 Park Avenue
New York, NY 10154


If to Perform:
c/o Alex Rice
With a copy to: Head of Legal - Perform Content
Perform Media Channels Ltd
Hanover House
Plane Tree Crescent
Feltham

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001468

TW13 7BZ, UK

*Counterparts.*  This Agreement shall not be effective until signed by a signatory of each Party.  Each of the individuals executing this Agreement certifies that he or she is duly authorized to do so.  This Agreement may be executed in any number of counterparts and by different Parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute but one and the same document.  Signatures sent by facsimile or other generally used electronic means (e.g., via PDF) shall be deemed original signatures.

[Signature page follows]

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001469

IN WITNESS WHEREOF, the undersigned Parties have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**Perform Media Channels Ltd**

By: _____
*(Signature)*

Name: ___ASHLEY   MILTON___
*(Print or Type)*

Title: ___GROUP   CFO___
*(Print or Type)*

Date: ___10 / 04 / 2017___

**NFL International LLC**

By: _____
*(Signature)*

Name: ___MARK   WALLER___
*(Print or Type)*

Title: ___EVP   NFL___
*(Print or Type)*

Date: ___10 / 04 / 2017___

**Approved by Finance**
RZ

APPROVED
NFL Legal & Business Affairs

[Signature Page]

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001470

**EXHIBIT A**

**REGIONS**

1. "**LatAm**" means Anguilla, Argentina, Aruba, Barbados, Barbuda, Belize, Bolivia, British V.I., Caymans, Chile, Colombia, Costa Rica, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guyana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Montserrat, Netherlands Antilles, Nicaragua, Panama, Paraguay, Peru, St. Barthelemy, St. Christopher & Nevis, St. Lucia, St. Martin, St. Vincent & the Grenadines, Suriname, Trinidad & Tobago, Turks and Caicos, Uruguay, and Venezuela.

2. "**Middle East**" means Afghanistan, Algeria, Bahrain, Cape Verde, Chad, Djibouti, Egypt, Gaza Strip, Iraq, Jordan, Kuwait, Lebanon, Libya, Mauritania, Morocco, Oman, Palestine, Qatar, Saudi Arabia, Somalia, Sudan, South Sudan, Tunisia, Turkey, United Arab Emirates, West Bank, and Yemen.

3. "**Other South America**" means Argentina, Bolivia, Chile, Colombia, Ecuador, Falkland Islands (Malvinas), French Guyana, Guyana, Paraguay, Peru, Suriname, Uruguay, and Venezuela.

4. "**Pan Asia**" means Bangladesh, Bhutan, Brunei, Cambodia, Hong Kong, Indonesia, Laos, Macao, Malaysia, Maldives, Mongolia, Myanmar, Nepal, Pakistan, Philippines, Singapore, South Korea, Sri Lanka, Taiwan, Thailand, and Vietnam.

5. "**ROW**" means Angola, Anguilla, Aruba, Barbados, Barbuda, Belize, Bouvet Island, British Indian Ocean Territory, British V.I., Burundi, Caymans, Christmas Island, Comoros, Cook Islands, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, Equatorial Guinea, Fiji, French Polynesia, Gabon, Gambia, Greenland, Grenada, Guadeloupe, Guatemala, Haiti, Honduras, Jamaica, Kiribati, Lao PDR, Liberia, Mali, Marshall Islands, Martinique, Mayotte, Micronesia, Montserrat, Netherlands Antilles, New Caledonia, Nicaragua, Niue, Palau, Panama, Papua New Guinea, Pitcairn, Reunion, Saint-Martin, Sao Tome and Principe, Seychelles, Solomon Islands, South Georgia and the South Sandwich Islands, St. Barthelemy, St. Christopher & Nevis, St. Helena, St. Kitts and Nevis, St. Lucia, St. Martin, St. Pierre and Miquelon, St. Vincent & the Grenadines, Syria, Timor-Leste, Tokelau, Tonga, Trinidad & Tobago, Turks and Caicos, Vanuatu and Zimbabwe.

