**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL FOOTBALL LEAGUE, a New York unincorporated association, and NFL ENTERPRISES, LLC, a Delaware limited liability company, <br><br> Defendants. | Civil Action No. 1:21-cv-1032 <br><br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** <br><br> <u>**ORAL ARGUMENT REQUESTED**</u> |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

    A.   Plaintiff And Defendants' NFL Game Pass ................................................. 2

    B.   Plaintiff Subscribes To Game Pass But Never Receives Notice That Defendants
Wanted To Relinquish Their Contractual Obligations ............................................ 3

    C.   The NFL's Contractual Relationship With Third Parties To Provide Game Pass
Remained The Same, Even In 2019 ....................................................................... 7

LEGAL STANDARD .......................................................................................................... 9

LEGAL ARGUMENT ....................................................................................................... 10

    I.   Plaintiff's Contract With The NFL Continued Through the 2020 SuperBowl ................. 10

    A.   In 2013, Plaintiff Agreed To An Indefinite, Automatically Renewing Contract With
Defendants ............................................................................................................ 10

    B.   Defendants' Motion Fails Even If The 2017 Or 2018 T&Cs Apply ........................... 12

    II.   There Is No Evidence That In 2019 The NFL Terminated The Contract Or That The
Parties Mutually Agreed To A Novation In 2019 ................................................... 14

    III.   Plaintiff Did Not Agree To A New Contract In 2019 With Third Parties .................... 16

    A.   The Parties' Prior Relationship Shows No Inquiry Notice ......................................... 17

    B.   Plaintiff Lacked Sufficient Notice To Assent To A New Contract ............................. 18

    C.   Defendants Fumble Their Case Law Citations .......................................................... 23

    IV.   Functional Privity Exists To Support Plaintiff's Implied Warranty Claim .................. 24

    **CONCLUSION** ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Ltd.*,
85 F.3d 68 (2d Cir. 1996) ........................................................................................ 2, 14

*Blue Citi, LLC v. 5Barz Int'l Inc.*,
2017 WL 11568966 (S.D.N.Y. Aug. 28, 2017) .................................................... 14, 15

*Chery v. Conduent Educ. Servs., LLC*,
---F.3d---, 2022 WL 179876 (N.D.N.Y. Jan. 20, 2022) ....................................... 24, 25

*City Sch. Dist. of City of Newburgh v. Hugh Stubbins & Assocs., Inc.*,
85 N.Y.2d 535 (N.Y. 1995) ........................................................................................ 25

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
352 F.3d 775 (2d Cir. 2003) ....................................................................................... 16

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014) .......................................................................................... 9

*Donnenfeld v. Petro, Inc.*,
333 F. Supp. 3d 208 (E.D.N.Y. 2018) ......................................................................... 15

*Guard Ins. Grp., Inc. v. Reliable Ins. Servs., LLC*,
2018 WL 3998053 (E.D.N.Y. Mar. 20, 2018) ............................................................ 25

*Holland v. Fahnestock & Co.*,
210 F.R.D. 487 (S.D.N.Y. 2002) .......................................................................... 15, 16

*L & Leung Leatherware LTD. v. Collection XIIX LTD.*,
2021 WL 1026163 (S.D.N.Y. Mar. 16, 2021) ......................................................... 9, 10

*Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*,
400 F. Supp. 3d 7 (S.D.N.Y. 2019) ............................................................................. 13

*Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*,
2019 WL 2281375 (S.D.N.Y. May 29, 2019) .............................................................. 25

*Meyer v. Uber Tech., Inc.*,
868 F.3d 66 (2d Cir. 2017) .............................................................................. 17, 23, 24

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) ............................................................... 17, 18, 21, 22

Slamow v. Del Col,
79 N.Y.2d 1016 (1992) ............................................................................................... 13

*SMG for Cnty. of Albany v. Metro. Ent. Consultants, LLC*,
2021 WL 810157 (N.D.N.Y. Mar. 3, 2021) ................................................................ 15

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
999 F.3d 828 (2d Cir. 2021) .................................................................................. 19, 23

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ........................................................................................ 16

*Starke v. Squaretrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) .............................................................................. 16, 20, 21

*U.S. Bank Nat. Ass'n v. Ables & Hall Builders*,
   696 F. Supp. 2d 428 (S.D.N.Y. 2010) ................................................................................ 16
*Valle v. ATM Nat., LLC*,
   2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ...................................................................... 23

**Statutes and Rules**

22A N.Y. Jur. 2d Contracts § 467 ........................................................................................ 14
Cal. Civil Code §1798.140 .................................................................................................... 9
Fed. R. Civ. P. 56(a) .............................................................................................................. 9

**INTRODUCTION**

In 2013, Plaintiff Sietel Singh Gill entered into a contract with Defendants the National Football League ("NFL") and NFL Enterprises, LLC ("NFLE", and together with the NFL, "Defendants" or "the NFL"). The contract—the 2013 Terms & Conditions (the "2013 T&Cs")—lacked any termination date and instead automatically renewed without any action by Plaintiff. Plaintiff fulfilled his obligations under the contract, including by updating his credit card information. And the contract, which automatically renewed each year, continued through the 2019–2020 football season. The NFL, however, did not fulfill its obligations, as the NFL Game Pass video stream failed for the 2020 Super Bowl. Plaintiff therefore brings claims for breaches of contract and implied warranty of merchantability.

Defendants have moved for summary judgment, erroneously contending that the *only* contract governing the 2019–2020 football season was one "for a one-year subscription to Game Pass Season Pro with OverTier and Deltatre for the 2019 NFL Season." ECF No. 76, Deft's Mem. of Law ("Mem.") at 11. Defendants point to the Game Pass 2019 Terms and Conditions ("2019 T&Cs"), which, unbeknownst to Plaintiff, stated that two international companies were counterparties to the contract. But Defendants' Motion still suffers from the same fatal flaw that this Court identified in denying their earlier motion to dismiss: that neither "the 2019-2020 Terms and Conditions . . . . [nor] any other cognizable material reflect[s], let alone establish[es], a relinquishment by defendants of their roles or responsibilities that the FAC alleges they bore in 2013." Order on Motion to Dismiss ("Order"), ECF No. 52 at 11.

*First*, the 2013 T&Cs governing Game Pass, including those through 2018, did not have a termination date but instead automatically renewed without any action by Plaintiff. Therefore, Defendants were still contractually obligated to Plaintiff through 2020. *Second*, even if Plaintiff agreed to a separate contract with third parties in 2019, there is no evidence to support an

"extinguishment of the old contract" between Defendants and Plaintiff. *See, e.g., Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82–83 (2d Cir. 1996).

