**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals,<br><br>                                          Plaintiffs,<br><br>                      v.<br><br>NATIONAL FOOTBALL LEAGUE, and NFL ENTERPRISES LLC,<br><br>                                    Defendants. | Case No. 1:21-cv-01032-PAE |

**DEFENDANTS' REPLY TO PLAINTIFF'S COUNTERSTATEMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANTTO LOCAL RULE 56.1 (c)**

Pursuant to Local Rule 56.1(c)., and in further support of Defendants' Motion for Summary Judgment, Defendants hereby submit this Reply.

**56.1(b) Counterstatement**

**The Parties**

1.      Plaintiff Sietel Singh Gill is and was at all relevant times a resident and citizen of New South Wales, Australia. [Joint Stipulation of Undisputed Facts ("Joint Stip.")[1], ¶ 1].

**Response:** Not disputed.

2.      Defendant NFL is an unincorporated association founded in 1920, the members of which are 32 professional football clubs.  The NFL maintains a principal place of business at 345 Park Avenue, New York, NY 10154. [Joint Stip., ¶ 2].

**Response:** Not disputed.

_____

[1] See Doc. No. 70.

3.     Defendant NFLE is a limited liability company organized under the laws of the State of Delaware and maintains a principal place of business at 345 Park Avenue, New York, NY 10154. [Joint Stip., ¶ 3].

**Response:** Not disputed.

**NFL Game Pass International Subscription**

4.     NFL Game Pass International[2] is a digital platform through which subscribers in various markets outside the United States can access and view NFL-related content, including on demand and live stream access to games throughout the NFL season. See Joint Stip., Ex. D, Doc. No. 70-4, 2013 Subscription Product Terms and Conditions; see also Ex. F, Max Boigon Deposition, p. 11.

**Response:** Not disputed.

5.     Subscribers can subscribe to several different NFL Game Pass International packages, which may affect the availability of some services, such as access to the playoffs and Super Bowl. [Joint Stip., Ex. D, Doc. No. 70-4].

**Response:** Not disputed.

6.     Each subscription is for a one-year term, which provides subscribers access to the NFL Game Pass International service for the NFL season that falls within the subscription term. See Joint Stip., Ex. D, H, J, Q, Doc. Nos. 70-4, 70-8, 70-10, 70-17; see also Ex. C,[3] 2014 Terms

---

[2] The name of Plaintiff's package from 2013-2016 was "Game Pass Season Plus." The name then changed to "Game Pass Season Plus Pass" starting with the 2017 NFL Season while the right to "manage, operate, offer, and sell Game Pass" was licensed to Perform Media Channels Ltd. See infra ¶ 13. Subsequently, when the license was granted to OverTier Operations for the 2019 NFL Season, the name was changed to "Game Pass Season Pro." See Boigon Dec., ¶ 4. Hereinafter, when the products are discussed in general or collectively, they will be referred to as "NFL Game Pass International." The particular names for each given season will be used when discussing Plaintiff's particular subscriptions for those seasons.

[3] References to "Ex. __" are to the exhibits to the accompanying Declaration of Thomas A. Leghorn.

and Conditions; Ex. D, 2015 Terms and Conditions; and Ex. E, 2018 Terms and Conditions; see also Declaration of Max Boigon ("Boigon Dec."), ¶¶ 9-11.

**Response:** Not disputed.

7.     Each season's subscription to the NFL Game Pass International service is subject to Terms and Conditions made available to subscribers. See Joint Stip., Exs. D, H, J, Q, Doc. Nos. 70-4, 70-8, 70-10, 70-17; see also Ex. C, 2014 Terms and Conditions; Ex. D, 2015 Terms and Conditions; and Ex. E, 2018 Terms and Conditions.

**Response:** Disputed to the extent that customer's subscriptions are subject to the Terms and Conditions they agreed to, but not necessarily the Terms and Conditions that may be available to that customer at any point in time if such Terms and Conditions were not agreed to. *See, for* e.g., *Starke v. Squaretrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019) (An offeree must have actual notice of the revised contract terms or be "on inquiry notice of them and assent[ ] to them through conduct that a reasonable person would understand to constitute assent.") Otherwise, these provisions are not disputed.

**Reply:**  Plaintiff has stipulated as an undisputed fact that the "Subscription Terms and Conditions applicable to the Game Pass International subscription service for the 2013 NFL season . . . went into effect on June 8, 2012 and were updated on July 29, 2013.  Ex. D." Joint Stipulation of Undisputed Facts (hereafter "Joint Stip" Docket Entry 70) ¶ 14 Plaintiff further stipulated that "he    agreed    to    the    2013    Subscription    Products    Terms    and Conditions." Joint Stip, ¶ 15.

**NFL Game Pass International Contracts**

8.     During the 2013 NFL Season, the NFL Game Pass International service was provided by NFLE, through a third-party vendor/operator called NeuLion. [Joint Stip, ¶¶ 6-7].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew at the time he agreed to the 2013 Terms and Conditions that NFLE was the specific NFL party to the agreement, as the 2013 Terms and Conditions does not specify the exact NFL counterparty. (Joint Stip Ex.D. at DEF0000001 ["The NFL is offering the following subscription, authentication, and mobile products... ."].) Otherwise, this provision is not disputed.

**Reply:** Plaintiff has stipulated that NeuLion, Inc. was contracted with as third-party to operate Game Pass International under 2013 Subscription Products Terms and Conditions. Joint Stip, ¶ 18.

9.      NFLE, through its operator NeuLion, provided NFL Game Pass International each season until the 2017 NFL Season. [Joint Stip., ¶ 8].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew at the time he agreed to the 2013 Terms and Conditions that NFLE was the "provider" of NFL Game Pass International, as the 2013 Terms and Conditions does not specify any specific NFL entity as a "provider." (Joint Stip, Ex. D. at DEF0000001 ["The NFL is offering the following subscription, authentication, and mobile products... ."].) Otherwise, this provision is not disputed.

**Reply:** The 2014 through 2017 NFL seasons generally are not relevant to Plaintiff's causes of action in that Plaintiff, without legal or factual support contends the 2013 Subscription Terms and Conditions continued through the 2020 Super Bowl. This fact, for which no contrary evidence has been provided, is set forth to simply establish the actual progression of Game Pass International between 2013 and the 2020 Super Bowl.

10.      Individual terms and conditions were issued for these seasons which indicated that NeuLion was operating NFL Game Pass International. See, e.g., Joint Stip., Ex. D, Doc. No. 70-4

("We have contracted with a third party (currently NeuLion, Inc.) to operate the above listed subscription product, on our behalf.").

**Response:** Disputed to the extent that this statement implies that Plaintiff agreed to any terms other than the 2013 Terms and Conditions. (Joint Stip ¶ 15.) Otherwise, not disputed.

**Reply:** The stipulated 2013 Terms and Conditions stated unequivocally that the term of the agreement ended "before the start of the following year's NFL Preseason (approximately July 31) …." Joint Stip, Ex. D., Doc No. 70-4.

11.    Between the 2016 and 2017 NFL Seasons, responsibility for NFL Game Pass International subscriptions shifted from NFLE and NeuLion to licensees of NFL International LLC ("NFLI"), an affiliate of NFLE. See Ex. F., Max Boigon Deposition, p. 12.

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:**  The 2014 through 2017 NFL seasons generally are not relevant to Plaintiff's causes of action in that Plaintiff, without legal or factual support, contends the 2013 Subscription Terms and Conditions continued through the 2020 Super Bowls.  This fact, for which no contrary evidence has been provided, is set forth to simply establish the actual progression of Game Pass International between 2013 and the 2020 Super Bowl.

12.    Starting with the 2017 NFL Season, NFL Game Pass International began being offered to the Australian Market by a third-party licensee of NFLI called Perform Media Channels Ltd. ("Perform"). [Joint Stip. Ex. A, Doc. No. 70-1, April 10, 2017 Product Development and Media Rights Agreement].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion (Joint Stip., ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:** The 2014 through 2017 NFL seasons generally are not relevant to Plaintiff's causes of action in that Plaintiff, without legal or factual support, contends the 2013 Subscription Terms and Conditions continued through the 2020 Super Bowls. This fact, for which no contrary evidence has been provided, is set forth to simply establish the actual progression of Game Pass International between 2013 and the 2020 Super Bowl.

