UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SIETEL SINGH GILL, individually and on behalf of other similarly situated individuals,

Plaintiffs,

v. 21 Civ. 1032 (PAE)

NATIONAL FOOTBALL LEAGUE, a New York unincorporated association, and NFL ENTERPRISES, LLC, a Delaware limited liability company,

Defendants.

------------------------------x

New York, N.Y.
January 20, 2023
10:00 a.m.

Before:

HON. PAUL A. ENGELMAYER,

District Judge

APPEARANCES

POLLOCK COHEN LLP
Attorneys for Plaintiffs
BY: RAPHAEL JANOVE
ADAM L. POLLOCK

LONDON FISCHER LLP
Attorneys for Defendants
BY: THOMAS A. LEGHORN
BENJAMIN RANALLI

ALSO PRESENT:

JOSHUA BROOKS, Pollock Cohen Paralegal

THE COURT: I'm calling the case of Gill v. National Football League, 21 Civ. 1032.

Who do I have for the plaintiff, Mr. Gill?

MR. JANOVE: Good morning your Honor, Rafael Janove for plaintiff. Along with me is Adam Pollock, and Josh Brooks who is a paralegal at our firm.

THE COURT: Good morning to all three of you.

And for the defense.

MR. LEGHORN: Good morning, your Honor. Thomas Leghorn for NFL, along with my associate Benjamin Ranalli.

THE COURT: Good morning. First of all, I want to wish everyone a happy new year. I'm mindful that I think twice we've attempted to have this hearing and twice COVID, not for the first time, has gotten in the way. So, let me just express the hope that everybody who took ill with it and whose illness or exposure prevented our hearings from going forward is all better.

MR. LEGHORN: All better. Thank you, your Honor.

THE COURT: Glad to hear that.

I also want to thank you for the very substantial series of presentations on the discrete issue that we're here on. I've given a lot of thought to it. I have some considered views about the range of issues presented on the essential issue of whether or not summary judgment can be granted to the defense on the issue of whether the named defendants were not

contract parties to Mr. Gill. In consequence, I think the most sensible way to proceed here is by my directing the discussion rather than having plenary argument to focus on discrete issues that are on my mind.

What I'd like to do is just begin by having my law clerk hand to all counsel a chart. So let me have it handed out. We'll mark it, and then I'll explain what I propose to do just to start our discussion.

I'll ask my law clerk to mark this as Court Exhibit A and we will put it on the docket so that, to the extent anyone is looking at this argument transcript, there is a reference point for it.

What Court Exhibit A is, it's really a grid. The horizontal axis reads "Subscription Terms and Conditions" and the vertical axis lists the different years for which different terms and conditions exist. What I'm trying to do is, at the outset, make sure I understand what each side's position -- we'll get to the legal reasoning underlying your views in a few moments, but I want to make sure that I understand what all of you believe.

So let's begin with the plaintiffs. First issue is which terms and conditions apply to which, if you will, NFL seasons. So my understanding is that, to begin, you agree that, for the 2013 NFL season, the 2013 terms and conditions apply to Mr. Gill.

MR. JANOVE: Correct, your Honor.

THE COURT: And your view is then that for all of the ensuing seasons, none of the updated or the ensuing terms and conditions apply to your client, whatever applicability they might have hypothetically to a person who, for the first time, started to use Game Pass in those later years, whatever relevance they might have to somebody else, your position is that none of those apply to Mr. Gill.

MR. JANOVE: Correct, your Honor. And just so I may clarify, we will argue that to the extent they would apply to Mr. Gill, the outcome would be the same.

THE COURT: If they --

MR. JANOVE: If they were to apply the subsequent terms and conditions, we would still argue you should deny NFL's motion.

THE COURT: Let's go to the other column here under Mr. Gill, which has to do with who the customers' counterparties are.

So I take it you agree that his counterparties for the 2013 season were the NFL and NFLE; correct?

MR. JANOVE: Correct.

THE COURT: It follows then, I take it from your perspective, if none of the ensuing terms and conditions apply to him, it therefore must be that for any ensuing season that he was receiving Game Pass paid by his credit card that

counterparties identified in that first set of terms and conditions to which he was bound, meaning NFL and NFLE, are also his counterparties?

MR. JANOVE: Correct.

THE COURT: Thank you.

Let me turn to you, Mr. Leghorn. Let's start off with your position as to which terms and conditions apply. I take it it's undisputed that for the 2013 season, the 2013 terms and conditions apply?

MR. LEGHORN: Yes, your Honor.

THE COURT: And then your view is that for each ensuing season -- well, let's go one by one. For 2014, it would be the 2014 to 2015 terms and conditions; correct?

MR. LEGHORN: Starting with 2014 rather than NFLE, it was --

THE COURT: Sorry. We'll get to the counterparties. I'm just looking at the first column here. The issue is syncing seasons to terms and conditions, so the first column under defendants' position.

Am I correct that your view is that when Mr. Gill was obtaining NFL Game Pass for the 2014 NFL season, your view is that the 2014 to 2015 terms and conditions apply to him?

MR. LEGHORN: Yes. I only hesitate because the way you have it listed here, I guess you're using -- looking at the first entry under defendants' position, 2013 to 2014 --

THE COURT: That's the NFL season because it extends into --

MR. LEGHORN: Right. But the terminology would be that would be the 2013 season.

THE COURT: Okay.

MR. LEGHORN: The postseason fell in '14, so '14 terms and conditions would be in the next column. Just clarifying that nomenclature here --

THE COURT: Right, because the NFL season, unlike the baseball season, spans two calendar years, we were being precise about it. But I certainly intend, when I write 2014 to 2015, to mean the season begins around Labor Day of 2014.

MR. LEGHORN: Understood, your Honor. And yes, there is no dispute with that first line all across.

THE COURT: Well, I'm going down, I'm doing vertically.

MR. LEGHORN: Understood.

THE COURT: So for the 2015 terms and conditions, your position is that they govern both the 2015 and 2016 season, but also the next season insofar as, as I understand it, there is not a new set of terms and conditions that rolled out in 2016; is that correct?

MR. LEGHORN: Correct. So the second and third line --

THE COURT: Is the chart; correct?

MR. LEGHORN: Correct.

THE COURT: And then in 2017, you've got new terms and conditions, and your view is that those bind Mr. Gill for the 2017 to 2018 season; correct?

MR. LEGHORN: Correct, your Honor.

THE COURT: And same for 2018 to 2019, that is to say the 2018 terms and conditions apply to him; right?

MR. LEGHORN: Correct, your Honor.

THE COURT: And then 2019 gets a little tricky because there is a set of 2019 terms and conditions, and I take it you are of the view that those bind Mr. Gill as that season gets underway?

MR. LEGHORN: Correct, your Honor.

THE COURT: But that on October 28th, a somewhat amended, not by a lot, but somewhat amended version of terms and conditions was rolled out, and although we'll get to it later, it is communicated by email. Your view is that from that point forward, it is the updated 2019 terms and conditions that bind Mr. Gill?

MR. LEGHORN: Correct, your Honor.

THE COURT: So the chart, as to the first column under defendants' position, is correct?

MR. LEGHORN: Yes, your Honor.

THE COURT: Now let's turn to the issue of who the counterparties were.

Mr. Leghorn, there comes a point at which NFL and NFLE are succeeded, in your view, under the series of terms and conditions of NFL and NFLI.

MR. LEGHORN: Correct.

THE COURT: What year is that?

MR. LEGHORN: That is 2014, your Honor.

THE COURT: So the very next line, the first blank here should read NFL, NFLI under defendants' position; correct?

MR. LEGHORN: Correct, your Honor.

THE COURT: And I take it your view remains the same for the next three boxes, that is under the 2015, 2017, and 2018 terms and conditions?

MR. LEGHORN: No, your Honor. Just lines 2 and 3.

THE COURT: I don't know what you mean by 2 and 3.

MR. LEGHORN: So 2014, 2015.

THE COURT: Okay. And then what happens in 2017?

MR. LEGHORN: Then, starting in 2017, the NFL switched from being the contracting party through a third-party operator to a licensor to a licensee, and in 2017 and 2018, that was an entity by the name of Perform.

THE COURT: Okay. But is it your view that the NFL was no longer a counterparty of Mr. Gill under the 2017 terms and conditions?

MR. LEGHORN: Yes, your Honor.

THE COURT: And the only counterparty that Mr. Gill

had under the 2017 terms and conditions was Perform?

MR. LEGHORN: Yes, your Honor.

THE COURT: And so, as of the 2017 season when you contend that he was bound by the 2017 terms and conditions, the only counterparty he has is Perform?

MR. LEGHORN: Yes, your Honor.

THE COURT: And is that the same for 2018?

MR. LEGHORN: Yes, your Honor.

THE COURT: And then in 2019, under both iterations of the terms and conditions that year, Overtier and Deltatre are the sole counterparties?

MR. LEGHORN: Yes, your Honor, and for the following year, as well.

THE COURT: Thank you. This is helpful. I just wanted to make sure I had pinned out everybody's bottom-line conclusions.

I think what I'd like next to do then is to focus on the communications with Mr. Gill, and I think it's most fruitful here, insofar as it's defendants' motion, to begin with you, Mr. Leghorn.