6. "**Sub-Saharan Africa**" means Benin, Botswana, Burkina Faso, Cameroon, Central African Republic, Congo (Brazzaville), Democratic Republic of the Congo, Côte d'Ivoire, Eritrea, Ethiopia, Ghana, Guinea, Kenya, Lesotho, Madagascar, Malawi, Mauritius, Mozambique, Namibia, Niger, Nigeria, Rwanda, Senegal, Sierra Leone, South Africa, Swaziland, Tanzania, Togo, Uganda, Western Sahara, and Zambia.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001471

**EXHIBIT B**

**GAME PASS PRODUCT ROADMAP**

1. <u>Schedules</u>.  The following shall set forth the timelines and schedules for development and launch of Game Pass:

   - Approved Device Release Milestones and Schedule

| | 2018 LAUNCH | TBD |
|---|---|---|
| iOS Mobiles (8+) | X | |
| iOS Tablets (8+) | X | |
| Android Mobiles (4.4+) | X | |
| Android Tablets (4.4+) | X | |
| Amazon (4.4+) | X | |
| | | |
| Chrome | X | |
| Firefox | X | |
| Safari | X | |
| IE | X | |
| Opera | | X |
| | | |
| Amazon Fire TV | X | |
| Amazon Fire TV Stick | X | |
| Android TV | X | |
| LG Smart TV (2014+) | X | |
| Panasonic Smart TV (2014+) | X | |
| Samsung Smart TV | X | |
| Sony Bravia TV | X | |
| Philips Smart TV | X | |
| Toshiba Smart TV | X | |
| Sharp Smart TV | X | |
| Sony PS3 | X | |
| Sony PS4 | X | |
| Apple TV Gen4+ | X | |
| XBox One | X | |
| Roku | | X |
| Chromecast | X | |

NFLI acknowledges that functionality and features set out in this <u>Exhibit B</u> will vary depending upon the technological restrictions associated with the Approved Device on which Game Pass is accessed.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001472

2. <u>Video</u>: Perform will provide the signal decode, demux and multiple transcode, as well as service for adaptive streaming of video content (including support for CDN caching, load balancing and real time QoS monitoring) and post processing of live game content for archive and VOD access.

3. <u>Encoding</u>: Perform will encode feeds and will distribute them for end user consumption on the Approved Devices.

4. <u>Transition from NeuLion Canada</u>:

   - <u>Migration of Canadian subscribers</u>: NeuLion and/or NFLI (as applicable) will (subject to applicable laws) provide Perform with the full list of subscribers of the 2016 Game Pass service in Canada in a timely fashion prior to the launch of DAZN in Canada.

   - <u>Migration of Canadian users for auto-renewal</u>: NeuLion and/or NFLI (as applicable) will provide PCI data via secure transfer with Perform's payment/billing vendor.

5. <u>Transition from NeuLion</u>:  Prior to the start of the 2018 NFL season, Perform shall work in good faith with NeuLion to seek an orderly handover of the necessary matters to enable a smooth transition of Game Pass.  NFLI shall procure the reasonable and good faith cooperation of NeuLion to facilitate an orderly handover and seamless continuation of the Game Pass service, with the aim of ensuring that, as far as reasonably and technically possible, there is no disruption in the supply of the Game Pass service and that there is no deterioration in the quality of the delivery of the Game Pass service during the transition period or on handover.  In order to facilitate such transition, prior to the 2018 NFL season, NeuLion and NFLI shall prepare an exit plan by October 1, 2017 ("<u>Exit Plan</u>") which will detail the transition referred to above and how the services will transfer to Perform including providing details of processes, documentation, data and database transfer, systems migration, security and the procedure for the segregation of NeuLion's technology components.  The Exit Plan shall be subject to Perform's reasonable comment and approval and shall be maintained and updated as required to take account of any changes in Game Pass.  The Exit Plan will focus on the following actions:
   - <u>Migration of entitled users</u>: NeuLion and/or NFLI (as applicable) will need to provide Perform with the full list of all entitled users who are allowed to access the 2017 Game Pass product.
   - <u>Migration of GP Territory users for auto-renewal</u>: NeuLion and/or NFLI (as applicable) will need to provide PCI data via secure transfer with Perform's payment/billing vendor.
   - <u>Archived content migration</u>: During the development of the new Game Pass product, Perform will analyze which types of content will be worth migrating to the new Game Pass product, in relation to which NeuLion and/or NFLI (as applicable) will need to verify which metadata (title, description, game unique identifier, thumbnail) are available, as well as time constraints and format availability of archived content.
   - <u>Transition assistance</u>: NeuLion and/or NFLI (as applicable) will also be needed for the following transition assistance tasks:
     o Coordination of SKU retirement/release with NFLI and Perform;
     o Messaging users within existing Game Pass apps to locate/download the new Game Pass apps for the 2018 NFL season;
     o Redirection of users;
     o Geo-location of users;
     o Availability during critical windows if necessary.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001473

- <u>Changes to the current platform</u>: NeuLion and/or NFLI (as applicable) will need to make any changes to the existing Game Pass app required in order to cause transition to take place as planned.