*Third*, Defendants have failed to submit evidence establishing, as a matter of law, that Plaintiff agreed to the 2019 T&Cs. Instead, Defendants parade a series of inadequate and misleading emails to Plaintiff in 2019, which did not provide him sufficient notice of the new contract. And *fourth*, even if Defendants' arguments were correct as to the contract claim, due to the unique circumstances of this case, privity functionally exists to sustain Plaintiff's implied warranty claim.

Accordingly, Defendants' Motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    Plaintiff And Defendants' NFL Game Pass

Defendant NFL is an unincorporated association founded in 1920. (*See* Joint Stipulation of Undisputed Facts, ECF No. 70 ("Joint Stip.") ¶ 2.) Defendant NFLE is a limited liability company affiliated with the NFL. (Joint Stip. ¶¶ 2–3.) Both Defendants maintain their principal place of business at 345 Park Avenue in New York. *Id*.

NFL Game Pass International ("Game Pass") is an online platform for digital NFL-related content, including live streaming of regular and post-season NFL games. (Joint Stip. ¶ 4.) Game Pass subscriptions are available to customers located outside the United States and its territories. *Id*. Customers purchase Game Pass through Defendants' websites by paying a subscription fee. (Joint Stip. Ex.D, ¶ 3).

In September 2013, Game Pass was provided by Defendant NFLE, with the assistance of a third-party vendor called NeuLion (Joint Stip. ¶ 6, Ex.D.) However, from the perspective of customers reading the terms, the party to the 2013 T&Cs is only the "NFL," with no reference to NFLE. (Plaintiff's Rule 56.1 Statement ("Pltf's Statement") ¶ 8.) Per the agreement between

2

NeuLion and NFLE, NeuLion provided Game Pass without any attribution to NeuLion. (Joint Stip. ¶ 7.) The 2013 T&Cs identified NeuLion as a mere third party-service provider. (Joint Stip. ¶ 18 & Ex.D.) Accordingly, the 2013 T&Cs were between Defendants and Game Pass subscribers, and Defendants do not dispute that they were parties to that contract. (Joint Stip. ¶ 15 and Ex.D; Pltf's Statement ¶ 71.)

In addition, the 2013 T&Cs lacked an end date and thus was indefinite. (Pltf's Statement ¶ 72; Joint Stip. Ex.D). Although the 2013 T&Cs state that Defendants had the right to modify subscription prices at any time, they did not state that Defendants could otherwise modify the Terms & Conditions at any time. (Joint Stip. Ex.D; Pltf's Statement ¶ 73.)

NFLE, with the assistance of NeuLion, provided Game Pass until the 2017 NFL season, under the NFL brand. (Joint Stip. ¶ 8.) Starting with the 2017 NFL Game Pass Season, and without any notice to consumers of any change in vendors, Game Pass in Australia was operated by Perform Media Channels LTD ("Perform Media"), through a contract with an affiliate of NFLE, NFL International LLC ("NFLI"). (Joint Stip. ¶ 9; Pltf's Statement ¶ 74.) The 2017 Terms & Conditions (the "2017 T&Cs") injected NFLI into the agreement as a new contracting counterparty, without any notice to customers of the party change; the agreement still (incorrectly) referred to NeuLion as the third-party service provider, with no reference to Perform Media. (Joint Stip. Ex.H; Pltf's Statement ¶ 75.)

### B.     Plaintiff Subscribes To Game Pass But Never Receives Notice That Defendants Wanted To Relinquish Their Contractual Obligations

Plaintiff is a resident and citizen of Australia. (Joint Stip. ¶ 1.) He subscribed to Game Pass in 2013 and agreed that his subscription would auto-renew each subscription year. (Joint Stip. ¶ 19; Pltf's Statement ¶ 76.) In September 2013, he subscribed to GamePass and agreed to the 2013 T&Cs; this agreement was between him and the NFL. (Joint Stip. ¶ 15; Pltf's Statement

3

¶ 77.) The 2013 T&Cs stated that Plaintiff's Game Pass annual subscription started upon purchase and that subscription would "automatically renew" on approximately August 1 of each year unless Plaintiff canceled prior to the automatic renewal. (Joint Stip. ¶¶ 16-17; Pltf's Statement ¶ 78.) If Plaintiff did nothing and allowed the NFL to charge his credit card every year, the subscription with the NFL would continue to automatically renew without Plaintiff doing anything at all. (Pltf's Statement ¶ 79.) In addition to the annually renewing subscription, the 2013 T&Cs governing the subscription provided for no end-date and thus was indefinite. (Pltf's Statement ¶ 80.)

The confirmation email Plaintiff received for his 2013 annual subscription asked him to visit nfl.gamepass.com to enjoy his Game Pass subscription, and to email gamepass.support@nfl.com to cancel his subscription. (Joint Stip. Ex.E; Plaintiff's 56.1 Statement ¶ 81.) The email also reiterated: "Auto Renewal. Your subscription will automatically renew annually (on or around August 1) at either the same price as the previous year's full season rate or the current full season rate, whichever is lower. You may cancel auto renewal at any time prior to next season." (Joint Stip. Ex.E.)

When Plaintiff's credit card information expired, Defendants informed him by email. Specifically, in July 2017, Plaintiff received an email from "Your NFL.com Team" reminding him to update his billing information prior to the end of the football season. (Joint Stip. ¶ 22 & Ex.G; Pltf's Statement ¶ 82.).

Plaintiff thus updated his credit card information on his Game Pass account. (Pltf's Statement ¶ 83.) Plaintiff merely enabled his subscription to renew; there is no evidence that he agreed to any new terms or agreements, nor does he have any memory of agreeing to any new terms or agreements. (Pltf's Statement ¶ 84.) After Plaintiff updated his billing details, his

subscription for the 2017-2018 season auto renewed for the 2018-2019 season, which was from August 2, 2018 through August 1, 2019. (Pltf's Statement ¶¶ 83 & 108.)

The July 2017 email instructing Plaintiff to update his billing details did not identify NFLI as the contracting counterparty or Perform Media as the new third party service provider, and Plaintiff never agreed to the new counter parties to the agreement. (Joint Stip. Ex.G; Pltf's Statement ¶ 84.) There is no record of any other email being sent by the NFL identifying these changes. (Pltf's Statement ¶ 85.)