13.    On April 10, 2017, NFLI and Perform entered into a license agreement by which "NFLI grants to Perform the non-transferable right and license and Perform accepts the obligations, during the GP Term and throughout the GP Territory to manage, operate, offer and sell Game Pass as a standalone subscription offering and distribute GP Content solely within Game Pass running on Approved Devices." [Joint Stip. Ex. A, Doc. No. 70-1, p. 10].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion. (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:** The 2014 through 2017 NFL seasons generally are not relevant to Plaintiff's causes of action in that Plaintiff, without legal or factual support, contends the 2013 Subscription Terms and Conditions continued through the 2020 Super Bowl. This fact, for which no contrary evidence has been provided, is set forth to simply establish the actual progression of Game Pass International between 2013 and the 2020 Super Bowl.

14.     Australia was within the GP Territory within which Perform was licensed to manage, operate, offer and sell Game Pass International as of April 10, 2017. [Joint Stip., Ex. A, Doc. No. 70-1, p. 6].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion. (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:**  The 2014 through 2017 NFL seasons generally are not relevant to Plaintiff's causes of action in that Plaintiff, without legal or factual support, contends the 2013 Subscription Terms and Conditions continued through the 2020 Super Bowl.  This fact, for which no contrary evidence has been provided, is set forth to simply establish the actual progression of Game Pass International between 2013 and the 2020 Super Bowl.

15.     On June 18, 2018, NFLI and OverTier Operations entered into a license agreement by which "NFLI grant[ed] to [OverTier Operations] the non-transferable right and license, and [OverTier Operations] accept[ed] the obligation, during the Term and throughout the territory to offer, market and sell Game Pass as a standalone subscription offering and distribute GP Content solely within Game Pass running on Approved Devices." The license encompassed international territories, including throughout Europe, but did not include Australia at the time. [Joint Stip., Ex. B, Doc. No. 70-2, p. 6, Exhibit A].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:** The stipulated 2013 Terms and Conditions stated unequivocally that the term of the agreement ended "before the start of the following year's NFL Preseason (approximately July 31) …." Joint Stip, Ex. D., Doc No. 70-4. Plaintiff has stipulated that the June 2019 e-mail to him noted the updating of the service providers which e-mail had Overtier Operations printed underneath the link to the Terms and Conditions. Joint Stip, Ex. D. Doc No. 70-4, ¶ 26 Those Terms and conditions stated in part "Who are we. Overtier Operations who is the official licensee of the content material and Deltatre S.p.a. who operates the platform and deals with customer queries. As a customer, you are contracted with both entities." Joint Stip, ¶ 27, Ex. J.

16.    On April 1, 2019, NFL International Licensing Inc. ("NFLILI"), an affiliate of NFLI that took over the role of licensing NFL Game Pass International, entered into an amended license agreement with OverTier Operations (the "2019 Amended Agreement"), which stated in part "[OverTier Operations] hereby confirms and agrees that it provided its consent for NFL International LLC to transfer and assign all of its rights and obligations under the Agreement to NFLILI, effective as of January 1, 2019. For the avoidance of doubt, all references to NFLI in the Agreement will be read and construed as references to NFLILI." [Joint Stip., Ex. C, Doc. No. 70-3, p. 1].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion. (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:** The stipulated 2013 Terms and Conditions stated unequivocally that the term of the agreement ended "before the start of the following year's NFL Preseason (approximately July 31) …." Joint Stip, Ex. D., Doc No. 70-4. Plaintiff has stipulated that the June 2019 e-mail to him

noted the updating of the service providers which e-mail had Overtier Operations printed underneath the link to the Terms and Conditions. Joint Stip, Ex. D. Doc No. 70-4, ¶ 26 Those Terms and conditions stated in part "Who are we. Overtier Operations who is the official licensee of the content material and Deltatre S.p.a. who operates the platform and deals with customer queries. As a customer, you are contracted with both entities." Joint Stip, ¶ 27, Ex. J.

17.    The 2019 Amended Agreement expanded OverTier Operation's territory over the NFL Game Pass International service to include Australia for the 2019 NFL Season. [Joint Stip., Ex. C, Doc. No. 70-3, Exhibit A].

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion. (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:**    The stipulated 2013 Terms and Conditions stated unequivocally that the term of the agreement ended "before the start of the following year's NFL Preseason (approximately July 31) …." Joint Stip, Ex. D., Doc No. 70-4. Plaintiff has stipulated that the June 2019 e-mail to him noted the updating of the service providers which e-mail had Overtier Operations printed underneath the link to the Terms and Conditions. Joint Stip, Ex. D. Doc No. 70-4, ¶ 26 Those Terms and conditions stated in part "Who are we. Overtier Operations who is the official licensee of the content material and Deltatre S.p.a. who operates the platform and deals with customer queries. As a customer, you are contracted with both entities." Joint Stip, ¶ 27, Ex. J.

18.    Accordingly, starting with the 2019 NFL Season, OverTier Operations was, and to the present remains, the exclusive licensee of NFLILI authorized to manage, operate, offer and sell

{N2191250.1 }

the NFL Game Pass International subscription service in Australia. <u>See</u> Joint Stip., Ex. C, Doc. No. 70-3.

**Response:** Disputed to the extent that this statement implies that Plaintiff knew that other vendors were involved in the provision of Game Pass after Neulion, as Plaintiff only agreed to the 2013 Terms and Conditions, which disclosed Neulion. (Joint Stip ¶ 15 & Ex.D. at DEF0000001.) Otherwise, this provision is not disputed.

**Reply:**  The stipulated 2013 Terms and Conditions stated unequivocally that the term of the agreement ended "before the start of the following year's NFL Preseason (approximately July 31) …." Joint Stip, Ex. D., Doc No. 70-4.  Plaintiff has stipulated that the June 2019 e-mail to him noted the updating of the service providers which e-mail had Overtier Operations printed underneath the link to the Terms and Conditions.  Joint Stip, Ex. D. Doc No. 70-4, ¶ 26 Those Terms and conditions stated in part "Who are we.  Overtier Operations who is the official licensee of the content material and Deltatre S.p.a. who operates the platform and deals with customer queries.  As a customer, you are contracted with both entities."  Joint Stip, ¶ 27, Ex. J.

**Gill's Subscription to NFL Game Pass International**

<u>The 2013 NFL Season</u>

19.    The Terms and Conditions applicable to the NFL Game Pass International subscription service for the 2013 NFL Season (the "2013 Terms and Conditions") went into effect on June 8, 2012 and were updated on July 29, 2013. [Joint Stip., Ex. D, Doc. No. 70-4].

**Response:** Not disputed.

20.    The 2013 Terms and Conditions stated, in part, "For Subscription Products billed on an annual basis (e.g., NFL Game Pass – Season Plus Subscription, NFL Game Rewind – Season Plus Subscription) the term begins when you purchase and ends before the start of the following

year's NFL Preseason (approximately July 31), with one-time billing immediately following your purchase." [Joint Stip., Ex. D, Doc. No. 70-4].

**Response:** Disputed to the extent this statement implies that that word, "term," means contract term, as the word, "term," in this sentence modified the phrase, "Subscription Products." Further, the quoted section above appears in a section entitled, "Billing and Automatic Renewal Policies for Certain Subscription Products," and not in any section covering the general term of the overall agreement. (Joint Stip. Ex.D, DEF0000002.) Otherwise, not disputed.

**Reply:** Disputed.  With Paragraph 19 of the Joint Stip, there is no dispute that Exhibit D were the Terms and Conditions applicable to the 2013 NFL season.  Plaintiff has offered no admissible evidence, or controlling legal authority, to support a contention that the plain English of the term beginning and ending has any meaning other than this was a contract for a single one-year period and that term ended no later than July 31, 2014.  It must be noted that despite the fact Plaintiff purports to dispute this paragraph, paragraphs 24 and 25 below, Plaintiff does not dispute that Plaintiff was advised on September 10, 2013 that his Game Pass Season Plus subscription "will end at 11:59 p.m. GMT on 31 July 2014 and within paragraph 25 below, the 2013 subscription was for a one-year term that expired on July 31, 2014.