Mr. Leghorn, can I ask you to just access the 2013 terms and conditions.

MR. LEGHORN: I think that's document 70-1?

THE COURT: That may be --

MR. LEGHORN: No, that's 70.

THE COURT: I've simply printed out --

MR. LEGHORN: I found them, your Honor.

THE COURT: I'm assuming if you look --

MR. LEGHORN: Yes, we're holding the same one.

THE COURT: It's document 51-1. Regardless, what I have here is I've got a comprehensive set in sequence of the terms and conditions. What I want to engage with you, Mr. Leghorn, is the very first one because that's the one where it is undisputed that Mr. Gill was bound.

MR. LEGHORN: Right. And just for clarity, its effective date, June 8, 2012, updated July 9, 2013, that would be right --

THE COURT: Correct. That's correct.

MR. LEGHORN: Okay.

THE COURT: So let me ask you, nobody's disputing that this bound Mr. Gill in that first NFL season of 2013. The issue has to do, as to this document, with what it says about the course of dealings going forward. The 2013 terms and conditions do speak to the capacity to auto renew.

What in here can you point to, if anything, that would alert Mr. Gill on the face of these as to what terms and conditions would apply to him in the event of auto renewal for a future year?

MR. LEGHORN: The fact that this is a one-year contract, it does not say that these terms and conditions will

auto renew, that this contract -- but that his ability to subscribe will auto renew. I'm just looking for it. I haven't anticipated this particular question, but somewhere in this document, it does say that these terms and conditions are subject to revision. As the witness that we put forward for the 30(b)(6) deposition, Max Boigon, who is in the group tech control, says that the subscription can auto renew, but each contract was for one finite year.

THE COURT: Right. But I'm focusing on what's communicated. Max Boigon never spoke to Mr. Gill; right?

MR. LEGHORN: No, nobody in the NFL ever spoke with Mr. Gill.

THE COURT: Right. So I'm focused on the communications to the user. So let's zero in on that.

MR. LEGHORN: Right.

THE COURT: It says here under F --

MR. LEGHORN: Under which one?

THE COURT: On the third page, it's under the boldface, billing and automatic renewal policies for certain subscription services. Under the subprovision F, it describes subscription products billed on an annual basis, which includes NFL Game Pass.

That's applicable here; correct?

MR. LEGHORN: Right.

THE COURT: And it says the term begins when you

purchase and ends before the start of the following year's NFL preseason.

MR. LEGHORN: Correct.

THE COURT: Now, I get that. Does it say something here to the user as to what the ground rules, the terms and the conditions will be for an ensuing year? Where to look? The fact that the terms and conditions may change? That sort of thing. Is there anything about that?

MR. LEGHORN: I had just found it and now I've lost it again. It indicates that these terms and conditions --

THE COURT: Show me, cite the provision. I'm not looking for your conclusion, but I'm just really trying to zero in on what was communicated verbatim to the customer.

MR. LEGHORN: What you have before you is what was communicated verbatim to him.

THE COURT: I'm giving you the opportunity to extract --

Mr. Leghorn, one of us can only speak at a time because of the court reporter.

My question is, point me to what you are relying on here that, from your perspective, alerts Mr. Gill that different terms and conditions may be in place in the event of an auto renewal.

MR. LEGHORN: First, it's that this is a finite one-year contract, that this contract exists for one year and

disappears.

THE COURT: Where does it say disappear?

MR. LEGHORN: Terminates.

THE COURT: Okay. The contract terminates.

MR. LEGHORN: The contract terminates on one year, which is at the onset of the next preseason, which is on or about July 31st, 2013.

THE COURT: Then it says with one-time billing immediately following your purchase. So that, I get that the season terminates.

Is there anything further, is there anything about the terms and conditions for the ensuing season in the event of a renewal?

MR. LEGHORN: I should have marked it when I found it. On the second page, No. 3, special terms and conditions, applicable subscription products.

THE COURT: Second page, what's the number? I'm on the third page --

MR. LEGHORN: I know, but I'm going back to the second page.

THE COURT: Okay. Go ahead.

MR. LEGHORN: I'm looking at this to see if this is the one I'm looking for. They reserve the right to modify the price. I'm looking for --

THE COURT: Mr. Leghorn, rather than narrating to me

what you're looking for, why don't you be silent until you find something that's responsive, otherwise --

MR. LEGHORN: Your Honor, I'm looking for it because I just saw it where it says when they reserve the right to notify these terms and conditions. So, therefore, with a new contract, they have the right to modify and issue new terms and conditions.

THE COURT: Again, I'm going to assume that the answer is no if you don't point me to something. I need you to point to a contract text. We're focusing on communications to the plaintiff here.

I see here, to help you out a little bit, that on page 4, about a third of the way through, under the paragraph that begins "By accepting this agreement..." It says: "By accepting the agreement, you agree that we may notify you about changes to pricing and/or the subscription products by sending an email message to your email address on file with us and by publishing such notices from time to time on the international pages of the site."

That's as close as I can get. Do you have anything else?

MR. LEGHORN: I think that's it, your Honor.

THE COURT: So just to be crystal clear, the document does not say we may change the terms and conditions, it does not say if you auto renew, ensuing terms and conditions apply.

It doesn't rule that out, but it does not say that. Is that correct?

MR. LEGHORN: It does not expressly say that, you are correct.

THE COURT: From 2013 up through the end of 2018, were there any emails to Mr. Gill that notified him of changes to terms and conditions?

MR. LEGHORN: Before Overtier took over, I cannot recall an email specifically alerting him to it, but with each successive season, whoever was the operator, even other than the NFL, with each season, would have provided a hyperlink to the then applicable terms and conditions.

THE COURT: In the record before me, and I'm deliberately stopping before the 2019 emails because we will engage about that in a moment, but in the record before me, I don't have any of those emails.

MR. LEGHORN: That is correct, your Honor, because as we mentioned, the NFLI switched from being the operator to the licensor, and once the relationship between the licensor and the interveining licensee ended, our ability to extract documents from them, who had the only contact with Gill, was beyond our control.

THE COURT: Sorry. But we had discovery on the issue that you've asked me to front-load, which is whether summary judgment can be granted to you on the grounds that the named

defendants here aren't counterparties.

Did you seek discovery from those third-party later operators to the extent that, for example, they might possess communications along the lines you're positing existed that perhaps might speak to the point?

MR. LEGHORN: Yes, we did, your Honor, and they did not retain those records, but we did get them from Overtier to establish the contract --

THE COURT: Right.

MR. LEGHORN: -- pertaining to the loss at issue.

THE COURT: Okay. But as to the years 2014 through 2018 inclusive, for better or worse, the record before me is devoid of any evidence of any email communication to Mr. Gill; is that correct?

MR. LEGHORN: Other than the terms and conditions for the interveining NFL years that we produced in addition to --

THE COURT: No. Sorry. Listen to my question.

Emailed to Mr. Gill. I don't think it's disputed that terms and conditions for the interveining year exist. The plaintiff is not disputing the existence of terms and conditions, but my focus is on the communication with your counterparty, the plaintiff.

Yes or no, is it correct that there are no emails in the record for the years 2014 through 2018 that alert him to the existing terms and conditions?

MR. LEGHORN: Yes, there are no documents in our possession responsive to your question.

THE COURT: Or that have been produced by the then operator of NFL Game Pass?

MR. LEGHORN: Correct, your Honor.

THE COURT: And I appreciate that what you're saying is it's possible that those things existed. They may simply not have been possessed at the time of your request by those operators, but for better or worse, as the record sits before me, we don't have such a thing?

MR. LEGHORN: Correct.

THE COURT: So let's then turn to 2019.

In 2019, we do have emails, and these, I think, are quite important in the case and I want to walk through them with you. Specifically, I've got four emails here in sequence, and I'll ask everyone to get those out. They are June 19th, July 1st, July 16th, and October of 2019. Specifically, I think it's October 28th.

Do you have those before you, Mr. Leghorn?

MR. LEGHORN: I have the first one in front of me. Mr. Ranalli is getting the others.

THE COURT: Let's take a moment. And plaintiffs, yes or no, do you have them before you?

MR. JANOVE: Yes.

THE COURT: Plaintiff, just yes or no, is there any

dispute that these emails were received by Mr. Gill?

MR. JANOVE: No dispute that they were received, your Honor.

THE COURT: Mr. Leghorn, do you now have all four of them?

MR. LEGHORN: I have the first one.

THE COURT: Just so as not to interrupt, why don't you take a moment and get all of them.

MR. LEGHORN: Your Honor, it would appear that in having this all spread out on my kitchen counter yesterday working on this, I somehow omitted those following three emails. I am familiar with all of them.

THE COURT: I think there's no substitute but for text because my questions to you are not going to be about what somebody thought they meant, but actual words used. My law clerk has graciously made extra copies, so she'll circulate them.

Thank you to my law clerk.

MR. LEGHORN: And I thank the wonderful law clerk, your Honor.

THE COURT: All right. Everyone now should have all four. Let's go one by one. Let's focus on the June 19th, 2019 email.