<u>Domain Management</u>:   NeuLion and/or NFLI (as applicable) will need to transfer all relevant domain names and URLs (regionalized to reflect the GP Territory) relating to Game Pass.

6.    <u>GP Content</u>: The following is a list of content that will be available to Game Pass subscribers, provided that the Parties acknowledge that they may, in good faith, determine on a case-by-case basis to exclude certain content from being distributed in certain portions of the GP Territory:

- Live streaming of NFL games.
- Replay of NFL games in different versions:
  - Full event replay
  - Condensed Games
- Live NFL Network and VOD NFL Network shows.
- Live NFL RedZone and VOD NFL RedZone.
- Coach's Film

7.   <u>Environments and IP adjustment</u>:  Perform will be responsible for the development, production and hosting of a production, development and QA environments for all landing/payment/my account and confirmation pages. Perform shall also provide capabilities to alter a particular IP address to simulate visiting a page from a different country.

8.   <u>Content Management System</u>:  Perform shall maintain a Content Management System ("CMS") that has the following features with respect to video metadata management: (a) thumbnail, (b) title of the video, (c) description of the video, (d) content classifications (i.e., tags to drive the categorization of the video); and (e) competition metadata (i.e., bind NFL-related data to the video). The CMS will also house all elements of landing pages and any other marketing and FAQ pages.

9.   <u>Reporting</u>:   Perform shall provide reports as prescribed in the "Reporting" section of the Agreement.

10. <u>Video Player Features</u>:

- Live video will support up to four live games at a time
- Controls:
  - i.     Pause/Play
  - ii.    Skip Forward/Skip Back (Time TBD)
  - iii.   Duration
  - iv.    LIVE Indicator (ability to "jump" to LIVE)
  - v.     Closed Captioning (to the full extent required by applicable law)
  - vi.    Chromecast
  - vii.   Airplay
  - viii.  Volume Control
- Save as expressly set out in this Agreement, no "DVR" functionality will be available (e.g., downloading of live NFL games is not permitted).

11. <u>Minimum Game Pass Features</u>:

- Stats and Standings (subject to NFLI's compliance with its obligations to provide Perform with access to GSIS)
- Live Game Stats (subject to NFLI's compliance with its obligations to provide Perform with access to GSIS)

Exhibit B- 3

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001474

12. <u>Game Pass Services</u>:
- Signal capture, encoding and transcoding (including archiving of live NFL games and live episodes of NFL RedZone)
- Production of Condensed Games (snap to whistle) and Archive Content (including full games without commercials)
- User authentication, entitlement and management
- Monitoring; and
- Deep Linking: If directed by NFLI, Game Pass subscribers in the GP Territory shall be able to access Game Pass, distributed through Game Pass, through "deep links" made available on NFL.com or other NFL digital properties.


13. <u>Video Scheduler:</u>
- Perform will make available a Video Scheduler(s) in order to properly manage the live workflow. In further detail, following is a list of high-level functionalities of such Video Scheduler(s):
  - Managing video platform in an semi-automated way;
  - 
  - Monitoring live operations; and
  - Automatic publishing of the video on the CMS when live.
- The system will support two types of live video streams:
  - Linear, such as NFL Network, a 24/7 channel and NFL RedZone; and
  - Event-based, used for streaming NFL games/events.

14.   <u>NFL SSO</u>: Perform shall work with NFLI to integrate with NFL.com SSO to ensure that the user requesting the Game Pass International ROW Web Subscription Service is allowed and authorized to watch content.

15.   <u>Analytics Tags:</u>  Perform will implement NFLI's analytics collection tags, to the full extent of the tracking requirements as provided by NFLI or its affiliates (including integrating with Adobe Dynamic Tag Manager and Adobe Video Heartbeat Tracking), within each version and iteration of Game Pass and each stream of GP Content within Game Pass for data analytics purposes.

16.   <u>Payment Gateway Integration</u>:  Perform shall provide standard and customary third party credit card authorization and billing services, and, where necessary based on the region, alternative payment methods.

17.   <u>Product Catalog</u>:   Perform to define and manage multiple content packages and price point variations based upon IP address, including,:
- Subscriptions;
- A la carte purchases;
- Bundling of both subscription and a la carte purchases; and
- Flexibility pricing by product type, geography, affiliate partner, etc.

18.   <u>VIP access</u>: Perform to provide NFLI with VIP solution allowing NFLI to view all content (live and VOD games/shows) without any geo-blocking restrictions.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001475

19.   <u>Scores on/off</u>: Perform to work with NFLI to seek to ensure that the user can easily turn scores on/off as a persistent setting.