In June 2018, NFLI and Overtier entered into an agreement such that Overtier would operate Game Pass in Australia. (Joint Stip. ¶ 9.) The Terms & Conditions effective in 2018 did not modify the 2017 T&Cs to reflect this material change. (Pltf's Statement ¶ 86.) Nor were emails sent to Game Pass subscribers notifying them of this change. (Pltf's Statement ¶ 86.)

In June 2019, NFL Game Pass updated its Terms & Conditions (the "2019 T&Cs") such that it was completely different from its previous iterations in both appearance and substance. (Pltf's Statement ¶ 87.) Among the changes, Overtier and Deltatre were identified as the sole contracting counterparties in the 2019 T&Cs. (Joint Stip. Ex.Q; Pltf's Statement ¶ 87.) Plaintiff did not receive notice of any changes to the terms.

Rather, in June 2019, Plaintiff received an email signed "NFL Game Pass" stating that "we're updating our service provider." The remainder of the email discussed Game Pass features and instructions on updating the mobile app. The email contained the NFL logo and used the words, "we" or "we're" four times, and the word, "our," once. (Joint Stip. ¶ 26 & Ex.I; Pltf's Statement ¶ 88.)

On July 1, 2019, while Plaintiff was still not on notice that there had been any changes to the Terms & Conditions, Plaintiff received another email from "NFL Game Pass," once again

5

stating that "*we're* updating our service provider," informing him that his Game Pass subscription was to auto-renew in 31 days, and advising him that he did not need to take any action for his subscription to continue. The remainder of the email discussed updates to NFL Game Pass features.  The email contained the NFL logo and used the words, "we" or "we're" four times, and the word, "our," once. (Joint Stip. ¶ 28 & Ex.K; Pltf's Statement ¶ 89.)

On July 16, 2019, Plaintiff received yet another email from "NFL Game Pass," again providing instruction on how to update the Game Pass mobile app, and again using the word, "we," with the NFL logo at the top of the email. (Joint Stip. ¶ 30 & Ex.L; Pltf's Statement ¶ 90.) This email was not relevant to Plaintiff because he never downloaded the Game Pass application on his phone, as he never used his subscription through his phone. (Pltf's Statement ¶ 91.)

On August 2, 2019, Plaintiff received an email from "NFL Game Pass" confirming that his renewal payment had been processed. (Joint Stip. ¶ 32 & Ex.M.) Then, on August 28, 2019, Plaintiff received an email from "NFL Game Pass" providing a "quick guide" of the subscription's features. The email used the NFL logo and the words, "we're" and "we've." (Joint Stip. ¶ 34 & Ex.O; Pltf's Statement ¶ 92.)

On October 29, 2019, Plaintiff received an email from "NFL Game Pass," again using the NFL logo and the word, "we." (Joint Stip. ¶ 36, Ex.P.) The email informed Plaintiff that "we are making" updates to "our Terms & Conditions" that would take effect as of the date of the email, i.e. October 29, 2019.  *Id*. The email stated that if Plaintiff used Game Pass on or after that date, he would be agreeing to the updated Terms & Conditions. *Id*. The updated 2019 T&Cs identified Overtier and Deltatre as the contracting counterparties. (Joint Stip. ¶ 38 & Ex.Q; Pltf's Statement ¶ 95.)

None of the emails Plaintiff received from "NFL Game Pass" between June 2019 and October 2019 advised Plaintiff that the 2019 T&Cs were completely different from the previous iterations with new counterparties and new terms. (Pltf's Statement ¶ 95; Joint Stip. Exs. I, K, L, O, P.) Nor do they say that Plaintiff would be agreeing to the completely brand-new Terms & Conditions upon auto-renewal of his Game Pass subscription. (Pltf's Statement ¶ 95; Joint Stip. Exs. I, K, L, O, P.) Finally, other than the October 29, 2019 email, none of the emails advised Plaintiff to review the Terms & Conditions for updates. (Pltf's Statement ¶ 96; Joint Stip. Exs. I, K, L, O.)[1]

Notably, while each of the Terms & Conditions stated that the Game Pass *subscription* lasted a single year, and included an option of automatic renewal, it was silent as to the term length of the Terms & Conditions.  (Pltf's Statement ¶ 97; Joint Stip. Exs. D, H, J, Q.)

### C.    The NFL's Contractual Relationship With Third Parties To Provide Game Pass Remained The Same, Even In 2019

When Plaintiff entered the contract with the Defendants and started his Game Pass subscription, he did so under the 2013 T&Cs. This document said that a third-party company, Neulion, has been contracted by Plaintiffs to "operate" the Game Pass subscription on behalf of Plaintiffs. (Joint Stip Ex.D.) Defendants' contract with NeuLion gave the NFL extensive control over Game Pass, including that it "would be exclusively branded by NFL without any attribution to NeuLion except to the extent pre-approved in writing." (Pltf's Statement ¶ 9; Kronenberger Decl. Ex.A, at DEF0001273.)

---

[1] In smaller font and grayed-out, low contrast text in the footer at the end of the emails was contained language stating, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here," with "here" hyperlinked to the 2019 Terms & Conditions (Joint Stip. ¶¶ 26, 28, 30, 34, & Exs. I, K, L, O, P.)

Defendants thereafter, over a period of years, engaged with other companies to perform the exact functions and duties of Neulion. For each football season, the Defendants maintained the same rock-solid control over Game Pass operations.[2]

For example, the NFL controlled all advertising within the video streams (*see* Joint Stip. Ex.B, at DEF0001051 (for Overtier); Joint Stip. Ex.A, at DEF0001438 for (Perform Media)); the NFL maintained rights to enforce its intellectual property rights via any agreements between vendors and consumers and to pass consumer private data back and forth between the vendor and NFL entities (*see* Joint Stip. Ex.B, DEF0001059 & Ex.A, DEF0001454); and the NFL retained all ownership of Game Pass content (*see* Joint Stip, Ex.B, DEF0001064, & Ex.B at DEF0001460). Notably, the NFL controlled the entire branding and look and feel of Game Pass. (Joint Stip. Ex.B, DEF0001047 ["NFLI shall have the sole right to determine and approve the branding of Game Pass."]; *see also*, Joint Stip Ex.A, DEF0001435 ["Notwithstanding anything to the contrary in this Agreement, NFLI shall have the sole right to determine and approve the branding of Game Pass."]).