21.     The 2013 Terms and Conditions stated, in part, "We have contracted with a third party (currently, NeuLion, Inc.) to operate the above listed Subscription Product, on our behalf." [Joint Stip., Ex. D, Doc. No. 70-4].

**Response:** Not disputed.

22.     On or around September 10, 2013, Gill purchased the Game Pass Season Plus package for the 2013 NFL Season. This was Gill's first time subscribing to NFL Game Pass International. Joint Stip., Ex. E, Doc. No. 70-5; Ex. G, Sietel Singh Gill Deposition, pp. 6-7.

**Response:** Not disputed.

23.    Gill's subscription for the 2013 NFL Season was governed by the 2013 Terms and Conditions, to which he agreed. See Joint Stip., ¶ 15; Joint Stip., Ex. D., Doc. No. 70-4.

**Response:** Not disputed.

24.    The September 10, 2013 email from nflgamepass@neulion.com informed Gill that his 2013 Game Pass Season Plus subscription "will end at 11:59 pm GMT on 31 Jul 2014." [Joint Stip., Ex. E, Doc. No. 70-5].

**Response:** Not disputed.

25.    Gill's subscription for the 2013 NFL Season was for a one-year term that expired on July 31, 2014, prior to the start of the 2014 NFL Season. [Joint Stip., Exs. D, E, Doc. Nos. 704, 70-5].

**Response:** Not disputed.

26.    During his deposition, Max Boigon of NFL International Licensing Inc. testified that the Terms and Conditions for Game Pass would not be renewed:

Q: Let me restate that. What does a person need to do in order to have this allegedly

one year or seasonal agreement renew for another season?

A: It can – this – the terms of service cannot be renewed for another season. They

are only for a single season.

Ex. F, Max Boigon Deposition, p. 63.

**Response:** Disputed because there is no evidentiary foundation for Mr. Boigon's statement that the Terms and Conditions would not be renewed. In fact, there is no end date to the Terms and Conditions in the document at all, thus contradicting Mr. Boigon. (*See, generally,* Joint Stip Ex.D.)

**Reply:**  The evidentiary foundation is Mr. Boigon's sworn testimony based upon personal knowledge.  As with most of Plaintiff's responses and counter-statements, absolutely no evidence in admissible form is provided in support of Plaintiff's position.

27.    Boigon clarified that "payment will renew but the terms of service will not. The terms of service are a single year, seasonal – annual." Ex. F, pp. 60-61.

**Response:** Disputed because there is no evidentiary foundation for Mr. Boigon's statement that a customer's payment will not renew the Terms and Conditions, as there is no end date in the Terms and Conditions, thus contradicting Mr. Boigon. Specifically, each annual subscription contained within the Terms and Conditions is for one year and renews automatically with payment. (Joint Stip Ex.D, DEF0000003.)

**Reply:**  The evidentiary foundation is Mr. Boigan's sworn testimony based upon personal knowledge.  As with most of Plaintiff's responses and counter-statements, absolutely no evidence in admissible form is provided in support of Plaintiff's position.

The 2014, 2015, and 2016 NFL Seasons

28.    Gill elected to auto-renew his Game Pass Season Plus subscription for each of the 2014, 2015 and 2016 seasons and, thereby, entered into three separate and distinct one-year subscriptions for Game Pass Season Plus for each of those respective NFL seasons. See Ex. G, Sietel Singh Gill's Deposition, p. 24; Ex. F, Max Boigon Deposition, pp. 63-64; see also Ex. C, 2014 Terms and Conditions; Ex. D, 2015 Terms and Conditions; Joint Stip., Ex. F, Doc. No. 706, Gill Credit Card Statement.

**Response:**  Disputed to the extent the statement implies that Plaintiff had to do anything to auto-renew his annual subscription, as the 2013 T&Cs provide for automatic renewal without the need for any "election." (Joint Stip Ex.D, DEF0000003.)  Otherwise, not disputed.

**Reply:** Plaintiff offers no evidence in admissible form to refute or overcome his stipulation to the fact that the 2013 Terms and Conditions were for a one-year term. Joint Stip ¶¶ 24 & 25. Nor does plaintiff offer any evidence in admissible form as to any of the other years in which he subscribed to Game Pass.

29.    Data relating to Gill's subscriptions, referred to within the Declaration of Max Boigon, reflects that his subscription for the 2014 NFL Season ran from August 1, 2014 to August 1, 2015, that his subscription for the 2015 NFL Season ran from August 7, 2015 to August 1, 2016, and that his subscription for the 2016 NFL Season ran from August 5, 2016 to August 1, 2017. Boigon Dec., ¶¶ 9-11 and Exhibit A, Subscription Order Tab, Columns U, AH and Al.

**Response:** Not disputed.

The 2017 NFL Season

30.    Gill did not auto-renew his subscription to Game Pass Season Plus Pass for the 2017 NFL Season. See Boigon Dec., ¶ 12.

**Response:** Disputed, as Plaintiff did not cancel his subscription and indeed paid for his subscription for the 2017 season, resulting in the subscription auto-renewing for the 2017 season. (Joint Stip Ex.D, DEF0000003; Boigon Deposition, 59:04-07, 63:18-64:03; Gill Deposition, 76:03-09.)

**Reply:** Disputed. See paragraph 31 below. Plaintiff has submitted no evidence in admissible form to refute that Plaintiff registered first for a seven-day free trial period on September 7, 2017 and only after that purchased his 2017 subscription. There was no auto-renewal.

31. Gill manually registered on September 10, 2017 for a seven-day free trial period of Game Pass Season Plus Pass. See Boigon Dec., ¶¶ 12-13. Following the completion of that trial

period, his credit card was charged for the 2017 Game Pass Season Plus Pass subscription on September 17, 2017. See Boigon Dec., ¶¶ 12-13.

**Response:** Disputed because there is no documentary evidence that Plaintiff did anything at all to renew his subscription in 2017, as the subscription was auto-renewing and he paid. (Boigon Deposition, 59:04-07, 63:18-64:03; Gill Deposition, 76:03-09.).

**Reply:** The citations to the Boigon deposition merely acknowledged that the initial one-year subscription was with the NFL and that the Plaintiff had the option to cancel auto renew for the 2014/NFL Season. Neither refutes the fact that the Plaintiff's subscription for the 2017 NFL Season was not auto-renewed.

31.    Gill's subscription for the 2017 NFL Season was governed by the Terms and Conditions applicable to the 2017 NFL Season (the "2017 Terms and Conditions"). [Joint Stip., Ex. H, Doc. No. 70-8]; see also Ex. F, Max Boigon Deposition, p. 63.

**Response:** Disputed to the extent that this statement implies that Plaintiff agreed to any Terms and Conditions other than the 2013 T&Cs. (Joint Stip ¶ 15.) Otherwise, not disputed.

**Reply:** The citations to the Boigon deposition merely acknowledged that the initial one-year subscription was with the NFL and that the Plaintiff had the option to cancel auto renew for the 2014/NFL Season. Neither refutes the fact that the Plaintiff's subscription for the 2017 NFL Season was not auto-renewed or that the 2017 NFL season was governed by the applicable Terms and Condition.

32.    The 2017 Terms and Conditions state in part, "These Subscription Terms and Conditions are between you and NFL International LLC." [Joint Stip., Ex. H, Doc. No. 70-8].

**Response:** Disputed to the extent that this statement implies that Plaintiff actually read the 2017 T&Cs. (Gill Deposition, 30:16-18.) Otherwise, not disputed.

33.     Gill's subscription to Game Pass Season Plus Pass for the 2017 NFL Season was, like his prior subscriptions, for a one-year term for that particular season. See [Joint Stip., Ex. H, Doc. No. 70-8]. The records referred to in the Boigon Declaration show that Gill purchased a subscription for the 2017 NFL Season running from September 10, 2017 through August 1, 2018. See Boigon Dec., Exhibit A, Subscription Order Tab, Columns U, AH and AL.