The email reads at its header: "Your NFL Game Pass subscription is getting an update." It then says: "As all 32

teams are busy preparing for the upcoming season. We wanted to share an update regarding your current NFL Game Pass subscription. Please read below to learn how this positively affects you!" The next sentence reads: "This season, we're updating our service provider as part of our commitment to providing a premium NFL experience to our fans around the world."

Does it state, Mr. Leghorn, who the new service provider is?

MR. LEGHORN: It does not in that sentence, but the bottom of the document shows the name of Overtier Operations on the bottom of the second page.

THE COURT: Saw that. So Overtier is the service provider?

MR. LEGHORN: Yes, your Honor.

THE COURT: Who, then, is "we"? Who's telling the customer that we are retaining, we're using a new service provider, who's the "we"?

MR. LEGHORN: Actually, this is Overtier's document. They are.

THE COURT: So Overtier is using the royal "we" to say that we, Overtier, are updating our service provider. Does this mean that Overtier had previously used a different service provider than Overtier before this email? That would be the implication.

MR. LEGHORN: Right.

THE COURT: And is that what it is saying?

MR. LEGHORN: What it's saying is Game Pass International is updating its service provider --

THE COURT: But wait. Where is Game Pass International?

MR. LEGHORN: Game Pass is listed at the top.

THE COURT: Sorry. Game Pass is a product. Game Pass is like saying iMac or 1% milk. It's not a company, it's a product. The problem with the sentence is if "we" refers to Overtier and the service provider refers to Overtier, what it seems to be saying is that we, Overtier, had a different service provider earlier and we're now switching to ourselves. If "we" refers to Game Pass, then "we" is referring not to an entity, but "we" is referring in some odd way to a product. Maybe that's the way people speak in the vernacular, but in the world of contract formation and figuring out who a counterparty is, you can't bring a suit against the 1% milk, you can't bring a suit against the widget, you sue the purveyor or the manufacturer.

So, I'm trying to figure out, from the perspective of the reader of this, what conclusion you would draw is as to who "we" is.

MR. LEGHORN: I understand, your Honor, and I don't think your analogy is fitting for this, because 1% milk is a

descriptive term whereas Game Pass is a trademark logo for one particular product.

THE COURT: It's a product, though, not the purveyor of the product. Somebody is selling it, somebody is marketing it. The problem is that if Overtier is the service provider, "we" is either Overtier or somebody else. It doesn't fit naturally to say that we, a product -- we, as in an anthropomorphizing thing, you're personalizing it. You're indicating it's an actor capable of volition, whether a corporate or individual actor. "We" you're saying is a product like this speaker or this pen, and I'm having difficulty understanding how Mr. Gill, receiving this, would understand "we" in this context. Why would he understand that, from this email, the only entity associated with the Game Pass product is Overtier?

MR. LEGHORN: And I think it's because in the digital world, Game Pass exists as a product that is only accessible through being a subscriber to it. So Game Pass has just been the span of Mr. Gill's subscription passed from NFLE to NFLI, to Perform, and now to Overtier, but Game Pass has always existed as that digital entity.

THE COURT: Well, but there might have been a way for somebody with a nuanced command of the language to convey that. That's not what was said here. And the challenge is if you're Mr. Gill and you haven't gotten any emails since 2013, you get

this one that says we're updating our service provider, wouldn't the natural inference be that the "we" refers to the people who have been offering the product to you which, in his lived experience most recently, is NFLE and NFL?

MR. LEGHORN: I understand what your Honor is saying, but I think this document has to be read in its totality.

THE COURT: Is there something else in -- what else in this document --

MR. LEGHORN: Because it says for further details on NFL Game Pass International terms and conditions, including billing, please click here.

THE COURT: Where is that?

MR. LEGHORN: That's at the very end right above where Overtier's name is mentioned.

THE COURT: Now, that is in the small print at the very bottom. It doesn't say anything about any change in the entity that is offering the service; correct?

MR. LEGHORN: It does by including the attached terms and conditions, which expressly states that they're contracting with Overtier and Deltatre.

THE COURT: You're familiar, no doubt, with Second Circuit law on what is required to be communicated in order for the defendant to be bound. The question here is, is there anything in this document, which, on the record before me, is the first communication in six years with Mr. Gill that tells

him that the terms and conditions change up who he's dealing with. In other words, the Circuit makes it clear that whether the person is obligated to read the terms and conditions has everything to do with how they're advertised to the user. This is in small print at the bottom and there's nothing about it that says, for example, our terms and conditions have changed, legal liability, name of counterparty, there's nada about that.

Is there something in this communication, and the answer may just be no, that tells Mr. Gill that there's anything of consequence, including a change in who was responsible for Game Pass since 2013?

MR. LEGHORN: Let me start at the beginning of that long question, your Honor. We have not put before you any communications --

THE COURT: And you're seeking summary judgment. So on the record before me, there are no communications. If you're positing that there may be a Rosetta Stone out there that hasn't been produced, we will get that when we get to plenary discovery. But on the record before me where you're the only movant, it's as if there was no communication.

MR. LEGHORN: I take that as your premise, your Honor --

THE COURT: Is that wrong?

MR. LEGHORN: In the record, no, there is not. In the record, as well, is an acknowledgement from the plaintiff that

each of the emails were received, he routinely did not read any of them, he never clicks on --

THE COURT: Be that as it may, I'm not disputing that. That isn't my question. Plaintiff may well be responsible for terms and conditions that he was supposed to read, but under the Second Circuit law, just because a term and condition is made known to a plaintiff does not mean, automatically, that he is obliged to read it. It has to do with how it is advertised.

My question to you, unanswered, is whether there is anything here that would alert him to something of consequence that has changed in the terms and conditions, including as to who he's dealing with. I think you haven't pointed to anything. I'm giving you a last chance to do that before we move to the next email.

MR. LEGHORN: There is nothing in here that says specifically that the terms and conditions have changed, but it points out significant changes, such as the service provider, and then if they're using a desktop or a mobile app, that needs to be changed, and you need to go in and read this and see what's going on. So his being alerted as to significant changes --

THE COURT: Look, as to the desktop and whatnot, it doesn't actually -- because all of that is explained in the text of the email, one might need not review the terms and conditions to get the assistance. Indeed, it sets out step by

step whether you're using an IOS Android or an Xbox or Amazon Fire. It tells you what you need to do without having to go to the terms and conditions. I think we've gone as far as we can here, but I'm making the point that the royal "we" here is, to say the least, confusing.

Before we move from the June 19th email, let me ask plaintiff, is there anything you would want to point out about that email?

MR. JANOVE: The only thing I would want to add, your Honor, of course under Second Circuit law, it's not only noted that there also needs to be assent, and here at the bottom where you have grade-out language, which doesn't alert any changes, there is also a conspicuous absence of any sort of call to action that informs plaintiff that if they continue -- in other words, what the plaintiff would have to do to assent to new terms and conditions.

THE COURT: This is in between seasons, right. So presumably, if the language had been as clear as you posit and Mr. Gill then signed up for the ensuing 2019 season, wouldn't that be assent? In other words, if it says, hypothetically, our terms and conditions, and then it bullet points in the text of the email what they say, whatever. At that point, if Mr. Gill goes on and signs up for 2019, he's bound by that; right?

MR. JANOVE: Assuming you get to clear notice first.

I'm really pointing out that it's not just notice. You also have to get to assent, and both of those features are lacking in this email.

THE COURT: I'm focused here on what put Mr. Gill on notice that, as defendants claim, the new people he is dealing with are Overtier and Deltatre.

By the way, Mr. Leghorn, am I correct that Deltatre is not referenced anywhere on the face of this document, on the email --

MR. LEGHORN: On the email, no, just on the terms and conditions.

THE COURT: Let me just go to plaintiffs as to this email. What is your view as to what a person reasonably reading this email would understand "we" to refer to in the second paragraph?

MR. JANOVE: Your Honor, as "we" most reasonably would be interpreted as the NFL. This language closely parrots the 2013 terms and conditions and all subsequent terms and conditions until 2019, which are along the lines of "we," the NFL, contract with a third-party service provider whom they change from time to time. So if I were reading the terms and conditions in these subsequent emails, the reasonable interpretation would be, oh, the NFL updating the service provider, that's something they've always done.

MR. LEGHORN: Your Honor, may I just -- the email

we're referencing, I understand the Court's questions, one could understand the "we" to mean the NFL, but I think what's getting lost, as well, is that this is not a document issued by the NFL, this is a document that was issued by Overtier.

THE COURT: Well, wait a minute. Do we have the email address that was used that would have presented to Mr. Gill when he received this document?

MR. LEGHORN: That was in the attachments to the next Boigon affidavit.

THE COURT: I don't have it handy before me. What was the email address?

MR. LEGHORN: The email address was as part of the license that they used the NFL Game Pass.

THE COURT: So is the name of the product was the email address?

MR. LEGHORN: Yes.

THE COURT: The problem with that, Mr. Leghorn, is that it is opaque as to what entity lies behind the product.