20.   <u>Search</u>: Perform will enable editorial search through all video metadata including title, description and related tagging.

21.   <u>Self Service Cancellation</u>: Perform shall:
- Allow a user to opt out of free trial at any time during their trial and not be charged (functionality should be available at launch).
- Allow user to opt out of auto renew and not be charged for the upcoming season (functionality should be available post launch).

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001476

REDACT

**EXHIBIT D**

**BUDGET**

[Attached]

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001478

REDACT

**EXHIBIT F**

**OTHER NFL CONTENT IN GAME PASS AS OF 2016 NFL SEASON**

|  |
| --- |
| A Football Life |
| Hall Of Fame |
| Hard Knocks |
| NFL Films Present |
| NFL Game Day |
| NFL Honors |
| The NFL Show |
| NFL this Week |

Exhibit F- 1

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001483

| |
|---|
| **NFL Total Access** |
| **Playbook** |
| **Sound FX** |
| **SB Archives** |
| **The Timeline** |
| **Top 100 Players** |
| **Undrafted** |
| **Coaches Film** |

Exhibit F- 2

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001484

**EXHIBIT G**

**SUPPLEMENTAL AUTHENTICATION AND CUSTOMER DATA PROTECTION TERMS**

WHEREAS the Parties seek to supplement, by way of amendment, the Agreement from the GDPR Effective Date to include appropriate data protection terms to comply with Article 28 of the General Data Protection Regulation.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the following:

**1.   Definitions**

1.1   Unless otherwise stated, defined terms used in this <u>Exhibit G</u> shall have the same meaning as the defined terms provided in the Agreement.  Terms used in this <u>Exhibit G</u> that are not specifically defined will have the meaning set out in the General Data Protection Regulation.

1.2   "**Covered Personal Data**" means any and all Personal Data that Perform processes on behalf of NFLI, including Existing Subscriber/Prospect Data and New Subscriber Data.

**2.   Processing of Covered Personal Data by Perform**

2.1   **General.**  The types of Covered Personal Data, the categories of EU data subject to whom that Covered Personal Data relate, the duration of the processing, the nature and purpose of the processing carried out by Perform, and the obligations and rights of NFLI are as set out in the Agreement and, where applicable, the section entitled "Authentication and Customer Data Protection".

2.2   **Processing or disclosure required by EU or Member State law.**  Where Perform is required by applicable EU or Member State law to process (including disclose) Covered Personal Data, it shall do so notwithstanding the requirements of the Agreement in the section entitled "Authentication and Customer Data Protection".  In such cases, Perform shall inform NFLI of that legal requirement before processing (including disclosing) Covered Personal Data, unless the relevant law prohibits such information on important grounds of public interest.

2.3   **Confidentiality.**  Perform shall, and shall ensure that any third party it engages to process Covered Personal Data shall, at all times keep confidential all Covered Personal Data it processes pursuant to the Agreement.  Perform and any third party it engages to process Personal Data under the Agreement may disclose Covered Personal Data to its employees, officers, representatives or advisers who need to know such information for the purposes of carrying out its obligations under the Agreement.  Perform shall, and shall ensure that any third party it engages to process Covered Personal Data shall, ensure that its employees, officers, representatives or advisers to whom it discloses Covered Personal Data comply with this Section 2.3.

2.4   **Security of processing.**  Perform shall provide NFLI, upon request, with a copy of the written information security program that it employs and maintains to ensure the security, confidentiality, reliability, and integrity of Personal Data and other confidential information.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001485

2.5 **Compliance assistance.** Perform shall duly assist and cooperate with NFLI to allow NFLI to comply with (i) its obligations under the General Data Protection Regulation and other applicable data protection law, including, where relevant, carrying out data protection impact assessments and engaging in prior consultations with the relevant supervisory authorities; (ii) any requests by data subjects to access, correct, delete, erase, restrict processing of, block, receive (for the purpose of porting) or cease the processing of Covered Personal Data by providing NFLI with the ability to take these actions directly or by Perform doing so on NFLI's behalf; and (iii) requests or notices served by public authorities (including supervisory authorities) on NFLI in relation to the processing of Covered Personal Data pursuant to the Agreement.

2.6 **Data breach notification.** If Perform discovers (or has reasonable suspicion of) a Security Breach it shall take the steps set out in the Agreement, and shall, when notifying NFLI of the Security Breach, provide at least the following detailed information, where possible:

    a.    the categories and approximate number of data subjects concerned;

    b.    the categories and approximate number of Personal Data records concerned;

    c.    the impact and likely consequences on NFLI and the affected data subjects of the Security Breach; and

    d.    the corrective action taken or to be taken by Perform.