Furthermore, the vendors were only able to use consumer data for and on behalf of the NFL, instead of being joint data controllers or licensees with rights to market or distribute their own products. This is because Defendants categorize the third-party vendors, Perform Media and Overtier, as "data processors" under the General Data Protection Regulation or "GDPR" (i.e., service providers that could only process personal data on behalf of the main controller, which is the NFL entity group), rather than "data controllers" (i.e., a business that can itself determine the

---

[2] Despite the level of control Defendants continued to exert with subsequent operators Perform Media Channels and Overtier, Defendants labeled them "licensees," even though Defendants did not refer to Neulion as a licensee. (Pltf's Statement ¶ 11; Joint Stip. Exs A, B, C, D.) Further, Perform Media Channels never even contracted directly with consumers, so consumers had no idea that Perform even existed, all in the context of consumers being inundated with emails using the NFL logo using the words, "we" and "our," creating the clear impression that the NFL was the party offering Game Pass. (*See* Pltf's Statement ¶¶ 74-75.)

purpose and means of processing data). (Pltf's Statement ¶ 109; Joint Stip. Exs. A, DEF0001066; Ex.B, DEF0001455.)[3]

Regardless of the NFL's vendor relationships, as reflected in the many emails received by Game Pass customers, the NFL logo was featured prominently at the top of each email, and the emails used the words "we" and "our" throughout, leading any reasonable consumer to believe that the NFL was operating Game Pass. (Pltf's Statement, Exs. B, C, E, F, H.) Further, these facts are consistent with the above contractual provisions between the NFL and its vendors, which demonstrate a great amount of control by the NFL.

### LEGAL STANDARD

Summary judgment is appropriate only "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *L & Leung Leatherware LTD. v. Collection XIIX LTD.*, 2021 WL 1026163, at *3 (S.D.N.Y. Mar. 16, 2021) (quoting Fed. R. Civ. P. 56(a)). In construing a motion for summary judgment, "the court must 'construe the facts in the light most favorable to the non-moving party' and 'resolve all ambiguities and draw all reasonable inferences against the movant.'" *Id.* (quoting *Delaney v. Bank of Am.* Corp., 766 F.3d 163, 167 (2d Cir. 2014)).

The party moving for summary judgment bears the initial burden of "com[ing] forward with evidence sufficient to entitle the movant to relief in its favor as a matter of law." *L & Leung Leatherware LTD.*, 2021 WL 1026163, at *3. If the party meets this burden, then the non-moving party "carries only a limited burden of production" and must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.*

---

[3] Specifically, a "processor" under Article 28 of the GDPR is limited to processing personal data "only on documented instructions from the controller," *see also* Article 4 (definitions), analogous to a "service provider" under US privacy laws, *see, e.g.*, Cal. Civil Code §1798.140.

**LEGAL ARGUMENT**

**I.    Plaintiff's Contract With The NFL Continued Through the 2020 SuperBowl**

Plaintiff brings suit for breach of contract and implied warranty based on the 2013 Subscription Terms & Conditions (the "2013 T&Cs"), which he agreed to when subscribing to Game Pass on September 10, 2013. Joint Stip. ¶¶ 15-16; *see L & Leung Leatherware LTD.*, 2021 WL 1026163, at *3 ("To establish a claim for breach of contract, a plaintiff must prove "the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."). At issue at this stage in this case is whether a contract exists between Defendants and Plaintiff for the 2019–2020 football season.

Defendants erroneously contend that the *only* contract governing the 2019–2020 football season was one "for a one-year subscription to Game Pass Season Pro with OverTier and Deltatre for the 2019 NFL Season." Mem. at 11. To the contrary, the evidence in this case shows only that Plaintiff and Defendants contracted for the provision of Game Pass in 2013 as set forth in the 2013 T&Cs, and that contract continued through the 2019–2020 football season.

**A.    In 2013, Plaintiff Agreed To An Indefinite, Automatically Renewing Contract With Defendants**

The 2013 T&Cs state that "the NFL" offered various Game Pass subscription services and that it had "contracted with a third party (currently NeuLion, Inc.) to operate" the subscriptions. (Joint Stip. Ex.D.) The terms provided that Plaintiff's Game Pass International Subscription "w[ould] automatically renew on approximately August 1 of the next year," unless Plaintiff affirmatively "elect[ed] not to participate in the auto-renewal option" by emailing gamepass.support@nfl.com "[t]o cancel the annual automatic renewal feature." *Id.* § 3(c)&(d).

The 2013 T&Cs lack any termination date. Indeed, the 2013 T&Cs are silent as to the NFL's ability to terminate any of its contractual obligations to Plaintiff. Instead, section V of the

10

T&Cs, entitled "Termination," allowed Plaintiff to "request that we [the NFL] terminate your access to a Subscription Product by e-mailing accountsupport@nfl.com."

Critically, the 2013 T&Cs also do not state that Plaintiff would be deemed to agree to any updated terms and conditions by permitting the subscription to automatically renew or by taking any other action. Indeed, the contract is silent on the NFL's ability to modify the 2013 T&Cs. Nor do the terms explain what kind of notice the NFL might provide Plaintiff about subsequent modifications to the terms. Furthermore, the 2013 T&Cs do not contain any requirement that Plaintiff must agree to subsequent updates or modifications to the terms.

Instead, the 2013 T&Cs placed only two affirmative obligations on Plaintiff in exchange for his contract with the NFL to automatically renew. He was to "notify [the NFL] of any change in [his] credit card information, including any change to [his] home address." (Joint Stip., Ex.D. at 2.) And Plaintiff otherwise agreed to "authorize [the NFL] to charge such card on a periodic basis" for his automatically-renewing subscription. *Id.*

Plaintiff complied with his contractual obligations. He received an email on September 10, 2013 confirming the purchase of his Game Pass subscription and advising him that "[his] subscription will automatically renew annually." (Joint Stip. Ex.E.) And, as required under the 2013 T&Cs, Plaintiff updated his credit card information on his Game Pass account in July 2017. (Pltf's Statement ¶ 83.) As he complied with his contractual obligations, his subscription automatically renewed. (Pltf's Statement ¶ 83.)

In sum, the evidence and plain contractual language shows that Plaintiff contracted with the NFL in 2013 by agreeing to the 2013 T&Cs, and that contract automatically renewed and continued through the present.