**Response:** Not disputed.

The 2018 NFL Season

34.     Gill also did not auto-renew his subscription to Game Pass Season Plus Pass for the 2017 NFL Season. See Boigon Dec., ¶ 14.

**Response:** Disputed, as Plaintiff's subscription has auto-renewed every year since he started his subscription in 2013. (Gill Deposition 76:3-9.)

**Reply:**   Apart from Plaintiff himself saying so, Plaintiff has presented no evidence in admissible form to refute that the 2017 Game Pass subscription was not auto-renewed.   See paragraphs 31-33 above.

36.     Rather, Gill manually paid for Game Pass Season Plus Pass for the 2018 NFL Season with a credit card on August 1, 2018. See Boigon Dec., ¶ 15. Gill's subscription for the 2018 NFL Season was, like each of his prior subscriptions, for a one-year term. See Ex. E, 2018 Terms and Conditions ("For versions of the Product which are billed on a seasonal or annual basis (e.g., NFL Game Pass (International) - Season Plus Subscription) ('Season Plus'), the term begins when you purchase a subscription to the Product and ends before the start of the following year's NFL Preseason (approximately July 31)."). The records of Gill's subscriptions show that that Gill purchased a subscription for the 2018 NFL Season running from August 1, 2018 through August 1, 2019. See Boigon Dec., Exhibit A, Subscription Order Tab, Columns U, AH and Al.

**Response:** Disputed, as there is no documentary evidence that Plaintiff did anything "manually," as his subscription auto-renewed each year.  (Gill Deposition 76:3-9.) Disputed to the extent this statement implies that there was a definite term for the overall Terms and Conditions, which had no term. (Joint Stip Ex. D [*see, generally*, for lack of term for overall agreement despite one-year automatically renewing subscription].) Otherwise, not disputed.

**Reply:**  Plaintiff has presented no evidence in admissible form to refute the fact that for the 2018 NFL Season Plaintiff did not auto-renew his Game Pass subscription.  Defendants have supported this position with the testimony of Max Boigon and the electronically stored and preserved business records.

37.     Gill's subscription for the 2018 NFL Season was "between [Gill] and NFL International LLC." Ex. E.

**Response:** Disputed to the extent this statement implies that Plaintiff had any notice about who the counterparty was to the agreement he entered in 2013, other than the "NFL." (Joint Stip Ex.D.) Otherwise not disputed.

38.     On November 4, 2018, Gill submitted a web form ticket reporting a technical issue he had with his Game Pass Season Plus Pass service. Within his report, Gill stated he had "a paid membership till mid-2019 with NFL Gamepass." [Joint Stip., ¶ 24].

**Response:** Not disputed.

**Reply:**  Disputed.  As shown within the accompanying memorandum of law, Plaintiff can claim lack of knowledge by choosing not to read the Terms and Conditions.

The 2019 NFL Season

39.    On June 19, 2019, Gill received an email from OverTier Operations regarding the changes to the NFL Game Pass International subscription service for the upcoming 2019 NFL Season. [Joint Stip., Ex. I, Doc. No. 70-9].

**Response:** Not disputed.

40.    The June 19, 2019, email stated in part, "This offseason we're updating our service provider as part of our commitment to providing a premium NFL experience to our fans around the world." The email continued, stating "Please note on July 25, 2019 your existing app(s) will no longer be in operation so please update before then." The email contained a footer which stated in part, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here." Underneath the link to the Terms and Conditions was OverTier Operations' name and P.O. Box information. [Joint Stip., Ex. I, Doc. No. 70-9].

**Response:** Not disputed.

41.    A screen shot of the new NFL Game Pass International app references "Delattre":



Ex. H, DEF0001393.

**Response:** Disputed to the extent this statement implies that Plaintiff downloaded or otherwise used an app to access Game Pass, which he did not, as he used his laptop to access Game Pass.  (Gill Deposition, 72:18-20; and 73:03.)

42.    The Terms and Conditions that were hyperlinked in the June 19, 2019 email were for subscriptions to the then upcoming 2019 NFL Season and stated, in part, "Who we are. Overtier Operations who is the official licensee of the content material and Deltatre S.p.A. who operates the platform and deals with customer queries. As a customer you are contracted with both entities." [Joint Stip., Ex. J, Doc. No. 70-10, p. 1].

**Response:** Disputed to the extent the statement implies that consumers would perceive this email as coming from a non-NFL entity, despite the use of the NFL logo and the words, "we" and "our," in the email. (Joint Stip, Ex.I.) Otherwise, not disputed.

**Reply:**  Disputed.  Plaintiff ignores that the name Deltatre appears in the notice and, as the accompanying memorandum of law has shown, Plaintiff can not deny knowledge by choosing not to read the Terms and Conditions.

43.    These 2019 Terms and Conditions additionally set forth that, "The governing law and the competent jurisdiction are the one of the countries where the consumer has his habitual residence." [Joint Stip., Ex. J, Doc. No. 70-10, p. 8].

**Response:** Not disputed.

44.    Moreover, the 2019 Terms and Conditions set forth that "[f]or any subscription product bought online you have a legal right to change your mind within 14 days and receive a refund." [Joint Stip., Ex. J, Doc. No. 70-10, p. 4; see also Ex. Q, Doc. No. 70-17, p. 4].

**Response:** Not disputed.

45.     These Terms and Conditions also set forth that Overtier's and Deltatre's "maximum aggregate liability for all proven losses, damages and claims arising out of or in connection with these terms or a supply under these terms, including liability for breach, in negligence or in tort or for any other common law or statutory action, is limited to the sum of $100." [Joint Stip., Ex. J, Doc. No. 70-10, p. 7].

**Response:** Not disputed.

46.     Plaintiff testified that he has not undertaken any search for Terms and Conditions applicable to the 2019 NFL Season other than the 2019 Terms and Conditions referenced above. See Ex. G, Sietel Singh Gill Deposition, pp. 56-58:

> Q: Do you have any document that embodies a contract between you and either the NFL or NFL Enterprises for the provision of Game Pass to you in Australia?
>
> A: I do not know.
>
> …
>
> Q: Have you looked for one? Have you undertaken a search for any such document?
>
> …
>
> A: [D]o I have a document that says that I was clearly in a direct contract for the provision of Game Pass with NFL Enterprises? I've not looked for that.

**Response:** Not disputed.

47.     The email account associated with Gill opened the June 19, 2019 email twice on the day it was received, at 11:45 A.M. and 12:29 P.M., as described by Richard Johnston, Chief Finance Officer of OverTier Operations. Johnston Aff., ¶ 18.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it is unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes. The Defendants have not presented any evidence of a so-called "read receipt." *See, for e.g., Liberty Media Holdings, LLC v. Marione*, No. 09-14617, 2010 WL 11545316, at \*4 (E.D. Mich. Apr. 15, 2010) (requiring an email with a read receipt for service.) (*See also*, Boigon Deposition, 35:4 - 36:6 (NFL representative admitting how he had no knowledge whatsoever of key spreadsheet purportedly showing emails sent and opened by Plaintiff).

**Reply:**  Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so.  The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment.  Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had stipulated as to the authenticity of those records at the most recent court conference.  It is not claimed Plaintiff read the e-mails, just that they were received and opened.  Whether Plaintiff chose to read them or not is immaterial.

48.    On July 1, 2019, Gill received another email from OverTier Operations. [Joint Stip., Ex. K, Doc. No. 70-11].

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it is unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.) The Defendants have not presented any evidence of a so-called "read receipt." *See, for e.g., Liberty Media Holdings, LLC v. Marione*, No. 09-14617, 2010 WL 11545316, at *4 (E.D. Mich. Apr. 15, 2010) (requiring an email with a read receipt for service.) (*See also*, Boigon Deposition, 35:4 - 36:6 (NFL representative admitting how he had no knowledge whatsoever of key spreadsheet purportedly showing emails sent and opened by Plaintiff).

**Reply:**  Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so.  The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment.  Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had stipulated as to the authenticity of those records at the most recent court conference.  It is not claimed Plaintiff read the e-mails, just that they were received and opened.  Whether Plaintiff chose to read them or not is immaterial.