MR. LEGHORN: It does, but, as you pointed out --

THE COURT: In other words, it would be a little bit like saying Amazon Prime. Now, Amazon Prime is a product, a person might reasonably assume that Amazon was behind it, much as NFL Game Pass, a person might assume the NFL is behind it. But, ultimately, the thing that is held out as the communicator is curiously the product itself as opposed to the entity behind

it.

MR. LEGHORN: Right. But as you pointed out, I'm here on a motion for summary judgment and I have my own particular burden, but we're beyond the motion to dismiss stage. At this point, the plaintiff falls short of their burden in proving that this document came from the NFL.

THE COURT: I'm asking him, rather, what inference a person would draw, and he made an argument as to the inference. I don't think this has to do with burdens. His argument is the last person I spoke to was the NFL. On the record before me, there has been stone cold silence for six years and then we get a royal "we," reasonable person would assume that we're picking up the conversation.

Let's move on to the next email, which is July 1, 2019. This one has the same ending language in which it, in smaller print, identifies Overtier, but not Deltatre, and it also says: "For further details on Game Pass and terms and conditions, including billing, click here."

As to the text of this communication, which reads: "Important email about your NFL Game Pass subscription." Is there anything of consequence here, Mr. Leghorn, that is different from the June 19th email? Is there any way that this email helps your cause in a way that isn't already covered by the June 19th email?

MR. LEGHORN: Just giving it another quick perusal.

The only difference here is that now, as the season is approaching, this is being more explicit on the second page that the subscriber has the opportunity to opt out, cancel, order, renew, and not do it. Otherwise, after August 1, the payment's going to kick in.

THE COURT: It basically says if you want to continue your Game Pass subscription, no action is required.

MR. LEGHORN: Correct.

THE COURT: And if you want to opt out, here's what you do.

Is there anything else of any relevance of this email to the issue before us?

MR. LEGHORN: No, it has the same Deltatre and, as you've already pointed out, the same --

THE COURT: Wait a minute. Wait a minute.

MR. LEGHORN: Excuse me. I meant Overtier.

THE COURT: Deltatre, in fact, again, the alleged co-purveyor is not mentioned here; correct?

MR. LEGHORN: Right. And just for clarification for the record, not anything to do with this. Overtier was the licensee and Deltatre was the platform by which the service was actually provided.

THE COURT: Maybe so, but from the experience of the user, we're talking about contract understanding and formation, Deltatre doesn't surface unless you look at the terms and

conditions.

MR. LEGHORN: Correct, your Honor.

THE COURT: And the use of the word "we" here, additionally, we wanted to let you know — that's still, from your perspective, the product talking?

MR. LEGHORN: Correct, your Honor.

THE COURT: And whereas from the plaintiffs' perspective, "we," although not self-defining, the plaintiffs argue that, in the mind of a person like Mr. Gill, may trace back to the one time that it identified interlocutory was identified, which was in 2013; correct?

MR. JANOVE: Correct.

THE COURT: Is there anything, Mr. Janove, you want to draw my attention to in the July 1 email or is it functionally the same as June 19th?

MR. JANOVE: Nothing to add, your Honor.

THE COURT: Then we get to July 16th. That, Mr. Leghorn, appears to be of the same nature. It doesn't change anything from the prior two emails; correct?

MR. LEGHORN: We've touched upon everything, nothing more.

THE COURT: Nothing new. Then we get to the one that is of a different character, October 2019. This one reads: "Updates to terms and conditions. We are writing to let you know about updates we are making to our terms and conditions.

These updates apply to all existing NFL Game Pass Australian subscribers only, and take effect on October 29, 2019.

"We invite you to please review the new terms and conditions in full here. You can also learn more on our FAQ's page here.

"If you continue to use our products and services on or after October 29, 2019, you are agreeing to the updated terms and conditions.

"Thank you for being part of the continuous growth of the NFL on Australia."

Then it's signed by the product, NFL Game Pass.

Then I take it the small print at the bottom is the same as on the preceding three emails; correct, Mr. Leghorn?

MR. LEGHORN: It appears to be identical, but I think it's slightly bigger.

THE COURT: I can't say I agree with that, but nothing turns on that; right?

MR. LEGHORN: Right, there is nothing significantly different in that final paragraph.

THE COURT: Is it your view, Mr. Leghorn, that under Second Circuit law, if, as of the moment before receiving this email Mr. Gill had not been obliged to look at any ensuing terms and conditions, is it your view that the October 2019 email, under Second Circuit law, was sufficient to alert him to consequential changes to the terms and conditions so as to put

him on notice of those, inquiry notice?

MR. LEGHORN: My reading of the Second Circuit law, and needless to say, I'm sure we've all disagreed at times with the Second Circuit, but my reading is that what preceded this was sufficient, that in the digital age and browser app rulings, that when someone such as Mr. Gill is partaking of a digital product, that when the terms and conditions are made available to him and he chooses not to look at them, that he would be bound to them. But I think the document we're now looking at really makes all of that irrelevant because at this point, which predated the 2020 Super Bowl, he had no excuse for not looking at it or learning it.

THE COURT: Well, he may or may not have had an excuse. The issue is whether he was on inquiry notice. We get stuff all day long, I'm sure you do, too, and some of it we're under an obligation to read and some of it we're not.

What's your best case authority that says that language like this, which doesn't direct him to any specific change work by the terms and conditions, isn't enough to put him on inquiry notice, among other things, that the terms and conditions identify different counterparties than the ones he last dealt with?

MR. LEGHORN: I think the one I had made a note of was *Meyer v. Uber Tech*, a Second Circuit case, and we cited it in our brief. The link terms and conditions under that case are

enforceable --

THE COURT: Speak into the mic. Lost the last sentence.

MR. LEGHORN: Such an agreement enforceable under the Mayer case, as long as the party to the agreement had actual and constructive notice of it.

THE COURT: Of the what?

MR. LEGHORN: Of the terms and conditions.

THE COURT: Sorry. Of the terms and conditions or of the general nature of the terms and conditions?

MR. LEGHORN: Of the terms and conditions.

THE COURT: I mean, the terms and conditions here, there's nothing about this email that tells you that something important has changed as opposed to that in some unspecified way they've changed; right?

MR. LEGHORN: Correct.

THE COURT: Is there anything about the context of this email that would alert the user in Mr. Gill's position that something more than a technicality had changed?

MR. LEGHORN: Well, my belief, my interpretation of this document is not conveying that there's only some minor or technical change here. They're saying there are changes to the terms and conditions, and this will apply to all existing Australian subscribers.

THE COURT: What were the most important changes that

this email communicated, put aside Mr. Gill's experience under which, on the record before me, he had had no communication with anybody until the June email of this year, from the perspective of the changes in the terms and conditions for Australian subscribers, what were the biggest changes that this new set of terms and conditions made over its predecessor?

MR. LEGHORN: The only changes that came into being in October of 2019 were items required under Australian consumer law to be included for any online subscriptions.

THE COURT: Got it.

MR. LEGHORN: Consumer law, consumer privacy issues.

THE COURT: Okay.

MR. LEGHORN: But the updated terms and conditions, you know, this doesn't say only look at that.

THE COURT: Look, I appreciate that the updated terms and conditions do say Overtier and Deltatre, that was not the purpose of the updated terms and conditions because had Mr. Gill reviewed the earlier ones, the predecessor did, too.

MR. LEGHORN: Correct.

THE COURT: But the purpose of this update, for better or worse, was I gather then to bring the terms and conditions into conformity with current Australian privacy law; is that about right?

MR. LEGHORN: That's correct.

THE COURT: And were those big changes in privacy law

or technicalities?

MR. LEGHORN: No, the change was necessary because prior to this year, Overtier had not had Australia as one of their designated territories of their license. So they had to update the terms and conditions for Australia to bring it in line.

THE COURT: Sorry. I thought Mr. Gill was in Australia at all times, no?

MR. LEGHORN: No, yes, but Overtier Deltatre was not providing the service in Australia prior to that. They were providing it for the NFL in other parts of the world.

THE COURT: I see. So when Overtier and Deltatre get into this line of work, they're working for the NFL elsewhere?

MR. LEGHORN: Yes, for the two years that Perform had the license for Australia, Overtier and Deltatre were providing this service elsewhere in the world.

THE COURT: For the NFL?

MR. LEGHORN: For the NFL Game Pass, correct. I'm sorry. For NFLI, yes, your Honor.

THE COURT: And at what point, from your perspective, do Overtier and Deltatre, to the exclusion of the NFL, NFLI, NFLE, just Overtier and Deltatre, at what point did they become exclusively responsible for Game Pass in Australia?

MR. LEGHORN: April of 2019, your Honor.

THE COURT: Prior to April of 2019, is it your

understanding that NFLI was also responsible for NFL Game Pass in Australia?

MR. LEGHORN: No, your Honor.

THE COURT: I'm confused.

MR. LEGHORN: NFLI was licensor for the Australian --

THE COURT: Up through April 2019?

MR. LEGHORN: Correct. Right.

THE COURT: Did NFL have any role in all this as of April 2019?

MR. LEGHORN: No, it was just NFLI.

THE COURT: When did NFL, as to Australia, drop out of the picture?

MR. LEGHORN: Did NF --

THE COURT: NFL, when did NFL, the football league, drop out of the picture?