If Perform is unable to provide the notice to NFLI within forty-eight (48) hours, it shall provide NFLI with reasons for the delay.

2.7 **Notification Obligation.** Perform shall notify NFLI promptly of the receipt of any communication, inquiry, request, or complaint from any third party, including a public authority or a data subject, relating to the processing by Perform of Covered Personal Data.

2.8 **Compliance with Applicable Data Law.** Perform shall at all times comply with all relevant provisions of the General Data Protection Regulation and other applicable data protection law.

2.9 **Inspection and Audit Rights.** As part of Perform providing NFLI with all necessary information (which may be in summary form) to enable NFLI to confirm that Perform has complied with its obligations under the Agreement, Perform shall allow for and contribute to audits, including inspections, conducted by NFLI or another auditor mandated by NFLI to ensure compliance with the General Data Protection Regulation and other applicable data protection law.

**3. Miscellaneous**.

3.1 Except as specifically provided above, all terms and provisions of the Agreement shall remain unmodified and in full force and effect; provided, that in the event of a conflict between this <u>Exhibit G</u> and the Agreement (excluding any conflict in which the terms of the Agreement are more protective of Covered Personal Data), the terms of this <u>Exhibit G</u> shall control and govern.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001486

3.2   This <u>Exhibit G</u> may be executed in counterparts, each of which shall be deemed an original, and all such counterparts together shall constitute but one and the same instrument.

3.3   It shall not be necessary to refer to this <u>Exhibit G</u> in any reference to the Agreement.  Any reference to the Agreement shall be deemed to be a reference to the Agreement as amended by this <u>Exhibit G</u> from the GDPR Effective Date.

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001487

**EXHIBIT H**

**REPORTING - RELEVANT DATA**

[Attached]

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001488

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

REDACT

**SCHEDULE A**

**HOLDBACK PERIOD**

| Holdback Period | Countries | Regions |
|---|---|---|
| 6 hours | Brazil | LatAm (except to the extent that portions of LatAm are included within the territory of a license agreement targeted to distribution in Mexico), Other South America, ROW (Americas countries only) |
| 12 hours | India, Israel, Angola, British Indian Ocean Territory, Bouvet Island, Burundi, Comoros, Equatorial Guinea, Gabon, Gambia, Greenland, Liberia, Mali, Mayotte, Reunion, Sao Tome and Principe, Seychelles, St. Helena, Syria, Zimbabwe | Middle East, Sub-Saharan Africa |
| 24 hours | Japan, New Zealand, Australia, Christmas Island, Cook Islands, Fiji, French Polynesia, Kiribati, Lao PDR, Marshall Islands, Micronesia, New Caledonia, Niue, Palau, Papua New Guinea, Pitcairn, Solomon Islands, Timor-Leste, Tokelau, Tonga, Vanuatu | Pan Asia |

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001501

March 5, 2018

Perform Media Channels Ltd
Hanover House
Plane Tree Crescent
Feltham
TW13 7BZ, UK
Attn: Alex Peebles

Dear Alex:

This letter amendment (the "**Amendment**"), effective as of the date hereof, amends that Product Development and Media Rights Agreement between NFL International LLC ("**NFLI**") and Perform Media Channels Ltd ("**Perform**") dated April 10, 2017 (the "**Agreement**"). Capitalized terms used but not defined in this Amendment will have the meanings set forth in the Agreement. In consideration of NFLI's and Perform's ongoing discussions with respect to further amendments to the Agreement, the Parties hereby agree as follows with respect to the 2017 Fiscal Year:

1.  2017 MG: The reference to REDACT

2.  2017 Additional Fees. The reference to REDACT

Except as modified by this Amendment, the Agreement remains in full force and effect according to its terms. Please countersign in the space below to confirm your acceptance and agreement.

Very truly yours,

NFL INTERNATIONAL LLC

By:
Name: M. MARKAVICH
Title: VP OF INTL MEDIA

ACCEPTED AND AGREED:

PERFORM MEDIA CHANNELS LTD

By:
Name: ROSS MacEACHERN
Title: CEO - PERFORM CONTENT

APPROVED
NFL LEGAL & BUSINESS AFFAIR
AJS

Approved by Finance
RZ

HIGHLY CONFIDENTIAL – ATTORNEY AND EXPERT EYES ONLY
DEF0001502