11

### B.      Defendants' Motion Fails Even If The 2017 Or 2018 T&Cs Apply

Defendants' Motion does not argue that the NFL or NFLE were not counterparties to the 2013 T&Cs. Instead, they claim that "the evidence produced in discovery establishes that Plaintiff's auto-payments ceased at the start of the 2017 NFL Season when he paid for a Game Pass Season Plus Pass subscription by entering his credit card details manually on September 10, 2017 and again on August 1, 2018." (Mem. at 16.)[4] But the NFL ignores that Plaintiff was merely complying with his obligation under the 2013 T&Cs "to notify us [the NFL] immediately of any change in [his] credit card information." (Joint Stip, Ex.D. ¶ 3.) This Court should reject Defendants' nonsensical argument that Plaintiff somehow terminated his contractual relationship when he expressly *fulfilled* his contractual obligations under the 2013 T&Cs by updating his credit card. Simply put, there is no evidence at all that Plaintiff agreed to any new or additional terms and conditions when he updated his credit card.

Moreover, when Plaintiff received an email in July 2017, requesting that he update his credit card information (*see* Joint Stip. ¶ 22 & Ex.G.), he was not notified of updated subscription terms. Nor was he notified that taking action to update his credit card information would somehow result in him assenting to a change in terms and conditions.

Even if the NFL were correct that Plaintiff, by updating his credit card information, agreed to new contract terms (despite a complete lack of evidence), Defendants' Motion still fails because the new terms are substantially the same as the 2013 T&Cs—including automatic renewal. The 2017 Terms and Conditions (the "2017 T&Cs") and 2018 Terms and Conditions (the "2018 T&Cs") (Joint Stip. Ex.E), which were purportedly effective when Plaintiff updated his credit card

---

[4] Defendants argue that Plaintiff signed up for a seven-day free trial in 2017, and then manually paid and registered for NFL Game Pass in 2017 and 2018, and therefore he did not auto-renew his subscription. Defendants' evidence is unreliable and contradictory. (Pltf's Statement ¶ 105.)

information in 2017, are largely the same. Although the 2017 and 2018 T&Cs were modified to reflect that NFL and NFLE affiliate, NFLI, were the contracting counter-parties,[5] like with prior versions, the 2018 T&Cs stated that "We have contracted with a third party (currently NeuLion, Inc.) to operate the above listed Subscription Products." And most importantly here, the 2017 and 2018 T&Cs state that Plaintiff's subscription would automatically renew, and, once again, completely omitted any mention of Defendants' right to modify or terminate the contract. *See, e.g.*, 2018 T&Cs § 3 ("Unless you elect not to participate in the auto-renewal option, your seasonal subscription will automatically renew. . . . Unless you elect not to participate in the auto-renewal option, . . . you will be auto-renewed.").[6]

In addition, just like the 2013 T&Cs, the 2017 and 2018 versions are silent about the NFL's right to terminate the contract. And, once again, the 2018 T&Cs are silent as to how or when Plaintiff would be deemed to agree to any subsequent changes to the terms and conditions. Indeed, it does not even provide the NFL the right to change the terms.

Thus, even if Plaintiff agreed to new terms in 2017 or 2018, the NFL is still liable on the contract. *See, e.g.*, *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992) ("The best evidence of what parties to a written agreement intend is what they say in their writing."). Under the 2013, 2017, or 2018 T&Cs, (a) the underlying contract existed uninterrupted, and (b) Plaintiff's subscription under the contract automatically renewed for the 2019–2020 season without him taking a single

---

[5] Defendants do not try to escape liability by claiming that the NFLI, instead of the NFL or NFLE were named in the 2017 and 2018 terms. There is no dispute that NFLI is an affiliate of NFLE, and is thus an NFL entity. Moreover, Defendants still retained the power to enforce the 2017 Terms & Conditions. Indeed, the 2017 Terms & Conditions state that even though those Terms are between the subscriber and NFLI, "each of [NFLI] and its affiliates may enforce any breach by the [subscriber] sue for breach of these [Terms & Conditions]."

[6] This Court should reject Defendants' self-serving affidavit from the NFL's representative, which states that the "payment will renew but the terms of service will not. The terms of service are a single year, seasonal – annual." Mem. at 16. Defendants' affidavit contradicts the plain written language of the applicable terms and conditions and other extrinsic evidence that shows Plaintiff's contract automatically renewed. *See Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 15 (S.D.N.Y. 2019) ("The only evidence that LJC cites in support of this proposition is a conclusory and self-serving affidavit from LJC's Vice President.").

13

affirmative act. His credit card was merely charged, again, on August 2, 2019. (Joint Stip. ¶ 32 & Ex.M.)

## II.    There Is No Evidence That In 2019 The NFL Terminated The Contract Or That The Parties Mutually Agreed To A Novation In 2019

As this Court stated in its ruling on Defendants' motion to dismiss, "[E]ven the 2019-2020 Terms and Conditions, on which defendants rely insofar as they identify Overtier as Game Pass's 'official licensee,' do not disclaim any continuing connection between the NFL and NFLE, on the one hand, and Game Pass, on the other." Order at 11. Even after months of discovery, this core problem remains for the NFL, just as this Court previously identified that "defendants have not identified any other cognizable material reflecting, let alone establishing, a relinquishment by defendants of their roles or responsibilities that the FAC alleges they bore in 2013." *Id.*

Instead of providing any evidence to support their claim, Defendants gloss over the issue of contract termination by pointing to the updates to the 2019 T&Cs, which, for the first time, substitutes a third party in the NFL's stead, purportedly relieving the NFL of obligations to consumers under the contract.

In effect, Defendants claim that in 2019, the NFL attempted a contract novation, washing its hands of its previous contractual obligations to Plaintiff (and other Game Pass) subscribers and making Overtier and Deltatre the new counterparties. *See Blue Citi, LLC v. 5Barz Int'l Inc.*, 2017 WL 11568966, at *4 (S.D.N.Y. Aug. 28, 2017) ("A novation . . . is a discharge of an existing obligation by the substitution of a new agreement.") (citing 22A N.Y. Jur. 2d Contracts § 467); *Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82-83 (2d Cir. 1996) (Under New York law, a novation requires "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract.").

14

"The key element of a novation is that the parties unequivocally intended to extinguish and discharge the prior obligation." *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 498 (S.D.N.Y. 2002). In addition, "'to establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement.'" *SMG for Cnty. of Albany v. Metro. Ent. Consultants, LLC*, 2021 WL 810157, at \*6 (N.D.N.Y. Mar. 3, 2021) (quoting *Holland*, 210 F.R.D. at 498).