49.     The July 1, 2019 email stated in part, "As a reminder from our previous email, we're updating our service provider as part of our commitment to providing a premium NFL experience to our fans around the world." The email continued, stating in part, "we wanted to let you know that your NFL Game Pass subscription is set to auto-renew in 31 days. Your subscription fee will be billed on or around August 1, 2019 at the same 2018 Season Plus full price in your market, 274.99 AUD." The email continued on, stating in part, "Click here to update your payment preferences/details. However, if you wish to cancel your subscription, you can manage your preferences here." The email also contained a footer which stated in part, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here." Following the link to the Terms and Conditions was OverTier Operations' name and P.O. Box information. [Joint Stip., Ex. K, Doc. No. 70-11].

**Response:** Not disputed.

50.     The Terms and Conditions that were hyperlinked in the July 1, 2019 email for the upcoming 2019 NFL Season were the same Terms and Conditions hyperlinked to the June 19, 2019 email. [Joint Stip., Ex. J, Doc. No. 70-10].

**Response:** Not disputed.

51.     The email account associated with Gill opened the July 1, 2019 email at 2:42 P.M. on the day it was received. Johnston Aff., ¶ 19.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it is

unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.)

**Reply:** Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so. The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment. Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had stipulated as to the authenticity of those records at the most recent court conference. It is not claimed Plaintiff read the e-mails, just that they were received and opened. Whether Plaintiff chose to read them or not is immaterial.

52. On July 16, 2019, Gill received another email from OverTier Operations. [Joint Stip., Ex. L, Doc No. 70-12].

**Response:** Not disputed.

53. The July 16, 2019 email stated in part, "With the NFL preseason kicking off in less than 3 weeks' time, we wanted to remind you that you will need to update your app(s) in order to watch the action this season. As previously shared, you will have until July 25, 2019 to update your existing NFL Game Pass app(s)." The bottom of the email stated in part, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here." Following the link to the Terms and Conditions was OverTier Operations' name and P.O. Box information. [Joint Stip., Ex. L, Doc No. 70-12].

**Response:** Not disputed.

54.    The Terms and Conditions that were hyperlinked in the July 16, 2019 email for the upcoming 2019 NFL Season were the same Terms and Conditions hyperlinked to the June 19, 2017 email. [Joint Stip., Ex. J, Doc. No. 70-10].

**Response:** Not disputed.

55.    The email account associated with Gill opened the July 16, 2019 email first at 11:46 A.M. on the day it was received and then again at 12:02 A.M. on the following day, July 17, 2019. Johnston Aff., ¶ 20.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it is unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.) The Defendants have not presented any evidence of a so-called "read receipt." *See, for e.g., Liberty Media Holdings, LLC v. Marione*, No. 09-14617, 2010 WL 11545316, at *4 (E.D. Mich. Apr. 15, 2010) (requiring an email with a read receipt for service.) (*See also*, Boigon Deposition, 35:4 - 36:6 (NFL representative admitting how he had no knowledge whatsoever of key spreadsheet purportedly showing emails sent and opened by Plaintiff).

**Reply:** Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so. The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment. Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre

documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had stipulated as to the authenticity of those records at the most recent court conference.  It is not claimed Plaintiff read the e-mails, just that they were received and opened.  Whether Plaintiff chose to read them or not is immaterial.

56.    The billing system used by OverTier reflected, for Gill, "New Subscription Created" on 06/05/2019 and "Renewal," on 08/02/2019. [Joint Stip., ¶ 33; Joint Stip., Ex. N, Doc. No. 70-14].

**Response:** Disputed to the extent that this statement implies that Plaintiff did anything to renew his subscription, which was automatically renewed due to the fact that Plaintiff did nothing. (Gill Deposition 76:03-09.) Further, the passing of data from one NFL vendor to another NFL vendor, resulting in a "new subscription" in a new vendor's system is not relevant to the legal analysis whether Plaintiff did anything to renew or re-start his subscription. (Boigon Deposition, 22:1-9; 25:17-22.)

**Reply:**  Disputed.  Plaintiff ignores the fact that he had contracted in 2018 with Deltatre and Overtier for his 2018 NFL Game Pass International subscription, not with any NFL entity or any prior NFL Licensee.

57.    On August 2, 2019, Gill received an automatically generated email stating, "your NFL Game Pass subscription has been processed on 08/02/2019…Sincerely, NFL Game Pass." [Joint Stip., Ex. M, Doc. No. 70-13].

**Response:** Not disputed.

58.    On August 28, 2019, Gill received an email from OverTier Operations. [Joint Stip., Ex. O, Doc. No. 70-15].

**Response:** Not disputed.

{N2191250.1 }

59.    The August 28, 2019 email stated in part, "Your Season Pro subscription will run until 1st August 2020 where you will have access to the entire NFL season at your fingertips." The email continued, stating, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here." Following the link to the Terms and Conditions was a hyperlink with the text "Want to unsubscribe or change your details?" After that, the email included OverTier Operations' name and P.O. Box information. [Joint Stip., Ex. O, Doc. No. 7015].

**Response:** Not disputed.

60.    The email account associated with Gill opened the August 28, 2019 email at 10:54 P.M. on the day it was received. Johnston Aff., ¶ 22.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it is unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.)

**Reply:**  Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so.  The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment.  Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had

stipulated as to the authenticity of those records at the most recent court conference. It is not claimed Plaintiff read the e-mails, just that they were received and opened. Whether Plaintiff chose to read them or not is immaterial.

61.    On October 29, 2019, Gill received an email from OverTier Operations. [Joint Stip., Ex. P, Doc., No. 70-16].

**Response:** Not disputed.

62.    The October 29, 2019 email began with the heading "**Updates to Terms and Conditions**" followed by a message stating in part, "We are writing to let you know about updates we are making to our Terms and Conditions. These updates apply to all existing NFL Game Pass Australian subscribers only and take effect on October 29, 2019. We invite you to please review the new Terms and Conditions in full here." The email continued, stating "If you continue to use our products and services on or after October 29, 2019, you are agreeing to the updated Terms and Conditions." The bottom of the email stated in part, "For further details on NFL Game Pass International Terms and Conditions, including billing, please click here." Following the link to the Terms and Conditions was OverTier Operations' name and P.O. Box information. [Joint Stip., Ex. P, Doc., No. 70-16].

**Response:** Not disputed.

63.    The updated 2019 Terms and Conditions that were hyperlinked to the October 29, 2019 email included changes to Clause 14 to ensure compliance with certain Australian marketing laws. [Joint Stip., Ex. Q, Doc. No. 70-17, p. 8].

**Response:** Not disputed.

64.    Clause 2.1 of the updated 2019 Terms and Conditions remained the same as the earlier 2019 Terms and Conditions, stating "Who we are. Overtier Operations who is the official

licensee of the content material and Deltatre S.p.A. who operates the platform and deals with customer queries. As a customer you are contracted with both entities." [Joint Stip., Ex. Q, Doc. No. 70-17, p. 1].

**Response:** Not disputed.

65.    The email account associated with Gill opened the October 29, 2019 email at 11:06 A.M. on the day it was received. Johnston Aff., ¶ 23.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it was unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.) The Defendants have not presented any evidence of a so-called "read receipt." *See, for e.g., Liberty Media Holdings, LLC v. Marione*, No. 09-14617, 2010 WL 11545316, at *4 (E.D. Mich. Apr. 15, 2010) (requiring an email with a read receipt for service.) (*See also*, Boigon Deposition, 35:4 - 36:6 (NFL representative admitting how he had no knowledge whatsoever of key spreadsheet purportedly showing emails sent and opened by Plaintiff).

**Reply:**  Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so.  The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston affidavit submitted in support of Defendant's motion for summary judgment.  Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had

stipulated as to the authenticity of those records at the most recent court conference.  It is not claimed Plaintiff read the e-mails, just that they were received and opened.  Whether Plaintiff chose to read them or not is immaterial.

66.     Gill testified at his deposition that he did not recall accessing a hyperlink in 2019 to review any new terms and conditions for Game Pass. Ex. G, Sietel Singh Gill Deposition, p. 53.