MR. LEGHORN: Well, NFL itself has never really been the entity providing it. In the initial year in which Mr. Gill subscribed, NFL was providing it through New Lion, and then the NFL went through one of its restructurings, and the international online services went with NFL International, NFLI. So from the second year of Mr. Gill's subscription through the operative dates of this complaint, it was NFLI as the licensor.

THE COURT: And the licensor, NFLI, it remained the licensor through April of 2019. Understanding that this is not

visible to Mr. Gill, what was it that happened in April 2019 that eliminated NFLI as relevant?

MR. LEGHORN: No, NFLI at that point -- the only thing that happened in April of 2019 was the switch from licensing from NFLI to Perform, it then became NFLI to Overtier.

THE COURT: How did that happen? Did Overtier buy something from NFLI?

MR. LEGHORN: It was NFL non-renewed Perform and extended the geographical territory of Overtier to include Australia.

THE COURT: Right. What I'm trying to figure out is your big picture point here is that before the interruption in the 2020 Super Bowl, the only entities that had any hand in the provision of Game Pass, whether as a service provider or anything, a licensor, were Overtier and Deltatre that, at some point prior to that point, apparently in or around April, the entity previously known as NFLI or whatever vanishes, and I'm trying to understand how that happened.

MR. LEGHORN: It was just a matter of the licensor breaching a contract with the new licensee.

THE COURT: But I mean, is there a new licensor?

MR. LEGHORN: No, it's the same.

THE COURT: Who is it?

MR. LEGHORN: NFLI.

THE COURT: So is NFLI still the licensor after April

2019 and through and into 2020?

MR. LEGHORN: Yes.

THE COURT: So Overtier and Deltatre operate this service, they're the licensee, but NFLI, in fact, is still the licensor as of the 2020 Super Bowl?

MR. LEGHORN: Yes, your Honor.

THE COURT: Helpful. Is there anything that you want to draw to my attention to about the text of the October 2019 email that you believe is sufficient under Circuit law to put Mr. Gill on inquiry notice as to the content of the new terms and conditions?

MR. LEGHORN: Yes. It's drawing specific attention to new terms and conditions, inviting him to please review them and click here for them in full, and Paramont's words, it expressly states if you continue to use our products and services after October 29th, 2019, you are agreeing to the updated terms and conditions.

THE COURT: Now, let's suppose the new terms and conditions had required that, for the first time, a particular arbitral forum be used to resolve a dispute whereas, beforehand, and hypothetically, there had not been an arbitration clause — it's a hypothetical — or something else of consequence like that. Is it your view that notice like this that doesn't spell out or doesn't identify the nature of the change, that this notice is sufficient to put the counterparty

on inquiry notice of such a modification?

MR. LEGHORN: My argument is yes.

THE COURT: I know that's your argument. Is there authority for it?

MR. LEGHORN: I did not look to that because that's not what we're arguing in the case here.

THE COURT: Look, the relevant point here is not about arbitration, it's the change in the counterparty. I appreciate that because of the perhaps unique journey of Mr. Gill, he, and maybe he alone, was unaware of the change in counterparties because he hadn't had any communication since 2013, but it's a practical matter in his experience, on the record before me, that's what he stands to learn about it if he reads the new terms and conditions.

MR. LEGHORN: He may, but I do recall that -- just as to your hypothetical, your Honor, the prior terms and conditions before, before being updated in October 2019, because it did, in fact, cover a number of different countries, indicated that it would be subject to the law of each jurisdiction.

THE COURT: Right.

MR. LEGHORN: So therefore, to the extent that the Australian law had such a provision, it technically was in there already, but they were doing what good regulatory lawyers would do.

THE COURT: In candor, what you have just said is clarifying because this is the sort of update that one would give if you were making ticky-tack technicality changes. There's nothing about this that — I don't think I'm going out on a limb here to say — indicates that something important has changed, it just says there's a change.

MR. LEGHORN: Right.

THE COURT: All right. After October 2019 through to the date of the Super Bowl, are there any other communications with Mr. Gill, Mr. Leghorn?

MR. LEGHORN: None pertaining to terms and conditions.

THE COURT: Are there any other ones that are germane to the controversy before me?

MR. LEGHORN: Not as to contract formation.

THE COURT: Right. As to the identity of who he's dealing with.

MR. LEGHORN: The only thing would be the annoying emails that any subscriber gets with updates or whatever that would have Overtier's name at the bottom of each, but that doesn't go to contract formation, your Honor.

THE COURT: This email comes in the middle of the NFL season?

MR. LEGHORN: Yes.

THE COURT: Mr. Gill has already paid for the 2019 season. Put aside whether he's under some obligation to read

the terms and conditions, what allows whoever is behind NFL Game Pass, to say to him, we're changing our terms and conditions in midstream where you've already paid. In other words, what is it that he's doing to signify assent, what's the consideration, if you will, that he provides in exchange for the modification that's being imposed on him?

MR. LEGHORN: I'm looking at the terms and conditions themselves, your Honor, and I'm looking at the document that's in the record at document 70-10.

THE COURT: The relevant one is the one from 2013 because that's the one that he undeniably, from summary judgment perspective, got and was responsible for accessing. It would be most useful to look --

MR. LEGHORN: You're looking back at the one --

THE COURT: I'm looking at the one that everyone agrees that he got. That would be the most useful one if you're making a point about updates to the terms and conditions.

MR. LEGHORN: Just for the record, our position is that one died at the end on July 31st --

THE COURT: I understand that's your position.

MR. LEGHORN: Understood.

THE COURT: And the problem is you've not pointed me to anything that would have told him what comes in its place.

MR. LEGHORN: Your Honor, I've approached this case --

rather, plaintiff has sued the NFL over what happened in 2020. I have looked at it that the plaintiff has failed to establish in 2020, in February of 2020, that that contract continued to exist.

THE COURT: May I ask you a question?

MR. LEGHORN: Yes.

THE COURT: Did the NFL use lawyers in developing any of these contracts, terms and conditions, or communications with the plaintiff? Were there lawyers that were used in this process or was this just done by nonlawyers, the documents here? Is this the product of legal work, the terms and conditions, the communications?

MR. LEGHORN: For the period of time when they were involved, yes, lawyers were involved, but once they licensed it out, their lawyers were not the ones doing it.

THE COURT: And the problem, that may be the problem, the NFL may have perhaps not had eyes on the nature and quality of the communications thereafter.

Look, I mean, I guess the question is in various products, we see terms and conditions changing in midstream, and I'm eager to understand what permits that. If the operative terms and conditions that a person was bound to say that the purveyor can do that, that the licensor or whatever can do that, that's one thing. The issue is that, on the record before me with Mr. Gill, the one set of terms and

conditions that he is undeniably bound to is 2013. I'm looking to see if there is something there that says, essentially, in mid season, we can change terms and conditions. Do you know of anything there?

MR. LEGHORN: Other than what we looked at earlier, by accepting this agreement, you agree that we may notify you about changes to prices and/or the subscription products by sending an email message.

THE COURT: But that's --

MR. LEGHORN: And that's in that one.

THE COURT: Right.

MR. LEGHORN: The Overtier one is express --

THE COURT: I know, but the problem you have is the assumption that the Overtier one, which wasn't sent to Mr. Gill and -- look, we've covered this. The problem is it's an assumption that he's bound by it, you're moving for summary judgment here, the burden's on you.

MR. LEGHORN: Right. And back to my point, is that it is our position that we presented to the Court in unrefuted testimony that the plaintiff received each and every one of the four emails that we have discussed, he had access in each of those four emails to these terms and conditions, and with that October one, that is four months almost before the operative date of the Super Bowl, he's alerted and asked to look at this, and if he didn't like whatever change it was, this contract,

under point 5, indicates what his rights are with respect to changes. If it's a minor change, we can do it. If it's a more significant change, you can ask for a refund.

THE COURT: Thank you.

Plaintiff, anything you want to add as to the October 2019 email?

MR. JANOVE: Yes. I would like to discuss briefly Meyer, the Second Circuit case which he cited, which I do not believe is on point and direct your attention to Schnabel, which I believe is directly on point in these circumstances here.

THE COURT: Go ahead.

MR. JANOVE: So Meyer, as you know, involved a user signing up for Uber. At the point where that consumer signed up for the account, they were presented with the terms and conditions, which contain an arbitration clause. We are not dealing with terms and conditions that were presented to Mr. Gill in 2013, we are dealing with terms and conditions that were added via email years later, and there is a Second Circuit case *Schnabel v. Trilegiant Corp.*, and if I may quote from that.

THE COURT: Please.

MR. JANOVE: Which I believe is directly on point. This is page 127. But, again, for context, this is involving where someone signs up for a service and they later receive an

email informing them there are potential changes to the terms and conditions. So that's the context where this quote is flowing from. "A reasonable person would not be expected to connect an email that the recipient may not actually see until long after enrolling in a service, if ever, with the contractual relationship he or she may have with the service provider, especially where the enrollment required as little effort as it did for the plaintiffs here." In this context, the email would not have raised a red flag vivid enough to cause a reasonable person to anticipate the imposition of a legally significant alteration to the terms and conditions of the relationship with Trilegiant, Trilegiant being the defendant there.