The NFL fails to meet the "stringent standard for novation": "not only must the intention to effect a novation be clearly shown, but a novation must never be presumed." *Blue Citi*, 2017 WL 11568966, at \*4 (quotation and citations omitted). While, as discussed in Part III, below, Plaintiff received insufficient notice to assent to a new contract for the 2019 football season with third-parties, there is also no evidence that Plaintiff agreed to release the NFL of its contractual obligations. To the contrary, the plain text of the 2013 (or 2017 and 2018) T&Cs established a contract with the NFL that had no set termination date and rather automatically renewed. And the 2019 T&Cs are silent about the NFL's prior contractual obligations.

Indeed, nothing in the 2019 T&Cs or anywhere else purported to sever the ongoing contractual relationship between Plaintiff and Defendants, which provided that, in exchange for Plaintiff's payment and commitment to update his credit card information, his subscription with the NFL automatically renewed each year. In addition, the NFL offers no other evidence that the 2019 T&Cs superseded the NFL's previous agreement with Plaintiff. Accordingly, Defendants' Motion must be denied. *See Blue Citi*, 2017 WL 11568966, at \*4 ("If there is any question that a party did not intend to extinguish its prior contract, the court cannot, as a matter of law, determine that a subsequent agreement constituted a novation."); *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 217 (E.D.N.Y. 2018) ("The terms of the Ceiling Price Contract are silent as to whether that

15

agreement was intended to extinguish, supersede, substitute, modify, or have any other effect on the Fixed Price Contract."); *Holland*, 210 F.R.D. at 499 ("Absent an express discharge of Fahnestock's obligations, the assignment provision can be interpreted as merely a consent to Fahnestock's delegation of duties.").

## III.    Plaintiff Did Not Agree To A New Contract In 2019 With Third Parties

As discussed above, even if Plaintiff assented to the 2019 T&Cs, which, for the first time, swapped out the NFL as a counterparty with third parties Overtier and Deltatre, Defendants are still liable to Plaintiff pursuant to the previous contract (the 2013 T&Cs, or the 2017 or 2018 T&Cs in the alternative), which automatically renewed, lacked any termination date, and was otherwise silent on any actions Plaintiff or Defendants could take to modify or terminate the contract. *See U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010) ("A court must give contract terms their plain meaning . . . [and] [l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."). In any event, Defendants fail to prove, as a matter of law, that Plaintiff "unambiguously manifest assent[ed]" to any contract other than the one he had with Defendants. *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 20 (2d Cir. 2002).

Under New York law, a fundamental basis for the existence of an enforceable contract is a "meeting of the minds" as to the essential terms and conditions, and a "manifestation of mutual assent." *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019). And contract modifications require "proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003). An offeree must have actual notice of the revised contract terms or be "on inquiry notice of them and assent[ ] to them through conduct that a reasonable person would understand to constitute assent." *Starke*, 913 F.3d at 289.

16

Courts, in determining whether, as a matter of law, a consumer is on inquiry notice of contract terms that "were delivered after that [contractual] relationship was initiated" look to whether, "in light of the history of the parties' dealings with one another, reasonable people in the parties' positions would be on notice of the existence of the additional terms and the type of conduct that would constitute assent to them." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012).[7] Here, "the history of the parties' dealings" demonstrate not only that Plaintiff lacked inquiry notice of the creation of a new contract, but also that the notices Plaintiff received were misleading and contradicted the new 2019 T&Cs. Accordingly, Defendants fail to prove, as a matter of law, that Plaintiff "unambiguously manifest assent[ed]" to any contract other than the one he had with Defendants. *See id.* at 120, 124. Plaintiff simply did not have actual or inquiry notice of a new contract with third parties that he never heard of before. (Pltf's Statement ¶ 95.)

### A.    The Parties' Prior Relationship Shows No Inquiry Notice

"[T]here was no prior relationship between the parties that would have suggested that" the NFL could, by a purported updated to terms and conditions, change the actual counterparties to the Game Pass subscription. *See Schnabel*, 697 F.3d at 126. To the contrary, the prior relationship shows that it was clear to a reasonable person that the NFL provided Game Pass and merely used a service provider to operate it on the NFL's behalf. The NFL confirmed that understanding by, in 2019, repeatedly sending communications stating that "we" had updated "our" service provider, instead of what the NFL claims—that "we" and the "service provider" were now one and the same. Nor did these communications clarify that the service provider was now actually the counterparty

---

[7] Although *Schnabel* applied California law, the decision applies here because "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (citing *Schnabel*, 697 F.3d at 119).

17

to the contract, and that the NFL wished to relinquish its prior contractual obligations to Game Pass subscribers.

As the 2013 T&Cs, which identify the NFL as the contracting party, stated: *"**We** have contracted with a third party (currently NeuLion) to operate the above listed Subscription Product on **our** behalf."* (T&C 2013) (emphasis added). Similarly, each version of the Terms & Conditions from 2014 through 2018 state that "we"—the NFL, or its affiliate the NFLI—used a third party, Neulion, to operate Game Pass on its behalf. (Pltf's Statement ¶ 9.)[8] All these terms were also silent on Defendants' right to modify them or on Plaintiff's obligation to accept new terms.

As such, Plaintiff had no reason to believe that he contracted with any entity other than Defendants for his NFL Game Pass subscription. Based on these prior dealings, "a reasonable person [would not] likely understand" that an update to subsequent terms and conditions would fundamentally alter the contractual relationship—that "we" was no longer the NFL, but actually the service provider itself. *See Schnabel*, 697 F.3d at 127.

**B.      Plaintiff Lacked Sufficient Notice To Assent To A New Contract**

Defendants cite to a handful of communications starting in June 2019 to Plaintiff about how "we are updating our service provider," and to one email on October 29, 2019 referencing "Updates to Terms and Conditions" (using the words "we" and "our" throughout, with the NFL logo at the top). While Defendants claim that Plantiff opened his email, that is disputed. (Pltf's Statement ¶ 100.)

---

[8] In April 2017, NFLI contracted with Perform Media Channels LTD to operate NFL Game Pass in Australia, in contradiction to the 2017 T&Cs (which were effective as of June 2017). (Joint Stip. ¶ 9.) There is no evidence that any email notice was sent to Plaintiff or any subscriber reflecting any of these changes to the 2017 T&Cs or as to Perform Media's role in Game Pass. The only known email to be sent to NFL Game Pass subscribers that year was in July 2017. (Joint Stip. Ex.G.) That email made no mention that NFLI replaced Defendants as contracting parties to the Terms & Conditions or about Perform Media. Further, the email was signed by "Your NFL.com Team", and on the footer at the very bottom of the email (in smaller print) Defendant NFLE is identified. Nowhere in the email is there a reference to NFLI. (Joint Stip. Ex.G.)