**Response:** Not disputed.

67.     However, the email account associated with Gill opened each and every one of the above-described emails, sometimes more than once, as described by Richard Johnston, Chief Finance Officer of OverTier Operations. See Johnston Aff. ¶¶ 18-20, 22-23.

**Response:** Disputed, as Plaintiff states that he does not remember opening any emails, and he also states that an executive assistant sometimes opened emails for him. (Gill Deposition 79:25-80:09.) The spreadsheet at issue is unreliable on its face, and also contains multiple levels of hearsay, thus lacking foundation and reliability. (Gill Deposition 77:15 - 78:07 re objections; note that the spreadsheet says that one of the emails was opened 329 times demonstrating how it was unreliable, and the spreadsheet does not account for automated email systems that "view" emails automatically for spam purposes.) The Defendants have not presented any evidence of a so-called "read receipt." *See, for e.g., Liberty Media Holdings, LLC v. Marione*, No. 09-14617, 2010 WL 11545316, at *4 (E.D. Mich. Apr. 15, 2010) (requiring an email with a read receipt for service.) (*See also*, Boigon Deposition, 35:4 - 36:6 (NFL representative admitting how he had no knowledge whatsoever of key spreadsheet purportedly showing emails sent and opened by Plaintiff).

**Reply:**  Plaintiff's counsel was given the opportunity take discovery from non-parties such as Deltatre but elected not to do so.  The documents and electronic records of Deltatre showing the various e-mails sent by Deltatre and then opened by Plaintiff were authenticated by the Johnston

affidavit submitted in support of Defendant's motion for summary judgment. Max Boigon is an NFLI employee, not with Deltatre, so clearly he could not testify as to the Deltatre documents/records and that is why the Johnston affidavit was provided and to which Plaintiff had stipulated as to the authenticity of those records at the most recent court conference. It is not claimed Plaintiff read the e-mails, just that they were received and opened. Whether Plaintiff chose to read them or not is immaterial.

68.    The Super Bowl for the 2019 NFL season took place on February 2, 2020 in Miami, Florida and the live stream of the Super Bowl was provided by OverTier and Deltatre as part of Gill's subscription to Game Pass Season Pro for the 2019 NFL Season. See Joint Stip., Exs. J, Q, Doc. Nos. 70-10, 70-17].

**Response:** Not disputed.

69.    Plaintiff filed the First Amended Class Action Complaint on April 30, 2021. Ex. A.
**Response:** Not disputed.

70.    Defendants answered the Amended Complaint on December 7, 2021. Ex. B.
**Response:** Not disputed.

## Plaintiffs Additional Statements Under Local Rule 56.1(b)

71.    Per the agreement between NeuLion and NFLE, the subscription services related to Game Pass were to be provided without any attribution to NeuLion. (Joint Stip. ¶ 7.) Accordingly, the 2013 T&Cs were between Defendants and Game Pass subscribers, and Defendants do not dispute that they were parties to the contract. (Joint Stip. ¶ 15.)

**Reply:**  Not Disputed.

72.     The 2013 T&Cs contained no end date or other term and thus was indefinite. (See, generally, Joint Stip. Ex.D, containing annually auto-renewing subscription at DEF00003 but not overall term for the contract.)

**Reply:**  Disputed.  Plaintiff has stipulated his 2013 Game Pass subscription would end at 11:59 p.m. 31 July 2014.  Joint Stip. ¶ 20.

73.     The 2013 T&Cs also state that Defendants had the right to modify subscription prices at any time but did not state that Defendants could otherwise modify the Terms & Conditions at any time. (Joint Stip. Ex. D, DEF0000004.)

**Reply:**  Disputed.  Disputed to the extent that the 2013 Terms and Conditions ended at 11:59 p.m. 31 July 2014 (Joint Stip, ¶ 20) and any terms can be changed upon agreement between the parties.

74.     Starting with the 2017 NFL Game Pass Season, and without any notice to consumers of any change in vendors, Game Pass in Australia was operated by Perform Media Channels LTD ("Perform Media"), through a contract with an affiliate of NFLE, NFL International LLC ("NFLI"). (Joint Stip. ¶ 9; Boigon Deposition 13:1-12.)

**Reply:**  Disputed.  Disputed to the extent Plaintiff has stipulated that Perform Media Channels LTD operated the 2017 NFL Game Pass International for the Australian territory.  Joint Stip. ¶ 9.

75.     The 2017 Terms & Conditions (hereinafter, "2017 T&Cs") injected NFLI into the agreement as a new contracting counterparty, without any notice to customers of the party change, and the agreement still (incorrectly) referred to NeuLion as the third-party service provider, with no reference to Perform Media. (Joint Stip. Ex.H, DEF0000064.)

**Reply:** Disputed. Disputed to the extent that the 2017 Terms and Conditions are not material to Plaintiff's claims as to the 2020 Super Bow in that Plaintiff has stipulated that by June 19, 2019, Plaintiff had received an e-mail as to the 2019 NFL Season which noted that the service providers had been updated and the hyperlink advised among other items that Plaintiff was contracting with Overtier Operations and Deltatre S.p.a. not any NFL entity or Perform – Joint Stip. ¶¶ 25, 26, 27.

76. Plaintiff is a resident and citizen of Australia. (Joint Stip. ¶ 1.) He subscribed to Game Pass in 2013 and agreed that his subscription would auto renew each subscription year. (Joint Stip. ¶¶ 15-16.)

**Reply:** Disputed. Disputed to the extent it implies that the 2013 NFL Game Pass subscription and its terms and conditions extended beyond 31 July 2013. Joint Stip. ¶ 20.

77. Plaintiff agreed to the Game Pass 2013 T&Cs when he subscribed to Game Pass in September 2013, and this agreement was between him and the NFL. (Joint Stip. ¶ 15, Ex.D.)

**Reply:** Not Disputed.

78. The 2013 T&Cs had no end date and thus had an indefinite term; further, the terms stated that Plaintiff's Game Pass annual subscription started upon purchase and continued through the football season ending approximately July 31, and the annual subscription would "automatically renew" on approximately August 1 of each year unless Plaintiff canceled prior to the subscription automatically renewing. (Joint Stip. Ex.D, DEF0000002.)

**Reply:** Disputed. Plaintiff has stipulated his 2013 Game Pass subscription would end at 11:59 p.m. 31 July 2014. Joint Stip. ¶ 20.

79.     If Plaintiff did nothing and allowed the NFL to charge his credit card every year, the subscription with the NFL would continue to automatically renew each year without Plaintiff doing anything at all. (Joint Stip. Ex.D, DEF0000002.)

**Reply:** Disputed. Plaintiff has stipulated his 2013 Game Pass subscription would end at 11:59 p.m. 31 July 2014. Joint Stip. ¶ 20.

80.     Despite the annually renewing subscription, the 2013 T&Cs governing the subscription provided for no end-date and thus was indefinite. (*See, generally,* Joint Stip. Ex. D.)

**Reply:** Disputed. Plaintiff has stipulated his 2013 Game Pass subscription would end at 11:59 p.m. 31 July 2014. Joint Stip. ¶ 20.

81.     The confirmation email Plaintiff received for his 2013 annual subscription asked him to visit nfl.gamepass.com to enjoy his Game Pass subscription, and to email gamepass.support@nfl.com to cancel his subscription. (Joint Stip. Ex. E.)

**Reply:** Not Disputed.

82.     When Plaintiff's credit card information expired, Defendants informed him by email. Specifically, in July 2017, Plaintiff received an email from "Your NFL.com Team" reminding him to update his billing information prior to the end of the football season. (Joint Stip. Ex. G.)

**Reply:** Not disputed only to the extent that the e-mail in question was sent.

83.     Thereafter in 2017, Plaintiff updated his credit card information on his Game Pass account. Plaintiff merely enabled his subscription to renew, and there is no evidence that he agreed to any new terms or agreements, and Plaintiff has no memory of agreeing to any new terms or agreements. After Plaintiff updated his billing details, his subscription for the 2017-2018 season

auto renewed for the 2018-2019 season, which was from August 2, 2018 through August 1, 2019. (Joint Stip. Ex. G; Gill Deposition 22:21, 24:05, 53:17.)