So here, we have an email, we are updating our service provider, "we" seems like it's the NFL. This is six years after he originally contracted. There's nothing saying if you continue after this date, you no longer have the relationship with NFL, you are now contracting with Overtier and Deltatre. The point is, your Honor, as I just mentioned, this is not some minor change to existing terms and conditions, this is a completely new contract.

THE COURT: Actually, Mr. Leghorn says that the change that is attached is minor, it's just that given the quirky experience of your client where he seems to have been out of touch for six years, the changes that have accreted over that

period of time add up to a big change.

MR. JANOVE: Yes, this is the first time he has notice or any time he has notice of what has cumulatively become a very legally significant alteration --

THE COURT: Which falls short of the Schnabel standard?

MR. JANOVE: Yes, which is Schnabel. That's what I would posit.

THE COURT: Let me ask you a second question, for plaintiffs' counsel, this is completely off point to the summary judgment, but I couldn't help noticing it. In every single one of the terms and conditions, including in 2013, which you have hitched your wagon to, the language says: "The availability of the subscription products may be affected by a variety of factors, including game delays and cancellations, technical problems, network delays, program reschedulings, or other reasons, you agree that we are not obligated to provide you with any specific content under this agreement." Appreciate we're not litigating that now, but one of the issues I may have to deal with at the end of this conference may have to do with the direction that the litigation takes. What's going to be the defense to that provision?

MR. JANOVE: I first note that we also have an implied warranty claim, which is hinging on privity of this current juncture, but as to that contract provision, this contract here

doesn't have a merger clause or an integration clause. It suggests that the offerings of the subscription service should or may change, but when we have, including some evidence in the record, that we are offering live-streaming of post-season games --

THE COURT: On your version of events, the 2013 terms and conditions continued to apply. I'm not sure anything matters as to the point I'm raising now because substantially the same language carries through. I'm asking you the question, because we're about to I think get into some expensive discovery that may involve international discovery and third parties and whatnot to see whether Mr. Gill has a claim that survives plenary summary judgment, not just this discrete issue. I'm trying to figure out where we're going here because that language appears to say to him, don't complain if you lose 20 seconds of the Super Bowl or whatever.

I'm not doing anything *sua sponte* here, but part of my job involves guiding parties to use their resources efficiently. What's going to happen when we bump up against that provision?

MR. JANOVE: Yes. So, to put in context, our discovery to date has really been limited to contract formation.

THE COURT: I know that. What are you going to do with that contract provision that seems to excuse exactly what

you claim happened here?

MR. JANOVE: Since this is an open-ended contract, let's break it down and go hypothetical. Judge, 2013, I want you to sign up on NFL, I have this great Game Pass product, you know, things might happen, service interruptions might happen, we're not responsible, but every subsequent year, I bombard you with emails and communications and marketing materials promising a specific feature, a specific game, a specific option through your subscription. So I would say --

THE COURT: Right now on the record before me, there is no bombarding, there is actually a cessation of bombardment for six years.

MR. JANOVE: Well, the record before you is a product of our limited discovery only as to contract formation, not to the description of the service as it changed over time --

THE COURT: Is it your suggestion that some bombarding communication in between takes back the language in the terms and conditions, which, as I understand it, in fact, is reiterated each year? I mean, because there comes a point -- maybe you've got some bombarding email that says notwithstanding the disclaimer about interruptions, we will offer no interruptions and we will pay you if you're interrupted. If there is anything like that, there comes a point at which -- well, end of the sentence there, is there something specifically you're pointing to beyond the general

happy description of the product that I assume exists in 2013, too?

MR. JANOVE: Your Honor, we're not exactly prepared to discuss this, but I do --

THE COURT: I know that. But assuming you win in defeating the summary judgment motion, we're zooming right into plenary discovery because I'm not breaking off bits of the case anymore, we're going to get a lot done in a hurry. I like the legal system to present as rational to my customers. I am concerned you could spend a lot of money, everybody here, including international discovery, only to bump against a provision that may be checkmate in favor of Mr. Leghorn.

MR. JANOVE: May we have one moment, your Honor?

THE COURT: Yes.

MR. JANOVE: I have something for the record I'd like to show you.

THE COURT: Yes, take a moment.

MR. JANOVE: So first thing first, we will make sure that discovery, of course, is not wasteful and proportionate. For example, proportionate goes to the issue, and we are aware that this is a big issue for us. But I do want to suggest, there are indications, even in the limited record supplied to us so far, that kind of supports our theory that this contract is not just what is in that language alone, it can be informed by other communications relating to the provision of the

service. One example would be, your Honor -- this is document No. 70-15. This is an example of the Game Pass Pro for 2019. It offers a description of the products for that year and for that service. I will have to say, your Honor, of course it's an issue we're aware of. We have some anticipation of this issue, and we have discovery that we would like to propound that I think will help us inform the scope of that claim.

THE COURT: Look, I didn't give you any notice I'd be raising this, but I am thinking about the case.

The other thing here is, we'll talk about this in a few moments, I imagine, but I am mindful that this is brought as a punitive class action. If it isn't obvious from the nature of the colloquy here, there is good reason to question whether the lived experience of the said Mr. Gill is representative of a class that could fit in more than a one-room schoolhouse. My expectation here is that I'm going to order plenary discovery merits and class, but that any motion first is going to be dealing with summary judgment as to this plaintiff because there's no point in spending a whole lot of time figuring out class issues if, at the end of the day, Mr. Gill gets knocked out, for example, by the provision I just read to you, this is just a waste of time.

So I'm going to give you time to think about what happens next and how to structure it, but I think there is value in conditioning your expectations as to whether you have

a tiger by the tail or a very small mammal.

MR. JANOVE: Yes, I know we're getting a little bit off topic, but to speak to class issues, I do believe, of course, we'll have more evidence, we'll subsequently brief this, it sounds like your Honor may want to brief another summary judgment before class cert, which is fine, of course. But in terms of -- I alluded to this earlier where I said did it really matter whether the 2013 terms and conditions applied, the 2014, 2015, 2016, 2017, 2018, we haven't seen a sign-up screen for individuals that signed up after April 2019. So perhaps for the class, perhaps someone who signed up in April 2019 would have had adequate notice --

THE COURT: First of all, there's an Australia issue. I don't know what the population is of people who get up in Australia to watch the Super Bowl, I'll tell you it's pretty hard for me to watch the Australian Open. So it's not clear to me that your class even begins with any size. But then you've got the issue of, as Mr. Leghorn points out, in short order, the defendants you sued drop away for people who read the terms and conditions. So you may be limited with Mr. Gill representing people who are, at most, blind to ensuing changes in the terms and conditions that would knock out these two defendants.

I'm just saying that I used to litigate class stuff when I was in private practice. This is a quirky punitive

class action to say the least.

In a moment, I'm going to take a recess and I'll come back, but when you are talking, as I will direct you at the end to think about a schedule here, I really hope everybody here has gimlet eyes on the actual outer-bound value of the case. It seems limited. I want you to factor that in because it's whether you're talking settlement or whether you're just measuring the scope of discovery here, this is an oddball case. I very much respect the force of your advocacy on the discrete point before me, you can get a sense of where I'm likely to go on the summary judgment motion, but the road ahead is uphill.

Mr. Leghorn, give me one minute on that provision about the interruptions, what's your take?

MR. LEGHORN: On the interruptions, I think the documents you asked us for in November are quite informative of that, in which you ask for the web terms and conditions that were incorporated within the NFL terms and conditions.

THE COURT: Well, the web raises a whole other set of issues, which I'm deliberately not going to today because it raises another set of issues --

MR. LEGHORN: No, but it --

THE COURT: Excuse me, Mr. Leghorn. One person speaking at a time.

I was not asking about the web conditions, in part because, among other things, the web conditions would require a

whole other level of inquiry notice of Mr. Gill to go to the website. I'm asking you a different question, which is, I read aloud a provision of the 2013 terms and conditions, which I understand to substantially replicate in the ensuing years, it seems to get your client off the hook for what happened here, to wit, a short-term interruption, and I'm asking you what your view is, when we get to that point in the litigation, about what work that will do for you. It's a softball.

MR. LEGHORN: Yes. Your Honor, we agree completely, and this is what we stated informally at the outset in discussing this, that we may have a tempus in the teapot here in that even accepting the fact that there was an interruption, it may not qualify as an actionable claim under whenever you look at the NFL terms and conditions, and even if you look at the Overtier terms and conditions.

THE COURT: Is there any consequential change to the terms and conditions over time with respect to interruptions?

MR. LEGHORN: No, your Honor.

THE COURT: And plaintiffs' counsel theorizes that subsequent promotional communications about the product, such as that which is at document 70-15, my law clerk has printed out that which plaintiffs' counsel provided, describes Monday Night Football is a perfect way to kickstart your week and things like that, it's nice graphics and stuff, but what is your perspective on the theory that flattering promotional

descriptions of the quality of the service and whatnot, how that can affect, or not, the interruption language or exclusion in the terms and conditions?