18

However, the 2019 Terms & Conditions reflected an entirely new contract with a new contracting party, which purportedly relieved the NFL of its prior contractual obligations, and not merely a modification to the prior parties' contractual relationship. Given the significance of this change, the emails in 2019 did not put Plaintiff on inquiry notice. *See Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021) ("A person is on inquiry notice of terms if they are presented in a clear and conspicuous manner.").

    1.   <u>June and July 2019</u>

On June 19, 2019, Plaintiff received an email with the heading "Your NFL Game Pass Subscription Is Getting an Update." (Joint Stip. Ex.I.) At the top of the email, under the NFL Game Pass Logo, the email states: "*we* wanted to share an update regarding your current NFL Game Pass subscription" and that "*we're* updating *our* service provider." *Id.* (emphasis added). The use of the terms "we" and "our" suggest that "we" is someone different from the service provider; not that "we" *is* the service provider.

In addition, the email is signed as, "NFL Game Pass," and not Overtier or Deltatre, further reinforcing Plaintiff's and other subscribers' belief that the NFL was still the contracting counter-party.



**Your NFL Game Pass Subscription Is Getting An Update**

As all 32 teams are busy preparing for the upcoming season, we wanted to share an update regarding your current NFL Game Pass subscription. Please read below to learn how this positively affects you!

This offseason we're updating our service provider as part of our commitment to providing a premium NFL experience to our fans around the world.

19

(Joint Stip. Ex.I.)

On the second page the last sentence of the email states, in greyed out text and in smaller font the last sentence, "for further details on NFL Game Pass Terms and Conditions, including billing, please click here." This is insufficient. *See Starke*, 913 F.3d at 293–94 ("[T]he SquareTrade email in no way signals to Starke that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link.").

On July 1, 2019, Plaintiff received an email stating that "*we* wanted to share details regarding your subscription," and, "[a]s a reminder from our previous email, *we're* updating *our* service provider." (Joint Stip. ¶ 28 & Ex.K) (emphasis added). The email also notified him that his subscription was "set to auto-renew in 31 days" and that he did not need to take any action. Like with the June 2019 email, references to Terms & Conditions were found in small, greyed out font on the bottom of the email.

On July 16, 2019, Plaintiff received a similar email from "NFL Game Pass," with a reminder for him to update his Game Pass app.  (Joint Stip. ¶ 30, Ex.L.) The email once again misleadingly used the term "we" next to the NFL Game Pass logo, without identifying that the "we" had actually changed to third parties that Plaintiff had never heard of. Further, the email merely referenced the Terms & Conditions buried in the greyed-out portion in the bottom of the email. Plaintiff did not update his Game Pass app, as he never used the Game Pass app, but instead used his laptop to access Game Pass. (Pltf's Statement ¶ 103.)

Accordingly, not only are these emails misleading by using "we" and "our" and referring to a "service provider" as a separate entity, they are also insufficient to deem Plaintiff on inquiry

20

notice of agreement to the new 2019 T&Cs because it did not "advise him that he would be deemed to agree to the [new] contract terms." *See Starke*, 913 F.3d at 293–94.[9]

### 2. August 2019

On August 2, 2019, Plaintiff received confirmation email from "NFL Game Pass" that his automatic payment and auto-renewal were successful. (Joint Stip. ¶ 32 & Ex.M.) Like previous communications, the email did not state that Plaintiff agreed to the 2019 T&Cs upon payment through the autorenewal feature. Nor did it inform him that he entered into a new contract with new contracting parties that are not Defendants. Indeed, the August 2019 email did not even refer to or mention any changes to terms and conditions.

In these circumstances, Plaintiff's automatic payment on August 2, 2019 does not amount to the unambiguous manifestation of assent to new terms of which Plaintiff was unaware. *See Schnabel*, 697 F.3d at 128 ("[Plaintiffs'] continued credit-card payments, which were auto-debited from their credit cards, were too passive for any reasonable fact-finder to conclude that they manifested a subjective understanding of the existence of the [new terms.]").

### 3. October 2019

On October 29, 2019, three months after Plaintiff's subscription automatically renewed, "NFL Game Pass" sent another email to subscribers advising about a generic update to terms and conditions. (Joint Stip. Ex.P.) The email stated that "*we* are writing to let you know about updates *we* are making to *our* Terms & Conditions," and that the changes take effect on October 29, 2019—

---

[9] *See also Nicosia v. Amazon.com,* 834 F.3d 220, 233-238 (2nd Cir. 2016) (question of fact whether customer was on inquiry notice to assent to Terms of Use where reference to the Terms of Use was not underlined or bolded, and was not conspicuous in light of the whole webpage which contained other weblinks, fonts, colors, and advertisements); *Specht*, 306 F.3d at 31–32 (finding no inquiry notice of contract terms that were provided via hyperlink at the very bottom of the Netscape webpage which distracted viewer with praise for the product and a "Download" button); *Nguyen v. Barnes & Noble In++c*., 763 F.3d 1171, 1177 (9th Cir. 2014) ("Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the [ ] agreement.").

i.e. the same day the email was sent (emphasis added). This is the same "we" in the June and July 2019 emails where it stated that "we" were changing their "service provider." In this context, the October 2019 email made it clear that "we" referred to the NFL and not to an unknown international (i.e. non-US) entity. The email was also signed by "NFL Game Pass."

This notice was deficient given that it "was both temporally and spatially decoupled from the plaintiffs' enrollment in and use of" Game Pass. *See Schnabel*, 697 F.3d at 127. It was also misleading, or inadequate at best, "in light of the history of the parties' dealings with one another." *See id.* This email hid the facts that the new terms were an entirely different contract, with new, unknown third parties as counter parties, and that the NFL was attempting to relieve itself of all its prior commitments to Plaintiff.



**Updates to Terms and Conditions**

We are writing to let you know about updates we are making to our Terms and Conditions. These updates apply to all existing NFL Game Pass Australian subscribers only and take effect on October 29, 2019.

(Joint Stip. Ex.P.)

Accordingly, the notice lacks sufficient clarity to bind Plaintiff to a new contract with new contracting parties. *See Schnabel*, 697 F.3d at 120 (noting that the "clarity and conspicuousness" of terms is "important" to determining whether a reasonably prudent person would be on inquiry notice) (alteration omitted). Further, even though Plaintiff continued to use NFL Game Pass after receiving the October 2019 email, this does not manifest assent without notice of the terms. *Schnabel*, 697 F.3d at 120 (continued use of an account only manifests assent when the user has received notice of the revised terms).