**Reply:** Disputed to the extent it implies Plaintiff auto-renewed for the 2017 NFL Season, he did not. See ¶ 30 *infra* and Boigon Dec ¶ 12.

84.    The July 2017 email from the NFL instructing Plaintiff to update his billing details did not identify NFLI as the contracting counterparty of the 2017 Terms & Conditions or Perform Media as the new third party service provider, and Plaintiff could not have agreed to any new counter parties to the agreement. (Joint Stip. Ex. G.)

**Reply:** Disputed. Plaintiff manually registered for a seven-day free trial period for the 2017 NFL Season and by doing so, and then extending the subscription for the entire season, agreed to the Terms and Conditions applicable to that season. ¶¶ 31, 32 *infra*.

85.    There is no record of any other email being sent by the NFL identifying this change in the 2017 Terms & Conditions or Perform Media's replacement of NeuLion. (Boigon Deposition 14:3-5.)

**Reply:** Disputed to the extent that it implies NeuLion continued on in any capacity in connection with Game Pass International or that Perform had the same or similar role as NeuLion. By June 2019, Plaintiff was provided notice of Overtier Operations and Deltatre S.p.a. being the NFL licensee and provider respectively. Joint Stip. ¶¶ 25, 26, 27.

86.    In June 2018, NFLI and Overtier entered into an agreement such that Overtier would operate Game Pass in Australia. (Joint Stip ¶ 10.) The Terms & Conditions effective in 2018 did not modify the 2017 T&Cs to reflect this material change. (Leghorn Declaration, Ex. E, Dkt No. 75-5.) Nor were emails sent to Game Pass subscribers notifying them of this change. (*See*

{N2191250.1 }

Joint Stip Exs.G & I, containing an email from July 2017 and an email from June 2019, with no intervening emails.)

**Reply:** Disputed to the extent that it implies terms and conditions prior to the 2019 NFL Season continued uninterrupted. As to the sole issue to be determined as to the construction of the operative contract for the 2019 NFL season, it is undisputed that Plaintiff contracted with Overtier Operations and Deltatre S.p.a. with their corresponding Terms and Conditions. (Joint Stip. ¶¶ 25, 26, 27)

87. In June 2019, NFL Game Pass updated its Terms & Conditions (hereinafter, "2019 T&Cs") such that it was completely different from its previous iterations in both appearance and substance. Among the changes, Overtier and Deltatre were identified as the contracting counterparties of the Terms & Conditions, and all NFL-related entities were removed from the Terms & Conditions as parties to the agreement. (Joint Stip Ex. J, DEF0001521.)

**Reply:** Not Disputed.

88. In June 2019, when Plaintiff was not on notice that there had been any changes to the Terms & Conditions, Plaintiff received an email signed "NFL Game Pass" stating that "we're updating our service provider…" The remainder of the email discussed Game Pass features and instructions on updating the mobile app. The email contained the NFL logo and used the words, "we" or "we're" four times, and the word, "our," once. (Joint Stip Ex. I.)

**Reply:** Disputed to the extent Plaintiff seems to be claiming he was unaware of any Terms and Conditions for the 2014, 2015, 2016, 2017 and 2018 seasons. First, that would be Plaintiff's failing in never reading or even looking for them (Gill Deposition, p.10 L21-24, p.18 L2 - p20 L7, Ex G to Defendant's Motion for Summary Judgment). Second, the terms and conditions prior to

2019 are irrelevant to the 2019 NFL season in that by that time, Plaintiff was contracting solely with Overtier Operations and Deltatre S.p.a. (Joint Stip. ¶¶ 25, 26, 27).

89.    On July 1, 2019, while Plaintiff was still not on notice that there had been any changes to the Terms & Conditions, Plaintiff received another email from "NFL Game Pass," reminding him that "we're updating our service provider," informing him that his Game Pass subscription was to auto-renew in 31 days, and that he did not need to take any action if he wished to continue his Game Pass subscription. The remainder of the email discussed updates to NFL Game Pass features. The email contained the NFL logo and used the words, "we" or "we're" four times, and the word, "our," once. (Joint Stip Ex. K.)

**Reply:**  Disputed to the extent Plaintiff seems to be claiming he was unaware of any Terms and Conditions for the 2014, 2015, 2016, 2017 and 2018 seasons.  First, that would be Plaintiff's failing in never reading or even looking for them (Gill Deposition, p.10 L21-24, p.18 L2 - p20 L7, Ex G to Defendant's Motion for Summary Judgment).  Second, the terms and conditions prior to 2019 are irrelevant to the 2019 NFL season in that by that time, Plaintiff was contracting solely with Overtier Operations and Deltatre S.p.a. (Joint Stip. ¶¶ 25, 26, 27).

90.    Plaintiff never downloaded the Game Pass application on his phone because he never used his subscription through his phone. (Gill Deposition 72:18-20; and 73:03.)

**Reply:**  Not Disputed.

91.    On August 28, 2019, Plaintiff received an email from "NFL Game Pass" welcoming him back and providing him a "quick guide" of the subscription's features.  The email also stated that Plaintiff's Game Pass subscription would last until August 1, 2020. The email used the NFL logo and the words, "we're" and "we've," despite Plaintiff not being on notice that all NFL parties had been removed from the Terms & Conditions. (Joint Stip Ex. O.)

{N2191250.1 }

**Reply:** Disputed. Plaintiff was on notice that no NFL entity was contracting with him for the 2019 season no later than June 19, 2019. (Joint Stip. ¶¶ 25, 26, 27)

92.     On October 29, 2019, without Plaintiff having any prior notice that the NFL parties had been removed from the Terms & Conditions, Plaintiff received an email from "NFL Game Pass" that was directed to NFL Game Pass Australian subscribers only, again using the NFL logo and the word, "we." (Joint Stip Ex. P.)

**Reply:** Disputed. Plaintiff was on notice that no NFL entity was contracting with him for the 2019 season no later than June 19, 2019. (Joint Stip. ¶¶ 25, 26, 27)

93.     The email informed Plaintiff that "we are making" updates to "our Terms & Conditions" that would take effect as of the date of the email, i.e., October 29, 2019. The email stated that if Plaintiff used Game Pass on or after that date, he would be agreeing to the updated Terms & Conditions. The email included a link to the updated Terms & Conditions, and a link to FAQs providing more information on the updates. (Joint Stip Ex. P.)

**Reply:** Not Disputed.

94.     The updated 2019 T&Cs identified Overtier and Deltatre as the contracting counterparties, and all NFL parties had been removed from the Terms & Conditions. (Joint Stip Ex. Q.)

**Reply:** Not Disputed.

95.     None of the emails advised Plaintiff that the Terms & Conditions were completely different from the previous iterations with new counterparties and new terms. Nor do they say that Plaintiff would be agreeing to the brand-new Terms & Conditions upon auto-renewal of his Game Pass subscription. (Joint Stip Exs. G, I, K, L, O, P.)

**Reply:** Disputed to the extent Plaintiff is trying to add terms to the various yearly Terms and Conditions which were each for one-year periods and did not extend from year to year. ¶¶ 6 & 7 *infra*.

96.    Finally, other than the October 29, 2019 email, none of the emails advised Plaintiff to review the Terms & Conditions for updates. (Joint Stip Exs. G, I, K, L, O.)

**Reply:** Disputed. The June 19, 2019 e-mail directed Plaintiff and all subscribers to the applicable Terms and Conditions which was stipulated to by Plaintiff in ¶ 40 *infra*.

97.    While each of the Terms & Conditions stated that the Game Pass *subscription* lasted a single year, and included an option of automatic renewal, it was silent as to the term length of the Terms & Conditions. (Joint Stip Exs. D, H, J, Q.)

**Reply:** Disputed. See ¶¶ 6 & 20 i*nfra*.

98.    Omitted.

99.    Plaintiff fulfilled his obligations under the 2013 T&Cs. His card was charged periodically, and his subscription was automatically renewed. And, as required under the 2013 T&Cs, Plaintiff updated his credit card information on his Game Pass account in July 2017. Thereafter, his account automatically renewed, once again. (Gill Deposition 76:03-09; Joint Stip, Exs. G, H)

**Reply:** Disputed to the extent Plaintiff is trying to allege that the 2013 Terms and Conditions continued uninterrupted through the 2019 NFL season. For all the reasons set forth before herein and the accompanying memorandum of law, it did not.