MR. LEGHORN: Well, it certainly will be of no avail to plaintiff Gill, even if I was to accept that premise, because he made it crystal clear in his deposition that he immediately and automatically deleted all of them without reading them. So to the extent he didn't read the terms and conditions from Overtier --

THE COURT: I see. So he's not going to be able to, you think, rely on any ensuing communication, as from his perspective, modifying the contractual provision.

MR. LEGHORN: Even if he could, yes.

THE COURT: How long was the interruption of the Super Bowl as experienced in Australia?

MR. LEGHORN: I think it was less than two minutes.

THE COURT: Counsel, I want to give our court reporter and all of you a break. It is 11:36. I'm going to come back at noon with what I expect will be a bench ruling. Thank you.

(Recess)

THE COURT: Counsel, I'm about to read aloud a bench decision on the pending motion for summary judgment brought by the defense. I will not be issuing a written decision, rather just a summary order reflecting that the motion was resolved and in the direction which the motion was resolved. So, to the

extent that the reasoning I'm about to set out on the record is important to you, which it may or may not be, you'll need to order the transcript of this conference. Here it goes.

Thank you, counsel, for the very helpful exchanges today. They've shed light on the discrete motion that is before me. Specifically, the Court authorized limited discovery on one question: whether a contract exists between the named defendants and plaintiff for the 2019 football season. The plaintiff Gill clearly was doing business with some entity or entities for that season insofar as he was a paid subscriber to Game Pass and was receiving services in exchange for his payments. The issue is whether, as Gill claims, the named defendants, NFL and NFLE, were subject to a binding contract with Gill for that season, when he claims that his contract was breached by a brief interruption of the Game Pass service during the Super Bowl. Defendants counter that by the 2019 season, Gill's counterparties were no longer NFL and NFLE as they had been when Gill first contracted for Game Pass in 2013. Instead, defendants argue, they were the non-parties Overtier and Deltatre. Gill's argument is that the 2013 set of subscription terms and conditions, and only that set, applied to his use of Game Pass through the 2019 season and during the 2020 Super Bowl. Defendants' argument is that the 2019 updated set of subscription terms and conditions, which identify Overtier and Deltatre, bound Gill.

The sole motion pending is defendants' motion for summary judgment on this point. Gill does not move for summary judgment.

For the defendants to prevail on their motion, they must show that there is no genuine dispute of fact as to the applicability of the 2019 subscription terms and conditions or the 2019 updated terms and conditions, both of which, again, identify non-parties Overtier and Deltatre as the counterparties to Game Pass subscribers. If that issue is decided in defendants' favor, that would mean that NFL and NFLE did not have a contract with Gill covering the 2020 Super Bowl, and summary judgment must be granted, ending Gill's present lawsuit in this Court. However, for the reasons that I will now set out, I find that material disputes of fact prevent the Court from crediting any of defendants' theories of how the 2019 updated set of terms and conditions bound Gill during his streaming of the 2020 Super Bowl. In other words, a finder of fact, construing the evidence in the light most favorable to the non-movant, Gill, could find that NFL and NFLE were never superseded as his counterparties, such that NFL and NFLE remain viable defendants on a breach of contract claim, although defendants of course would be at liberty to implead other parties, such as Overtier and Deltatre if, for example, they believe that legal responsibility for Game Pass had been transferred to those entities by 2019.

The Court has analyzed what it understands to be the various theories advanced by defendants as to how Gill might have been bound by the 2019 updated terms and conditions. I will discuss each theory in turn now. I count three distinct theories.

First, defendants contend that each set of terms and conditions contains language that appears to "self-terminate" the terms and conditions at the end of each NFL season. 2013, 2014, 2015, 2017, and 2018 subscription terms and conditions contain similar language. For the benefit of the parties now, I'll read, in relevant part, from the 2013 terms and conditions: "For subscription products billed on an annual basis (e.g. NFL Game Pass-season plus subscription, NFL Game Rewind-season plus subscription) the term begins when you purchase and ends before the end of the following year's NFL preseason (approximately July 31), with one-time billing immediately following your purchase."

"Term," according to the defendants, refers both to the term of the subscription, that is the season, and the word term within the phrase "terms and conditions." In support of this reading, the defendants point the Court to deposition testimony from Max Boigon, available at docket 75-6, an NFL executive involved in the marketing and administration of subscriptions. He testified that "The terms of service cannot be renewed for another season. They are only for a single

season." This reading of "term" to mean both the subscription season and the terms and conditions, however, is disputed. The Court has received in the record subscription terms and conditions again for 2013, 2014, 2015, 2017, 2018, and two sets in 2019. Notably, there is no set corresponding to 2016. But, defendants submit, as a factual matter, that the 2015 terms and conditions apply to both the 2015 season and the 2016 season. That fact, if true, is irreconcilable with defendants own theory of contract construction that the terms and conditions are "for a single season" only and that those terms and conditions do not and cannot carry forward. The fact that Gill was purportedly bound by those same terms and conditions across those two seasons, for each of which he auto-renewed, is in conflict with defendants's theory that the terms and conditions in any given year "self-terminate." The implication would be that these conditions for the 2015 terminated or in the words of the contract provision, end[ed], but in some unexplained fashion, then revived in identical form for the purposes of an auto-renewing user for the next season, possible that's what happened, but the terms and conditions to which Gill was privy did not clearly say so, to wit, that the terms and conditions for each NFL season would expire or end after that season. Nor did they say what would happen in the event of an auto-renewal without any new terms and conditions existing. Defendants would have it that new terms and conditions would apply, unless

there were no new terms and conditions, in which case the old ones vampire-like or Rasputin-like, if you will, having ended would somehow resurrect and spring back to life. There is no document that says that. To the extent that this is an issue of contract interpretation for the Court, defendants have not given Court more than a conjectural basis — an ipse dixit to find that the word "term" that "ended" each year refers to the terms and conditions, as opposed to the chronologic term corresponding to the NFL season. To the extent that this is a jury question of fact, a jury could find for the plaintiff that the phrase "term" in the contract referred only to a chronologic concept corresponding to the NFL season, as opposed to the subscription terms and conditions themselves. So, defendants cannot obtain summary judgment on their first theory.

Second, defendants contend that Gill was on "inquiry notice" of the 2019 updated terms and conditions. There appears to be no dispute that Gill lacked actual notice of the 2019 updated terms and conditions. That is, there appears to be no dispute that he did not read those terms and conditions, and that he was, in fact, unaware of the counterparty substitution. In any event, there is evidence, to wit, Gill's testimony, that he did not read those or know of the substitution of counterparties. Now, inquiry notice of contractual terms is actual notice of circumstances sufficient

to put a prudent person upon inquiry. See *Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021). As the Second Circuit has held in the case to which plaintiffs' counsel rightly pointed today, whether a user has inquiry notice of a digital agreement depends, it depends on the design and content of the digital announcement (or here, the email) and the agreement's web page as relevant. See *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012). Under Second Circuit law, this Court, in assessing whether Gill was on inquiry notice of contract terms that "were delivered after the contractual relationship was initiated," looks to whether, "in light of the history of the parties' dealings with one another, reasonable people in the parties' positions would be on notice of the existence of the additional terms and the type of conduct that would constitute assent to them." Citing Schnabel, 697 F.3d 124. For a digital contract, the Circuit has stated, reasonable conspicuousness, terms on "the design and content of the relevant interface." Soliman, 999 F.3d 835.

Here, defendants argue that the October 28th, 2019 email sent to Gill in the middle of the 2019 season to which he was a current subscriber, and its explicit alert to the fact of continued use of the product was a form of assent, put Gill on notice that he had new counterparties, Overtier and Deltatre. Defendants note that a hyperlink as to the terms and conditions — which courts routinely require as one component of inquiry

notice — was, itself, conspicuous. Lastly, defendants point out that the name "Overtier Operations" — one of the two new purported counterparties — appears in text at the bottom.

These features, in isolation, assist defendants, but they're not the end of the story. Other features of the email point in the other direction as to whether Gill had inquiry notice that he had new counterparties. First, the NFL logo presents at the top of the email. The NFL, of course, was the party with whom Gill overtly contracted in 2013, the one time he did anything other than auto-renew. Second, the email says "we" and "our" at various points, before signing off with "NFL Game Pass." It notably does not define who "we" and "our" are. It certainly does not rule out that these refers to the "NFL" or the "NFLE" who, on the record before the Court, were the last identified entities to actually communicate with Gill about NFL Game Pass and "NFL Game Pass," as presented to the customer, is the name of the product. It is not the name of the entity providing that product, or the entity legally responsible for that product. And even defendants have not claimed that Gill's counterparty was ever something called "NFL Game Pass." Third, the email does not reference the major meaningful change in the terms and conditions as relevant to Gill, that the counterparties are new or, for that matter, that NFL and NFLE (or possibly NFLI) were no longer part of the picture. In fact, the October 2019 email is milk toast. It

says literally nothing whatsoever about new counterparties, let alone that any change of consequence has been made. As defense counsel helpfully explained today, that is for good reason. There was no consequential change made by the October 2019 terms and conditions referenced in the October email. It merely updated the terms and conditions to conform to Australian privacy law. Fourth, although the word "Overtier" appears in the footer of the email, it appears as a name with an address. There is no context. The word is untethered from any indication that the unidentified "Overtier" might be a new counterparty to Gill. And, of course, there's nothing about Deltatre at all. A reader, to the extent focused on the footer at all, could easily view Overtier as a service provider, or marketer, who was an agent of the entities offering or legally responsible for the NFL Game Pass product.