22

As such, the "totality of the circumstances" shows that Plaintiff was not on inquiry notice of the updated 2019 T&Cs. *See Soliman*, 999 F.3d at 839.

###### C.    Defendants Fumble Their Case Law Citations

Defendants throw an interception by heavily relying on *Valle v. ATM Nat., LLC*, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015). *See Mem.* at 18-19. That case merely involved the updates to terms between the existing contract counterparties to add an arbitration clause, and the notice there "highlighted that the Amended Agreement *would supersede any previous agreement* and *specifically pointed out* the new Arbitration Provision." 2015 WL 413449, at *3 (emphasis added); *see also id.* (defendant "also highlighted the arbitration provision on the first page of the Agreement and in the letter"). Here, however, Defendants have cited nothing that informed Plaintiff that his indefinite, automatically renewing subscription with the NFL was supposedly terminated and replaced with a contract with new parties. *See Valle,* 2015 WL 413449, at *3. Moreover, the NFL did not provide *any* time for Plaintiff to decide whether to acquiesce to the new terms or to demand a refund for his 2019 subscription, unlike in *Valle*, where customers had 60 days to reject the new terms. *Id.* at *4. And critically, here Plaintiff did not take any action to acquiesce to the new terms, as he had already paid almost three months prior and his subscription was automatically renewed. *Cf. id.* at *3 ("[W]here automated payments were insufficient for finding assent in *Schnabel*, here plaintiffs actively used their account over the course of several months with ATM transactions.").

Defendants citation to *Meyer v. Uber Tech., Inc.*, 868 F.3d 66 (2d Cir. 2017), is also easily picked off. *See Mem.* at 19. *Meyer* had nothing to do with later updates to terms and conditions, let alone whether a bald notice of updated terms and conditions is legally sufficient where the entire counterparty changed. Instead, in *Meyer*, the consumer downloaded defendant's mobile application and had to click a registration button, which created an account but also manifested

23

"assent" to the terms and conditions. *Meyer*, 868 F.3d at 79–80. Here, Plaintiff did not take a single action to assent to the 2019 T&Cs whatsoever.

In addition, *Meyer* relied on the "transactional context of the parties' dealings," including that "[t]he registration process clearly contemplated some sort of *continuing relationship* between the putative user and [defendant]." *Id.* at 80 (emphasis added). Here, unlike *Meyer*, the NFL attempts to disavow its "continuing relationship" with Plaintiff. In addition, the "transactional context" here reflects the opposite: all applicable terms prior to the 2019 season were between Plaintiff and the NFL, with a service provider operating Game Pass on the NFL's behalf, and Plaintiff received communications with the NFL Game Pass logo stating that "we are updating the service provider," instead of what the NFL contends the email means—that "we [*are*] the service provider."

## IV.    Functional Privity Exists To Support Plaintiff's Implied Warranty Claim

Because Plaintiff had a contract with the NFL for Game Pass, his implied warranty of merchantability claim may proceed. But even if the NFL's contract with Plaintiff ceased in 2019, there is a genuine dispute of material fact as to whether functional privity nonetheless existed to support Plaintiff's implied warranty claim. *See Chery v. Conduent Educ. Servs., LLC*, ---F.3d---, 2022 WL 179876, at *11 (N.D.N.Y. Jan. 20, 2022) ("[U]nder the unusual facts presented by this case there are genuine disputes regarding whether 'functional privity' might have existed between [defendant] and the Class members."). Plaintiff originally contracted with the NFL in 2013 and that contract was automatically renewed each year. Each year the NFL had a service provider operate Game Pass on its behalf.

In 2019, the NFL simply decided to make the service provider the named contract counterparty. However, the contractual relationship between the NFL and the new service provider remained essentially the same. (*See* Kronenberger Decl. Ex.A.) The NFL exerted the same level

of control over Game Pass, including that the NFL retained its (a) ownership of Game Pass content; (b) rights to protect its intellectual property via any agreements between vendors and consumers; (c) ability to pass consumer private data back and forth between the vendor and NFL entities; (d) control over all advertising within the video streams; and (e) control over Game Pass branding. (Joint Stip., Ex.B; Pltf's 56.1 Statement ¶ 109.)

Given the Parties' prior existing contract and history of dealing, their relationship was "so close as to be the functional equivalent of privity." *Media Glow Digital, LLC v. Panasonic Corp. of N. Am.*, 2019 WL 2281375, at *4 (S.D.N.Y. May 29, 2019). Plaintiff clearly "was not a stranger to the contract," and therefore his relationship with the NFL "was the 'functional equivalent' of privity." *City Sch. Dist. of City of Newburgh v. Hugh Stubbins & Assocs., Inc.*, 85 N.Y.2d 535, 538-39 (N.Y. 1995) (citation omitted); *cf. Guard Ins. Grp., Inc. v. Reliable Ins. Servs., LLC*, 2018 WL 3998053, at *4 (E.D.N.Y. Mar. 20, 2018) ("[T]he functional equivalent of contractual privity [doctrine] is a question of fact governed by the particular relationship between the parties.") (quotation marks omitted).

In sum, "under the unusual facts presented by this case there are genuine disputes regarding whether 'functional privity' might have existed between" the NFL and Plaintiff. *Chery*, 2022 WL 179876, at *11.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion for Summary Judgment. Plaintiff requests that this matter be heard before the Court by oral argument.

Respectfully Submitted,                    **KRONENBERGER ROSENFELD, LLP**

Dated: June 30, 2022

                                                    */s/ Karl S. Kronenberger*

25

Karl S. Kronenberger
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
karl@KRInternetLaw.com


**ROME & ASSOCIATES, A.P.C.**


*/s/ Eugene Rome*

Eugene Rome (admitted *pro hac vice*)
2029 Century Park East, Suite 450
Los Angeles, CA 90067
Telephone: (310) 282-0690
Facsimile: (310) 282-0691
eugene@romeandassociates.com

**POLLOCK COHEN LLP**


*/s/ Raphael Janove*

Adam Pollock
Christopher K. Leung
Raphael Janove
111 Broadway, Suite 1804
New York, NY 10006
Telephone: (212) 337-5361
adam@pollockcohen.com
cleung@pollockcohen.com
rafi@pollockcohen.com

*Attorneys for Plaintiff Sietel Singh Gill
and the Proposed Class*

26