100.    Plaintiff did not have actual notice of the new 2019 T&Cs and had never heard of Overtier and Deltatre. (Gill Deposition 53:17.) While Defendants claimed he opened his email, that is disputed. (See par. 88, above.)

**Reply:**  Disputed.  Plaintiff was on notice that no NFL entity was contracting with him for the 2019 season no later than June 19, 2019.  (Joint Stip. ¶¶ 25, 26, 27)

101.    In June 2018, NFLI contracted with Overtier to operate NFL Game Pass in Australia.  However, the 2018 Terms & Conditions were not updated to reflect this change or the nature of Overtier's role in Game Pass. (Boigon Deposition 14:3-5.)

**Reply:**  Disputed to the extent Plaintiff is alleging that the 2018 Terms & Conditions are applicable to this case or were effective beyond the 2018 NFL season.  (Joint Stip. ¶¶ 25, 26, 27)

102.    Plaintiff did not update his Game Pass app, as he never used the GamePass app, but instead used his laptop to access Game Pass. (Gill Deposition 72:18-20; and 73:03.)

**Reply:**  Not Disputed.

103.    On July 16, 2019, Plaintiff received a similar email from "NFL Game Pass," with a reminder for him to update his Game Pass app.  (Joint Stip ¶ 30, Ex. L.) The email once again misleadingly used the term "we" next to the NFL Game Pass logo, without identifying that the "we" had actually changed to third parties that Plaintiff had never heard of. (Id.) Plaintiff did not update his Game Pass app, as he never used the GamePass app, but instead used his laptop to access Game Pass. (Gill Deposition 72:18-20; and 73:03.)

**Reply:**  Not Disputed as to Plaintiff not using an app for his Game Pass subscription.  As to the balance, Plaintiff ignores that the e-mail bears the name of Deltatre and wrongly, without legal support, tries to allege a licensee of a famous logo can not use it without creating some relationship between the licensor and the end-user.  (Joint Stip. ¶¶ 25, 26, 27).   Reply Memorandum of Law

104.    Defendants argue that Plaintiff signed up for a seven-day free trial in 2017, and then manually paid and registered for NFL Game Pass in 2017 and 2018, and therefore he did not auto-

renew his subscription. In support of their position, Defendants point to backend data maintained and collected by NeuLion. (See 108 below and 99 above.)

**Reply:** Not Disputed except to the extent Plaintiff claims "back and data" in any manner affected the Terms and Conditions for either 2017 or 2018 NFL seasons.

105. However, the information provided in that spreadsheet is unreliable. For example, in the "subscription order" tab, it shows that Plaintiff participated in a seven-day free trial and was subsequently not charged and did not make any payment for the 2017-2018 season. (Boigon Dec. Ex. A, ¶¶ 12-15.)

**Reply:** Disputed. Plaintiff has submitted no evidentiary support for this contention when Plaintiff has access to his credit card account information and has not produced any to support his position. Similarly, the spreadsheet information has been authenticated by both the Johnston and Boigon Affidavits and stipulated as authentic business records at the most recent court conference.

106. The spreadsheet also says that Plaintiff did not auto renew his subscription. However, Plaintiff only recalls updating his credit card information, and maintains that he always auto renewed his subscription. (*Id.;* Gill Deposition, 76:03-09.)

**Reply:** Disputed. As has been documented, Plaintiff did not auto-renew as shown by both the Boigon and Johnston affidavits and Plaintiff has failed to submit any documentary evidence to support this contention.

107. The NFL is suggesting that there were additional contract terms that Plaintiff agreed to for the 2017-2018 season, without producing evidence of those terms, in stark contrast to Plaintiff's contention that he agreed to no new terms in after the initial 2013 T&Cs. (*See, for e.g.,* Gill Deposition 22:21, 24:05, and 53:17.)

**Reply:** Disputed. Defendants' position is that he entered into a new, stand alone, contract for the 2019 NFL season and by Plaintiff's use of Game Pass International accepted those Terms & Conditions with Overtier Operations and Deltatre S.p.a., not with any NFL entity. Defendants' Rule 56.1 Statement ¶¶ 39-67.

108. Defendants also read the Overtier spreadsheet to say that Plaintiff used a Visa credit card for both the 2017 and 2018 seasons, and that neither were auto renewed. However, this spreadsheet is vague, confusing, and completely lacking in evidentiary foundation. For example, the NFL's representative, Mr. Boigon, attached this spreadsheet to a declaration. However, during Mr. Boigon's deposition, he refused to comment on any document that was created by Overtier. (*see* Boigon Deposition, 32:7-11, 34:14-19, 40:13-20, 42:18 – 43:10, 45:16 – 46:4, 47:21-25, 48:16-24.) Furthermore, there is no evidence about who created this spreadsheet, when it was created, and what the columns mean. In contrast, Mr. Gill has stated that his subscription auto-renewed each year. (Gill Deposition, 76:03-09.)

**Reply:** Disputed. The Boigon and Johnston Affidavits fully explain the spreadsheet in question. As to the Boigon deposition testimony, Mr. Boigon is an employee of NFLI and was not in a position to answer under oath questions as to a Deltatre document and Plaintiff elected not to depose Deltatre. The Johnston affidavit provided the full evidentiary support for all of the Deltatre documents.

109. Because Defendants categorize the third-party vendors, Perform Media and Overtier, as "data processors" under the General Data Protection Regulation or "GDPR" (i.e., service providers that could only process personal data on behalf of the main controller, which is the NFL entity group), rather than "data controllers" (i.e., a business that can itself determine the purpose and means of processing data). (Joint Stip Ex. G, Article 28 GDPR.) It does not make

{N2191250.1 }

sense that consumers would not have purportedly contracted for Game Pass directly with third-party vendors, Perform Media and Overtier, for because these two vendors were simply "data processors" under the General Data Protection Regulation ("GDPR"); data processors can only process personal data on behalf of the main controller, which is the NFL entity group. *See* GDPR Arts. 4, 28. By contrast, the "data controller" (i.e., the NFL entity group) would be in a position contract with directly with consumers, determine the purpose and means of processing, and be responsible for communicating and responding to consumers. *See* GDPR Arts. 4, 12-23; *see also e.g.,* Cal. Civil Code §1798.140 (similar California law for "service providers" only acting on behalf of a "business").

**Reply:** Disputed. Plaintiff continues its fiction of claiming an NFL entity was a contracting party with Plaintiff for the 2019 NFL season. Plaintiff was in contract with Deltatre, S.p.a. and Overtier Operations. Defendants' Rule 56.1 Statement ¶¶ 39-67.

110. The contract between the NFL and vendor NeuLion states that, "Any and all Subscription Services hereunder will be "white label" services, which will be exclusively branded by NFL without any attribution to NeuLion except to the extent pre-approved in writing by Company... ." (Kronenberger Declaration, Ex. A, DEF0001273). The contract also states, "The content derived from NewLion's services hereunder (collectively, the "Work") shall be deemed to be "works made for hire" for Company under federal copyright laws ... ." (*Id*. at DEF0001279.)

**Reply:** Disputed to the extent that Plaintiff implies NeuLion had any role in the provision to Plaintiff in 2019 of his NFL Game Pass International subscription. Only Overtier Operations and Deltatre S.p.a. were in contract with Plaintiff for the 2019 NFL season. Defendants' Rule 56.1 Statement ¶¶ 39-67.

Dated: New York, New York
      July 29, 2022

                            Respectfully submitted,

                            LONDON FISCHER LLP

                            *Thomas A. Leghorn*

By: _____

                            Thomas A. Leghorn
                            Jason M. Myers
                            *Attorneys for Defendants*
                            National Football League and
                            NFL Enterprises LLC
                            59 Maiden Lane
                            New York, New York 10038
                            (212) 972-1000
                            Fax (212) 972-1030
                            File No.: 810.0567597

{N2191250.1 }