And the earlier emails sent to Gill in June and July of 2019, reviewed in court today with counsel, do not cure this problem. Those emails announced a new "service provider," but they did not identify Overtier and Deltatre as such, let alone articulate what defendants posit was the case, which is that Overtier and Deltatre were not only service providers, but they had substituted as the user's counterparties to the exclusion of the defendants in this case. Those emails also reminded user to update their applications to the most recent versions, and announced various updates to the Game Pass service.

Critically, though, is what they did not say. They did not indicate, in the slightest, that the counterparties to whom users were obligated were changing or had changed. The parties have not briefed whether this issue is a legal one for the Court as a matter of contract construction or a factual one for the jury. There is no occasion for the Court to resolve that now. Suffice it to say that whether viewed as a question of law, a question of fact, or a mixed question, summary judgment on this theory cannot be entered for defendants. Competent drafting counsel could easily have achieved the necessary clarity, I might add, at any number of stages here. That, alas, did not happen. Alas, the communications with Gill by the ambiguous author identifying itself as "NFL Game Pass" did not do so. The email communications from 2019 here, culminating in the October 2019 email on which defendants rely, on the present record, cannot be found by a court or jury to so clearly satisfy the Second Circuit's standards for putting a user on inquiry notice as to support entry of summary judgment for defendants on this theory. The Court therefore rejects defendants' second theory as a basis for summary judgment, to wit, that Gill was on inquiry notice that the counterparty associated with his use of NFL Game Pass were no longer NFL or NFLE or NFLI as the 2019 updated terms and conditions apparently stated.

Now, defendants advance a third and slightly different

theory. It is that for the 2017 and 2018 seasons, Gill did not auto-renew his subscription, but rather signed up for new subscriptions. In support of this claim, defendants offer various business records that have entries that state that there was a "new subscription" for Gill in each of those two seasons, and which indicate that he was given a seven-day free trial period for at least one of those seasons, such as in contrast for the records in the earlier seasons, which identify Gill as auto renewing.

There is a threshold issue about whether these records are admissible — Gill says no. And if they are admissible for some purposes, there is an issue about whether, without any underlying factual support in the form of communications with Gill substantiating the conclusions stated in these records, that these entries can be taken for the truth of the matter as asserted. That is to say that renewal was by some means other than auto-pay.

In any event, even if these evidentiary questions were called in defendants' favor, there would still be a dispute of fact. Gill denies entering a new subscription as opposed to giving new credit card information, as consistent with his obligations to do so per the 2013 terms and conditions. And while his denial might be overcome had defendants come forward with, say, authenticated records of communications with Gill reflecting that, in fact, he entered into a new subscription,

for example, records reflecting his acknowledgement that in providing a new credit card, he was doing so, and if Gill did not have a good faith basis to refute the authenticity of such records, such might have overridden a rote denial by Gill that he had done so, but defendants have not come forward with such records. There is thus a clear dispute of fact that prevents the Court from entering summary judgment for defendants to the effect that Gill, in taking such steps as he took to obtain the 2017 and 2018 NFL Game Pass products, agreed to the terms and conditions associated with those years. I note that the Court pointedly requested additional documentary records from defendants on this point in November of last year, 2022, viewing this theory as potentially dispositive in defendants' favor. If defendants had a record, for example, reflecting Gill, for example, checking a box agreeing to the 2017 subscription terms and conditions at the time that he renewed, that could easily have been dispositive. Defendants did not produce anything of the sort. They claim they couldn't get anything out of, I guess, Deltatre and Overtier, so be it. Accordingly, genuine issues of fact prevent entry of summary judgment on this third theory.

Bottom line: For all these reasons, the Court denies defendants' motion for summary judgment on the ground that the evidence did not establish the existence of a contract between Gill and the defendants for the 2019 season.

So here is where we are. It was worthwhile to have limited discovery and summary judgment briefing on the discrete point on the existence of a contract with the named defendants. This had the potential to obviate the need for plenary discovery. Alas, it did not do so.

The case will now proceed to full merits discovery. Because plaintiffs have brought this case as a punitive class action, in the interests of efficiency, I would propose that class action or class certification discovery be taken alongside merits discovery. My expectation, however, is that, as to motions, the next motions in the case will be summary judgment motions only. In other words, I expect that we will likely first see whether Mr. Gill's claims survive summary judgment, and if so, on what theory. As you can tell from my colloquy, at least one reason, I have some skepticism. We'll see. If they do survive summary judgment, at that point, we will take up class certification. That said, I will be open to counsel's views on that point. I'm not closing the door to a different sequence of briefs, but the one I proposed seems, to me, clearly a more logical one. For now, in any event, it's time to complete discovery. Today is Friday, January 20th. Counsel, I'd like you, by January 25th, which is next Wednesday, to get me a case management plan that encompasses merits discovery and class certification and that completes these, consistent with the presumption in my individual rules,

within four months' time.

Any reason you can't do that, get me such a schedule by next Wednesday?

MR. JANOVE: Not an issue, your Honor. We'll get it to you.

MR. LEGHORN: Your Honor, could you extend it to the following week, simply the unavailability of people that I need to discuss with in the interim.

THE COURT: Sure. Why don't we do this, why don't I give you until Monday, January 30th.

MR. LEGHORN: That would be fine.

THE COURT: Mr. Leghorn, what I'd like, the relevant point is I'd like four months to cover the discovery here. So, for all practical purposes, have the discovery at the end of May.

MR. LEGHORN: I fully understand and appreciate that. But, your Honor, just as to the decision, if I could point out as --

THE COURT: You're not going to reargue the decision --

MR. LEGHORN: No. No. No. No. At one point, you said for '17 and '18, I couldn't get the material from Overtier and Deltatre. It was before, Overtier and Deltatre weren't in.

THE COURT: Fair enough. Bottom line is, maybe there's some third party who has the thrill-shot document that

you imagine, but you didn't produce it, couldn't get it, maybe it will come sometime down the road, but for now, it's not a basis for granting summary judgment, that's all.

MR. LEGHORN: It's just we will collectively be seeking cooperation from both Overtier and Deltatre, and I don't want them to read a misprint where they think they were being blamed for something that wasn't there.

THE COURT: Fair enough. Fair enough.

So look, get me that by a week from Monday. I will put into the case management plan a next conference date, which will be approximately a month after the end of May as a case management conference.

Under my individual rules, and Mr. Leghorn at least has had other cases before me, I will typically meet with counsel four weeks after the close of fact discovery. Those conferences typically function as premotion conferences in anticipation for a motion for summary judgment. Under my individual rules, if anyone's got intents to move for summary judgment, you are to write me a three-page, single-spaced letter two weeks after the close of fact discovery. The other side has a week to respond at comparable length. These are not the motions, they're not oppositions, they're just previews, but my staff and I read them carefully and use them to inform me. And at the conference we'll hold four weeks after the close of fact discovery, I will keep the tires on the potential

summary judgment motion, make sure that all relevant issues are being briefed, I'll put in place, based on my discussion with you, a rational schedule. I will also almost certainly require counsel to preface the beginning, the filing of the first motion with a filing of joint stipulated facts that are undisputed so as to limit the size of your 56.1 statements and oppositions and the like. So that will be the next step in the case. If I don't hear otherwise, I'm going to assume that it is common ground that the right way to proceed here is litigating summary judgment before litigating class cert. In the event that somebody takes a different view, you're at liberty to put that, let us say, in the premotion letters that come in two weeks after and three weeks after the end of fact discovery.

But I came to the conclusion that I did with considered thought. There is a swirl of issues and ambiguities and quirky features as to the saga of plaintiff Gill. Seems to me probably a waste of time to start litigating class certification first until we see whether Gill has any claim that can survive summary judgment, and second of all, if so, what the meats and bounds of that claim are. Hypothetically, there are circumstances under which he might have a claim that survived, but under circumstances that are really, as the old Supreme Court case says for this day and this train only, we're better to know that before people start litigating class

certification, otherwise you're going to wind up, I fear, litigating class certification on a bunch of hypotheticals that may never come to pass. In any event, just saying.

Before we adjourn, anything further from the plaintiff, any way I can be useful today?

MR. JANOVE: Thank you, your Honor, for your time and attention to this matter.

THE COURT: Nothing else I can be useful for?

MR. LEGHORN: No.

THE COURT: Mr. Leghorn.

MR. LEGHORN: No, nothing, your Honor.

THE COURT: Be well. Stay safe. Look forward to hearing from you all down the road and I look forward a week from Monday to getting an agreed-upon schedule.

I would encourage you to get on the phone and talk, don't just merely send it back and forth, to anticipate what may be some of the quirks of the case. There is at least a degree of an international dimension to this case, for example. I'd like you to talk beforehand about what you can do together, for example, to the extent that there are oddities of fact discovery to get out of the gate early so that there is no need for a request for extension.

Be well. Thank you.

* * *